IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| DEMETRE DURHAM, | Civil No. 23-00244 MWJS-WRP |
| Plaintiff, | ORDER GRANTING IN PART, DENYING IN PART, AND RESERVING RULING IN PART ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND CALLING FOR SUPPLEMENTAL BRIEFING |
| vs. | |
| NATIONAL CREDIT ADJUSTERS, LLC, | |
| Defendant. | |

## INTRODUCTION

In the summer of 2022, a $470.56 debt was incurred—through an online payday loan provider—in Plaintiff Demetre Durham's name.  Defendant National Credit Adjusters, LLC (NCA) bought the debt, sought to collect on it, and reported it to credit reporting agencies.  Durham thereafter asserted that he was the victim of identity theft.  Although there is no evidence conclusively proving Durham right, NCA closed the account once he provided a police report and affidavit to substantiate his claim.  But Durham maintains that NCA should never have reported the debt at all, that NCA had no right to ask for substantiating documentation, and that NCA did not adequately investigate his assertion.  This lawsuit followed, in which Durham contends that NCA's conduct violated the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA), and Hawaiʻi state law.

NCA now moves for summary judgment, contending that there are no genuine disputes of material fact and that it is entitled to prevail as a matter of law on each of Durham's claims. Durham also moves for partial summary judgment on some of his claims and as to certain issues.

For the reasons explained below, the Court GRANTS IN PART and DENIES IN PART NCA's motion for summary judgment as to Durham's FCRA and FDCPA claims. The Court GRANTS IN PART and DENIES IN PART Durham's motion for partial summary judgment. And because it is unclear whether triable issues remain as to Durham's state law claims in light of these rulings, the Court RESERVES decision on whether to grant NCA's summary judgment motion as to Durham's state law claims and ORDERS the parties to submit supplemental briefing addressing that question.

## BACKGROUND

### A.    Statutory Background

Durham's lawsuit principally rests on two federal statutes, the FCRA and the FDCPA. Although they overlap in their coverage, they address different concerns.

1. The FCRA was enacted in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The statute imposes some responsibilities directly on credit reporting agencies, or "CRAs." But "to ensure that credit reports are accurate," the FCRA also "imposes some duties on the sources that provide credit

2

information to CRAs, called 'furnishers' in the statute." *Gorman v. Wolpoff & Abramson,*

*LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009).

Three furnisher duties are relevant here.  First, a furnisher has a duty not to

report information about a consumer to a CRA if it "knows or has reasonable cause to

believe that the information is inaccurate."  15 U.S.C. § 1681s-2(a)(1)(A).  There is no

private right of action to enforce this obligation, however, because "Congress limited

the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies."

*Gorman*, 584 F.3d at 1154 n.9.

Second, whenever a consumer disputes the "completeness or accuracy" of any

furnished information, the furnisher must give the CRAs "notice" that the information

is disputed before continuing to furnish it.  15 U.S.C. § 1681s-2(a)(3).  The FCRA thus

does not *prohibit* a furnisher from furnishing information to a CRA merely because it

has been disputed.  Instead, the FCRA provides that if the furnisher chooses to furnish

disputed information to a CRA, it must also provide notice that the information is, in

fact, disputed.

Third, furnishers have a duty to investigate consumer disputes.  When

consumers present their disputes to the CRAs, those agencies generally are required to

inform furnishers of the disputes.  Credit reporting agencies typically do this through

automated credit dispute verifications (ACDVs), which are electronic messages

informing a furnisher that a customer has disputed information on a credit report.  And

whenever a furnisher receives notice from a CRA that the consumer disputes furnished information, the furnisher must "conduct an investigation with respect to the disputed information" and "review all relevant information provided by the consumer reporting agency." *Id.* § 1681s-2(b)(1)(A), (B). That investigation must be a reasonable one—that is, it must be "an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." *Gorman*, 584 F.3d at 1155. At the same time, "[a]n investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Id.* at 1161. The question of "whether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable depends in large part on the allegations provided to the furnisher by the credit reporting agency." *Id.* at 1160 (cleaned up). Less needs be done to conduct a reasonable investigation, for example, when a CRA has "provided the furnisher with 'scant information' to carry out the investigation." *Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1110 (9th Cir. 2012) (quoting *Gorman*, 584 F.3d at 1157).

If the disputed information is "found to be inaccurate or incomplete or cannot be verified after any reinvestigation," the furnisher must modify, delete, or permanently block the reporting of that information to the CRAs. 15 U.S.C. § 1681s-2(b)(1)(E).[1]

---

[1]    Customers might instead present their disputes directly to a furnisher, and the furnisher is required to reasonably investigate these "direct" disputes. But Congress limited enforcement of that duty to federal and state agencies; it did not provide for a

2.  The principal focus of the FDCPA, by contrast, is not credit reporting, but rather debt collection.  Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Id.* § 1692(e).  Through its various requirements, the FDCPA aims to address "the recurring problem of debt collection agencies' dunning of the wrong persons or attempting to collect debts that consumers ha[ve] already paid."  *Sambor v. Omnia Credit Servs., Inc.*, 183 F. Supp. 2d 1234, 1238 (D. Haw. 2002).

Consistent with its focus, the FDCPA applies only if the plaintiff is a "consumer" and the defendant is a "debt collector."  15 U.S.C. § 1692a.  The FDCPA defines "consumer" as a "natural person obligated or allegedly obligated to pay any debt."  *Id.* § 1692a(3).  A "debt," in turn, is defined narrowly as one incurred "primarily for personal, family, or household purposes," as opposed to commercial or investment purposes.  *Id.* § 1692a(5).  And a debt collector means "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to

---

private cause of action under the FCRA.  *See Gorman*, 584 F.3d at 1154 ("Duties imposed on furnishers under subsection (a) are enforceable only by federal or state agencies." (citing 15 U.S.C. § 1681s-2(d)).

collect, directly or indirectly, debts owed or due or asserted to be owed or due another."
*Id.* § 1692a(6).

When the FDCPA applies, § 1692g(a) requires a debt collector to send a written notice to the consumer that contains the amount of the debt, the creditor's name, "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector," and information about how a consumer can dispute the debt within that initial thirty-day period. *Id.* § 1692g(a).

If a consumer disputes the debt within the thirty-day period, then "the debt collector shall cease collection of the debt . . . until the debt collector obtains verification of the debt or a copy of a judgment." *Id.* § 1692g(b). Obtaining verification of the debt "involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed." *Clark v. Cap. Credit & Collection Servs, Inc.*, 460 F.3d 1162, 1173-74 (9th Cir. 2006) (cleaned up); *see also id.* at 1174 (explaining that the FDCPA does not impose on debt collectors a "duty to investigate independently the claims" made by a creditor). If the debt collector receives no dispute, "[c]ollection activities and communications that do not otherwise violate" the FDCPA "may continue during the 30-day [validation] period," so long as they do not "overshadow" and are not "inconsistent with the disclosure of the consumer's right to dispute the debt." 15 U.S.C. § 1692g(b).

The FDCPA separately prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* § 1692e. The statute provides a detailed list of sixteen types of conduct that are considered "false, deceptive, or misleading" under the FDCPA. *Id.* The list includes, for example, "[t]he false representation of . . . the character, amount, or legal status of any debt"; "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken"; "[t]he false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer"; and "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." *Id.*

## B. Factual Background

On June 30, 2022, an account in Durham's name was opened with CashCentral.com—an online lender that offers payday loans and installment loans—and a debt of $470.56 was incurred. ECF No. 46, at PageID.183 (Def.'s Concise Statement of Facts (CSF) ¶ 1); ECF No. 46-3, at PageID.208.[2] That debt consisted of a $400 "Online Payday Loan" and a "Fee" of $70.56. ECF No. 46-10, at PageID.275, 280.

