Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


DEMETRE DURHAM,                    ) CIVIL NO.
                                   ) 1:23-CV-00244 LEK-WRP
                                   )
              Plaintiff,           )
                                   )
        vs.                        )
                                   )
                                   )
NATIONAL CREDIT ADJUSTERS, LLC,)
                                   )
                                   )
              Defendants.          )
_____   )


ZOOM DEPOSITION OF
JENICE BESLEY


Taken on behalf of the Plaintiff, DEMETRE DURHAM, Via
Zoom Format, Commencing at 7:00 a.m. HST, on September
19, 2024, pursuant to notice.


BEFORE:
      SHEILA MOORE, RPR, RMR, CMRS, CRR, CSR No. 501

Page 2

```
 1   APPEARANCES:
 2   For Plaintiff, DEMETRE DURHAM:
 3      DURAN KELLER, ESQ.
        8 N. 3rd Street, Suite 403
 4      Lafayette, IN  47901
        765.444.9202
 5      duran@kellerlaw.com
 6         And
 7      JUSTIN A. BRACKETT, ESQ.
        515 Ward Avenue
 8      Honolulu, HI  96814
        808.377.6778
 9      justinbrackettlaw@gmail.com
10
     For the Defendants, National Credit Adjusters, LLC:
11
        KUKUI CLAYDON, ESQ.
12      STARN O'TOOLE MARCUS & FISHER
        Pacific Guardian Center, Makai Tower
13      733 Bishop Street, Suite 1900
        Honolulu, HI  96813
14      808.537.6100
        kclaydon@starnlaw.com
15
16   ALSO PRESENT:
17      Jacob Bach
        Jenice Besley
18
             - - - - -
19
20
21
22
23
24
25
```

Page 3

```
 1            INDEX
 2   EXAMINATION BY:              PAGE
 3   MR. KELLER                   4
 4
 5        INDEX OF MARKED EXHIBITS
 6   NO.              PAGE
 7   NCA Bates Docs
 8
 9   ** ALL EXHIBITS MARKED AFTER DEPOSITION CONCLUDED **
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            JENICE BESLEY,
 2   Of lawful age, called for examination, being by me
 3   first duly sworn, as hereinafter certified, deposed
 4   and said as follows:
 5        EXAMINATION OF JENICE BESLEY
 6   BY MR. KELLER:
 7     Q. Good morning.
 8     A. Good morning.
 9     Q. So the time is 1:06 p.m. Eastern, I think 7:06
10   a.m. Hawaii Time, and probably 12:06 p.m. your time,
11   yeah?
12     A. Right.
13     Q. All right.  So we're here for the
14   stenographic/audio visual deposition of -- give us
15   your name, please.
16     A. Jenice Besley.
17     Q. Jenice Besley.  Miss Besley, where do you work?
18     A. National Credit Adjusters.
19     Q. You also know them as NCA?
20     A. Right.
21     Q. How long have you worked for NCA?
22     A. Seven years.
23     Q. What's your title?
24     A. E-OSCAR representative.
25     Q. What -- what led you to start working for NCA?
```