---

[2]     The original loan agreement also refers to a local creditor called "Buckeye Check Cashing of Tennessee, LLC." ECF No. 46-3, at PageID.208. But the remainder of the evidence in the record refers to the debt as having come from CashCentral.com, as do the parties. *See, e.g.*, ECF No. 48-2, at PageID.350 (NCA employee referring to "that

1.  NCA is a company that buys and collects consumer debts, and on
November 28, 2022, it acquired the account in Durham's name for collection.  ECF No.
46, at PageID.183 (Def.'s CSF ¶ 4); *see* ECF No. 46-1, at PageID.200 (Hess Decl. ¶ 86).  As
required by the FDCPA, on November 30, 2022, NCA sent its initial notice letter to
Durham at an address in Antioch, Tennessee, which is the address associated with the
CashCentral.com account.  ECF No. 46-2, at PageID.203; ECF No. 46-3, at PageID.208;
ECF No. 46-4, at PageID.219.

Durham indeed had been living at that Antioch, Tennessee address until at least
February 2022, and possibly as recently as June 2022.  ECF No. 46, at PageID.183 (Def.'s
CSF ¶ 3); *see* ECF No. 46-2, at PageID.203 (NCA's records referring to a "Moved Date"
of "02/22").  *But see* ECF No. 46-7, at PageID.254 (lease contract for Durham's Hawaiʻi
address dated June 15, 2022); *id.* at PageID.257 (Durham's Identity Theft Victim's
Compl. and Aff. representing that he has lived in Hawaiʻi since "06-2022"); ECF No. 46-
8, at PageID.271 (police report memorializing Durham's statement that Antioch,
Tennessee was his "former address" and that he "arrived in Hawaii June 30th, 2022").
But by November 2022, when NCA sent the initial notice letter, Durham had moved to
Hawaiʻi.  And NCA "received a change of address notice related to Plaintiff at the time

---

cashcentral.com debt"); ECF No. 45-1, at PageID.159 (referring to a debt incurred "with
CashCentral.com").  The Court will therefore do the same.

it sent the initial notice, which provided NCA with a new address in Hawaii." ECF No.

46-1, at PageID.191 (Hess Decl. ¶ 20); *see* ECF No. 46-2, at PageID.203.

NCA has not—at this stage—offered any evidence that it resent the initial notice

letter to the new Hawaiʻi address. *See* ECF No. 46-2, at PageID.203. But after sending

the initial notice letter to Tennessee, NCA "did not get any notices of the letter being

returned or undeliverable." ECF No. 46, at PageID.183 (Def.'s CSF ¶ 6); *see* ECF No. 46-

1, at PageID.191 (Hess Decl. ¶ 19); ECF No. 46-2, at PageID.203. Nor did NCA receive

any notice of dispute from Durham in response to the initial notice letter. And so on

January 15, 2023, NCA began reporting the account to credit reporting agencies,

including the "Big Three": TransUnion, Experian, and Equifax. ECF No. 46, at

PageID.183 (Def.'s CSF ¶ 7); ECF No. 55, at PageID.456 (Pl.'s Add'l Facts ¶ 32).

2. Once the NCA account showed up on Durham's credit report, he began to

contact the credit reporting agencies and NCA. In his calls to NCA, he asserted that the

debt was not his and that he was the victim of identity theft. NCA requested that

Durham provide a police report or an affidavit to substantiate his identity theft claim,

which he initially refused to do. But once Durham provided NCA with a copy of a

police report made with the Honolulu Police Department and an identity theft affidavit,

NCA marked the account as fraudulent and closed it.

a. Durham first called NCA to dispute the account on February 3, 2023,

apparently after receiving a credit report that listed the debt. ECF No. 46, at PageID.183

(Def.'s CSF ¶ 9); *see* ECF No. 47-1, at PageID.305-06.  He told an NCA agent that he did
not know about the account and that it must have been opened fraudulently.  ECF No.
46-5, at PageID.222-26 (Tr. of Feb. 3, 2023, Phone Call).  The NCA agent informed
Durham that he needed to submit either a police report or an affidavit substantiating
the identity theft claim for the account to be closed.  *Id.*; ECF No. 46, at PageID.183
(Def.'s CSF ¶ 10).  At that time, NCA "moved" Durham's account to "Temp[orary]
Fraud," which paused any collection calls for thirty days.  ECF No. 46-1, at PageID.192-
93 (Hess Decl. ¶¶ 28-29); ECF No. 46-2, at PageID.204.

In the following weeks, Durham made several additional calls to NCA.  Each
time, he told NCA call agents that he had been the victim of identity theft.  *See* ECF No.
46-5 (Tr. of Feb. 3, 2023, Feb. 6, 2023, Feb. 7, 2023, Feb. 27, 2023, and Mar. 30, 2023, Phone
Calls).  And each time, the NCA call agents gave him instructions on how he could
substantiate his claim:  he could submit either a police report or an affidavit of fraud,
and he could send that documentation to NCA via email or fax.  *See, e.g., id.* at
PageID.224-25 (informing Durham of the "four items of information that have to be on
the report" to verify that he was "a victim of identity theft").

On February 6, 2023, Durham reported his identity theft claim to the Honolulu
Police Department.  ECF No. 46-7, at PageID.252.  But when he called NCA thereafter,
and NCA offered to provide him with an email or fax number where he could send a
copy of the police report—which it did on at least two separate occasions—Durham

refused and instead told the agents "you guys are going to have to get it [yourselves]."

ECF No. 46-5 at PageID.232; *see id.* at PageID.240.

b.  In addition to calling NCA directly, Durham contacted the CRAs to dispute

the NCA account with them.  This prompted the agencies to send NCA multiple

ACDVs informing NCA that Durham had disputed information on his credit report.

*See* ECF No. 46-2.

At first, the ACDVs contained only terse messages and were accompanied by no

supporting documentation.  NCA received the first ACDV from a credit reporting

agency on February 7, 2023, which simply stated, "Not mine.  Provide or confirm

complete ID," and provided "001" as the dispute code.  *Id.* at PageID.204.  NCA

received a second ACDV on February 13, 2023, with the same dispute code, which

again "did not include any supporting documents or evidence."  ECF No. 46-1, at

PageID.194 (Hess Decl. ¶ 42).  A third ACDV, received on February 16, 2023, noted,

"[c]laims true identity fraud, account fraudulently opened.  Provide or confirm

complete ID," but still did not attach any documents.  ECF No. 46-2, at PageID.205; ECF

No. 46-1, at PageID.194 (Hess Decl. ¶ 44).  The fourth ACDV, sent on February 20, 2023,

contained a note that stated "FILE[D] A FRAUD REPORT WITH THE POLICE

DEPARTMENT," and included a copy of the police report number, although no copy of

the report was provided.  ECF No. 46-2, at PageID.205; ECF No. 46-1, at PageID.195

(Hess Decl. ¶ 46).