Page 5

```
 1     A. I heard it's a new company when I just started
 2   it was just recently in Jamaica.  I heard about it so
 3   I was interested in coming here to work.
 4     Q. Where were you working before?
 5     A. Global Gateway Solution.
 6     Q. What's that?
 7     A. That's another call center.
 8     Q. Do you know what they do, Global Gateway
 9   Solutions?
10     A. Yes, they're collect -- collecting accounts.
11   They're collecting -- collecting agency, collecting
12   accounts.
13     Q. Global Gateway Solutions is a debt collector?
14     A. Yes.
15     Q. NCA is also a debt collector?
16     A. Yes.
17     Q. What did you do for Global Gateway Solutions?
18     A. I was a collector or account manager.
19     Q. Account manager is what they call --
20     A. Collectors.
21     Q. -- the collectors at Gateway?
22     A. Um-hum, yes.
23     Q. NCA also -- scratch that.  You said Global
24   Gateway Solutions, right?
25     A. Right.
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 6

1    Q. NCA calls its debt collectors account managers,
2  correct?
3    A. Right.
4    Q. What the debt collectors for NCA are actually
5  doing, is they're calling consumers to try to collect
6  on consumer debt, yes?
7    A. Yes.
8    Q. What did you want to be when you were growing
9  up?
10    A. Actually I did want to be a teacher.
11    Q. Any specific --
12    A. Grade one teacher.
13    Q. I like that.  Got to have patience for that.
14    A. Right.
15    Q. Why didn't you pursue that?
16    A. Because I got pregnant out of school early, so
17  all the dream I have to scratch that and take care of
18  family.
19    Q. Where'd you start working after school?
20    A. A daycare center.
21    Q. How long did you do that?
22    A. About three years.
23    Q. And then where'd you go?
24    A. After that I -- I pursued other certificates.
25  I went to HEART TRUST/NTA, that's an institute in

Page 7

1  Jamaica.  We learn skills.  And I also went to another
2  training institution where I do front desk management.
3    Q. What's the name of the institute in Jamaica
4  that you went to first?
5    A. HEART TRUST/NTA.
6    Q. HEART TRUST/NTA?
7    A. Yes.
8    Q. Right on.  And where's that located?
9    A. Sandy Bay, Jamaica.  Sandy Bay, Lucea, Jamaica.
10    Q. Can you pronounce that for me?  I love your
11  accent, but I couldn't make it out.
12    A. Sandy Bay, Hanover, Jamaica.
13    Q. Hanover, Jamaica, my apologies.
14      So you went to HEART TRUST/NTA, and then you
15  said you did front desk work elsewhere.  Where was
16  that?
17    A. I only did the course, I did not actually do
18  the job.  And then I -- I didn't pursue those goals --
19  after I did the training I really didn't continue.  I
20  work also at Sandals, housekeeping.
21    Q. All scaping?
22    A. House.  Housekeeping.  At Sandals Royal.
23    Q. Spell that name for us.
24    A. Sandals, S-a-n-d-a-l-s.
25    Q. Sandals.  You were -- you were a housekeeper

Page 8

1  for --
2    A. Right.
3    Q. -- the company Sandals?
4    A. Right.
5    Q. What about after that?
6    A. After that, then I -- I wasn't working for a
7  little while because I take care of my children.  And
8  then I went to Global -- no, I went to Alliance One
9  first, and then I leave Alliance One, went to Global,
10  and then to NCA.
11    Q. What's Alliance One?
12    A. It's another call center.  They're now known as
13  Teleperformance.
14    Q. Teleperformance.  For Global also known as
15  Teleperformance, who would you answer calls or make
16  calls for?
17    A. Could you repeat your question?
18    Q. Yeah.  For -- when you worked for
19  Teleperformance, did Teleperformance accept calls for
20  another company?
21    A. Teleperformance would be a collection agency as
22  well.  They do collection as well there.
23    Q. I'm thinking there's a name I may be mixing up.
24  I may be mixing up companies.
25      Anyway, so you left Alliance One, right?

Page 9

1    A. Right.
2    Q. You started --
3    A. Global Gateway Solution.
4    Q. Global Gateway Solutions was also known as
5  Teleperformance, correct?
6    A. No.
7    Q. Oh, that was a separate call center?
8    A. Yes, that's two different companies.
9    Q. My -- I think that's why I was confused.  I
10  thought you were saying Global was known as
11  Teleperformance.
12      Teleperformance was its own company?
13    A. Yes.
14    Q. When did you work for Teleperformance?
15    A. I can't think quite here as yet.  I don't quite
16  remember.  I did work for them and then I went to
17  Global and now I'm at NCA.
18    Q. What did your job at Teleperformance require
19  you to do?
20    A. I was a collector.
21    Q. Were you collecting for Teleperformance or
22  other companies?
23    A. Teleperformance, they collect on debts
24  outstanding for companies like Target, Capital One, so
25  forth.  So I was on Capital One at Teleperformance.

3 (Pages 6 to 9)

Page 10

1    Q. How much were you paid when you worked for
2  Teleperformance?
3    A. Not a lot. Not a lot. When I just started I
4  get $120 JMD per hour. So it wasn't a lot.
5    Q. Did it increase?
6    A. Yes, but not by much.
7    Q. When you worked for Global, how much were you
8  paid?
9    A. Global, around 200-and-something dollars per
10  hour.
11    Q. So a bit more?
12    A. Yes, a bit more. That's why I moved from one
13  place to the other.
14    Q. And what made you -- what made you decide to
15  move to working for NCA?
16    A. Like I said, it was a new company in Jamaica
17  and I heard about the pay, so, yes.
18    Q. What was the pay?
19    A. When I started I -- I started at $3.25 per
20  hour. That's $3.25 U.S. per hour.
21    Q. What year did you start working for NCA?
22    A. July 10, 2017.
23    Q. What did you do when you first started working
24  for NCA?
25    A. When I started working I was an account

Page 11

1  manager.
2    Q. A debt collector?
3    A. Right.
4    Q. Did you like that job?
5    A. Yes, but it can be a bit stressful at times.
6  But, yes.
7    Q. Do you get a lot of calls of people complaining
8  that they don't owe money or you got the wrong person?
9    A. Actually I was on the outbound side. I was
10  making all the calls.
11    Q. So it was your job to try to get people to pay
12  money?
13    A. Right.
14    Q. How long did you work as a debt collector for
15  NCA?
16    A. I did a year and a half. I did a year and a
17  half working as a collector.
18    Q. And during that year and a half, what was the
19  target that you were required to meet?
20    A. Honestly I don't remember the exact quotas I
21  did have at that time --
22    Q. But there was --
23    A. -- but there was a goal to me, a monthly goal.
24    Q. There was a monthly goal that you had to
25  achieve in your job?

Page 12

1    A. Right.
2    Q. When did you -- I'll ask you a new question,
3  okay? Can you hear me?
4    A. Yes, I'm hearing you.
5    Q. After you were a debt collector for NCA, what
6  was your next job?
7    A. I was still -- I'm still working at NCA. After
8  -- after account manager position I went to the dialer
9  tech support.
10    Q. Data tech?
11    A. Dialer tech. We send calls to the agents.
12    Q. So it was your job to send phone calls to the
13  debt collectors --
14    A. Right.
15    Q. -- so they could be connected to consumers?
16    A. Right.
17    Q. In that job would you have a list of a bunch of
18  consumers and phone numbers and it was your job to
19  dial them and connect them?
20    A. No. No.
21    Q. What did you do?
22    A. It's -- it's a queue, all the information come
23  in the queue and then we'll just press enter and it
24  will send off, but we are not seeing the account
25  information or anything.

Page 13

1    Q. So your job was to click a button to --
2    A. To just click a button and send off the calls
3  to -- and any available agent will receive it.
4    Q. And that was when you were working for NCA as a
5  dialer tech, yes?
6    A. Right.
7    Q. How long did you work in that position?
8    A. It's another year and a half I did work there.
9    Q. What were you paid there?
10    A. $4 and -- no -- $3.50. Somewhere about there.
11    Q. When did you start working -- what was your
12  next job for NCA after being a debt collector and a
13  dialer tech?
14    A. E-OSCAR rep.
15    Q. When did you start as an e-OSCAR rep?
16    A. June, 2020.
17    Q. Did you ask for that job or did someone place
18  you there?
19    A. I was on dial tech and the position became
20  position became available so I did apply for it.
21    Q. What was the pay for an e-OSCAR rep when you
22  started in June of 2020?
23    A. $4.04.
24    Q. $4.04?
25    A. Right.

4 (Pages 10 to 13)

Page 14

1    Q. What did you do -- what you did as an e-OSCAR
2    rep in June of 2020, was that the same thing that you
3    do today?
4    A. Right.
5    Q. Did your pay increase from when you started as
6    an e-OSCAR rep in June of 2020, to today?
7    A. Yes.
8    Q. What were the increases?
9    A. It's now $5.15. $5.25, my bad. 25 cents.
10   Q. And were those incremental increases over time?
11   A. Yes.
12   Q. So you went from $4.04 per hour to what?
13   A. $5.25.
14   Q. Well, $5.25 today, right?
15   A. Right.
16   Q. But did it go straight from 4.04 all the way up
17   to 4.25 or were there other increases in between?
18   A. It went up to $5.25.
19   Q. Okay, so you -- your pay was increased by one
20   dollar and 21 cents all at one time?
21   A. I think so.
22   Q. In your job as an e-OSCAR rep when you first
23   started to today, did NCA have any targets that you
24   were required to meet as far as how many ACDVs you
25   were supposed to process?

Page 15

1    A. Yes, we would have to process 10 to 15 per
2    hour.
3    Q. So that's 10 to 15?
4    A. ACDVs per hour.
5    Q. And ACDVs are the document that corresponds to
6    when a consumer is disputing something in their
7    credit, right?
8    A. Right.
9    Q. So you had to do 10 to 15 of those per hour,
10   right?
11   A. Right.
12   Q. Is that still the same today?
13   A. It's a bit up to 20. It's up to 20 per hour
14   now.
15   Q. So since you've started NCA has actually
16   increased the requirement, the target for how many
17   ACDVs you're required to process?
18   A. Yes.
19   Q. Do you have available to you the opportunity
20   for overtime, bonuses, promotions, anything like that?
21   A. Yes, it's given. They're given, yes. But we
22   haven't had overtime for a while now, and if position
23   is available you can apply for it.
24   Q. When you say --
25   A. And we do get bonus, yearly bonus. We get

Page 16

1    yearly bonus.
2    Q. How does NCA determine what your yearly bonus,
3    if any -- that was a bad question, I'll ask you a new
4    question, okay? Can you hear me?
5    A. Yes, I'm hearing you.
6    Q. Your yearly bonus whether NCA gives you a
7    yearly bonus, what's that based on?
8    A. Knowledge of the account, of the job.
9    Q. What's that mean?
10   A. What we're required to do on e-OSCAR, knowledge
11   of it.
12   Q. Your bonus is based on processing a certain
13   number of ACDVs, correct?
14   A. Not necessarily.
15   Q. That is one of the factors that encompasses how
16   much you get as far as a bonus, correct?
17   A. One of.
18   Q. Can you tell me any other factors other than
19   the number of ACDVs that you process?
20   A. Accuracy.
21   Q. Anything else?
22   A. You go by accuracy, amount of ACDVs. I
23   don't quite remember anything else, but accuracy is
24   one of the main. The main factor.
25   Q. That's what they tell you?

Page 17

1    A. Yes.
2    Q. Accuracy; if one of your ACDVs, one of your
3    ACDV responses is audited, whether it's accurate
4    depends on whether the information that you submitted
5    to the credit bureaus matches the data that's in NCA's
6    system, correct?
7    A. Repeat your question, please.
8    Q. Sure. Accuracy for your job in processing
9    ACDVs at NCA simply means that your submission of the
10   ACDV to the credit bureaus includes the same data
11   which is in NCA's collection system, correct?
12   A. Yes.
13   Q. You don't know where the information in NCA's
14   collection system comes from, correct?
15   A. Basically when we pull up the account we can
16   see that it comes from different places or credit
17   places like Cash Central, to name a few. So, yes, we
18   can see where it's coming from, but otherwise from
19   that.
20   Q. Sorry, I didn't mean to interrupt you. Were
21   you done?
22   A. Yes.
23   Q. You assume based on reading on the screen and
24   your collection notes that the name for the original
25   creditor is where the information is coming from,

5 (Pages 14 to 17)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 18

1    right?
2        A.  Right, from the notes that we pull up.
3        Q.  And you also assume that the information from
4    the original creditor comes from the consumer; is that
5    right?
6        A.  Because that's what we are seeing.
7        Q.  Right.  But you don't actually -- you've never
8    actually spoken to anyone who works for the alleged
9    original creditor, right?
10       A.  No.
11       Q.  You've never actually done any investigation on
12   whether the information in the NCA system is true or
13   accurate, correct?
14       A.  No.
15       Q.  No, that's not true or, no, you've not done any
16   investigation?
17       A.  No, we don't do any investigation.  At least I
18   don't do any investigation.
19       Q.  You've never done any investigation in the
20   entire time that you've been working for NCA, correct?
21       A.  No, never done an investigation.
22       Q.  That's never been your job, right?
23       A.  No.
24       Q.  It's not anybody's job at NCA to conduct any
25   investigations, correct?

Page 19

1        A.  I'm not sure, but that's not part of my job
2    description.
3        Q.  And your job description is to process the
4    ACDVs that come in from the credit bureaus by matching
5    the data that's in NCA's system back to the credit
6    bureaus, right?
7        A.  Right.  So we use both systems.  We use NCA
8    system and also e-OSCAR system, so we match
9    information there and then send it off.
10       Q.  I appreciate that.  So how long have you been
11   working for NCA?
12       A.  Seven years.
13       Q.  I apologize, you told me that.
14          What's your understanding of what NCA
15   accomplishes?
16       A.  Repeat your question, please.
17       Q.  Yes, what does National Credit Adjusters do?
18       A.  National Credit Adjusters is a collection
19   agency.  Collect on outstanding debts.
20       Q.  It collects on debts that it alleges are owed;
21   is that right?
22       A.  Right.
23       Q.  All consumer debts, right?
24       A.  Consumer debts, yes.
25       Q.  And NCA does that how many days per week?

Page 20

1        A.  Five days.
2        A.  Five days per week every week.
3        A.  Monday through Friday every week.
4        Q.  And that's been as long as you've been working
5    for the company, yes?
6        A.  Yes.
7        Q.  What's your phone number?
8        A.  876-298-9562.
9        Q.  Your email address?
10       A.  BesleyJenice92@gmail.com.
11       Q.  Could you go ahead and spell your name for us?
12   I should have asked that earlier.
13       A.  B-e-s-l-e-y, J-e-n-i-c-e.
14       Q.  And how would you like me to address you?
15       A.  Miss Besley is good.
16       Q.  What year were you born?
17       A.  1982.
18       Q.  What's your highest level of education?
19       A.  I graduated from junior high and then I went
20   for, like I stated, to get further certificates in
21   different fields.
22       Q.  Did you say junior high?
23       A.  Yes.
24       Q.  And where was that?
25       A.  Mount Salem Primary and Junior High.

Page 21

1        Q.  Could you spell that for us?
2        A.  That's M-o-u-n-t, S-a-l-e-m, J-u-n-i-o-r,
3    H-i-g-h, S-c-h-o-o-l.
4        Q.  Thank you.
5        A.  You're welcome.
6        Q.  You said you have certificates in different
7    fields?
8        A.  Right.
9        Q.  What all certificates do you have?
10       A.  Food and beverage management, housekeeping
11   management, front desk management.
12       Q.  Anything else?
13       A.  No.
14       Q.  You said that you had a child.  Do you have
15   just one child?
16       A.  No.
17       Q.  How many children do you have?
18       A.  Five.
19       Q.  And what are their ages?
20       A.  27, 22, 20, 17, 8.
21       Q.  Has to be fun around the holidays.  I'm the --
22   I'm the youngest of five so mom's always delighted
23   when we all get together.
24          So tell me -- you started working for NCA seven
25   years ago?

6  (Pages 18 to 21)

Page 22

1  A. Right, 2017.
2  Q. What hours do you work in your job for NCA?
3  A. On average eight hours per day. That would be
4  Monday through Friday when I started, it would be 8 to
5  5, and 12 to -- 12 to 1, Monday through Friday, and 12
6  to 1 on Fridays. But now that I'm on e-OSCAR I am now
7  working from 7 a.m. to 3:30 p.m.
8  Q. Is there a lunch break built in there?
9  A. Yes, we get lunch break, but because we like to
10  leave a little bit earlier we just work through our
11  lunchtime and combine our breaks to take that lunch.
12  Half an hour to take our lunch.
13  Q. So you have a lunch break, but you choose to
14  work through lunch so you can leave work earlier?
15  A. Right.
16  Q. Do you know what the Fair Credit Reporting Act
17  is?
18  A. Yes, I have an idea.
19  Q. What is the Fair Credit Reporting Act?
20  A. It's the law that protects consumers.
21  Q. From what?
22  A. From -- protect them from -- I don't quite
23  remember, but I know it's something about that.
24  Q. Okay. Do you know what the Fair Debt
25  Collection Practices Act is?

Page 23

1  A. I don't quite remember, but I know that is a
2  law that protects the consumer, consumer rights.
3  Q. Have you ever heard of the Deceptive Consumer
4  Protection Act?
5  A. Yes.
6  Q. And so you've heard of the deceptive acts and
7  practices as it pertains to the Commercial Regulations
8  Act?
9  A. Yes.
10  Q. Where did you hear about those things?
11  A. Here at NCA we actually do training on them.
12  Q. What sort of training did you have with the
13  Deceptive Consumer Protection Commercial Practices
14  Act?
15  A. So we do a yearly test and we go over, read
16  about the Fair Debt Credit Practice and then we get
17  tested on the -- on what we have read.
18  Q. What is it that you've learned in all those
19  trainings?
20  A. We basically just learn about the different
21  form of practices regarding to consumer rights. Yes.
22  Q. Can you tell me what the legal requirements are
23  in your job processing consumer disputes concerning
24  the Fair Debt Collection Practices Act?
25  A. I don't remember.

Page 24

1  Q. Can you tell us what the legal requirements are
2  in your job, the job you've had for years in
3  processing ACDVs pertaining to the Fair Credit
4  Reporting Act?
5  A. Right, so if -- if -- based on my knowledge, if
6  we don't do the correct procedure regarding to the
7  accounts we -- it can be a lawsuit against the
8  company.
9  Q. Anything else?
10  A. No.
11  Q. And doing the correct procedures according to
12  NCA is matching the data that's in NCA's collection
13  software to the ACDV response, yes?
14  A. Right.
15  Q. Nothing else?
16  A. No.
17  MS. CLAYDON: For the record, Mr. Drake --
18  sorry -- Mr. Keller, when you are speaking about
19  the unfair and deceptive trade practices act are
20  you speaking about a specific one? A specific
21  state? A general one? Can you please clarify
22  when you are asking the questions?
23  MR. KELLER: When I pass the witness you
24  can clarify anything you'd like on cross, but I'd
25  appreciate if we don't have any speaking

Page 25

1  objections. Thank you.
2  BY MR. KELLER:
3  Q. In your job when you submit an ACDV response
4  you have certain fields that are on your computer
5  screen, right?
6  A. Yes.
7  Q. The last thing you do in order to process a
8  dispute that comes in through e-OSCAR is to click the
9  submit button, right?
10  A. We have to know the account on WinDebt and then
11  we click the correct code, so the account would go in
12  the correct code.
13  Q. The last --
14  A. The last thing that we do on the account we
15  choose the code, then we submit the account.
16  Q. By clicking the submit button, right?
17  A. Right.
18  Q. Now, when you click submit, on your screen,
19  what you're doing is agreeing that you are processing
20  the dispute by complying with all legal requirements
21  and confirming that the information is accurate,
22  correct?
23  A. It's true and accurate.
24  Q. So you don't actually know where the
25  information that comes from NCA system is coming from,

7 (Pages 22 to 25)

Page 26