On February 23, 2023, NCA received a fifth ACDV, again with the simple "001"

code.  ECF No. 46-2, at PageID.205.  But this time, the ACDV included a letter in which

Durham "request[ed] the removal of the following credit inquiries as I did not

authorize them:  cashcentral.com and/or NCA to loan money under my name or my

ssn."  ECF No. 46-6, at PageID.247.  In response to this ACDV, "NCA electronically

moved the Account to a dispute status."  ECF No. 46, at PageID.185 (Def.'s CSF ¶ 28)

NCA received a sixth ACDV on March 15, 2023, that stated "[c]laims true

identity fraud" and "I also filed a police report" but still had no supporting

documentation.  ECF No. 46-2, at PageID.205.

It was not until the seventh and final ACDV, received on April 18, 2023, that

NCA received a copy of the police report and an identity theft affidavit.  *Id.* at

PageID.206; ECF No. 46-1, at PageID.197 (Hess Decl. ¶¶ 61-64).  At that point, NCA

"marked the account as fraudulent, closed the account, and marked the account for

tradeline deletion."  ECF No. 46-1, at PageID.197 (Hess Decl. ¶ 66); *see* ECF No. 46-9, at

PageID.273.

3.  Although the parties dispute whether NCA's investigation was reasonable,

there is no dispute that NCA took some investigative steps in response to Durham's

calls and the ACDVs it received.

As noted, in response to Durham's first call, NCA flagged his account as

"temp[orary] fraud," and "froze any action on the Account" for thirty days.  ECF No.

46, at PageID.183 (Def.'s CSF ¶ 12).  And in response to the fifth ACDV—the first with

supporting documentation—NCA placed the account in a "dispute" status.  *Id.* at

PageID.185 (¶ 28).

Moreover, after each ACDV it received, NCA investigated by "reviewing all

NCA's documentation on the Account, including the documents and information NCA

received from the original creditor of the debt."  *Id.* at PageID.186 (¶ 45).  NCA cross-

referenced the ACDVs it received from the CRAs with "[t]he information provided by

the original creditor, [which] had Plaintiff's name, social security number, and an

address Plaintiff had resided at."  *Id.* (¶ 46).  And that information, NCA contends, "did

not contain any information which would have alerted NCA to fraudulent activity on

the Account."  *Id.* (¶ 47).

### C.    Procedural History

Durham filed this lawsuit in June 2023.  ECF No. 1.  He alleges that NCA violated

the FCRA by failing to conduct a reasonable investigation of the debt after receiving the

messages concerning his disputes from the CRAs.  *See id.* at PageID.14-17.  Durham

further alleges that NCA committed several violations of the FDCPA in its debt

collection efforts:  (1) NCA made false or misleading representations by reporting—and

initially refusing to stop reporting—the $470.56 debt to the CRAs, despite Durham's

representation that he was the victim of identity theft; (2) NCA engaged in an unfair

practice by communicating two different debt balances ($470.00 and $470.56); and

13

(3) NCA failed to send an initial notice letter by sending it to the wrong address.  *See id.*

at PageID.9-12.  Finally, Durham contends that NCA's conduct also violated Hawaiʻi

state law.  *See id.* at PageID.12-14.

NCA now moves for summary judgment as to each of Durham's claims, ECF No.

45, and Durham moves for partial summary judgment as to certain aspects of his

complaint, ECF No. 47.  A hearing on these motions was held on February 13, 2025.

ECF No. 67.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when a moving party shows "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  To prevail, the movant must demonstrate the

absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  Put differently, the question is whether "there is the need for a trial—

whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of

either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

When the moving party will not have the burden of proof at trial, it must do

more than simply "deny[] the allegations in the opponent's pleadings" or "assert[] that

the nonmovant lacks evidence to support its claim."  10A Charles A. Wright, Arthur R.

Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727.1 (4th ed. June 2024

14

Update).  Instead, the movant must "produce evidence negating an essential element of the nonmoving party's claim" or "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden" at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party makes that showing, the burden then shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).  This burden "is not a heavy one," as "the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."  *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (cleaned up).

When reviewing cross-motions for summary judgment, the Court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'"  *Lenz v. Universal Music Corp.*, 801 F.3d 1126, 1130-31 (9th Cir. 2015) (quoting *Am. C.L. Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)).  And if the facts and reasonable inferences drawn in the nonmoving party's favor show that "a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

## DISCUSSION

### A.    The Fair Credit Reporting Act

In his complaint, Durham brings two sets of claims under the FCRA.  His first is

that NCA violated 15 U.S.C. § 1681s-2(a)(1)(A), which prohibits a furnisher from

reporting information about a consumer to a CRA if it "knows or has reasonable cause

to believe that the information is inaccurate."  As NCA correctly notes, however,

Durham has no private right of action to enforce this duty because "Congress limited

the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies." *Nelson*

*v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002).  Durham's

opposition to NCA's motion for summary judgment does not contest this point.  The

Court therefore GRANTS summary judgment to NCA on Durham's claims based on

§ 1681s-2(a).

Durham's summary judgment submissions focus, instead, on his second set of

FCRA claims, in which he alleges that NCA violated § 1681s-2(b)(1)(A) by failing to

conduct a reasonable investigation in response to the dispute information provided in

the ACDVs.  Here, Durham plays both offense and defense.  In his own motion for

partial summary judgment, Durham argues that he has satisfied the threshold

requirement of a reasonable-investigation claim:  that there was something inaccurate in

NCA's reporting that it had an obligation to reasonably investigate.  *See Gross v.*

*CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022) (holding that "if there is no

16

inaccuracy [in a furnisher's reporting], then the reasonableness of the investigation is not in play").  In particular, Durham contends that the inaccuracy was the fact that he owed the debt at all, given his contention that he was the victim of identity theft.  This is not obviously a persuasive argument.  As the Court explains below, for FDCPA purposes, there is nothing false or misleading about a debt collector informing a credit reporting agency that the originator of a debt is indeed claiming the debt is owed, even if the originator turns out to be mistaken.  But because NCA's opposition does not dispute that there was an "inaccuracy" for FCRA purposes, NCA has effectively forfeited on this issue.  The Court therefore GRANTS Durham's motion for summary judgment as to this threshold issue.

Durham still has defense to play, however, for NCA moves for summary judgment on the question of whether its investigation was reasonable.  Here, Durham starts with a strong hand, as the question of whether a furnisher's investigation was "reasonable" ordinarily is reserved for jury determination.  As the Ninth Circuit has explained, "summary judgment is generally an inappropriate way to decide questions of reasonableness," given "the jury's unique competence in applying the 'reasonable man' standard."  *Gorman*, 584 F.3d at 1157 (cleaned up).  At the same time, the Ninth Circuit has recognized that summary judgment may be warranted even on the question of reasonableness when "only one conclusion about the conduct's reasonableness is possible."  *Id.* (cleaned up).

17

So the question for the Court is whether a rational jury, drawing all inferences in Durham's favor, could conclude that NCA's investigation in response to the ACDVs was unreasonable. At the outset, it is clear as a matter of law that a rational jury *could not* conclude that NCA's investigation was unreasonable merely because it did not turn up any other evidence of identity theft or confirm Durham's allegation (at least before it received his police report). For as the Ninth Circuit has made clear, "an investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Id.* at 1161. The issue, therefore, is not whether Durham was satisfied with the results of any investigative process, but whether that process was reasonable.

In judging the reasonableness of that process, a jury would be instructed that Durham's initial calls to NCA did not trigger its duty to conduct a reasonable investigation—only the ACDVs would have initiated that obligation. *See id.* at 1154 (noting that a furnisher's reasonable investigation obligation is "triggered 'upon notice of dispute'—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information" (quoting 15 U.S.C. § 1681s-2(b)). And the jury would be instructed that "whether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable depends in large part on the allegations provided to the furnisher by the credit reporting agency." *Id.* at 1160 (cleaned up). To the extent the CRAs provided NCA "with scant information to

18

carry out the investigation," NCA's response is more likely to be reasonable.  *Drew*, 690

F.3d at 1110 (cleaned up).