```
 1    correct?
 2        A.  No.  No.
 3        Q.  No, you don't know?
 4        A.  No, I don't know.
 5        Q.  But NCA requires you to press that button and
 6    make those certifications anyway, right?
 7        A.  The job description provide us to match that we
 8    have the current information on the account and submit
 9    it.
10        Q.  And that's been the same as long as you've been
11    working for NCA, correct?
12        A.  Yes.
13        Q.  And that's the same for you as everybody else
14    who processes ACDVs for NCA, correct?
15        A.  Yes.
16        Q.  In fact, you yourself are one of the top
17    performers, right?
18        A.  Yes.
19        Q.  About how many -- yesterday your colleague told
20    us, Miss Brown told us that you would process 250
21    disputes per day or more.
22            Can you tell us how many disputes you process
23    through e-OSCAR?
24        A.  The overall amount?
25        Q.  Sure.
```

Page 27

```
 1        A.  No, I can't give the overall amount.
 2        Q.  How many per day?
 3        A.  Now it's around 125, but first I used to do
 4    200, but since they have system issues I'm not doing
 5    that much.
 6        Q.  So you used to do 200 per day?
 7        A.  Right.
 8        Q.  And why did that change?
 9        A.  If there's overtime it could go up to 250.  If
10    there's overtime.
11        Q.  Why did it change from 200 per day?
12        A.  Some of the time I have system issue, my system
13    is not working properly, or -- some of the time that's
14    it.
15        Q.  So if you're having a system issue, you can
16    only do around 125, but if you don't have any system
17    issues, you can do 200 per day?
18        A.  Yes.
19        Q.  And you get paid more money the more ACDVs you
20    process, right?
21        A.  No.
22        Q.  Earlier you told me that you had a yearly bonus
23    that's available to you if you meet certain criteria,
24    right?
25        A.  Yes.
```

Page 28

```
 1        Q.  And the bonus for each person processing ACDVs
 2    is not the same, right?  You all have different
 3    bonuses, correct?
 4        A.  I would assume so.
 5        Q.  And that's because you all process a different
 6    number of ACDVs, right?  You being one of the top
 7    performers and Miss Brown, for example, not doing as
 8    many ACDVs as you, correct?
 9        A.  Yes.
10        Q.  So your yearly bonus is higher than most of the
11    other people processing ACDVs, correct?
12        A.  Because -- because the evaluation that we do
13    yearly bonus, it doesn't -- it's not -- say the amount
14    of ACDVs that we do will -- I would say determine the
15    bonus that we get.  It's the knowledge of the job and
16    of the e-OSCAR in general.
17        Q.  Have you -- well, but one of the factors is
18    whether you meet your goal and how far you surpass
19    your goal, right?
20        A.  No.  Like I said it to you, the ACDVs that we
21    do, it doesn't determine -- it's not one of the main
22    factors that determine our yearly bonus.
23        Q.  Please tell us all of the factors that
24    determine your yearly bonus.
25            MS. CLAYDON:  Objection, asked and
```

Page 29

```
 1    answered.
 2        Q.  You can go ahead, ma'am.
 3        Q.  You're speaking to me?
 4        Q.  Yes, please.
 5        A.  It's also include accuracy and knowledge of the
 6    job.
 7        Q.  Accuracy, knowledge --
 8        A.  And knowledge of the job.
 9        Q.  Anything else?
10        A.  No, sir.
11        Q.  So it's your testimony that the yearly bonus
12    that you received as an ACDV processor for NCA is no
13    way based on the number of ACDVs that you process; is
14    that correct?
15        A.  Like I said it to you, it's not the main
16    factor.  It's not one of the main factors for the
17    bonus.  Accuracy, knowledge of the job.  You could say
18    ACDVs, but that's not the main focus of the main --
19    the determinate.
20        Q.  So I was asking you about all of the factors
21    that determine your yearly bonus and you only told me
22    accuracy and knowledge of the job.  Then when I asked
23    you about whether ACDVs, you said it's not one of the
24    main --
25        A.  But I stated to you before that it's not the
```

8 (Pages 26 to 29)

Page 30

```
 1   main, it's not one of the main factors.  ACDVs per day
 2   is not one of the main factors of the job.
 3       Q.  Can you tell me all of --
 4       A.  So -- go ahead, please.
 5       Q.  Thank you.  Miss Besley, would you tell us all
 6   of the factors that are considered in determining your
 7   yearly bonus as an ACDV --
 8           MS. CLAYDON:  Objection, asked and
 9       answered.
10       Q.  You can go ahead, ma'am.
11       A.  Okay.  So some of the factors of the yearly
12   bonus is knowledge of the job, accuracy, and ACDVs.
13       Q.  Is there anything other than ACDVs, accuracy,
14   and knowledge of the job?
15       A.  No, sir.
16       Q.  Okay.  So you have these three things:
17   accuracy, knowledge of the job, and ACDVs, right?
18       A.  Right.
19       Q.  For accuracy, accuracy is determined simply
20   based on whether the information that you submit in
21   response to the ACDVs matches the information that's
22   in NCA's system, correct?
23       A.  Yes.
24       Q.  So that factor, accuracy, it's not based on
25   whether the information in NCA's system is correct or
```

Page 31

```
 1   not, it's just based on whether you matched that
 2   information, right?
 3       A.  That's my job description, to match what is
 4   there.
 5       Q.  Right.  And that's what accuracy is for NCA?
 6       A.  For e-OSCAR.
 7       Q.  And knowledge of the job, can you tell me what
 8   is considered in determining knowledge of the job?
 9       A.  Just knowing what you're doing and making sure
10   that you're putting it in the correct field, that you
11   don't make a mistake on it.  It's actually knowing
12   what you're doing as well.
13       Q.  So knowledge of the job for NCA's purposes is
14   ensuring that you know how you're supposed to process
15   the ACDVs according to NCA's policies and procedures,
16   correct?
17       A.  Yes.
18       Q.  And that includes matching data and using the
19   correct codes that NCA tells you to use, correct?
20       A.  Yes.
21       Q.  Nothing else concerning knowledge of the job,
22   right?
23       A.  No.
24       Q.  No, there's nothing else?
25       A.  Nothing else.
```

Page 32

```
 1       Q.  And so the last factor is ACDVs, meaning the
 2   number of credit disputes that you process through the
 3   e-OSCAR system back to the credit bureaus, right?
 4       A.  Right.
 5       Q.  Okay.  Earlier you told me that ACDVs were not
 6   one of the main factors.  So my question is, between
 7   accuracy, knowledge of the job, and ACDVs, how much
 8   weight is given to accuracy?
 9       A.  Accuracy is a hundred percent actually.
10       Q.  Okay.  So then knowledge of the job and ACDVs
11   don't matter at all in determining --
12       A.  No, they do matter.  All right, if you're
13   saying a percentage right then.  You'd say knowledge
14   of the job would be -- sorry -- accuracy would be 70
15   percent then, and knowledge of the job another 20, and
16   then ACDV would probably be 10 to round it up.  Just
17   saying.
18       Q.  You're guessing, right?
19       A.  Because it never break down like that, so I'm
20   just -- because you're asking that question I'm just
21   saying because they never break down like that.
22       Q.  Sure, so you're saying NCA never breaks down
23   exactly how it bases your yearly bonus, right?
24       A.  I'm just giving an example of what I stated.
25   I'm just giving an example.
```

Page 33

```
 1       Q.  How much is your annual bonus?
 2       A.  It differentiates yearly.  It's not a set
 3   amount that's given.
 4       Q.  Right.  How much was it last year?
 5       A.  Last year.  About $300.
 6       Q.  $300 U.S. dollars?
 7       A.  Yes, approximately.  I'm not quite sure.
 8       Q.  So you're paid $5.25 per hour in 2023, right?
 9       A.  To now.
10       Q.  Right.  So -- and you work 40 hours per week?
11       A.  Right.
12       Q.  Do you work every single week, or do you take
13   two weeks off, something like that?
14       A.  If you want a vacation you can apply for one.
15   The vacation is available, you can apply for it, but I
16   work straight through.  I haven't taken any days off I
17   said.
18       Q.  So you work 40 hours a week, 52 weeks a year,
19   right?
20       A.  Not all the time.  Sometimes sick times come
21   in.  I'm not feeling well so I'm not at work.
22       Q.  Would you say maybe you work at least 50 of the
23   52 weeks per year?
24       A.  No, it would be less than that, because even if
25   I'm not taking the full two weeks, if I need one day,
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 34

1    I could take a one day off, vacation day off.  So it
2    would be less than 50.
3        Q.  Okay.  So let's do this, you get paid $5.25 per
4    hour, 40 hours a week, that's $210 in a week that you
5    make, right?
6        A.  Right.  I guess you're calculating it.
7        Q.  Your yearly bonus last year was $300, more than
8    you make --
9        A.  Approximately.
10       Q.  More than you make in an entire week, right?
11       A.  Yes.
12       Q.  And you're telling me that NCA does not tell
13   you how it's calculating your annual bonus?
14       A.  No, I'm not saying they did not tell us how it
15   is calculated, that's what I remembered.  But if it's
16   on the system we can always go back and check on it to
17   get the current information.
18       Q.  Do you have a better knowledge of the job than
19   Miss Brown, your colleague?
20       A.  No.
21       Q.  Her --
22       A.  Because basically we have thought the same
23   thing, because you're on the same team so it's the
24   same process for both of us to go through.
25       Q.  Right, so she has the same knowledge of job as

Page 35

1    you, and the accuracy between the two of you is the
2    same.  Both of you match data the same, right?
3        A.  Yes, that's the job description.
4        Q.  But the number of ACDVs, you process more than
5    her, correct?
6        A.  Some of the time.
7        Q.  More often you process more ACDVs than her and
8    you know that because each day you get a sheet telling
9    you how many ACDVs you and the other people on your
10   team process?
11       A.  Yes, we get a daily report.
12       Q.  Right.  So you know that you consistently
13   process more ACDVs than Miss Brown your colleague,
14   right?
15       A.  Right.
16       Q.  So the only difference between the three
17   factors that you just described to me -- accuracy,
18   knowledge of job, and ACDVs -- the only difference
19   between you and Miss Brown is ACDVs that are
20   processed, right?
21       A.  Right.
22       Q.  Yet your bonus is significantly higher than
23   hers.  That's because your annual bonus is based
24   largely on the number of ACDVs that you process,
25   right?