With those instructions in hand, no rational jury could conclude, on the evidence

available in the summary judgment record, that NCA's investigation was unreasonable

as to the first two ACDVs.  Those simply stated, "[n]ot mine" and to "confirm ID."  ECF

No. 36-2, at PageID.204.  Based on that information, NCA checked its internal records,

reviewing the documents and information from the original creditor.  And that

investigation reflected that "[t]he information provided by the original creditor had

Plaintiff's name, social security number, and an address Plaintiff had resided at."  ECF

No. 46, at PageID.186 (Def.'s CSF ¶ 46); *see* ECF No. 46-10.  Given the scant information

that the CRAs provided, and the fact that there was no contradictory information in

NCA's own files—files that already included the documents supplied by the original

creditor—NCA's investigative steps at this stage were reasonable as a matter of law.

Durham points to no evidence in the record showing that the information in

NCA's own files at the time of his disputes to the CRAs would have revealed that the

CashCentral.com account was fraudulent.  While his declaration states that, for

example, he has never "had an account with Suntrust Bank or Truist Bank," there was

no information in NCA's own records or in the records supplied by CashCentral.com

that would have raised that red flag—or that even would have supported the veracity

of Durham's assertion.  ECF No. 48-7, at PageID.367.  This is not, therefore, a case in

which the furnisher failed to discover and report accurate information in its own file.

*Cf. Vasquez-Estrada v. Collecto, Inc.*, No. 14-CV-01422, 2015 WL 6163971, at *4 (D. Or. Oct.

20, 2015) (holding that a "reasonable juror could find that defendant's failure to

discover and report accurate account information from its file amounted to an

unreasonable investigation").  At the hearing on the pending motions, Durham's

counsel also asserted that Durham's driver's license and phone number did not match

the CashCentral.com account.  But there is no evidence in the record that NCA had a

copy of Durham's accurate driver's license information—and the first two ACDVs did

not supply one.  Indeed, even at the summary judgment stage, Durham has not

proffered evidence of what exactly was inaccurate about the driver's license or phone

number listed in the CashCentral.com account, and he does not attest to having no prior

connection with the license and phone number in that account.

As far as the first two ACDVs are concerned, then, no rational jury could

conclude that NCA conducted an unreasonable investigation in response.  Instead, the

evidence is similar to that in *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th

Cir. 2005), in which the Seventh Circuit affirmed a grant of summary judgment to a

furnisher.  In *Westra*, the ACDV sent to the furnisher merely indicated that the

consumer was "disputing the charge on the basis that the account did not belong to

him."  *Id.*  It did not "provide any information about possible fraud or identity theft or

include any . . . documentation."  *Id.*  And so the furnisher simply "verified" the

20

consumer's "name, address, and date of birth" and sent the ACDV back to the credit

reporting agency.  The Seventh Circuit concluded that this was reasonable as a matter of

law:  Had the furnisher been given "notice that the nature of the dispute concerned

fraud," that court explained, "then perhaps a more thorough investigation would have

been warranted."  *Id.*  But in the face of the "scant information" received in the ACDV,

the furnisher's investigative steps were enough.  *Id.*  So too here.  The Court therefore

GRANTS summary judgment to NCA as to the FCRA reasonable investigation claims

based on the first two ACDVs.

Matters change, however, once we turn to the third, fourth, fifth, and sixth

ACDVs.[3]  The fifth ACDV included a letter from Durham in which he "request[ed] the

removal of the following credit inquiries as I did not authorize them:  cashcentral.com

and/or NCA to loan money under my name or ssn."  ECF No. 46-6, at PageID.247; *see*

ECF No. 46, at PageID.185 (Def.'s CSF ¶ 28).  And while the third, fourth, and sixth

ACDVs did not include supporting documentation, each of them provided "notice that

the nature of the dispute concerned fraud."  *Westra*, 409 F.3d at 827.  The third, for

example, noted that Durham "[c]laims true identity fraud, account fraudulently

opened."  ECF No. 46-2, at PageID.205.  The fourth contained a note stating "FILE[D] A

---

[3]    In response to the seventh and final ACDV—in which Durham finally provided
a copy of the police report—NCA "marked the account as fraudulent, closed the
account, and marked the account for tradeline deletion."  ECF No. 46-1, at PageID.197
(Hess Decl. ¶ 66).  There is no dispute that NCA's response to that seventh ACDV was
reasonable.

FRAUD REPORT WITH THE POLICE DEPARTMENT," and included the police report

number. *Id.* And the sixth again flagged "identity fraud." *Id.* In the face of these

ACDVs—which indicated in clear terms that Durham was asserting that he was the

victim of identity theft—a rational jury could conclude that "perhaps a more thorough

investigation would have been warranted." *Westra*, 409 F.3d at 827.

Resisting this result, NCA represents that, after it received each ACDV, it

"review[ed] all NCA's documentation on the Account, including the documents and

information NCA received from the original creditor of the debt." ECF No. 46, at

PageID.186 (Def.'s CSF ¶ 45). But the Court concludes that a rational jury could find

that a reasonable investigation of an identity theft allegation would not have been

limited to re-reviewing internal records. A rational jury could, for instance, find that a

reasonable investigation would at least include a phone call to CashCentral.com to see

whether the original creditor might have any additional records that would bear on

Durham's claim of identity theft. After all, the question is not whether

CashCentral.com *in fact* possessed any such records, but rather whether a reasonable

investigator would take the time to check. *See Drew*, 690 F.3d at 1110 (explaining that

"an FCRA violation is tied to the reasonableness of an investigation rather than the

accuracy of its results").

NCA rejoins that the FCRA does not require it to conduct the kind of

investigation into identity theft that law enforcement would conduct. That is

undoubtedly true.  Furnishers are not expected to have grand jury subpoena or search

warrant authority, and there are many types of records that they simply cannot obtain

on their own.  No party here disputes, for example, that NCA could not obtain a copy of

Durham's police report on its own; only Durham could have obtained and supplied

that record.  ECF No. 46-1, at PageID.194 (Hess Decl. ¶ 39).  And, of course, the FCRA

does not require furnishers to take or try to take steps that are not possible, or even

reasonable, for them to undertake.  The FCRA does not expect furnishers to have the

investigative capabilities of the Pinkerton agency.

But the case law does not support NCA's contention that a reasonable

investigation can, as a matter of law, be limited to reviewing the records already in its

possession.  The Ninth Circuit's decision in *Gorman* shows otherwise.  There, the Ninth

Circuit concluded that a furnisher's investigation was reasonable as a matter of law.

*Gorman*, 584 F.3d at 1161.  But it reached that conclusion not based on the notion that

furnishers never need to look beyond their own records.  Instead, it relied on the fact

that the furnisher had previously conducted an investigation that included contacting

the customer and the merchant.  *Id*.  The furnisher thus had "gone outside its own

records to investigate the allegations contained in the CRA notice."  *Id*.  Having

previously taken those steps, the Ninth Circuit merely held that the furnisher did not

have to take them all over again, but could instead rely on its earlier investigation when

conducting a reinvestigation of the disputed debt.  *Id.* (explaining that a furnisher does

not have "an obligation to repeat an earlier investigation, the record of which is in the

furnisher's records").  From those facts, this Court infers that a rational jury *could*

conclude that a furnisher fails to conduct a reasonable investigation if it *never* looks

outside of its own records—that is, a jury might find that it was unreasonable for NCA

not to simply pick up the phone or send a quick email to CashCentral.com to check

whether the creditor had any records that might bear on Durham's dispute.  Reliance

solely on a furnisher's internal records is not always a reasonable investigation.  And a

jury could, in this case, conclude that it was not reasonable for NCA to rely on those

internal records in response to the third, fourth, fifth, and sixth ACDVs.