Page 36

1        A.  No.  It's all factors combined.
2        Q.  It's all factors combined, but you don't know
3    the breakdown, right?
4        A.  I don't have that on my head right now, but
5    it's in the system.  We can always go back and check
6    on it.
7        Q.  Great.  Can you go get that information and
8    give it to your attorney to give to us?
9        A.  Sure.
10       Q.  Great.  How about you just do that within the
11   next week and we'll have it all, cool?
12       A.  No problem.
13       Q.  Great.  Who's -- who's your boss at NCA?
14       A.  Wayne Sinclair.
15       Q.  Wayne, can you spell Wayne Sinclair?
16       A.  W-a-y-n-e, S-i-n-c-l-a-i-r.
17       Q.  And do you have the same boss as Miss Brown?
18       A.  Yes.
19       Q.  Do you have any other bosses?
20       A.  Yes.  We have our team leader, you call our
21   supervisor, Sherene Waugh; and the team manager,
22   that's the e-OSCAR team manager, would be Kelly Dote;
23   and then we have our general manager for NCA over all.
24       Q.  Who's the general manager?
25       A.  I can't quite remember his name right now, but

Page 37

1    we also have Mitch Faning [sic], that's one of the
2    managers.
3        Q.  Wayne Sinclair, does he work with you in your
4    office at NCA?
5        A.  Yes, he work in the office at NCA.
6        Q.  Sherene Waugh, she works with you in your
7    office at NCA?
8        A.  NCA Jamaica.
9        Q.  How about Kelly Dote?
10       A.  No, she doesn't work in NCA Jamaica.
11       Q.  She works in Chicago, Illinois?
12       A.  No.  She work in another NCA, but I'm not quite
13   -- I don't quite remember.
14       Q.  Do you know what country --
15       A.  Hutchinson.  I think it's Hutchinson.  Kelly
16   works at Hutchinson.
17       Q.  Can you spell that for us?
18       A.  H-u-t-c-h-i-n-s-o-n.
19       Q.  Hutchinson?
20       A.  Right.
21       Q.  Do you know, is that in the United States?
22       A.  Yes.
23       Q.  Do you know what state in the United States?
24       A.  No.
25       Q.  Your team manager, Kelly Dote, has she ever

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 38

1    been to the NCA office where you work?
2    A. No.
3    Q. How about your general manager?
4    A. Yes, he came one time since I'm working here.
5    Q. One time in seven years?
6    A. Yes.
7    Q. Did you speak to him?
8    A. No.
9    Q. Does NCA operate the same today as it did when
10   you first started working for NCA?
11   A. Yes, it's the same -- same thing they do from
12   then till now.
13   Q. And you still process disputes for NCA in the
14   same way that you did when you first started working
15   on the e-OSCAR team, correct?
16   A. Yes, from 2020, up till now, it's the same way.
17   Q. Let's do this.  It is 1:58 p.m. Eastern.  Let's
18   just go ahead and take a ten-minute break.  Does that
19   work with you?
20   A. No problem.
21        (Recess taken.)
22   BY MR. KELLER:
23   Q. The time is 2:11 Eastern, all the same parties
24   are present, and we're here ready to continue the
25   stenographic/audio visual deposition of Miss Besley.

Page 39

1       Miss Besley, are you ready to continue
2    testifying?
3    A. Yes, I am.
4    Q. Does NCA rank the employees at NCA?
5    A. No.
6    Q. Is anyone else in the room with you?
7    A. Yes.
8    Q. Who?
9    A. Kavia.
10   Q. Kavia Brown?
11   A. Right.
12   Q. Did you speak to anyone during the break?
13   A. I went to the restroom and get back.
14   Q. Did you speak to anyone during the break?
15   A. No, I did not.
16   Q. And where is Kavia in relation to you?  Is she
17   behind your computer?
18   A. Yes.
19   Q. Okay.  Not beside you?
20   A. No.
21   Q. So you sat through Miss Brown's testimony all
22   day yesterday, right?
23   A. Right.
24   Q. Can you tell us why?
25   A. Because the area that we were working, that our

Page 40

1    station is at, we couldn't sit there because it would
2    be a bit noisy and this room is the only available
3    room we could sit to have this meeting.
4    Q. Your normal work station was too noisy to --
5    A. It would be because it's not -- it's not a
6    secluded place so a person would have to pass by so it
7    could be a bit noisy.  A person passing by and this
8    meeting going on.  So a person could be talking while
9    passing by and the meeting is going on, so we come to
10   a secluded place.
11   Q. So what you were you doing while Miss Brown was
12   testifying yesterday?
13   A. Continued to do my ACDV responsibility.
14   Q. You were working to meet your quota?
15   A. No, I don't -- I'm actually doing my job, the
16   ACDVs leads that we do per day.
17   Q. Right, you have a quota of ACDVs that you have
18   to process per day, right?
19   A. Yes.
20   Q. Did you meet your quota yesterday while you
21   were listening into the deposition?
22   A. No.
23   Q. Is that because you were trying to pay
24   attention to the deposition?
25   A. No.

Page 41

1    Q. Why didn't you meet your quota?
2    A. Because the relocation process and getting
3    settled down here.
4    Q. Did you speak to Miss Brown at all yesterday
5    about the deposition?
6    A. Yes.
7    Q. What'd you all discuss?
8    A. It just -- it just -- just talking about the
9    length of time that she spent yesterday because it was
10   a three-hour and she stated it finished at 4.  My
11   shift end at 3:30 so I leave before her.
12   Q. You were saying it took a long time?
13   A. Because initial time that we have it would be
14   three hours, that was sent.
15   Q. Anything else you two discussed other than the
16   amount of time?
17   A. No, not necessarily.
18   Q. You and Miss Brown yesterday did not discuss
19   anything other than how long the deposition was
20   taking; is that correct?  Is that correct?
21   A. When the meeting finished yesterday I wasn't
22   here, so we did not speak about the meeting.  Because
23   I wasn't here when you finished yesterday.  During the
24   time we weren't talking.  My shift end at 3:30, I left
25   her here, I went home.

11 (Pages 38 to 41)

Page 42

1    Q. Did you two speak this morning?
2    A. Not about -- nothing -- not about it.
3    Q. Okay, what did you speak about?
4    A. Normal -- we just come here and then she said
5    just to relax and answer the question, nothing more.
6    Q. Okay. Just curious.
7       Do you -- what resources are available to you
8    in your job processing ACDVs for NCA?
9    A. The system that we use, WinWeb -- WinDebt,
10   sorry, and e-OSCAR, that's what we have to process the
11   account. Once the information comes in, we look at
12   it, and that's how we do our job.
13   Q. So you have a collection software called
14   WinDebt. Anything else?
15   A. The e-OSCAR system.
16   Q. e-OSCAR system.
17   A. Right.
18   Q. You're given some sort of a computer?
19   A. Yes, we have computers.
20   Q. Is it a laptop or a regular computer?
21   A. Regular desktop.
22   Q. Did you bring your regular desktop to this room
23   yesterday so that you could process ACDVs while Miss
24   Brown was testifying?
25   A. I carry the CPU with my information that is

Page 43

1    stored on it to do my job.
2    Q. You carried the what?
3    A. The CPU. We don't move the computer because we
4    have computer in this room. We move the CPU so where
5    the information is stored on.
6    Q. What's in the CPU?
7    A. It's the brain of the computer where everything
8    is at.
9    Q. So you have your collection software, the
10   e-OSCAR system with your computer, and a mouse, right?
11   A. Right.
12   Q. Anything else?
13   A. The keyboard. The keyboard.
14   Q. Keyboard. Anything else?
15   A. The headset. A camera.
16   Q. You have a headset and a camera?
17   A. Right.
18   Q. What do you use the headset for?
19   A. If there's a meeting, we do a meeting, we use
20   the headset for our meetings.
21   Q. Okay. You don't use the headset in processing
22   ACDVs, right?
23   A. No. No.
24   Q. Do you have a phone?
25   A. No.

Page 44

1    Q. Do you -- are you allowed to access the
2    internet outside of the e-OSCAR system and WinDebt?
3    A. Yes, we can access the internet, but we're not
4    allowed to go on it.
5    Q. So could access the internet, but NCA doesn't
6    allow you to use the internet in your job, right?
7    A. Right. Right.
8    Q. Sorry, I don't think I asked before -- I asked
9    you your phone number, right?
10   A. Yes.
11   Q. What's your address where you live?
12   A. 172 Jimmy Cliff Avenue, Providence at St.
13   James, Jamaica.
14   Q. Would you spell that for us.
15   A. That's 172, J-i-m-m-y, C-l-i-f-f,
16   P-r-o-v-i-d-e-n-c-e, Montego Bay, M-o-n-t-e-g-o,
17   B-a-y, J-a-m-a-i-c-a.
18   Q. Can you tell us the address where you work?
19   A. 11 Mangrove Way, Montego Bay, Free Zone.
20   Q. And I'm sorry, could you spell that for us?
21   A. 1 M-a-n-g-r-o-v-e, W-a-y, Free Zone, F-r-e-e,
22   Z-o-n-e, M-o-n-t-e-g-o, B-a-y.
23   Q. Is that 11 Mangrove Way, or 1 Mangrove Way?
24   A. 1.
25   Q. How far is where you live to your work?

Page 45

1    A. It could take around 45 minutes to get here.
2    Q. How do you get there?
3    A. Regular taxi.
4    Q. You don't have a car, correct?
5    A. No.
6    Q. I'm sorry, no, that's not correct, or no, you
7    don't have a car?
8    A. No, I don't have a car.
9    Q. Did you do anything to prepare for your
10   deposition?
11   A. Yes, we did a deposition prep.
12   Q. What'd you do?
13   A. We discussed some of the basic information,
14   questions that would be asked.
15   Q. Who'd you discuss with?
16   A. Jacob Bach.
17   Q. Who's that?
18   A. With Kelly Dote and Sherene Waugh.
19   Q. That meeting, what was that -- was it done over
20   the phone or by Teams?
21   A. Yes, it was -- it was done Zoom as well.
22   Q. Just like this?
23   A. Right.
24   Q. How long was that meeting?
25   A. Half an hour.

12 (Pages 42 to 45)

Page 46

1      Q. Was Miss Brown in that meeting with you?
2      A. No, it was a one-on-one. She would do -- she
3    did hers and then mine afterwards.
4      Q. So each of you had separate meetings with Kelly
5    Dote, Sherene and Jacob Bach?
6      A. Right.
7      Q. Who is Mr. Bach?
8      A. One of NCS attorneys.
9      Q. Anybody else other than Jacob Bach, Kelly Dote,
10    Sherene?
11    A. No.
12    Q. And did you review any documents to prepare for
13    your deposition?
14    A. No, sir.
15    Q. So no documents, nothing on the computer, no
16    call recordings? Nothing?
17    A. No.
18    Q. Did you want to review any documents?
19    A. No. When we originally heard about this
20    deposition I just pulled up the account number to view
21    the account to see what was on it, but otherwise than
22    that, we didn't, and I didn't have to.
23    Q. Okay. So you did review the account notes?
24    A. Yes, I did go over it.
25    Q. Can you tell us the name of the consumer in

Page 47

1    this action?
2      A. I see Durham, something like that. Durham.
3      Q. And where do you see that?
4      A. It was sent also in the email and I also pull
5    it up on WinWeb, bring up the account on WinWeb.
6      Q. So you received an email from one of the
7    attorneys?
8      A. No, the email that was sent was regarding the
9    meeting that was set up, that would set up. So it
10    would state the name and the reason for the meeting,
11    along with the account number.
12    Q. What's your understanding of why you're
13    testifying?
14    A. I heard that there was some lawsuit going
15    against NCA regarding this account.
16    Q. Anything else?
17    A. That I notate on the account, that's one of the
18    reasons why I'm now here.
19    Q. Sure, but nobody told you that you did anything
20    wrong, right?
21    A. Right, I was told I did not do anything wrong,
22    which I also saw that I did not do anything wrong on
23    the account.
24    Q. Who told you did not do anything wrong?
25    A. Miss Dote spoke to us and said that we didn't

Page 48

1    do anything wrong on the account, and also the
2    notation that I'm seeing on the account, I did not do
3    anything wrong on the account.
4      Q. So you didn't do anything wrong according to
5    what NCA requires you to do, correct?
6      A. Right. Right.
7      Q. So -- and you don't know what this lawsuit is
8    about?
9      A. Not actually, no.
10    Q. Nothing in your job has changed as a result of
11    this lawsuit, right?
12    A. No.
13    Q. When did you first learn that you were going to
14    be giving a deposition in sis case?
15    A. The first email was sent was about -- I don't
16    actually remember the date when we get the first
17    email. I'd have to go back, but last week, sometime
18    last week we heard that we'd have this meeting.
19    Q. Okay. How often do you work overtime at NCA?
20    A. We were mostly working overtime during the
21    covid period because we were behind and we were doing
22    overtime to get caught up on the ACDVs, but since
23    lately we haven't worked any.
24    Q. How many people work on NCA's ACDV team?
25    A. We have 14 including our manager. 14? Yeah.