For these reasons, the Court GRANTS NCA's motion for summary judgment as

to any reasonable investigation claims based on the first and second ACDVs.  But as to

any such claims based on the third, fourth, fifth, and sixth ACDVs, the Court cannot say

that "only one conclusion about the conduct's reasonableness is possible."  *Id.* at 1157

(cleaned up).  NCA's motion for summary judgment is therefore DENIED as to claims

based on those latter ACDVs.

### B.    The Fair Debt Collection Practices Act

Durham also advances several claims under the FDCPA, but that statute only

applies if he can satisfy the threshold requirement of showing that he is a "consumer"

within the meaning of the statute.  In his motion for partial summary judgment,

Durham argues that there is no genuine dispute of material fact on that issue.  NCA

24

opposes the motion, contending that Durham has not even offered sufficient evidence

to make that showing, let alone establish it as a matter of law.  *See* ECF No. 52, at

PageID.388-90.  The Court begins by considering this threshold question.

Recall that the FDCPA defines a "consumer" as a "natural person obligated or

allegedly obligated to pay any debt," and defines "debt" as those incurred "primarily

for personal, family, or household purposes."  15 U.S.C. § 1692a(3), (5).  This is no easy

requirement for Durham to satisfy, for his foundational contention is that he had

nothing to do with the CashCentral.com debt.  It goes without saying that the victim of

identity theft is rarely well-positioned to prove why the actual debtor took out a

fraudulent loan.  And in recognition of that fact, some courts have simply excused

identity theft victims from the statutory burden of having to prove the purpose of the

fraudulent loan, and have placed the burden on the defendant instead.  *See, e.g., Davis v.

Midland Funding, LLC*, 41 F. Supp. 3d 919, 925 (E.D. Cal. 2014) ("It would be absurd to

hold that a plaintiff who is subject to debt collection efforts for an obligation that he

does not owe is ineligible for the FDCPA's protections simply because he cannot

characterize the nature of that obligation.").

The Court need not resolve here whether shifting the burden is appropriate.  No

party disputes that the FDCPA can only apply if the debt is found to be consumer

debt—that is, "primarily for personal, family, or household purposes."  15 U.S.C.

§ 1692a(3), (5).  And regardless of which party bears the burden on this issue, the Court

concludes that there is sufficient evidence for a jury to find that the debt was consumer debt—and that Durham therefore is a consumer within the meaning of the FDCPA—but insufficient evidence to require that result as a matter of law.

The evidence on which a jury could rely to find that Durham is a consumer includes the anticipated testimony of Lori Hess, NCA's Director of Compliance and Rule 30(b)(6) designee, who stated at her deposition that NCA "buy[s] and collect[s] consumer debt." ECF No. 48-1, at PageID.335. Based on that testimony, the very fact that NCA purchased this loan at least suggests that it was fairly viewed as a consumer debt. The jury could also rely on the fact that the CashCentral.com creditor appears to have provided a "payday loan," which is not typically the type of loan used for commercial or long-term investment purposes. ECF No. 46-3, at PageID.210.

But while these bits of evidence are enough to make out a triable issue, they are not enough to require the conclusion that Durham was a consumer as a matter of law. That is especially so because Hess did not represent that NCA *only* buys and collects consumer debts. And a businessperson *could* take out a payday loan for business purposes, even if it is not typical to do so.

For these reasons, the Court DENIES Durham's motion for summary judgment on this threshold point, leaving the matter for the jury to resolve. The Court now turns to each of Durham's specific FDCPA claims, and asks whether NCA—which has moved for summary judgment on each of them—is entitled to prevail as a matter of law.

### 1.    The Initial Written Notice Requirement

Durham's first FDCPA claim is that NCA failed to send him an initial written notice of the debt, as required by § 1692g(a).  As a result, Durham argues, NCA deprived him of his right to a thirty-day validation period, in which he had a right to verbally dispute the debt before NCA presumed that it was valid.  Durham further contends that NCA engaged in unlawful "overshadowing" of his rights during the thirty-day validation period by asking him to substantiate his identity theft claim before the thirty-day validation period could be said to have ended.

There is no dispute that NCA sent the initial written notice on November 30, 2022, to an address in Antioch, Tennessee.  ECF No. 46-2, at PageID.203.  That was the address associated with the CashCentral.com account, and there is no dispute that Durham did live there until sometime in 2022.  And Lori Hess, NCA's Director of Compliance, states in her declaration that the initial written notice was never returned to NCA.  ECF No. 46-1, at PageID.191 (¶ 19).

NCA's system shows, however, that around the same time it mailed the initial written notice, NCA was informed that Durham's address had changed, apparently as of February 2022.  ECF No. 46-2, at PageID.203.  Moreover, NCA has not—at the summary judgment stage—offered any evidence that it resent the written notice to Durham's new address.  So at least on the current record, the question is whether NCA met its obligations under § 1692g(a) by sending the initial written notice to Durham's

prior address, even though NCA became aware a day after sending it that Durham had moved from that address.

NCA contends that it is entitled to summary judgment because it need only send the initial written notice, and need not prove that Durham actually received it.  And NCA is correct that "section 1692g(a) requires only that a Notice be 'sent' by a debt collector" and that NCA therefore "need not establish actual receipt by the debtor." *Mahon v. Credit Bureau of Placer Cnty. Inc.*, 171 F.3d 1197, 1201 (9th Cir. 1999); *see also id.* (rejecting the argument that "information is not truly 'sent' until 'received'").  But sending an initial written notice, even assuming NCA successfully did so here, would not fully answer Durham's claim.  That is because the thirty-day validation period only starts running after the debtor's "receipt of the notice."  15 U.S.C. § 1692g(a)(3).  So even if NCA can satisfy its obligation to *send* an initial written notice by mailing it a person's prior address—an issue the Court need not definitively resolve here—the thirty-day validation period still would not start until the letter has been *received*.

As to this issue of receipt, NCA contends that it should benefit from the common law mailbox rule, under which "proper and timely mailing of a document raises a rebuttable presumption that it is received by the addressee."  *Mahon*, 171 F.3d at 1202 (quoting *Anderson v. United States*, 966 F.2d 487, 491 (9th Cir. 1992)).  NCA notes that in *Mahon*, the Ninth Circuit concluded that because the initial written notice had been sent, it was appropriate to "presume that it was received shortly thereafter."  *Id.*  But *Mahon*

is not squarely on point, because NCA did *not* send the initial written notice to Durham's current and proper address; NCA therefore cannot say that it made a "proper . . . mailing of a document." *Id.* (cleaned up).