Page 49

1      Q. And when you first started working on the ACDV
2    team, did you have more people or less?
3      A. We did have less.
4      Q. Other than process ACDVs on e-OSCAR, do you
5    have any other jobs that you're supposed to do for
6    NCA?
7      A. No.
8      Q. So your job, all you do all day every day is
9    process ACDVs?
10    A. Correct.
11    Q. And you are one of the top performers at NCA,
12    correct?
13    A. On the e-OSCAR team.
14    Q. Sure. NCA has top performers as far as the
15    debt collectors separately, correct?
16    A. Yes, I would assume so, yes.
17    Q. But on the e-OSCAR team you're one of the top
18    performers?
19    A. According to the reports that are sent daily.
20    Q. So yes?
21    A. According to the reports that are sent daily.
22    Q. Well, do you have any reason to dispute that
23    you're one of the top performers?
24    A. Because some days it's not normally the same.
25    Because I could come in today and do that amount, and

13 (Pages 46 to 49)

Page 50

1    the next day I'll do another -- a lesser amount.
2        Q. Right, but on average you're consistently one
3    of the top performers, right?
4        A. On average.
5        Q. Who are the other top performers?
6        A. We have Felicia Grant, Patricia Campbell,
7    Karena Hurd, Shirika Campbell.
8        Q. So Felicia Grant, Patricia --
9        A. Campbell.
10       Q. Campbell.
11       A. Um-hum.
12       Q. Shirika?
13       A. Campbell.
14       Q. Campbell.
15       A. Um-hum.
16       Q. Anybody else?
17       A. Karena Hurd.
18       Q. Karena.
19       A. And myself.
20       Q. You all are the top performers?
21       A. Right.
22       Q. What's the most ACDVs that you've processed in
23   a day?
24       A. Like I said it to you, we -- I normally do 200,
25   but recently have been doing less than 200.  So it's

Page 51

1    about 125, around that amount.
2        Q. And recently you've been doing less than 200
3    because of the system errors, right?
4        A. Yes.
5        Q. Do you know how much your annual bonus was in
6    2022?
7        A. No, sir, I don't remember that.
8        Q. Do you have discussions with your boss about
9    whether you're meeting your quota for ACDVs?
10       A. We have discussion when we do evaluations on --
11   about our knowledge of the job and everything that
12   comprise of the work, the job.
13       Q. Including the number of ACDVs that you process?
14       A. Include -- included the ACDVs as well.
15       Q. Are you proud of the number of ACDVs that you
16   process?
17       A. Yes.
18       Q. And you said that there is no ranking among the
19   employees; is that correct?
20       A. Right.  We don't have a ranking necessarily.
21       Q. It's never been part of you to find out
22   whether a consumer other owes a debt, correct?
23       A. No, because we just normally work with --
24   whatever comes in the system, that's what we work
25   with.

Page 52

1        Q. You've never made a decision about whether a
2    person owes a debt, you just simply match data,
3    correct?
4        A. Correct, that's what I do.  That's my job
5    description.
6        Q. So, in fact, NCA's system prepopulates the
7    response by matching such that you don't have to go
8    and search for the information, correct?
9        A. No, we don't have to search for any
10   information.
11       Q. NCA's system prepopulates a response, right?
12       A. Right.
13       Q. When you process an ACDV you always do it by
14   yourself?  It's not you and other people, correct?
15       A. No.
16       Q. You do all of your ACDVs by yourself, correct?
17       A. Yes.
18       Q. Does anybody ever review or audit your work?
19       A. Yes.
20       Q. What's the auditing process for NCA?
21       A. I'm not sure of the process.
22       Q. Do you know who is responsible for doing the
23   audits?
24       A. I know the agent that is on the team.
25       Q. Who's that?

Page 53

1        A. That's Donovan Whitaker and Samantha.
2    Samantha.
3        Q. You don't know Samantha's last name, do you?
4        A. What's her last name?  Martin, sorry.  Samantha
5    Martin.  Samantha Martin and Donovan Whitaker.
6        Q. And they both work with you in Jamaica, yes?
7        A. Yes, they work in the Jamaica office.
8        Q. You've never been disciplined or needed to be
9    corrected based on any ACDV you've processed, correct?
10       A. Correct.
11       Q. In fact, you've only been promoted, correct?
12       A. Right.
13       Q. The area where you work, you're on the second
14   floor of an office building; is that right?
15       A. Right.
16       Q. And you're on one side of the room, and the
17   debt collectors are on the other side of the room,
18   right?
19       A. Right.
20       Q. When you're working and processing ACDVs, is it
21   quiet or loud?
22       A. Quiet.
23       Q. You told me that yesterday it was gonna be too
24   loud to do the deposition?
25       A. Person -- person can pass by while speaking and

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 54

1    it would effect the meeting, but it's not the case
2    that they were always making noise.  But if the
3    meeting is keeping they could pass by and say
4    something or have a conversation with someone.
5        Q.  Did you ever work remotely for NCA?
6        A.  Yes.
7        Q.  When did you work remotely?
8        A.  During the covid period.
9        Q.  And you returned in 2021, or was it 2022?
10       A.  I think it's 2022 we came in the office.
11       Q.  Does it sound correct that you returned in June
12   of 2022?
13       A.  June, July, somewhere there.
14       Q.  And since then you've been working in person?
15       A.  In the office, yes.
16       Q.  So your job being somebody who processes the
17   credit disputes that come in from the credit bureaus
18   on e-OSCAR, you follow me so far?
19       A.  Right.
20       Q.  You've never done any investigation in your
21   job, right?
22       A.  Never.  If we do receive an image that comes in
23   on e-OSCAR, and there's some wording that we don't
24   understand, then we send it to our manager to do
25   regular checks or review on the account before we

Page 55

1    process it.
2        Q.  And that rarely happens, correct?
3        A.  Right.
4        Q.  That didn't happen with respect to this account
5    that we're here about, correct?
6        A.  I'm not sure about that.
7        Q.  In fact, you don't know what you did in
8    processing the dispute -- the disputes that are
9    involved in this case, correct?
10       A.  According to the notes that I made on the
11   account, back in 2023, I did what I was supposed to do
12   on the account.
13       Q.  According to NCA's policies, what they require
14   you --
15       A.  According to the job description.
16       Q.  So the only basis you have for being able to
17   state what you did is reviewing NCA's collection
18   notes; is that correct?
19       A.  Reviewing the account, that's the only thing
20   that we could see, yes.
21       Q.  And without that you have no clue what you did?
22       A.  No, because we wouldn't still have the account
23   here.  Once we do what we do on the account, then we
24   move on to another account.
25       Q.  Right, and given what you've done thousands and

Page 56

1    thousands of these; is that right?
2        A.  Right.
3        Q.  So given that you've done thousands and
4    thousands of ACDVs in your job, you don't remember any
5    particular dispute that's come in which you processed,
6    correct?
7        A.  No.
8        Q.  No, that's not correct, or no, you don't
9    remember?
10       A.  No, that's not correct, because whatever comes
11   on the system each day that's what we go about, I'm
12   doing.
13       Q.  Sure.  And I'm sorry, I may have asked you a
14   poor question, I'll try again, okay?
15       A.  Okay.
16       Q.  You process so many disputes that you don't
17   remember any specific dispute or what you did with it,
18   correct?
19       A.  Right.  Because once the account comes in, I
20   would do what we supposed to do on the account, we
21   move on to another account.  It's not something that's
22   stayed with us and that we keep remembering on that.
23   Once we're through with the accounts, we move on to
24   another account.
25       Q.  And some of these disputes people are

Page 57

1    complaining about how they believe they don't owe
2    anything, right?
3        A.  Right.
4        Q.  And they're telling you how it's affecting them
5    at times, right?
6        A.  Right.
7        Q.  But you have so many disputes that you do that
8    you can't even remember any one of them, right?
9        A.  Our job description that we do, we process the
10   account, we match the information that we have here,
11   and then once we put in the current disposition on the
12   account, then it will go in the back and they will
13   take it up from there.
14       Q.  It's never been your job to report any
15   investigation results to the credit bureaus because
16   you've never done any investigation, right?
17       A.  No.
18       Q.  No, you've never done any investigation?
19       A.  No, I never do any investigation.
20       Q.  And so it's never been your job to report any
21   results of an investigation, correct?
22       A.  Right.  Once we're through with the account,
23   then it goes in the back and then it goes where it's
24   supposed to go.
25       Q.  So you've never been able to determine whether

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 58

1  the information in NCA's system that you're matching
2  to the ACDV; you follow me so far?
3       A.  No.  Could you repeat the question?
4       Q.  The information that's in NCA's system --
5       A.  Um-hum.
6       Q.  -- you don't actually know where that data
7  comes from, correct?
8       A.  Right, I don't know where it comes from.
9       Q.  And you don't even have a phone that you're
10  able to use in your job at NCA, correct?
11       A.  Because the job don't have us use the phone
12  because we don't make calls.
13       Q.  NCA doesn't allow you to make calls to find any
14  information out, correct?
15       A.  Because the job description don't provide us
16  with a phone.  We don't need a phone to do our job.
17       Q.  The way that NCA wants you to, right?
18       A.  The job description that NCA has, yes.
19       Q.  So you've never been able to verify whether any
20  information in the system that you're submitting back
21  to the bureaus is correct, right?
22       A.  Whatever is on e-OSCAR, we match it to what's
23  on WinWeb.  If there's an ACDV that comes in we'll
24  check that.  Whether they're saying they're filing
25  fraud or it's a dispute, then we dispatch that to the

Page 59

1  different areas that they should go in and move on to
2  the other account.
3       Q.  Right.  So you've never been able to verify
4  whether information in the system that you're
5  submitting to the bureaus is accurate, correct?
6       A.  Correct, because we're just going by what we
7  seeing here on the screen.
8       Q.  If NCA required you to actually conduct an
9  investigation like by picking up the phone, calling
10  the consumer, by calling the alleged original creditor
11  to do any sort of searches, if NCA allowed you to do
12  that, would you do it in your job?
13       A.  If it's what the job entitles for us to do,
14  then we'd have to do it.
15       Q.  But that's not what NCA requires of you,
16  correct?
17       A.  No.
18       Q.  No, that's not correct, or no, that's not what
19  they require?
20       A.  That's not what they required of us to do.
21       Q.  Can you -- can you walk us through the process
22  of you got your computer screen up and you go to the
23  queue, from the time that you pull something from the
24  queue until the time that you process a dispute, could
25  you walk us through what that looks like, please?