The mailbox rule typically creates a presumption that a person has received a document when it has been properly sent to their correct address. The logic of the presumption is that when mail has been sent to the right address, the person who controls that address is in the best position to explain why they might not have received the mail. And so, conversely, when the wrong address is used, the presumption rests on shakier ground. *See, e.g.*, *Veloz v. Sears, Roebuck & Co.*, No. 16-CV-05982, 2017 WL 5127337, at *1 (C.D. Cal. Jan. 10, 2017) (holding that "if the jury believes the Plaintiff that he moved prior to the mailing of the agreement, the Defendant would no longer be entitled to a presumption that the Plaintiff received the agreement simply because it was mailed to his old address, and it would need to prove that the Plaintiff received the agreement in another way, such as through email"); *Ponce v. BCA Fin. Servs., Inc.*, 467 F. App'x 806, 807-08 (11th Cir. 2012) (affirming the district court's conclusion that a debt collector violated § 1692g(a) by sending its initial notice letter to a consumer's "address at which [the consumer] had not lived for over eight months").

That is not to say that the mailbox rule's presumption could *never* apply in cases involving the wrong address. There are, for example, situations in which it is simply unclear what a debtor's correct address is. In cases of that sort, a debt collector might

send the initial written notice to the best available address and not receive any

indication that the mailing was undelivered.  And if, months or years later after debt

collection efforts have been undertaken, a plaintiff were to argue that the address was

incorrect, a court might well allow the debt collector to rely on a modified version of the

mailbox presumption rule.  *See, e.g.*, *Glynn v. Midland Funding, LLC*, No. 16-CV-02678,

2018 WL 2021360, at *6 (C.D. Cal. Apr. 27, 2018) (cataloguing cases in which the mailbox

rule was applied in like circumstances).

But in this case, the evidence does not show—at least not at the summary

judgment stage—that NCA diligently sent the initial written notice to the best address it

had for Durham.  Instead, the evidence in the record shows that NCA learned, around

the time it sent the initial written notice to Tennessee, that Durham no longer lived in

Tennessee and had instead moved to Hawaiʻi.  The evidence also shows that Durham

had moved from Tennessee as of February or June 2022, several months before the

November 2022 mailing had been sent.  Given that NCA received information about

Durham's updated address, it easily and promptly could have mailed a copy of the

notice to Durham's new address.  And one suspects that if the letter had been

something NCA *wanted* Durham to receive—as opposed to a letter that was designed to

afford Durham the procedural right to object to the debt during the thirty-day

validation period—then NCA surely *would have* resent the letter.  Allowing a debt

collector to benefit from the mailbox rule's presumption in these circumstances would

serve only to reward a debt collector that failed to take prudent action to protect a
consumer's rights.

The Court therefore DENIES NCA's motion for summary judgment on
Durham's § 1692g(a) claim based on NCA's alleged failure to provide an initial written
notice.  And because Durham's overshadowing claims hinge in part on whether NCA
properly sent an initial notice, the Court DENIES NCA's motion for summary judgment
on Durham's § 1692g claims generally.

### 2.    False, Deceptive, or Misleading Representations

Durham separately alleges that NCA's reporting of the CashCentral.com account
to CRAs constituted a "false, deceptive, or misleading representation" under § 1692e of
the FDCPA.  Specifically, Durham argues that NCA violated § 1692e(2)(A) by falsely
representing the "character, amount, or legal status of any debt" because he contends
that he was the victim of identity theft and the debt therefore was not properly assigned
to him.  The false statement, in Durham's view, is that he owed *any* amount to
CashCentral.com.

At the hearing on the pending motions, Durham's counsel clarified that his
claims are limited to the timeframe *after* Durham first called NCA to report that he was
the victim of identity theft.  After that period, Durham argues, it was a false statement
for NCA to continue to report the CashCentral.com debt to the CRAs.  While there is no
evidence that NCA knew or even had reason to believe that Durham's identity theft

31

assertion was valid in any period during which NCA continued to report the debt to the

CRAs—indeed, even the current record contains nothing that conclusively proves the

validity of his assertion—Durham argues that NCA's knowledge is irrelevant because

the FDCPA is a strict liability statute. *See Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1130

(9th Cir. 2021) ("The FDCPA takes a strict liability approach to prohibiting misleading

and unfair debt collection practices.").  And he emphasizes that the FDCPA has such a

standard because debt collectors do not need to report to the CRAs, but if they choose to

do so, they are subject to the high scrutiny of the FDCPA's proscriptions. *See Edeh v.*

*Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1035 (D. Minn. 2010) ("[T]hreatening to

report and reporting debts to CRAs is one of the most commonly-used arrows in the

debt collector's quiver.").

It is true that NCA chose to accept Durham's assertion of identity theft once he

provided a police report.  And it is also true that, at the summary judgment stage, NCA

does not dispute that Durham was indeed the victim of identity theft.  These

concessions alone are not sufficient, however, to show that Durham has a viable FDCPA

claim for false, deceptive, or misleading statements.  Durham must additionally show

that a rational jury could conclude that something NCA said about the

CashCentral.com debt was false, deceptive, or misleading—and that it was *materially*

false, deceptive, or misleading.  Because he has not offered sufficient evidence to

support either necessary conclusion, Durham cannot overcome NCA's motion for summary judgment on these claims.

a. To begin with, Durham has not offered sufficient evidence to create a triable issue over the falsity of any of NCA's statements. He does not contend that NCA inaccurately reported the "character" or "amount" of the debt CashCentral.com claimed was owed. He instead contends that the false statement is that he owed any amount at all to CashCentral.com. But there is no question that CashCentral.com was, at all relevant times, asserting that he owed that debt. And by reporting the CashCentral.com debt to the CRAs, NCA did no more than inform those agencies that a creditor— CashCentral.com—was indeed asserting its right to collect on the debt from Durham. To that extent, NCA's report was unquestionably an accurate statement, even if it turned out that CashCentral.com was wrong to take the position it did.

Of course, if NCA somehow went *beyond* merely informing the CRAs that CashCentral.com was claiming a debt owed by Durham—if, for example, NCA ever took a position about the "legal status" of the debt—then those additional statements could conceivably amount to a false statement about the "character, amount, or legal status" of the debt at issue. 15 U.S.C. § 1692e(2)(A). But Durham has offered no evidence that NCA, in addition to reporting the existence of the debt, made any assertion about the debt's *validity*, legal or otherwise.

To the extent Durham's theory is that the mere act of reporting a debt to the CRAs amounts to vouching for its validity, that theory is not supported by the FDCPA. That is clear because the FDCPA expressly allows a debt collector to continue with its debt collection activities, even in the face of a consumer's dispute, so long as the debt collector first validates the debt. Where, as here, it is possible that a debt collector did not comply with its § 1692g(a) initial notice requirement, a debt collector may simply cease collecting on the debt until it receives validation on its end—which is exactly what NCA did. *See Sambor*, 183 F. Supp. 2d at 1242. And obtaining validation of the debt "involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed." *Clark*, 460 F.3d at 1173-74 (internal quotation marks omitted). The FDCPA does not impose on debt collectors a "duty to investigate independently the claims" made by a creditor. *Id.* at 1174. Validation of a debt only requires a debt collector to confirm that the underlying creditor is indeed claiming the amount at issue; "debt collectors do not [themselves] have to vouch for the validity of the underlying debt." *Id.* (cleaned up). When a debt collector reports a disputed debt to a CRA, then, it is not vouching for the *validity* of the debt, but merely conveying to the CRA that a creditor truly does *claim* the debt in the stated amount.