Page 60

1       A.  Okay, so first we get the account on e-OSCAR.
2  We look on -- we copy the SSN, that's the social of
3  the account, and pull up the account on the WinDebt
4  account.  We verify what the status the account is in
5  on WinWeb, and then we go ahead and verify both
6  system, the information on e-OSCAR and WinWeb.
7       Once we've done that we notate the account.
8  Whatever the code is on the account, that's what we
9  copied and note on the system.  And then we'll get
10  next.  If there's an image that comes in, it could
11  take a little bit more time.  We have to download the
12  image and view it and see what the consumer is stating
13  on the image.  Then we go ahead and do the same
14  verification.  And if it's a fraud account, then we'll
15  move it to our fraud.  And then if it's a dispute,
16  IDS, we move it to IDSP and move on.
17       If the account comes in with a 1 or 3 code we
18  know that's a tem fraud account and we copy that and
19  note the account as tem fraud and get next to another
20  account.
21       Q.  When you say verify both systems on e-OSCAR and
22  WinWeb, what you mean by verify is matching, correct?
23       A.  Right, matching the name, that we have the
24  correct name, the correct Social, the address on the
25  account, along with a telephone number.  That's what

Page 61

1  we match on the account.
2       Q.  You're not able to submit an ACDV response when
3  there's an image until after you've clicked to
4  download the image, correct?
5       A.  Right, we have to download the account, the
6  image, before we can move on on e-OSCAR.
7       Q.  Right, the system literally would not allow you
8  to hit --
9       A.  Right.
10       Q.  -- submit until it's at least downloaded,
11  correct?
12       A.  We can't continue on the account until we
13  download the image.
14       Q.  And when you say then you do the same
15  verification, you mean data matching?
16       A.  Matching.  Data match.
17       Q.  So then you said if it's fraud you move it to
18  fraud?
19       A.  Right.
20       Q.  But the only time that NCA allows you to
21  determine that an account is fraud is only if you
22  receive a police report or an identity theft
23  affidavit; is that correct?
24       A.  Right, that's when we move it to I fraud.
25       Q.  So the only circumstances in which NCA would

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 62

1  allow you to stop credit reporting an account, would
2  be if the collection software WinDebt tells you that
3  you can delete an account, or if you receive an
4  identity theft affidavit or police report, correct?
5      A.  Right.  Because we look on the system and see
6  that it's saying delete, and then we know that this
7  account should be deleted.
8      Q.  You have never had a discussion with your boss
9  about any negative performance, correct?
10     A.  Right, I never have that discussion.
11     Q.  In your job at NCA you never listen to call
12  recordings, correct?
13     A.  No, I never listened -- yes, I listened when I
14  was account manager, we'd have to go over a call,
15  like, to let us better prepare and to go on another
16  call to do our call.
17     Q.  In your job as an e-OSCAR representative for
18  NCA, one of the people that processes the credit
19  disputes that comes in through the bureaus, you've --
20  you've never listened to call recordings, correct?
21     A.  I never listened to recordings.
22     Q.  NCA wouldn't allow you to listen to call
23  recordings in your job, correct?
24     A.  Because that's not one of the description for
25  e-OSCAR rep.

Page 63

1      Q.  That would also take you longer to do your job,
2  correct?
3      A.  That's not part of the job description for
4  e-OSCAR so we don't listen calls.
5      Q.  Your training that you've had for NCA has all
6  been about which codes to use and how to use and
7  navigate NCA's system, correct?
8      A.  Right.
9      Q.  Your training has not been about the legal
10  requirements of the Fair Credit Reporting Act,
11  correct?
12     A.  No, we do training on fair credit and reporting
13  as well.
14     Q.  But you can't tell me any single legal
15  requirement of any of those laws, correct?
16     A.  I don't quite remember all of them in my head
17  right now, but I know that fair trading is what
18  protects the consumer rights.
19     Q.  Do you believe that what you do protects the
20  consumer?
21     A.  Yes.
22     Q.  Can you tell me any single legal requirement?
23     A.  Single requirement of what?
24     Q.  Any single legal requirement that's involved in
25  your job.

Page 64

1      A.  Just to make sure that the information that
2  we're seeing on the screen is the correct information
3  that we are submitting.
4      Q.  Do you know what law that complies with?
5      A.  I think it's deceptive.  I'm not sure.
6      Q.  So the only single legal requirement that you
7  -- that you think you know is that you're required to
8  make sure data matches, right?
9      A.  Right.
10     Q.  The way that you do your job, that's all been
11  the same since you first started working at an e-OSCAR
12  representative for NCA, correct?
13     A.  Right, it's the same way from 2020, up to now.
14     Q.  Can you tell us -- Mr. Durham, you know that he
15  was disputing the collection account because he was a
16  victim of identity theft; is that right?
17     A.  According to the note that we have on the
18  account, we go over the notes that is on the account,
19  right, and I worked according to what I saw on the
20  account and what comes in the system.
21     Q.  So your job in processing ACDVs is you review
22  collection notes to figure out all of the
23  circumstances that are available, but then in
24  processing the dispute you're required to match the
25  data that's already in NCS's system; is that correct?

Page 65

1      A.  We match the data in the system.  We also look
2  on the image that comes in on the system if there's an
3  image on account.  Also we check the FCRA to see what
4  it's stating.  And the account, when I went on the
5  account it was already in a tem fraud status on the
6  account, so I did not do anything much on the account
7  other than verify the normal that I should do on the
8  account.
9      Q.  So when you process a dispute you will look, or
10  you sometimes look at the collection notes to see what
11  the consumer has said, right?
12     A.  Yes, because -- yes, we do look on it, but
13  that's necessary.
14     Q.  But that does not change the information that
15  you communicate on e-OSCAR?  The information that you
16  communicate on e-OSCAR is still matching the data
17  that's in NCA's system, correct?
18     A.  Okay, if the consumer calls in and account
19  manager that would receive the call and he would state
20  what's ever the customer stated on the account, then
21  that would be noted on the account.  But my job
22  description is to go by what comes in on e-OSCAR and
23  we match that on WinWeb and we submit it to the
24  correct department it should go to.
25     Q.  Your job is to --

17 (Pages 62 to 65)

Page 66

1    A. To verify that we have the correct person and
2   the name and the Social is correct on the account.
3    Q. Sure, but you never verified that you had the
4   correct person for this --
5    A. According to the system --
6    Q. If I may --
7    A. -- we have to verify.
8    Q. So you never verified that you had the correct
9   person for this debt, you simply verified that the
10   information in the system matched the information you
11   were responding to?
12    A. Right, that's how we verify.
13    Q. Okay.  Okay.  So verify to you is just
14   matching, right?
15    A. Matching what I see on the system.
16    Q. So you're aware now from looking at the
17   collection notes that Mr. Durham told NCA that he was
18   the victim of identity theft, right?
19    A. Yes, according to the information that is here.
20    Q. What are you looking at right now?
21    A. The WinWeb, the account actually.
22    Q. So you have your computer screen open to the
23   right of you now?
24    A. Correct.
25    Q. Okay.  What's on your computer screen right

Page 67

1   now?
2    A. Just the screen that we are on and my WinDebt
3   account, the WinDebt account.
4    Q. Anything else?
5    A. No.
6    Q. Have you been messaging with anybody else?
7    A. No, because we don't have that -- we can't use
8   that system while we're on this so that's not up.
9    Q. So you know that Mr. Durham indicated that the
10   account was fraudulently opened and that he himself
11   did not open up the account, right?
12    A. According to the notes that I'm seeing here.
13    Q. Yes?
14    A. Yes, according to the notes that I'm seeing
15   here.
16    Q. Those notes were available to you at the time
17   that you processed his dispute, correct?
18    A. Yes, it was always there.
19    Q. But you did not do anything to determine who
20   actually opened up the account because that's not your
21   job, right?
22    A. That's not my job description and according to
23   the account, and the note that is on the account, the
24   account was already until a tem fraud status, right?
25   So the client would have to send in the police report

Page 68

1   or FTC so it could go in the I fraud status.
2    Q. Miss Brown, you yourself never attempted to --
3    A. Besley.
4    Q. Besley?
5    A. Yes.
6    Q. Miss Besley, you yourself never attempted to
7   try to find who opened up the account that's in Mr.
8   Durham's name, correct?
9    A. No, sir, I never attempted to do so because
10   that's not my job.
11    Q. And you never even attempted to determine
12   whether Mr. Durham himself was involved at all in
13   opening this account, right?
14    A. No.
15    Q. No, that's not right, or no, you never
16   attempted to do so?
17    A. Never attempted to do so because that's not in
18   my job description.
19    Q. What's your understanding of what you
20   accomplish in your job?
21    A. To make sure that we have the correct
22   information on the system that once it is submitted
23   it's the right person that is being reported on.
24    Q. Excuse me.  If at any point you want a break,
25   just let me know.

Page 69

1    A. Okay.
2    Q. Do you believe that your job in processing
3   consumer disputes, do you believe your job is
4   important?
5    A. Yes, it is important.
6    Q. Why?
7    A. Because you can advise persons for them to be
8   paying on the account at NCA, they could clear up the
9   outstanding accounts that they have and will try to
10   get their credit better.
11    Q. Okay, so you believe your job is important so
12   that people can pay money?
13    A. To better themself.
14    Q. Sure.  Let's say that someone didn't actually
15   open an account and they didn't actually owe any
16   money, but NCA was saying that they believe they owed
17   money because their name was used?
18    A. Okay, that's when the processor comes in and
19   they will check on that, and if the consumer stating
20   that they're disputing or they didn't open it, it was
21   opened illegally, then we would have to make a note on
22   the account and then stop all collection activity on
23   that account.
24    Q. But you only stop collection activity -- NCA
25   only stops collection activity if it receives an

18 (Pages 66 to 69)

Page 70

1  identity theft affidavit or a police report, correct?
2      A. Right.
3      Q. So in a situation like Mr. Durham's --
4      A. And if it's -- if it's a lawyer, there's a
5  lawyer involved, they are filing bankruptcy, then we
6  stop collection activity. They have a POA, then they
7  won't speak to the consumer, they speak to the --
8  those persons.
9      Q. After getting lawyers involved and being here
10 for this deposition, going back and looking at your
11 collection notes, knowing what you know now, if you
12 could go back, would you still do -- would you still
13 process this dispute for Mr. Durham the same as you
14 did previously?
15     A. There's nothing different I would do because
16 it's the same job description that I'll be doing then
17 I will be doing now. So there's nothing different I
18 will do.
19     Q. You treated Mr. Durham the same as you would
20 have treated any other person in the world?
21     A. I treated the account as any other account that
22 I received on the system.
23     Q. You do your job the way your employer wants you
24 to, right?
25     A. I do the job based on the job description that

Page 71

1  I was told, and trained in.
2      Q. Let's go ahead and take a five- or ten-minute
3  break.
4          MS. CLAYDON: I want to check what time
5      you needed to leave today, just to be sure.
6          THE WITNESS: My shifts end at 3:30.
7          MS. CLAYDON: Okay, so it is now --
8          THE WITNESS: It is now 2:01.
9          MS. CLAYDON: Okay. Is that sufficient
10     time for you?
11         MR. KELLER: I don't know, but let's just
12     make it a five-minute break so we can try.
13         (Recess taken.)
14 BY MR. KELLER:
15     Q. The time is 3:08 p.m. All the same parties are
16 present. We're here for the continued audio
17 visual/stenographic deposition of Jenice Besley.
18     Ma'am, are you ready to continue testifying?
19     A. Yes, I am.
20     Q. All right. I'm gonna share my screen here.
21 Can you see my screen?
22     A. Yes, I am.
23     Q. These are the collection notes, also known as
24 account notes, correct?
25     A. Right.