The cases Durham cites, in which false or misleading statements were found, involved situations in which debt collectors went beyond merely conveying to the

34

CRAs the accurate fact that the original creditor was still claiming the debt as owed.  In

*Kaiser*, for example, the debt collector took the additional step of threatening to bring a

lawsuit to collect on a debt, despite the fact that the debt was time-barred.  989 F.3d at

1134.  "Both suing and threatening to sue on time-barred debts," the Ninth Circuit held,

"misrepresent the legal enforceability of those debts."  *Id.*  That is because "[s]uing or

threatening to sue on a debt implicitly represents that the debt is legally enforceable, at

least absent a clear disclaimer to the contrary."  *Id.*  And "[w]hether a debt is legally

enforceable is a central fact about the character and legal status of that debt."  *Id.*

(internal quotation marks omitted).  A false or misleading representation about that

issue, therefore, qualifies as a false or misleading statement about the "character,

amount, or legal status of any debt" under § 1692e(2)(A).

Similarly, in *Edeh*, the district court did not hold that a debt collector made a false

statement under § 1692e simply by reporting that the originator of a debt continued to

claim the debt was owed.  There, the debt collector continued to report a debt to the

CRAs even though the consumer disputed the debt during the thirty-day validation

period, and even though the debt collector had not yet validated the debt.  748 F. Supp.

2d at 1034.  The court therefore found that the debt collector violated § 1692g(b)—by

reporting a disputed debt to the CRAs before verifying that debt—but did not discuss

whether such reporting would violate § 1692e, the provision that Durham claims would

prohibit NCA's reporting.  *Id.* at 1035-36.

It is also significant that, while § 1692e contains a lengthy list of the types of statements that would qualify as false or misleading, it does not include the act of reporting a debt to a CRA that later proves to have been invalid for some reason.  That is not surprising, for as noted earlier, "debt collectors do not [themselves] have to vouch for the validity of the underlying debt."  *Clark*, 460 F.3d at 1174 (cleaned up).  And, indeed, § 1692e's list *does* include, as a false or misleading statement, "the failure to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).  That provision is consistent with the FDCPA's general approach of allowing a debt collector to communicate about a debt, even one that is disputed, so long as the dispute is acknowledged.  And it is inconsistent with Durham's suggestion that a debt collector could discover, after the fact, that it made a false statement by communicating about a disputed debt simply because the dispute turned out to be a valid one.

Durham has therefore failed to identify a genuine dispute of material fact as to whether any of NCA's statements in reporting the CashCentral.com debt were false or misleading.

b.  Durham's § 1692e claims are legally deficient for a further reason:  even if he had identified a false or misleading statement, Durham has not offered sufficient evidence to create a triable issue on the *materiality* of any such statement.

The FDCPA "requires an objective analysis that considers whether the least sophisticated debtor would likely be misled by a communication."  *Donohue v. Quick*

*Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010) (cleaned up).  Statements that do not

meet this standard—even if they might be considered false or misleading—are not

actionable because such "non-material representations are not likely to mislead the least

sophisticated consumer."  *Id.*

Durham argues that NCA's reporting of the CashCentral.com debt to the CRAs

was material because it had significant effects on him.  He notes, for example, that he

"abandoned his efforts to purchase" a "duplex set of condominiums in Kentucky" after

NCA reported the debt on his credit report.[4]  ECF No. 54, at PageID.442; *see* ECF No. 48-

7, at PageID.368 (Durham Decl. ¶¶ 17-18).  But in the context of the FDCPA, a

"materially" false statement is not one that has some sort of impact or effect on the

consumer.  Instead, materially false statements "are those that could cause the least

sophisticated debtor to suffer a disadvantage in charting a course of action in response

to the collection effort."  *Afewerki v. Anaya L. Grp.*, 868 F.3d 771, 773 (9th Cir. 2017)

(cleaned up).  So, for example, the false identification of an original creditor is a material

misrepresentation because that false information might lead the least-sophisticated

debtor to "engage in a fruitless attempt to investigate the facts of this non-existent debt,

---

[4]    NCA argues that Durham's credit reports, or excerpts from them, are
inadmissible hearsay and may not be considered in resolving the summary judgment
motions.  Because the Court's analysis does not rely on these reports, and reliance on
the reports would not change its decision in favor of either party, it need not resolve
this evidentiary objection at this stage.

in a responsible effort to determine how to most effectively respond to the collection notice." *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1121 (9th Cir. 2014).

But a rational jury could not conclude that NCA's continued reporting of the disputed debt to a credit reporting agency would somehow impede the least sophisticated debtor's ability to respond to that disputed debt. Nor does Durham identify any other conduct on NCA's part that would have played a role in making its reporting of the debt material. In his phone calls with NCA, for example, when Durham asserted that he was the victim of identity theft, NCA employees did not respond that he was being untruthful or that his identity theft claim was meritless. Instead, they offered him information about how he might substantiate that identity theft claim.[5]

The facts of this case, therefore, are similar to those in *Blackmon v. Ad Astra Recovery Services, Inc.*, No. 20-CV-800, 2021 WL 1541647, at *4-5 (S.D. Cal. Apr. 20, 2021),

---

[5]      Durham nonetheless contends that NCA's representatives made false statements by requiring him to provide substantiation of his identity theft claim. That is not so. The representatives may well have violated § 1692g(a) because of the failure to properly send Durham the initial written notice—and so, as explained above, the Court has denied NCA's motion for summary judgment as to that claim—but that does not change the fact that NCA accurately described the ways in which Durham might provide information that would lead (as it ultimately did) NCA to accept his claim and close the account.
         Durham separately asserts that in these phone calls—which he initiated—various representatives repeated the "false" information that he owed the CashCentral.com debt. Here again, Durham conflates a statement that an original creditor is claiming a debt (which NCA's representatives accurately recounted) with vouching for the validity of that debt (which there is no evidence that any NCA representative did).

in which the district court granted summary judgment to a debt collector on a consumer's § 1692e claims even though it reported a disputed debt to the CRAs after the consumer called to report identity theft. The debt collector's representative gave the consumer instructions about how to substantiate that claim, but the debt collector did not withdraw its credit reporting. *Id.* at *4. The district court held that neither the continued reporting of a disputed debt nor the communications with the consumer about how to substantiate the alleged identity theft "would confuse or mislead even the least sophisticated debtor's attempt to remove the fraudulent account from their credit report." *Id.* at *5. The same conclusion is warranted here.

    c. Although Durham's § 1692e claims rely almost exclusively on his assertion that NCA made false statements by continuing to report the CashCentral.com debt to the CRAs, he briefly floats one additional theory: that on at least one of the phone calls that he made to NCA, an employee failed to inform him that NCA was a debt collector "attempting to collect a debt and that any information obtained will be used for that purpose," as required by § 1692e(11). His declaration states that "[d]uring at least one call with Defendant the representative did not assert they were debt collectors or that they were attempting to collect the debt." ECF No. 48-7, at PageID.367 (Durham Decl. ¶ 16). And he suggests that this failure to identify NCA as a debt collector separately constituted a false or misleading statement under § 1692e.

This claim fails as a matter of law for two separate reasons. First, Durham points to no *specific* facts in the record showing that NCA's representatives failed to identify themselves as debt collectors—he does not, for example, provide any details about the relevant call or cite to any of the transcripts of his conversations with NCA representatives indicating where they failed to identify themselves. By failing to identify the evidence on which he purports to rely, Durham has forfeited this claim. Second, even if Durham had identified the evidence supporting his claim, it would still fail for the additional reason that no rational jury could conclude that any failure of an NCA representative to identify themselves would have been material within the meaning of the FDCPA. Durham himself called NCA on each occasion. He made these calls to assert that he was the victim of identity theft and demand that NCA stop reporting the debt to the CRAs. Under these circumstances, any omission would have been immaterial as a matter of law. *Cf. Davis v. Hollins L.*, 832 F.3d 962, 967-68 (9th Cir. 2016) (holding that a debt collector's failure to comply with § 1692e(11) when leaving a voicemail did not violate the FDCPA because the consumer and collector had been in settlement negotiations for weeks).