Page 72

1      Q. And we're looking at what's been marked as NCA
2  5 to NCA 8. Those are the collection notes for
3  Demetre Durham, correct?
4      A. Yeah.
5      Q. All right. And these notes, these are all
6  available to you at the time that you're processing
7  ACDVs, correct?
8      A. Yes.
9      Q. And you don't know whether any of the
10 information in here is true, just that it comes from
11 NCA's system, correct?
12     A. Correct.
13     Q. What are the dates of the disputes that you
14 processed?
15     A. I processed on this account the 20th of
16 February, 2023, and also the 23rd of February, 2023.
17     Q. Okay. February 20th and February 23rd. So the
18 first dispute that you did was processed February
19 20th, 2023 at 12:10 p.m., right?
20     A. No, that's 2:10. 2:10 p.m.
21     Q. No, it's 12:10 p.m., right?
22     A. 2/20/23, 0210 p.m.
23     Q. You don't see a 12 here?
24     A. That's what's showing there so it could be a
25 time zone. But that's what's on the system, in your

Page 73

1  system.
2      Q. Okay. So the very first dispute that you
3  processed, you were able to see that the code that
4  came in from the CRA is claims true identity fraud,
5  account fraudulently opened, correct?
6      A. Correct.
7      Q. And you had no information available to you
8  that indicated he was not the victim of identity
9  fraud, correct?
10     A. Because there wasn't a FTC that comes in at
11 that time.
12     Q. Right, so the answer is correct, you did not
13 have any information to dispute that Mr. Durham was
14 the victim of fraud concerning this account, correct?
15     A. No, we did not have any information regarding
16 to that. Only the FCRA that is there. And at that
17 time the FCRA is there, then the account would go into
18 tem fraud.
19     Q. And Mr. Durham indicated as it showed in the
20 ACDV that came in on your system that he filed a fraud
21 report with the police report, correct?
22     A. According to the notes there.
23     Q. But you wouldn't stop reporting that because
24 you didn't have a police report, correct?
25     A. Once the information comes in, that's what I

Page 74

1  have to note on the account.
2      Q. I would appreciate because you want to get out
3  of here soon enough I gotta get answers to my
4  questions, and you're telling me other things. So if
5  you could try to answer the question that I'm asking
6  and we'll be able to get out of here quicker, okay?
7      A. I go by what comes on the system and that's
8  what I do. At that time we didn't get a police
9  report.
10     Q. That's not -- that's not what I'm asking you at
11 all. I'm asking you a certain question.
12     A. What's your question?
13     Q. So when you received the ACDV concerning the
14 account telling you that Mr. Durham was disputing, you
15 knew that he was claiming identity fraud, correct?
16     A. According to the information that is on the
17 system.
18     Q. So the answer is yes, right?
19     A. Yes.
20     Q. Okay, thank you. You also knew that he stated
21 he had filed a fraud report with the police
22 department, yes?
23     A. According to information that is on the system,
24 that's what he stated, but he was also told to send in
25 the police report.

Page 75

1      Q. If you're -- here's the problem, if you're
2  gonna go on and state other stuff, I'm gonna have to
3  ask you questions based on those things, and I just
4  learned from you all recently that you want to try to
5  get out of here by 3:30. So I'm gonna ask you some
6  yes-or-no questions. I know the answer to most of
7  these already, but if you're go off and continue to
8  tell me other things it's gonna make this thing
9  longer. So I'm just telling you I'm gonna ask you
10 yes-or-no questions at this point. Okay?
11     A. Okay.
12     Q. So you knew at the time you were processing Mr.
13 Durham's dispute, the first dispute you were handling
14 on February 20th of 2023, that he claimed he was the
15 victim of identity fraud, yes?
16     A. Yes.
17     Q. And that also included that the account was
18 fraudulently opened, right?
19     A. Yes.
20     Q. You knew that Mr. Durham's position was that he
21 had already filed a report with the police department,
22 correct?
23     A. No, I don't know.
24     Q. Well, you know that that was the ACDV that came
25 from the credit bureaus, correct?

Page 76

1      A. On the system where the FCRA stated that it's
2  possible -- it's possibility that he filed fraud on
3  the e-OSCAR system in the 103 code, that's a tem fraud
4  status that he had filed a police report.
5      Q. No, but I'm -- that's not what I'm asking you.
6  The FCRA relevant information box which is the
7  information where a -- the credit bureau is submitting
8  in the ACDV to you and they can type that information
9  out, in that box, it indicated that Mr. Durham was
10 claiming he filed a fraud report with the police
11 department, right?
12     A. Right.
13     Q. Okay. So but the reason you didn't stop
14 reporting that is because NCA requires you to actually
15 have a police report, correct?
16     A. There's no other way we could process the
17 account. That's the only way that it's supposed to
18 process, so yes.
19     Q. Well, that's the way it's supposed to process
20 according to NCA, correct?
21     A. According to the NCA policy.
22     Q. If NCA had a policy that if somebody said they
23 were the victim of identity theft and they had nothing
24 to contradict that, you'd follow the policy that NCA
25 requires, correct?

Page 77

1      A. Once we finish -- once --
2      Q. Ma'am, could I ask you a question?
3      A. Sure.
4      Q. If NCA's policy were that if somebody claimed
5  they were the victim of identity theft or fraud and
6  you had nothing to dispute that, that you were
7  required to delete the account from credit reporting,
8  then you would follow that policy if it existed,
9  right?
10     A. Repeat your question, please.
11     Q. If NCA had a policy that if a consumer stated
12 they were the victim of identity theft or fraud
13 concerning an account, in that scenario NCA would
14 require you to delete the account, you would follow
15 NCA's policy and delete the account, correct?
16     A. Yes, if it's stated to delete, yes, I'll delete
17 it.
18     Q. But in this case, the only way NCA would allow
19 you to cease reporting is if you had an FTC identity
20 theft affidavit or a police report that was provided,
21 correct?
22     A. Yes.
23     Q. You also knew at the time you processed the
24 very first dispute that you processed on February
25 20th, 2023, that Mr. Durham had called multiple times

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 78

1    previously and indicated that he did not open up the
2    account that's the subject of the debt, correct?
3        A. According to the last information that I'm
4    seeing noted on the account.  KAJ.
5        Q. After February -- yeah, your initials are KAJ?
6        A. No.  JAB, that's my initial.
7        Q. Yes, excuse me.  Your initials are JAB, yes?
8        A. Right.
9        Q. What was the next dispute that you processed
10   after February 23rd, 2023?
11       A. The next dispute as in another account?
12       Q. Yeah, did you process any other disputes other
13   than the February 23rd, 2023 dispute for Mr. Durham?
14       A. I'm showing on the note that went on the
15   account again on the 23rd.
16       Q. You processed two disputes on February 23rd,
17   correct?
18       A. No, it's only one dispute, one time I went on
19   the account on the 23rd.
20       Q. Okay.  I thought you just -- that's what I --
21   that's what I'm seeing, but I thought you told me
22   something else.
23       All right, so we have 12:10 p.m., claims true
24   identity fraud, and it also has FCRA relevant
25   information indicating that Mr. Durham says he filed a

Page 79

1    fraud report with the police department, right?
2        A. Correct.
3        Q. But in that case you continued the credit
4    reporting by matching data, correct?
5        A. Once we note the account that -- because 103
6    code is a tem fraud status, there's a possible fraud
7    on the account, then that would stop until the
8    information that comes in to state that it's -- they
9    are actually filing fraud.
10       Q. Yeah, but the credit reporting continues,
11   correct?
12       A. No credit reporting was done on the account.
13   It was marked on the 15th of March -- of February.
14       Q. So you're telling me that on --
15       A. It was -- it was marked, but I also -- it was
16   marked on the 20th that it would be credit reporting
17   on the 20th.  Right?  And also when I went on the
18   account and it is in the tem fraud status, then it
19   would go in the back end and they will take it up from
20   there.
21       Q. The credit reporting still continued when you
22   processed the dispute, correct?
23       I'm not talking about what you did in NCS's
24   internal collection notes, I'm talking about the
25   communication that you submitted back to the credit

Page 80

1    bureaus.  Do you understand?
2        A. Yes.
3        Q. The credit reporting to the bureaus remained
4    the same, correct?
5        A. Yes.
6        Q. So Mr. Durham disputed, and you received the
7    dispute about his credit information, but when you hit
8    submit to your ACDV, you on behalf of NCA
9    communicated that the information was true and
10   accurate, correct?
11       A. The data system that we get issued an accurate,
12   that's what I did on the account, my job description
13   was to verify that the information I received in
14   e-OSCAR is the correct regarding to the data on
15   WinWeb -- WinWeb.
16       Q. And for your purposes verify simply means
17   matching?
18       A. Matching.
19       Q. Not to confirm whether the information is
20   itself true, correct?
21       A. It's just a match to find out that we have the
22   current information on the system --
23       Q. Well, not --
24       A. -- to be reported on -- the current data
25   information on the system.

Page 81

1        Q. Right, here's what I want to clarify.  You had
2    -- you had no way of determining whether the
3    information itself was correct in your system, but
4    regardless of whether that information is correct,
5    your job was to match the information in NCA's
6    collection software to the response to the ACDV, yes?
7        A. Yes.
8        Q. Sorry, I lost a screen here, I'm trying to
9    share it.
10       Can you see my screen?
11       A. Yes.
12       Q. We're looking at what's been marked as NCA 10.
13   Do you see that?
14       A. Yes.
15       Q. This is one of Mr. Durham's disputes which
16   would have come into the system through images,
17   correct?
18       A. Right.
19       Q. And this is something that you would have been
20   required to at least download, correct?
21       A. Yes.
22       Q. Mr. Durham tells you that he's disputing the
23   reporting by NCA because he has no knowledge of the
24   debt and that he did not authorize cashcentral.com or
25   NCA to loan money under his name or Social Security

21 (Pages 78 to 81)

Page 82

1    Number, correct?
2    A. Correct.
3    Q. An that's information that you received through
4    the e-OSCAR system from the credit bureaus, correct?
5    A. Yes, that comes through e-OSCAR.
6    Q. All right. Let me try to streamline this here
7    so that we can get you out. I don't think I'm gonna
8    make 3:30, but I'm gonna do my best to get as close as
9    I can, okay?
10    A. Okay.
11    Q. So to recap here -- do you still have anything
12    on your screen?
13    A. Just the account. Mr. Durham account.
14    Q. Your name is Jenice Besley?
15    A. Yes.
16    Q. You work for National Credit Adjusters, also
17    known as NCA, correct?
18    A. Yes.
19    Q. NCA is a debt collector, right?
20    A. Yes.
21    Q. And you live at -- you live in Montego Bay,
22    Jamaica, correct?
23    A. Yes.
24    Q. You also work in Jamaica, correct?
25    A. Yes.

Page 83

1    Q. So you work in an office that NCA has in
2    Jamaica, takes you about 45 minutes to get to work,
3    right?
4    A. Yes.
5    Q. Your highest level of education is junior high
6    school?
7    A. Yes.
8    Q. Your -- you have achieved certificates in
9    things like food and beverage management and
10    housekeeper management, correct?
11    A. Yes.
12    Q. Also front desk management and nothing else?
13    A. No, nothing else.
14    Q. You've worked for NCA for seven years?
15    A. Yes.
16    Q. Growing up you wanted to be a first grade
17    teacher, yes?
18    A. Yes.
19    Q. You -- your title at NCA is e-OSCAR
20    representative, correct?
21    A. Yes.
22    Q. And as an e-OSCAR representative you're
23    required to take credit disputes of Americans and
24    process those disputes, right?
25    A. To match the information there in processing.

Page 84

1    Q. But you -- you started off with NCA getting
2    paid $3.25 per hour, correct?
3    A. Yes.
4    Q. That was in July -- July 10th of 2017?
5    A. 2017, yes.
6    Q. And at that time you were what NCA calls an
7    account manager, which is another way of saying a debt
8    collector, correct?
9    A. Yes.
10    Q. You worked for a debt collector for a year and
11    a half, as a debt collector for a year and a half,
12    right? Is that right?
13    A. Yes.
14    Q. And at that time you had a target that you were
15    required to meet for how much money you were to
16    collect or how many calls you were to make?
17    A. A goal, that would be money to collect.
18    Q. Per the company, yes?
19    A. Per month.
20    Q. And after your job as a debt collector, you
21    worked as a dialer tech, that's you sending calls to
22    other debt collectors, right?
23    A. Yes.
24    Q. You did that for a year and a half and you were
25    paid 3.50 an hour?