*     *     *

Durham's § 1692e claims fail as a matter of law, both because he has not identified any actionable false or misleading statement and because he has not offered sufficient evidence of materiality to create a triable issue. The Court therefore GRANTS

40

NCA's motion for summary judgment on these claims and DENIES Durham's motion for partial summary judgment on the same.

### 3.    Communication of False Information

Durham's next FDCPA claim is that NCA violated § 1692c(b) by communicating false information about the CashCentral.com debt to the CRAs.  Section 1692c(b) provides that "except as provided in section 1692b," debt collectors may "not communicate, in connection with the collection of any debt" with a credit reporting agency, unless "otherwise permitted by law."  Durham appears to argue that furnishing information to a CRA when there is "reasonable cause to believe that the information is inaccurate," which is barred by § 1681s-2(a)(1)(A), a provision of the FCRA, would therefore be a violation of the FDCPA's § 1692c(b) prohibition.  *See* ECF No. 54, at PageID.441.

This argument is meritless.  As noted, § 1681s-2(a)(1)(A) is a provision of the FCRA, not the FDCPA.  And, significantly, there is no private right of action to enforce that provision of the FCRA:  "Congress limited the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies."  *Gorman*, 584 F.3d at 1154 n.9.  A court should not interpret one statute's private cause of action as undermining the carefully limited enforcement mechanism of another—as Durham here proposes—for "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Segalman v. Sw. Airlines Co.*, 895 F.3d 1219, 1225-26 (9th

Cir. 2018) (alteration in original) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

Here, it would undermine Congress's decision to limit enforcement of § 1681s-2(a) to

governmental bodies if a private litigant could nonetheless enforce the provision by

simply engrafting it onto the FDCPA.  That is reason enough to reject Durham's

position.

Durham is not authorized to enforce § 1681s-2(a) of the FCRA, and he may not

do so using the FDCPA as his vehicle.  For these reasons, the Court GRANTS NCA's

motion for summary judgment against this claim.

### 4.    Unfair Practices

Durham's complaint contains two final FDCPA claims, both of which rely on

§ 1692f(1).  That section prohibits "[t]he collection of any amount (including any

interest, fee, charge, or expense incidental to the principal obligation) unless such

amount is expressly authorized by the agreement creating the debt or permitted by

law."  Neither of Durham's § 1692f claims survives summary judgment.

First, the complaint alleges that NCA improperly reported two different figures

for the CashCentral.com debt:  $470.00 and $470.56.  ECF No. 1, at PageID.10.  In

support of its summary judgment motion, NCA offers evidence that any discrepancy in

the cents value would have been due to the credit reporting agencies' "policy of only

reporting whole numbers."  ECF No. 45-1, at PageID.179; *see* ECF No. 46-1, at

PageID.200 (Hess Decl. ¶ 90).  Durham's opposition does not contest this argument, nor

does he offer any evidence in response.  The Court therefore GRANTS NCA's motion

for summary judgment as to this effectively abandoned claim.

Second, the complaint makes a § 1692f claim that is largely redundant of his

§ 1692e claims:  here again, he argues that it was unfair and unconscionable for NCA to

attempt to collect a debt he did not owe.  In effect, Durham contends that NCA

attempted to "collect[] an amount greater than that which is owing," which is

prohibited under § 1692f, by seeking to collect a debt that should not have been

assigned to him.

Durham cites to no relevant authority supporting his argument that attempting

to collect a debt from the wrong person constitutes a § 1692f(1) violation.  To the

contrary, several courts have held that attempting to collect a debt from the wrong

person does not violate § 1692f(1).  *See Opico v. Convergent Outsourcing, Inc.*, No. C18-

1579, 2021 WL 1611505, at *9 (W.D. Wash. Apr. 26, 2021) (surveying similar cases and

concluding that "because § 1692f(1) specifically concerns the *amount* of obligation

sought, which plaintiff does not take issue with—plaintiff complains only that the

obligation was sought from the wrong individual—liability does not lie under

§ 1692f(1)"); *Taylor v. Midland Credit Mgmt., Inc.*, No. 07-CV-582, 2008 WL 544548, at *4

(W.D. Mich. Feb. 26, 2008) (holding that "where the amount being collected by the

collection agency was not different than the amount owed, § 1692f(1) was inapplicable

to the plaintiff's claim that the collection agency was attempting to collect the debt from the wrong person").

To the extent Durham contests whether he owed the debt, he cannot prevail under § 1692f(1) merely because he was the victim of identity theft. That is because NCA did not alter the amount that was allegedly owed or otherwise misrepresent the amount in question. It is understandable why Durham would be frustrated that he received several credit reports containing the allegedly fraudulent account—even if it came with the note that the account was "disputed." But while Durham may be able to recover on his § 1692g claims, NCA's subsequent responses to his calls informing him of the amount of the alleged debt and the continued reporting of the debt to the CRAs as disputed did not constitute a false or misleading action, or otherwise constitute "unfair or unconscionable means to collect" a debt.

Accordingly, the Court GRANTS summary judgment to NCA on Durham's § 1692f(1) claims, and DENIES Durham's motion for partial summary judgment on the same.

### C. Durham's Hawai'i State Law Claims

NCA also moves for summary judgment on Durham's Hawai'i state law claims. In his complaint, Durham alleged claims under Hawai'i Revised Statutes (HRS) § 480 for NCA's "unfair methods of competition" and § 480-2, for its "unfair or deceptive acts or practices." ECF No. 1, at PageID.12-13. He also brings claims under HRS § 443B-

44

18(5) that effectively mirror his FDCPA claims: he alleges that NCA made a "false

representation" by communicating to him and the CRAs that he was liable for a debt

that he did not actually owe. *Id.* at PageID.13-14.

According to NCA, summary judgment is warranted against these state law

claims because they essentially duplicate Durham's FCRA and FDCPA claims. As

explained above, the Court has granted summary judgment against Durham's FCRA

and FDCPA claims only in part. It is therefore unclear whether the Court's rulings

leave any factual matters for a jury to resolve under the state-law claims. Moreover, at

the hearing on the motions, counsel for Durham suggested—without citation to any

particulars—that the state laws at issue are more generous to his client than their

federal counterparts.

Given this record, the Court RESERVES ruling on whether summary judgment

should be granted against Durham's state law claims. The parties are ORDERED to

submit supplemental briefing on the question of whether there remain triable issues on

the state law claims in light of this Court's rulings on the federal claims. Each party's

supplemental brief shall be no longer than fifteen pages and shall be due on March 31,

2025. After receiving these supplemental briefs, the Court will determine whether to

call for a further reply from either party or whether a further hearing is warranted.

//

//

## <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

NCA's motion for summary judgment as to Durham's FCRA and FDCPA claims,

GRANTS IN PART and DENIES IN PART Durham's motion for partial summary

judgment, RESERVES ruling on NCA's motion for summary judgment as to Durham's

state-law claims, and ORDERS the parties to submit supplemental briefing by no later

than March 31, 2025.

IT IS SO ORDERED.

DATED:  March 14, 2025, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Civil No. 23-00244 MWJS-WRP; *Demetre Durham v. National Credit Adjusters, LLC*;
ORDER GRANTING IN PART, DENYING IN PART, AND RESERVING RULING IN
PART ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN
PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT, AND CALLING FOR SUPPLEMENTAL BRIEFING