Page 85

1    A. Yes.
2    Q. You were -- then -- then you got a job as an
3    e-OSCAR representative which is your current job,
4    right?
5    A. Right.
6    Q. You started in June of 2020, correct?
7    A. Yes.
8    Q. Your job started off at $4.04 per hour?
9    A. Yes.
10    Q. And it's increased over the last four years or
11    so to 5.25 per hour, correct?
12    A. Yes.
13    Q. You have -- when you first started you had a
14    target number of ACDVs of 10 to 15 per hour that you
15    were required to process, right?
16    A. Yes.
17    Q. That means every hour when you first started
18    you were required to process the credit disputes that
19    were coming in from consumers claiming they didn't owe
20    money or that something was wrong, you had to do at
21    least 10 of those each hour, yes?
22    A. Yes.
23    Q. And now as time's passed, you have to do at
24    least 20 per hour, correct?
25    A. Yes.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 86

1    Q. And that's the same as everybody else at NCA
2  who does your job, right?
3    A. On e-OSCAR, yes.
4    Q. And there's -- there are also other people that
5  do this job that work on the same floor as you, right?
6    A. No. We only have one e-OSCAR department that
7  does this job.
8    Q. Right, but it's not just one employee?
9    A. No.
10   Q. Right. So the hours that you work are 7 a.m.
11 to 3:30 --
12   A. Right.
13   Q. -- because you skip lunch so you can leave
14 early, right?
15   A. Yes.
16   Q. You've had -- you can't tell me any single
17 legal requirement concerning the Fair Debt Collection
18 Practices Act or the Fair Credit Reporting Act,
19 correct?
20   A. I don't remember them.
21   Q. But in processing ACDVs you're required in
22 order to submit an ACDV to certify that you have
23 complied with all legal requirements, correct?
24   A. All the legal requirements, all the information
25 that's on the system, that's all we submit.

Page 87

1    Q. The field that you have to -- when you hit the
2  submit button to process a credit dispute, send
3  information back to the credit bureaus, one of the
4  fields is that you're certifying that the information
5  is true and that you have complied with all applicable
6  laws, right?
7    A. Right, that information that I have on WinWeb
8  is the current information that I have on the e-OSCAR
9  system.
10   Q. NCA requires you to submit that certification,
11 correct?
12   A. Yes.
13   Q. And that's even though you don't know what the
14 legal requirements are, correct?
15   A. As my job description is stated what is on the
16 system, that's what I go ahead and verify it, and the
17 different codes, that's the correct code that I choose
18 to put the account in, and then it will go to the back
19 end and then it will go from there.
20   Q. So NCA tells you that that's what you're
21 supposed to do, but you yourself do not know what's
22 required by law, right?
23   A. Yes, I know that there's law governing it, but
24 what my job description does is to process the account
25 to make sure that I have the current name and Social

Page 88

1  on the account, and once I submit that, put in the
2  current code, then it will go to the different
3  department and they'll take it up from there.
4    Q. It's never been your job to find out whether a
5  person owes a debt, correct?
6    A. Correct.
7    Q. It's never been your job to make a decision
8  about whether a person owes a debt or opened an
9  account, correct?
10   A. Correct.
11   Q. So you've never had to search for any
12 information to determine whether information is true
13 or not because your job has always been simply to
14 match any information that's in NCA's system, correct?
15   A. Right, I don't have to search for anything. I
16 just go by what's on the system.
17   Q. Even though you don't know whether the
18 information in the system is accurate, correct?
19   A. If the Social is different from what we have on
20 WinWeb we'll put different. We don't know anything
21 else about the account.
22   Q. Right, you don't know whether the information
23 that's in NCA's system is accurate and you don't do
24 anything to determine whether the information is
25 actually true, correct?

Page 89

1    A. Correct.
2    Q. You did receive documents when you processed
3  Mr. Durham's dispute including indicating that he had
4  no knowledge of the debt and that he didn't authorize
5  cashcentral.com or NCA to loan money or give his
6  Social Security Number, correct?
7    A. Okay, that's the information that comes in.
8    Q. Yeah, that came in from the credit bureaus,
9  right, through the ACDV?
10   A. That would be on the e-OSCAR system.
11   Q. Right. And you saw that information, yes?
12   A. Right.
13   Q. You also knew that Mr. Durham had called NCA
14 and had conversations with NCA before you processed
15 your dispute, correct?
16   A. The information is there, yes.
17   Q. But you didn't listen to any call recordings
18 because NCA doesn't allow you to, correct?
19   A. Right, I don't listen to calls.
20   Q. So the dispute process is that you have the
21 e-OSCAR system, which is how you communicate with the
22 credit bureaus, and then you also have your collection
23 software called WinDebt, right?
24   A. Right.
25   Q. You open up one of the credit disputes that's

23 (Pages 86 to 89)

Page 90

1  in the queue, the system prepopulates a response, and
2  your job is to match the data, correct?
3      A.  Match the data.  If there's an image, we view
4  the image and see what's on the image, then we note
5  the account.  Then we change the status if the status
6  is to change, and then we submit the account.
7      Q.  If you don't receive an actual police report or
8  identity theft affidavit in a consumer's dispute
9  you're not allowed to delete the account, right?
10     A.  Right.
11     Q.  And all of that has been the exact same since
12 you first started working for NCA, correct?
13     A.  Yes.
14     Q.  So you yourself never actually verified whether
15 the information that's being disputed is itself true,
16 just that you're required to match, right?
17     A.  No, I never verify that.
18     Q.  And you yourself have never conducted any
19 investigation in your job, correct?
20     A.  Correct.
21     Q.  So the -- you process -- you process sometimes
22 up to 250 credit disputes per day.  If there are no
23 system issues you do 200 disputes per day, correct?
24     A.  The first time, yes.
25     Q.  And NCA makes available a yearly bonus to

Page 91

1  e-OSCAR members such as you, correct?
2      A.  Correct.
3      Q.  That yearly bonus is based on the number of
4  ACDVs processed, and according to you knowledge of the
5  account and accuracy, correct?
6      A.  Right.
7      Q.  Knowledge of the account is simply just knowing
8  which codes you're supposed to put in according to the
9  NCA, right?
10     A.  Right.
11     Q.  Accuracy simply means matching the system,
12 correct?
13     A.  Correct.
14     Q.  And the number of ACDVs that you process,
15 that's the other factor that considers how much your
16 bonus is going to be, correct?
17     A.  Those are part of the factors.
18     Q.  And, in fact, as far as knowledge of account
19 and accuracy, you are the same as Miss Brown your
20 colleague, correct?
21     A.  Yes.
22     Q.  Where you differ is in the number of ACDVs you
23 process, right?
24     A.  Right.
25     Q.  You do more than she does consistently, right?

Page 92

1      A.  Right.
2      Q.  And you received a higher bonus than her,
3  correct?
4      A.  I'm not sure what she's getting.
5      Q.  Your bonus has consistently been more than you
6  make in an entire week at least, right?
7      A.  Yes.
8      Q.  The auditing team for NCA is two employees that
9  work with you in Jamaica, but you don't know what that
10 process is like, right?
11     A.  No, I don't know their process.
12     Q.  You've never been disciplined?
13     A.  No.
14     Q.  You've only been promoted, correct?
15     A.  Right.
16     Q.  You don't know why you're testifying in this
17 case, correct?
18     A.  I just know that there's a lawsuit pending
19 against NCA.
20     Q.  NCA operates the same today as it did when you
21 first started working for NCA in processing ACDVs,
22 yes?
23     A.  Yes.
24     Q.  And you process ACDVs the same way today as you
25 did then, when you first started?

Page 93

1      A.  Yes.
2      Q.  If you could go back, you wouldn't do anything
3  differently, correct?
4      A.  Correct.
5      Q.  You treated Mr. Durham the same as you would
6  any other person in the world, correct?
7      A.  I'll treat the account just as any other
8  account comes in the system.
9      Q.  You do your job precisely as your employer
10 requires you to, right?
11     A.  As the job requires, yes.
12     Q.  But if NCA had changed those requirements and
13 made it to where you actually needed to determine
14 whether information was true, you would follow NCA's
15 new policies and procedures, correct?
16     A.  If it's what they required of me.
17     Q.  And if NCA required that if you could not
18 verify information as true and correct and accurate,
19 you would do that, right?
20     A.  If it's what's required of me.
21     Q.  But that's never been required of you, correct?
22     A.  No, correct.
23     Q.  Given that you live and work in Jamaica, you --
24 let me ask you this:  Given the choice, would you be
25 willing to testify in a trial in this case, in the

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 94

1    United States?
2        A.  No.
3        Q.  And you're not a United States citizen so you
4    couldn't yourself come to the United States even if
5    you were required to, correct?
6        A.  Right.
7        Q.  It's 3:38 p.m. Eastern.  I really appreciate
8    your time, ma'am.  I don't have any other questions
9    for you.  Thank you very much and I wish you the best
10   of luck.
11       A.  Thank you, you too.
12          MS. CLAYDON:  Miss Besley, I don't have
13   any follow-up questions.
14          THE WITNESS:  Okay, ma'am.
15          MR. BRACKETT:  I'll ask two questions,
16   they're always the same.  Would you like the
17   opportunity to read and review your transcript?
18          MS. CLAYDON:  I will answer for Miss
19   Besley and say yes, we'd like the opportunity to
20   review.  Thank you.  And we would also like to
21   order a copy electronically.
22          MR. BRACKETT:  Very good.  That was my
23   last question, would you like a copy of your
24   transcript.
25          Thank you for your time, Miss Besley.

Page 95

1          THE WITNESS: You're welcome.  You're
2    welcome.
3        (Deposition concluded at 9:44 a.m. HST)
4           - - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1    I, JENICE BESLEY, hereby certify that I have read the
2    foregoing typewritten pages, 1 through 97, inclusive,
3    and corrections, if any, were noted by me, and the
4    same is now a true and correct transcript of my
5    testimony.
6       DATED:  Honolulu, Hawaii, _____
7
8
9
10   _____
11   JENICE BESLEY
12
13   Signed before me this _____
14   Day of _____, 20____.
15
16   _____
17
18
19
20
21
22
23   Case:  DEMETRE DURHAM vs. NATIONAL CREDIT ADJUSTERS,
     LLC
24   Civil No.:  1:23-CV-00244 LEK-WRP
     Deposition Dated:  September 19, 2024
25   Taken by:  Sheila Moore

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1                       CERTIFICATE

2       I, Sheila Moore, Certified Shorthand Reporter, do
Hereby certify:

3

4       That the foregoing deposition was taken before me
on the date and at the time shorthand and was
thereafter reduced to typewriting; that the foregoing
5 represents, to the best of my ability, a true and
correct transcript of the proceedings had in the
6 foregoing matter.

7       That pursuant to Rule 30(e) of the Hawaii Rules of
Civil Procedure, a request for an opportunity to
8 review and make changes to this transcript:

9       _X_ Was made by the deponent or a party (and/or
their attorney) prior to the completion of the
10 deposition.

11       ___ Was NOT made by the deponent or a party (and/or
their attorney) prior to the completion of the
12 deposition.

13       ___ Was waived.

14       I further certify that I am not an attorney for any
of the parties thereto, nor in any way concerned with
15 the cause.

16       Dated this 8TH day of OCTOBER, 2024, in Honolulu,
Hawaii.

17

18       _____

19       Sheila Moore, CSR No. 501

20

21

22

23

24

25