Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


DEMETRE DURHAM,                    ) CIVIL NO.
                                   ) 1:23-CV-00244 LEK-WRP
                                   )
              Plaintiff,           )
                                   )
         vs.                       )
                                   )
                                   )
NATIONAL CREDIT ADJUSTERS, LLC,)
                                   )
                                   )
              Defendants.          )
_____)


ZOOM DEPOSITION OF
KAVIA BROWN


Taken on behalf of the Plaintiff, DEMETRE DURHAM, Via
Zoom Format, Commencing at 7:00 a.m. HST, on September
18, 2024, pursuant to notice.


BEFORE:
     SHEILA MOORE, RPR, RMR, CMRS, CRR, CSR No. 501

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 2

```
1   APPEARANCES:
2   For Plaintiff, DEMETRE DURHAM:
3       DURAN KELLER, ESQ.
        8 N. 3rd Street, Suite 403
4       Lafayette, IN  47901
        765.444.9202
5       duran@kellerlaw.com
6           And
7       JUSTIN A. BRACKETT, ESQ.
        515 Ward Avenue
8       Honolulu, HI  96814
        808.377.6778
9       justinbrackettlaw@gmail.com
10
11  For the Defendants, NATIONAL CREDIT ADJUSTERS, LLC:
12      KUKUI CLAYDON, ESQ.
        STARN O'TOOLE MARCUS & FISHER
12      Pacific Guardian Center, Makai Tower
13      733 Bishop Street, Suite 1900
        Honolulu, HI  96813
14      808.537.6100
        kclaydon@starnlaw.com
15
16  ALSO PRESENT:
17      Jacob Bach
        Genice Besley
18
                - - - - -
19
20
21
22
23
24
25
```

Page 3

```
1               INDEX
2   EXAMINATION BY:              PAGE
3   MR. KELLER                     4
4
5         INDEX OF MARKED EXHIBITS
6   NO.               PAGE
7   NCA Bates Docs
8
9   ** ALL EXHIBITS MARKED AFTER DEPOSITION CONCLUDED **
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1               KAVIA BROWN,
2   Of lawful age, called for examination, being by me
3   first duly sworn, as hereinafter certified, deposed
4   and said as follows:
5       EXAMINATION OF KAVIA BROWN
6   BY MR. KELLER:
7       Q.  Good -- I'll say good afternoon.  Good morning.
8   How are you?
9       A.  Good morning, I'm okay.  And you?
10      Q.  I'm doing okay, you know.  I appreciate you
11  asking.
12      A.  No problem.
13      Q.  Would you please state your name for us.
14      A.  My name is Kavia Brown.
15      Q.  Would you mind spelling that for us.
16      A.  K-a-v-i-a, B-r-o-w-n.
17      Q.  How would you like me to address you?
18      A.  Miss Brown is fine.
19      Q.  Miss Brown, where do you work?
20      A.  I work at National Credit Adjusters.
21      Q.  What is National Credit Adjusters?
22      A.  National Credit Adjusters is a company.
23      Q.  A debt collection company?
24      A.  A debt collection company.
25      Q.  How long have you worked for National Credit
```

Page 5

```
1   Adjusters?
2       A.  Five years, seven months.
3       Q.  So you knew that right away.  Is there some
4   event that helps you remember, like, was it close to
5   your birthday or, was it an otherwise pivotal time for
6   you?
7       A.  I was checking.
8       Q.  Okay, you checked?
9       A.  Yeah.
10      Q.  What's your email address?
11      A.  Kaviabrown@Yahoo.com.
12      Q.  What year were you born?
13      A.  1999.
14      Q.  Your phone number?
15      A.  876-487-7054.
16      Q.  When you first started working for National
17  Credit Adjusters, what was your title?
18      A.  I was account manager.
19      Q.  What do you do as an account manager?
20      A.  I -- I do calling.
21      Q.  Did you say I do calling?
22      A.  Yes.
23      Q.  Can you tell us what that means for those of us
24  that don't work for a debt collection company?
25      A.  So normally we normally call consumers
```

2 (Pages 2 to 5)

Page 6

1 regarding their debts.
2 Q. By consumers, you mean people who are alleged
3 to owe money, right?
4 A. Right.
5 Q. And by their debts, does NCA presume that the
6 people that are on the call list, that you all attempt
7 to collect money from people who owe the money?
8 A. I don't understand.
9 Q. Sure. You said we normally call consumers
10 regarding their debt.
11 A. Right.
12 Q. Do you know whether each of the people that you
13 would call owe the money?
14 A. No, not all the time.
15 Q. Okay. So when you say their debt, you mean the
16 debt that NCA claims to be owed?
17 A. Right.
18 Q. So when you first started working and your
19 title was account manager, when was that?
20 A. That was 2019, February 4th, to, I think
21 September 9th of 2020. I think. Yeah.
22 Q. Can you describe what all you would do as an
23 account manager, the person who calls consumers?
24 A. So normally when we called we'll ask them
25 questions pertaining to the consumer, then answer if

Page 7

1 it's correct. If it's correct details, then we can go
2 through with the calls regarding to what is on the
3 system.
4 Q. So when you were working -- so the title is
5 account manager, but what you would do is call
6 consumers to try to collect money from them, yeah?
7 A. Right.
8 Q. What hours would you work when you were making
9 phone calls as an account manager?
10 A. When I'm on morning shift it would be 8 to 5.
11 If it's night shift it would be 10 to 8, at that time.
12 Q. Okay. So morning shift was 8 a.m. to 5 p.m.
13 and night shift was 10 p.m. to 8 a.m.?
14 A. No, 10 a.m. to 8 p.m., at that time.
15 A. All right. So the night shift started at 10
16 a.m. --
17 A. 10 a.m., right.
18 Q. -- and ended at 8 p.m.?
19 A. Right.
20 Q. Did you do both morning shifts and night
21 shifts?
22 A. Week on/week off sometimes, yes.
23 Q. And so how many hours would you work per day as
24 an account manager?
25 A. Per day, at that time it was required eight

Page 8

1 hours.
2 Q. You were required to work eight hours each day?
3 A. Yes, when I was an account manager.
4 Q. How many days per week?
5 A. Five days per week.
6 Q. Did you ever have the opportunity for overtime?
7 A. No, not on the phone, but you can put in hours
8 if you like.
9 Q. I'm sorry, you can what?
10 A. You can do hours if you like.
11 Q. You can do overtime hours if you'd like?
12 A. It wouldn't consider overtime.
13 Q. You'd get paid the same thing if you went past
14 40 hours?
15 A. Well, it's based on your decision.
16 Q. Right, but would you get a higher pay if you
17 worked over 40 hours?
18 A. It wasn't considered overtime so, no.
19 Q. And I'm sorry, I'm confused. I understand, and
20 correct me if I'm wrong, sounds like you're saying you
21 could work more than 40 hours if you wanted to, but
22 it's not considered overtime so you'd be paid the same
23 rate; is that correct?
24 A. Right, extra hours, right.
25 Q. Okay. Extra hours, same pay?

Page 9

1 A. Yes.
2 Q. When you -- when you were on the phones as an
3 account manager, did you have any sort of quota goal
4 or target or -- for your job and what you were trying
5 to do?
6 A. We have monthly goals.
7 Q. Monthly goals. What were the monthly goals?
8 A. Well, it depends on the team you're on. At the
9 time I was a starter, so it would be, like, 1,500 if I
10 can recall.
11 Q. 1,500 calls?
12 A. No, the goal.
13 Q. Oh, okay. I'm sorry, the goal was 1,500 what?
14 A. Yes, as a starter.
15 Q. 1,500 as a starter, but 1,500 what?
16 A. $1,500.
17 Q. So 1,500 phone calls?
18 A. No, not phone calls. We have a set goal to
19 meet monthly, so it would be $1,500 per month as a
20 starter.
21 Q. So as a starter --
22 A. Right.
23 Q. -- you need to collect $1,500 per month at
24 least; is that right?
25 A. Depending on the team you're on.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 10

1    Q. And the team you were on was which team?
2    A. I was a starter as I said, so I was out of
3    training on production so that was my goal.
4    Q. Okay.
5    A. As a trainee.
6    Q. You said that was your goal as a trainee?
7    A. Right.
8    Q. Did you stay as a trainee during your entire
9    time, February 4th, 2019, to September 9th, 2020?
10   A. No, after three months then you're fully off
11   you would say probation, so you were considered to be
12   on the floor.
13   Q. And what's the goal then?
14   A. So each time it increases, so it will go up.
15   Q. So after your three-month probationary
16   period --
17   A. Right.
18   Q. -- what's your goal?
19   A. After that I think it would be 1,800, or some
20   times 2,000 I think.  About that.
21   Q. And what's the highest that it got up to?
22   A. I can't recall.
23   Q. Okay.  Did you always meet your goal?
24   A. Not all the time.
25   Q. What are the consequences for not meeting your

Page 11

1    goal?
2    A. Well, the consequences would be once you're
3    over 95 percent then you're considered to stay, but if
4    you're under 95 percent, then you'll get a warning.
5    Q. What happens with a warning?
6    A. So it starts off at verbal, written.
7    Q. And then if you remain under 95 percent the
8    next month, what happens?
9    A. Never been in the position so I don't know, but
10   that's what it was considered as.
11   Q. Do you know of anybody who lost their job
12   because they didn't meet the goals?
13   A. No, I don't.
14   Q. So what did you get paid as someone who's on
15   the team for NCA that calls people to try to collect
16   debt?
17   A. You're asking my salary?
18   Q. Yeah, as of that time.
19   A. As of that time I was getting $3.60.
20   Q. $3.60 per call?
21   A. No, that was my base pay.
22   Q. Okay.  3.60 every hour?
23   A. Yes, an hour.
24   Q. And you'd work 40 hours a week?
25   A. Right.

Page 12

1    Q. What was that team called, the people who are
2    part of the call center?
3    A. Like each individual team?
4    Q. So I understand that they called your title
5    account manager?
6    A. Right.
7    Q. Was every debt collector who called people
8    called an account manager?
9    A. Yes.
10   Q. And would you all have meetings, like, with a
11   boss or someone else to discuss your work?
12   A. The team manager.
13   Q. Okay.  So all of the account managers have a
14   team manager, right?
15   A. Right.  Right.
16   Q. Who was the team manager when you were an
17   account manager?
18   A. Well, I started off with Kiyana Miller.  Then I
19   went off with Prawl, my last team was with Monifa
20   Grey.
21   Q. Would you mind --
22       STENOGRAPHER:  Yes, I couldn't understand.
23       MR. KELLER:  Madam Court Reporter, I'll
24   make sure on the record for those ones we care
25   about, I'll go ahead and get them.

Page 13

1    BY MR. KELLER:
2    Q. Would you try to spell those for us.
3    A. Kiyana Miller, that's K-i-y-a-n-a, M-i-l-l-e-r.
4    Prawl, J-u-n-i-o-r, P-r-a-w-l.  And Monifa,
5    M-o-n-i-f-a, G-r-e-y.
6    Q. Got it.  And those people, do they still work
7    with NCA?  Did they get promoted or did they leave?
8    A. Kiyana got promoted.  She's now a trainer for
9    the institution.  Monifa is still a manager for our
10   team.  Prawl is no longer with us.
11   Q. He's no longer with the company at all?
12   A. No.
13   Q. And Monifa, she's a manager for which team?
14   A. Big league.
15   Q. Big league.  What's big league?
16   A. Well, she has a team of both account managers
17   and inbound collectors.
18   Q. Did you say inbound managers and collectors?
19   A. She have a team of both account managers and
20   inbound collectors.
21   Q. What are inbound collectors?
22   A. Inbound collectors are the ones who receive
23   calls; so consumer calls them.
24   Q. So correct me if I'm wrong, there are inbound
25   collectors and then there are account managers; is

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 14

1  that right?
2      A. Correct.
3      Q. So the account managers call out to consumers,
4  yes?
5      A. Yes.
6      Q. The inbound collectors are the ones receiving
7  calls from consumers?
8      A. Right.
9      Q. Does NCA still have -- does NCA still operate
10 the same concerning the account managers and inbound
11 collectors as when you worked as an account manager?
12     A. No.
13     Q. How's it different?
14     A. Well, I can't go into details because I'm no
15 longer on that side, but there are changes.
16     Q. Okay, what changes do you know of?
17     A. Changes in regarding to goals now are
18 different. That's all I know.
19     Q. The goals are higher?
20     A. I'm not sure if they are higher, but it's
21 different from when I was an account manager.
22     Q. Do you believe that the goals are lower?
23     A. I'm not sure.
24     Q. What makes you say that the goals have changed?
25     A. Because it's no longer doing, like, goals like

Page 15

1  when I was an account manager, it's more like ranking.
2      Q. What's that word? Round King?
3      A. Ranking.
4      Q. Oh, ranking?
5      A. Right.
6      Q. Okay. So now -- now NCA ranks the debt
7  collectors from who's performing the best to the
8  least?
9      A. Yes, we have that.
10     Q. Got it. And based on the ranking, does that
11 determine how people will get paid?
12     A. Yes.
13     Q. So somebody who ranks at the top of collecting
14 the most money will get paid more money than the next
15 person below that person, right?
16     A. Yes, because it would be a higher person.
17     Q. What -- what work did you do for NCA after your
18 work as a debt collector titled account manager?
19     A. E-OSCAR.
20     Q. Can you tell us what e-OSCAR is?
21     A. So we are handle ACDVs pertaining to consumers'
22 complaint.
23     Q. And what -- can you tell me the date that you
24 started working on the e-OSCAR team?
25     A. So my date is September -- yeah, September 9th,

Page 16

1  as I said, to today.
2      Q. September 9th of 2020, until now?
3      A. Yes.
4      Q. What is your title in the e-OSCAR department?
5      A. I'm an e-OSCAR representative.
6      Q. For someone who's not in your field, who
7  doesn't work for a debt collector, can you tell us
8  what an e-OSCAR representative does?
9      A. So an e-OSCAR representative handles consumer's
10 complaint pertaining to a debt.
11     Q. Can you say more?
12     A. Pardon?
13     Q. Can you say more about what you do?
14     A. And also credit reporting. So we handle
15 complaints from consumers about the debt and credit
16 reporting.
17     Q. Can you walk us through what it looks like on
18 an e-OSCAR's representative end who is gonna receive a
19 complaint or dispute from e-OSCAR and process that,
20 tell us what that looks like?
21     A. I'm sorry, I'm not understanding.
22     Q. In your job as an e-OSCAR representative,
23 you're required to process consumer disputes relating
24 to credit reporting, right?
25     A. Right.

Page 17

1      Q. You do that by using a computer, yes?
2      A. Yes.
3      Q. And you use some sort of software or the
4  internet, right?
5      A. Yes.
6      Q. What is the software that you use?
7      A. So we use both an e-OSCAR sheet, and so we
8  transfer information from e-OSCAR on WinWeb and we
9  would -- pertaining to the customer.
10     Q. And I'm sorry, I think I heard you say the
11 software is both e-OSCAR sheet and our email?
12     A. WinWeb.
13     Q. WinWeb.
14     A. Yes.
15     Q. W-i-n-w-e-b?
16     A. Right.
17     Q. Okay. So you all use the online e-OSCAR, which
18 is e, hyphen, capital O, capital S, capital C, capital
19 A, capital R?
20     A. Right.
21     Q. You all use the online e-OSCAR interface in
22 addition to your own collection software which is
23 called WinDebt, yes?
24     A. Yes.
25     Q. At your -- do you work around other people?

5 (Pages 14 to 17)

Page 18

1    A. Yes, I have a team.
2    Q. How many people are part of that team?
3    A. Thirteen.
4    Q. Thirteen people on -- on the ACDV team?
5    A. Yes.
6    Q. When you first started, how many people were on
7    the ACDV team?
8    A. I can't recall.
9    Q. Was it more or less?
10   A. Less.
11   Q. So when you first started on the ACDV team
12   processing consumers' disputes, what were your goals?
13   A. At the time we were required to do 10 to 15 per
14   hour.
15   Q. So 10 to 15 credit disputes that you had to
16   process per hour?
17   A. Right.
18   Q. And so eight hours we're talking -- okay, so
19   we're talking between 80 and 120 per day, right?
20   A. Right.
21   Q. So you had to submit between 80 and 120
22   disputes per day when you first started on the e-OSCAR
23   team?
24   A. Right.
25   Q. Now, what determined whether it was gonna be 80

Page 19

1    or 120?
2    A. Well, it depends, because when we get images it
3    takes us a little bit more time than normal.
4    Q. Okay, so if you got 80 credit disputes in per
5    day, it wouldn't matter that you didn't get 120?
6    A. Yes, it would still matter.  We just do to the
7    best of our ability, try to do more than the day
8    before.
9    Q. But the goal was -- well, so I'm a little
10   confused because the goal was between 80 and 120, but
11   was it at one point 120 and another point 80?
12   A. When you're talking per day.
13   Q. Yeah, you're right, and let me back up because
14   you told me that you have 10 to 15 per hour.  So if
15   one hour you only got nine you could get in trouble
16   for not meeting your goal, right?
17   A. No, not really.
18   Q. So the target wasn't so much per hour as it was
19   per day?  Or was it per hour?
20   A. Well, as I said, like most times when we get
21   images it takes us a little bit more time.  So
22   sometimes the next hour when there's no image we can
23   make up back for the hour before.
24   Q. Well, when you get in credit disputes, do you
25   have different batches, like, on one day is it all

Page 20

1    disputes with no images and then the next day disputes
2    with images?
3    A. No, it's a mixture each day.
4    Q. So what I'm trying figure out is how do you
5    know if your goal is supposed to be 10 per hour or 15
6    per hour?
7    A. Oh, that's what you're asking, per hour.
8    Q. Can you tell us how NCA determines whether your
9    goal will be 10 per hour at that time or 15 per hour?
10   A. Well, it's not a matter of determine, but
11   that's -- that's a goal that is set for us to do.  So
12   we try to meet that goal within our means.  But as I
13   said, sometimes with images, we get images, it takes
14   us a little bit more time to do.  But other time when
15   there's not much images or no images at all we can
16   make up back within that hour.
17   Q. So the requirement that NCA had for the number
18   of disputes to process per hour, which was 10 to 15
19   when you started, that increased after you started,
20   correct?
21   A. Yes.
22   Q. What did it increase to?
23   A. So now it's -- it's approximately 100 and more
24   per day.
25   Q. It's approximately 100 -- I'm sorry, I didn't

Page 21

1    hear --
2    A. 100 and more per day.
3    Q. So 100 or more per day?
4    A. Right.
5    Q. So if it was before -- if before it was between
6    80 and 120, you'd call that to be an increase because
7    now it's at least 100?
8    A. Because as a starter back then I wasn't as
9    fast, but as time goes by I increase.  Sometimes I'm
10   at 200, sometimes I'm at 150, 180.  So it's
11   approximately 100 and more per day.
12   Q. Okay.  Does NCA -- does NCA also use its
13   ranking system in dealing with the e-OSCAR employees?
14   A. No, because we work as a team.
15   Q. How -- what's your salary on the e-OSCAR team?
16   A. Currently it is $4.25.
17   Q. $4.25 per hour?
18   A. Right.  Right.
19   Q. When you first started working on the e-OSCAR
20   team, what was your salary?
21   A. I was at $3.75.
22   Q. How many raises have you got on the e-OSCAR
23   team?
24   A. Two so far.
25   Q. Were those raises from 3.75 to $4, and then $4

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 22

1  to 4.25?
2      A. It was from 3.75 to 4.10, and then 4.10 to
3  4.25.
4      Q. So you got a 35 cent raise and then you got a
5  15 cent raise?
6      A. Right.
7      Q. And when were those raises?
8      A. I can't recall, but the last one was recent
9  since this year.
10      Q. The other people on the ACDV team, are they
11  paid the same as you?
12      A. Yes, it's one rate across the board.
13      Q. But there's a target number of disputes that
14  you have to process each day, yes?
15      A. Yes.
16      Q. And that's the same for everyone on the ACDV
17  team, right?
18      A. Yes.
19      Q. Okay. Who's your boss now?
20      A. For the team?
21      Q. For the ACDV team.
22      A. Currently it's Kelly, but Sherene Waugh is the
23  team lead.
24      Q. Would you spell those for us, please.
25      A. Kelly Dote, K-e-l-l-y, D-o-t-e. Sherene,

Page 23

1  S-h-e-r-e-n-e, Waugh, W-a-u-g-h.
2      Q. And Kelly Dote, I'm sorry, give me her title
3  again.
4      A. She is -- she's the team manager.
5      Q. Team manager for the ACDV team?
6      A. Right.
7      Q. And Sherene Waugh?
8      A. She's a team lead.
9      Q. Team lead. What's the difference between a
10  team manager and a team lead?
11      A. I'm not sure.
12      Q. Do you take directions from both of them?
13      A. Yes, I do.
14      Q. Do you have regular meetings with any of them?
15      A. Yes.
16      Q. And how long have you had regular meetings with
17  them?
18      A. So Kelly is over -- over -- it's not face to
19  face.
20      Q. It's not face to face?
21      A. No, it's over -- where we have -- the teams,
22  that's where we communicate through.
23      Q. Okay.
24      A. But Sherene is face to face. But we all have
25  meetings.

Page 24

1      Q. Sherene works physically with you?
2      A. Right.
3      Q. Okay. Sorry, I don't think I asked earlier,
4  where do you live?
5      A. Lot 881 West Green, Montego Crescent, St.
6  James.
7      Q. Would you spelling that for us.
8      A. So that's L-o-t, 881, M-o-n-t-e-g-o,
9  C-r-e-s-c-e-n-t, W-e-s-t, G-r-e-e-n, St. James, S-t,
10  J-a-m-e-s.
11      Q. And what city is that in?
12      A. It would be country, so it's -- the country is
13  St. James.
14      Q. Got it. St. James for some reason I was
15  thinking --
16      A. Jamaica.
17      Q. St. James, Jamaica?
18      A. Right.
19      Q. Okay. How long have you lived in St. James,
20  Jamaica?
21      A. Five years, seven months.
22      Q. Where'd you live before that?
23      A. Clarendon.
24      Q. Can you spell that?
25      A. C-l-a-r-e-n-d-o-n. Do you need the full

Page 25

1  address?
2      Q. No, I don't need the full address.
3      A. Okay.
4      Q. So these are the addresses where you have
5  lived. Let me ask you this, where do you work?
6      A. Where do I work?
7      Q. The -- do you know the address where you work?
8      A. No.
9      Q. All right. How far is it away from your home?
10      A. Less than ten minutes away.
11      Q. Do you drive?
12      A. No, I don't.
13      Q. How do you get to work?
14      A. Public transportation.
15      Q. I'm curious, is the public transportation there
16  free?
17      A. No.
18      Q. Is it a bus? Subway?
19      A. It's a bus.
20      Q. How much does the bus cost?
21      A. So, well, I should ask if you're asking
22  overall, or just -- because I do take taxi to come to
23  work, but the bus drops me back home. The company
24  provides that.
25      Q. Okay. The company provides you a bus to get to

7 (Pages 22 to 25)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 26

1    work?
2        A.  From.
3        Q.  I'm sorry.  So you have to get to work on your
4    own, right?
5        A.  Public transportation, right.
6        Q.  And NCA provides transportation to take you to
7    home after work?
8        A.  Yes, it's a staff bus.
9        Q.  And the public transportation that you take on
10   the way to work, is that a taxi or a bus?
11       A.  It's a taxi.
12       Q.  How much does that cost?
13       A.  $140.
14       Q.  Per what?
15       A.  Per day.
16       Q.  $140 per day?
17       A.  Yes.  JMD
18       Q.  Got it.  So the denomination is JMD?
19       A.  Yes.
20       Q.  All right.  You're paid in American dollars?
21       A.  Right.
22       Q.  One U.S. dollar is $157.19 JMD, correct?
23       A.  Correct.
24       Q.  Okay.  Have you ever done a deposition before?
25       A.  No.

Page 28

1        A.  Yes.
2        Q.  And you agree to give the most complete and
3    accurate answers as possible for the judge and jury?
4        A.  Yes.
5        Q.  What's your understanding of why you're
6    testifying?
7        A.  Well, I don't have an understanding of this.
8        Q.  How did you learn that you would be testifying?
9        A.  How did I learn?  I don't understand.
10       Q.  How did you learn that you'd be answering
11   questions today?
12       A.  Oh, I got a prep session.
13       Q.  Preparation session?
14       A.  Right.
15       Q.  Who was involved in that preparation session?
16       A.  Jacob Bach and Kelly Dote, Sherene Waugh was on
17   the line.
18       Q.  Sherene was on the line as well?
19       A.  Yes.
20       Q.  Was that done by phone?  In person?  By Teams?
21       A.  Zoom call.
22       Q.  When was that phone call?
23       A.  Monday.
24       Q.  So two days ago?
25       A.  Yes.

Page 27

1        Q.  Okay.  Well, I'll tell you what, and I
2    apologize I forgot to say this at the beginning, if at
3    any point you want to take a break, just let me know,
4    I'll just require you to finish my line of questioning
5    before we take a break.  Fair?
6        A.  Okay.
7        Q.  Will you tell me if you don't understand my
8    question?
9        A.  Yes.
10       Q.  And you've done a good job so far.  Will you
11   tell me if you find my question to be confusing?
12       A.  Yes.
13       Q.  Will you tell me if you don't know the answer
14   to a question?
15       A.  Yes.
16       Q.  Will you need to be reminded to follow these
17   rules?
18       A.  Okay.
19       Q.  Can you tell me the name -- well, let me ask
20   you this:  What is your -- is there any reason that
21   you wouldn't be able to testify truthfully today like
22   you're on medicine or something else?
23       A.  I'm not on anything.
24       Q.  Okay.  So you can give me your complete and
25   accurate answers, right?

Page 29

1        Q.  How long was the phone call?
2        A.  About 30 minutes.
3        Q.  Earlier I thought you said your software was
4    called -- what's the software that you all use called
5    again?
6        A.  We use e-OSCAR and WinWeb.
7        Q.  WinWeb, not WinDebt?
8        A.  Oh, WinDebt.
9        Q.  Okay.  It's actually called WinDebt?
10       A.  WinDebt.
11       Q.  Did you review any documents to prepare for
12   your deposition?
13       A.  What do you mean by documents?
14       Q.  I mean either a physical document, looking at a
15   computer, anything electronic that you could read,
16   pictures.  Anything.
17       A.  I'm sorry, repeat.
18       Q.  Yeah.  Did you look at anything or listen to
19   anything in preparing for your deposition?
20       A.  No, just get some questions, that's it.  Just
21   the questions that was asked.
22       Q.  Okay.  And who is Jacob Bach?
23       A.  I'm not sure who he is, but I got an email --
24   I'm sorry?
25       Q.  I'm sorry to interrupt you.  If I told you that

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 30

1    Jacob Bach is NCA's in-house counsel, does that sound
2    familiar?
3        A. No.
4        Q. Okay. And Kelly Dote, you told us who Kelly
5    Dote is?
6        A. Yes.
7        Q. Okay. So other than Jacob Bach, Kelly Dote,
8    and Sherene, did you have any meeting with anyone else
9    to discuss or prepare for this deposition?
10       A. No, I didn't.
11       Q. Do you know at all what this case is about?
12       A. No, I don't. Just pertaining to the account,
13   nothing else.
14       Q. Okay. So what is your understanding of what's
15   going on here?
16       A. I'm not sure.
17       Q. Do you know that a lawsuit has been filed?
18       A. Yes. Pertaining to the email that I have
19   received.
20       Q. What's your understanding of what that lawsuit
21   is about?
22       A. I'm not sure.
23       Q. Has anybody discussed your work with you about
24   -- let me ask you this -- that was a bad question,
25   I'll ask you a new question, okay?

Page 31

1        A. Okay.
2        Q. Do you know the name of the person who brought
3    the lawsuit against NCA?
4        A. Not by on top of my head right now, but I can
5    go back through my emails and see.
6        Q. Have you gone back through your emails in
7    preparation for this deposition?
8        A. Just the questions that I got yesterday, that's
9    it.
10       Q. Do you know whether the person who filed the
11   lawsuit against NCA is a female or a male?
12       A. I think I could tell by the name, I'm not sure.
13   No, I don't.
14       Q. Okay. It's about five till the hour, why don't
15   we go ahead and take a short-five-minute break and
16   then come back.
17           MR. KELLER: The time is 1:55 p.m.
18       Eastern, and we can go off the record, Madam
19       Court Reporter.
20           (Recess taken.)
21   BY MR. KELLER:
22       Q. The time is 2:03 p.m. Eastern. All the same
23   parties are present for the stenographic/video
24   deposition of Miss Brown.
25           Miss Brown, you understand you're still under

Page 32

1    oath?
2        A. Pardon?
3        Q. Are you ready to continue testifying?
4        A. Yes, I am.
5        Q. All right. Are you aware of -- let me ask you
6    this: What made you start working for NCA?
7        A. When I was recommended by a friend.
8        Q. You were recommended by a friend?
9        A. Yes.
10       Q. Where were you working before you started
11   working for NCA?
12       A. This is my first job.
13       Q. How old were you when you started working for
14   NCA?
15       A. I was 19.
16       Q. What is your highest level of education?
17       A. High school.
18       Q. What did you want to be when you were growing
19   up?
20       A. I wanted to be a nurse.
21       Q. And you chose to go a different route?
22       A. Yes.
23       Q. Do you like what you do?
24       A. Yes, I do.
25       Q. What do you like about it?

Page 33

1        A. It's no pressure.
2        Q. You said it's no pressure?
3        A. Yes.
4        Q. Was it -- was there pressure when you were an
5    account manager that would call consumers?
6        A. Yes, because it was my first job, so it was a
7    little bit challenging.
8        Q. And all you have to do now is process at least
9    the 100 -- 100 disputes per day, right?
10       A. Right.
11       Q. Is that easy for you to do?
12       A. Somewhat, yes.
13       Q. And when was it easy for you to do 100 disputes
14   per day?
15       A. After I think five to six months.
16       Q. The -- you're not aware of any other lawsuits
17   that have been filed against NCA, are you?
18       A. No, I'm not.
19       Q. And the only reason that you learned about this
20   one is because someone told you that you were asked to
21   answer questions?
22       A. Right.
23       Q. Is your pay in any way tied to the number of
24   disputes that you process?
25       A. No.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 34

1    Q. So you get paid hourly, correct?
2    A. Correct.
3    Q. Is there any consequence to not meeting NCA's
4    target of disputes to process?
5    A. I can't recall.
6    Q. As far as you can remember, you've met the
7    target easily?
8    A. Yes.
9    Q. At NCA do you have any opportunity for bonus or
10   other additional pay?
11   A. Yes.
12   Q. What's that?
13   A. Overtime.
14   Q. Under what circumstances can you get overtime?
15   A. If we have good amount of numbers in the queue,
16   yeah, then we consider to get overtime.
17   Q. And by good amount of numbers in the queue, you
18   mean more disputes to process?
19   A. Yes.
20   Q. So if there are a lot of disputes to process,
21   NCA will allow you to have overtime, correct?
22   A. Right.
23   Q. And overtime just means you can work more
24   hours, not that you get more pay, correct?
25   A. No, not correct.

Page 35

1    Q. Oh.
2    A. Overtime --
3    Q. Explain to me how much you get paid in
4    overtime.
5    A. Time and a half.
6    Q. Okay. And I'm sorry, because I thought,
7    correct me if I'm wrong, when I asked earlier I was
8    asking whether you could get more than 40 hours. And
9    would you consider -- when does overtime kick in; when
10   it it's more than?
11   A. Hours worked over 40 hours.
12   Q. Okay, so overtime is more than 40 hours?
13   A. Right.
14   Q. When you go over 40 hours you get paid
15   one-and-a-half times your normal hourly rate, correct?
16   A. Right.
17   Q. Okay. Glad we were able to clear that up.
18   How often do you get overtime?
19   A. Not often.
20   Q. Do you know how many disputes NCA gets per day
21   or per month?
22   A. Well, considered we work with -- when we get
23   our report daily we can see how many numbers are in
24   the queue to work with.
25   Q. How do you receive daily reports? Is that by

Page 36

1    email, or is it handed to you?
2    A. Email.
3    Q. What do those reports show?
4    A. Shows the amount of ACDVs that was done the day
5    before and it shows how many are in each queue.
6    Q. All right. And is it the job of the ACDV team
7    to clear out all of the ACDVs that are in the queue?
8    A. I don't understand.
9    Q. So you all get daily reports, yes?
10   A. Yes.
11   Q. And in those daily reports it says the amount
12   of ACDVs that were processed the day before, right?
13   A. Yes.
14   Q. Those ACDVs that were processed the day before,
15   is it broken down by employee or just the total
16   department?
17   A. By each employee.
18   Q. Are you able to see -- are you able to see how
19   many ACDVs your colleague, somebody who works with
20   you, processed the day before?
21   A. Yes, it's on the report. So the numbers is
22   besides each individual's name.
23   Q. And then in that report it also shows the
24   number of ACDVs that are in the queue which are to be
25   processed, right?

Page 37

1    A. Right.
2    Q. Now, that's not broken down by individual
3    because you don't have a certain number that you have
4    to process, it's just the entire team has to process
5    the disputes in the queue; is that right?
6    A. I'm sorry, I'm not understanding.
7    Q. So let's say you see there are 3,000 disputes
8    in the queue.
9    A. Right.
10   Q. Those 3,000 disputes are not gonna be broken
11   down in any -- it's not gonna be, here, you get these
12   specific disputes, and you get these specific
13   disputes, it's just you start clicking the queue to
14   pull up whatever ACDV is there; is that right?
15   A. Right.
16   Q. Okay. Who were the top performers on NCA's
17   ACDV team?
18   A. Who are -- Karena; Karena Hurd. Patricia.
19   Genice. Shirika.
20   Q. Can you spell Karena Hurd for us?
21   A. K-a-r-e-n-a, H-u-r-d.
22   Q. And Patricia, is that just P-a-t-r-i-c-i-a?
23   A. Yes.
24   Q. Genice?
25   A. Genice, G-e-n-i-c-e.

10 (Pages 34 to 37)

Page 38

1    Q. Shirika, S-h-i-r-i-k-a?
2    A. Yes.
3    Q. And you said the others fluctuate?
4    A. Fluctuate.
5    Q. You're not one of the consistent top
6  performers?
7    A. Not consistent.
8    Q. But you regularly surpass your goal?
9    A. Yes.
10   Q. And you said you do 150, sometimes 200 disputes
11 per day. What's the most ACDVs that you've processed
12 per day?
13   A. 220. 220.
14   Q. 220?
15   A. Yes.
16   Q. How many times have you gotten over 200 in a
17 day?
18   A. I don't know a set number. I don't recall set
19 number.
20   Q. But on average do you get 180? 200? How many
21 ACDVs do you process on average?
22   A. On average 140.
23   Q. The top performers, about how many ACDVs do
24 they process per day?
25   A. 250. Sometimes more. 250.

Page 39

1    Q. Is there any opportunity for you to earn any
2  additional money other than overtime?
3    A. No.
4    Q. Is there any end-of-the-year bonus or any other
5  type of money that you can collect?
6    A. Yes.
7    Q. What's that?
8    A. It's an annual bonus that's AAIP.
9    Q. AAIP?
10   A. Yes.
11   Q. Would you tell us what that stands for?
12   A. I don't remember.
13   Q. Okay. And how much is the annual bonus? Or,
14 I'm sorry, what's the annual bonus based on?
15   A. It's based on the knowledge of the work.
16   Q. Is your -- sorry, you said knowledge of the
17 work?
18   A. Yes.
19   Q. Is the annual bonus the same for every
20 employee, or does it differ?
21   A. It differ.
22   Q. What does the annual bonus that NCA pays depend
23 on?
24   A. It depends on the knowledge of the job.
25   Q. Is knowledge of the job determined on the

Page 40

1  number of ACDVs that you process?
2    A. I don't know.
3    Q. Let me ask you this: The top performers,
4  people like Karena, Patricia, and Genice, do they
5  receive a higher annual bonus than you?
6    A. Yes, they do.
7    Q. Do you know why that is?
8    A. Consistency.
9    Q. Consistency meaning they consistently process
10 more disputes?
11   A. Yes.
12   Q. How much is the annual bonus?
13   A. I don't remember.
14   Q. Okay. Can you give me an approximation?
15   A. Approximation. I think 180 something. I'm not
16 -- I don't remember.
17   Q. So over a hundred and possibly up to $200?
18   A. Yes.
19   Q. And that was your bonus. Your bonus is about
20 $180, right?
21   A. Yes.
22   Q. What was the bonus for the top performers?
23   A. I don't know.
24   Q. You just know that it's higher than what you
25 received?

Page 41

1    A. Yes.
2    Q. The pay information, is that made available to
3  you to see; not just yours, but other people?
4    A. I don't understand.
5    Q. So you know what other people get paid because
6  you all get paid the same and your bosses tell you
7  that, right?
8    A. As in our base pay?
9    Q. Yes.
10   A. Yes.
11   Q. But you also know how much people are getting
12 paid for bonuses because you talk about it in the
13 office?
14   A. Yes. But not the actual money, just the
15 points, the score points; what we score.
16   Q. Okay, so NCA has -- NCA scores you all based on
17 points?
18   A. For the team?
19   Q. Well, when you say score points, you mean each
20 person is scored based on points, right? A point
21 system?
22   A. Well, our team manager.
23   Q. The team manager is the one that scores each
24 employee?
25   A. It's an evaluation.

11 (Pages 38 to 41)

Page 42

1    Q. Okay. So NCA scores employees based on points
2  through an evaluation?
3    A. Right.
4    Q. And what all is taken into consideration in
5  those evaluations?
6    A. Could you repeat?
7    Q. Yeah. There's an evaluation that leads to a
8  point score for each employee, correct?
9    A. Correct.
10    Q. What is the criteria that goes into those
11  points? For example, I assume the biggest criteria is
12  the number of production, the ACDVs you process; is
13  that right?
14    A. Yes.
15    Q. So NCA scores employees based on points, and
16  that is based on the number of ACDVs that employee
17  processes; yes?
18    A. Yes.
19    Q. Anything else?
20    A. How assertive you are, multitasking. Just
21  things about the job.
22    Q. You said how assertive you are?
23    A. Yes.
24    Q. And can you give us an example of what it means
25  to be assertive?

Page 43

1    A. Like, how you would process the account.
2    Q. I'm so sorry, I didn't understand.
3    A. It would be based on, like, timely manner how
4  you would process your account.
5    Q. So how fast you are?
6    A. How fast you are.
7    Q. And multitasking, you mean somebody does
8  multiple jobs for the company?
9    A. No; with the screen.
10    Q. I'm sorry, could you explain that to me, what
11  you mean when you say multitasking?
12    A. Because we use e-OSCAR and we use WinDebt at
13  the same time, so.
14    Q. Okay, so -- so another way of how fast you can
15  use the system?
16    A. Yes.
17    Q. Okay. Anything else?
18    A. Not that I can think of.
19    Q. Let's do this. So what tools do you have
20  available to you to do your job? Like, I'm assuming
21  you have a computer, maybe a mouse; is that right?
22  The internet?
23    A. Yes.
24    Q. What all tools do you have available to do your
25  job?

Page 44

1    A. Just the computer, the mouse, and the keyboard.
2    Q. We may go back to that.
3       You told me your bosses' names and I forgot.
4  Give me those names one more time.
5    A. Kelly Dote and Sherene Waugh.
6    Q. Kelly Dote and Sherene Waugh.
7    A. Yes.
8    Q. Can you tell me where Kelly Dote works? Does
9  she work out of the same office as you?
10    A. No, she works overseas. She's overseas.
11    Q. In what country?
12    A. I don't remember.
13    Q. Is she in the United States based out of
14  Illinois?
15    A. I'm not sure.
16    Q. Okay. And Sherene works in Jamaica with you;
17  is that right?
18    A. Yes. Yes.
19    Q. Let me back up a second. You've worked for NCA
20  for almost six years?
21    A. Almost, yes.
22    Q. NCA is a debt collector, correct?
23    A. Correct.
24    Q. NCA attempts to collect debt from consumers,
25  right?

Page 45

1    A. Right.
2    Q. And it does that through calling consumers,
3  taking phone calls from consumers; is that correct?
4    A. Right.
5    Q. And it also does that through credit reporting,
6  correct?
7    A. Right.
8    Q. And NCA credit reports to Equifax, Experian and
9  TransUnion, correct?
10    A. Yes.
11    Q. Does anyone at NCA review or audit the work of
12  the debt collectors or the people that work on the
13  ACDV team?
14    A. Yes.
15    Q. And who is that?
16    A. The auditing team is Samantha and Donovan.
17    Q. Samantha, and who else?
18    A. Donovan.
19    Q. Donovan. Do you know their last names?
20    A. Donovan Whitaker. I don't remember Samantha's
21  last name.
22    Q. Okay. Donovan, D-o-n-o-v-a-n?
23    A. Yes.
24    Q. And Whitaker, W-h-i-t-a-k-e-r?
25    A. I think that's it.

12 (Pages 42 to 45)

Page 46

1    Q. And how long have they been NCA's auditing
2  team?
3    A. I'm not sure.
4    Q. As long as you've been with the company?
5    A. I don't remember.
6    Q. Okay. At least for the last two years?
7    A. Last two years? I'm sure for at least one, the
8  past year.
9    Q. Okay. So at least since the beginning of 2023,
10  yes?
11    A. 2023? I'm sure for 2024, I'm not sure about --
12  I can't recall about 2023, but 2024.
13    Q. Do you know whether there was anyone else that
14  was a part of NCA's auditing team in 2023?
15    A. I don't remember.
16    Q. Can you tell us what NCA's auditing process is?
17    A. I don't know. That's not a part of my job
18  description, I don't know.
19    Q. Has your work ever been audited?
20    A. Yes.
21    Q. You've never been subject to any discipline or
22  complaints from NCA about your -- about the disputes
23  you process, correct?
24    A. Correct.
25    Q. Do you know if you're scored at all based on

Page 47

1  those audits?
2    A. I don't know.
3    Q. Nobody's ever told you that you -- that you've
4  done a bad job or that you need to improve something,
5  have they?
6    A. With the work?
7    Q. Yeah. I presume that you've never been
8  disciplined or told that you need to improve your work
9  in any way, right?
10    A. No.
11    Q. Let me ask you this -- I heard you say no but
12  let me ask you this way: Have you ever had any
13  meeting with anyone at NCA to discuss your performance
14  other than the volume of disputes you process?
15    A. No.
16    Q. Your work station where you work, what does it
17  look like?
18    A. It's a desk.
19    Q. So you have a desk with a computer?
20    A. Yes.
21    Q. And do you share a desk with anybody else?
22    A. No, we all have individual desks.
23    Q. Okay, so it's not like a call center -- well,
24  let me ask you this: Is your desk right next to the
25  desks of the other people who process ACDVs?

Page 48

1    A. Yes, it's in -- it's in a row.
2    Q. I'm sorry?
3    A. It's in rows.
4    Q. Is it, like, cubicles?
5    A. Cubicles would be considered of blocking each
6  side, but, no.
7    Q. So your desk is not blocked off from the other
8  desks?
9    A. No, it's not.
10    Q. Do you have a phone at your desk?
11    A. No.
12    Q. Have you ever had a phone at your desk?
13    A. No.
14    Q. Any of the people who process credit disputes,
15  have any of them ever had a phone at their desk?
16    A. No. Unless it's with supervisor.
17    Q. Are you able to process those ACDVs yourself
18  without any oversight from anybody else?
19    A. Yes.
20    Q. And that's what you do, right? You process the
21  ACDVs all by yourself, right?
22    A. Yes.
23    Q. And it's the same for the other people on the
24  ACDV team; each individual person processes all of
25  their own disputes all by themselves, right?

Page 49

1    A. Yes.
2    Q. Your work station, is it loud?
3    A. No.
4    Q. It's quiet?
5    A. Yes.
6    Q. Where do the debt collectors work?
7    A. Some are on one section, and we're on one side
8  of the room and they're on the other, opposite
9  direction.
10    Q. And did you used to work on the other side?
11    A. It's a different building.
12    Q. Okay. Where you work is at an office building,
13  correct?
14    A. Yes.
15    Q. How many floors are on the building?
16    A. Two. No, three. We're on the second floor.
17    Q. Is National Credit Adjusters in Jamaica, is
18  that -- do they just have one floor, or do they have
19  all three of the floors of that building?
20    A. Just one.
21    Q. Okay. And that's the second floor?
22    A. Yes.
23    Q. So where you work, do you have -- do you have
24  windows?
25    A. Yes.

Page 50

1    Q. And can you see or hear the debt collectors
2 that are on the other side of the room?
3    A. Not really.
4    Q. So you can't hear them. Can you see them?
5    A. Yes.
6    Q. If you were to stand up and walk to where the
7 debt collectors work, how long would it take you to
8 walk over to them?
9    A. Less than two minutes.
10    Q. Is it separated by a door or a divider?
11    A. It's separated by -- it's a divider.
12    Q. How many people work as a debt collector for
13 NCA in Jamaica?
14    A. I don't know the numbers to be exact. I don't
15 know.
16    Q. Have you ever been worked remote, like worked
17 from home?
18    A. Yes.
19    Q. When did you work remote?
20    A. That was two years ago or a year-and-a-half
21 ago.
22    Q. Did it coincide with the covid-19 pandemic?
23    A. Yes.
24    Q. So that was probably about early 2020, right?
25    A. Yes. Not early, because I came on the team

Page 51

1 September, so it would be, like, October.
2    Q. Okay, so you started with the ACDV team in
3 September of 2020, and you all -- you started working
4 remotely in October of 2020?
5    A. Yes.
6    Q. Did everybody work remotely at that time?
7    A. Yes.
8    Q. How long did you work remotely?
9    A. I think one year.
10    Q. Okay. So from October of 2020, until about
11 October of 2021?
12    A. But that's for me, because I was the last one
13 who came on the team at that time.
14    Q. I'm sorry, so you worked remotely from October
15 of 2020, until about of October of 2021, correct?
16    A. No, not October. I think we came back in
17 office June -- June or July. I'm not sure. June or
18 July.
19    Q. So somewhere in the middle of 2021?
20    A. Yes.
21    Q. And after that, you all were working back in
22 the office in person?
23    A. Yes.
24    Q. So you can see the people who were working in
25 person as a debt collector for NCA, right?

Page 52

1    A. Yes, I can see them.
2    Q. So about how many people are there that work as
3 a debt collector for NCA?
4    A. I'm not sure.
5    Q. Okay. There were more debt collectors than
6 there are on the ACDV team, correct?
7    A. Yes. There are, yes.
8    Q. A lot more?
9    A. Yes.
10    Q. Enough that you can't count them?
11    A. It can be counted, but I'm just not sure of the
12 numbers.
13    Q. Sure, and I don't mean to suggest that you
14 can't count to that number, I just mean that you can
15 see these people each day, but all you can tell by
16 looking at them is that it's a lot, not a specific
17 number, right?
18    A. Right. Right.
19    Q. Can you walk us through how the dispute process
20 works for your company?
21    A. Okay, so depending on the accounts and the
22 status of the account. So would you prefer, like, an
23 image or just a regular account?
24    Q. Why don't we -- we'll start this way, you can
25 correct me if there's anything that's wrong or

Page 53

1 anything that you want to add, okay?
2    A. Okay.
3    Q. You have a computer screen that has e-OSCAR
4 open, correct?
5    A. Yes.
6    Q. On that same computer screen, you also have
7 NCA's collection software WinDebt, correct? On
8 e-OSCAR, you can click the queue to open up a dispute
9 for you to process, right?
10    A. Right.
11    Q. And when you do that, you compare the
12 information that's coming from the ACDV in e-OSCAR to
13 the information that's in NCA's debt collection
14 software, correct?
15    A. Right.
16    Q. And your job is to ensure that the information
17 that's already in NCA's software matches the
18 information that you put in the ACDV, correct?
19    A. Right.
20    Q. So what you're required to do is match data,
21 correct?
22    A. Correct.
23       MS. CLAYDON: For the record, object to
24 this line of questioning since you're testifying,
25 but go ahead.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 54

1    Q. And your job has been -- what you do as an
2    employee on the ACDV team, that's been the same since
3    you've started working on the ACDV team years ago,
4    correct?
5    A. To just match data?
6    Q. Yes.
7    A. Yes.
8    Q. Now, when there's an image, meaning image means
9    there is some sort of dispute letter or other
10   attachment that comes along with the ACDV, right?
11   A. Right.
12   Q. When there's an image, you're required to open
13   up the image in order to check the box that the image
14   was opened. Let me ask you this: It's true that
15   image means there's a dispute letter or supporting
16   documents, right?
17   A. Right.
18   Q. And your software does not allow you to submit
19   the ACDV response without at least clicking to open up
20   the images, correct?
21   A. Right.
22   Q. What is it that you're required to do, if
23   anything, with the images that come in?
24   A. So you're asking like if there's a dispute or
25   any other attached information to the image, what do I

Page 55

1    do?
2    Q. Correct. Well, you say if there's a dispute,
3    but all -- everything that comes in through the
4    e-OSCAR system is a dispute?
5    A. Is a dispute. Or any other information that is
6    attached to the image. So you're asking me how would
7    I process it?
8    Q. Yeah. Is there anything that you're required
9    to do with the images, any dispute letters or any
10   other documents?
11   A. So, if -- if it is attached with an FTC or
12   police report, then I would have to change the status
13   of the account. So FTC is correct to be a fraud. So
14   when it -- once that is verified, then I would
15   disposition it as fraud.
16   Q. You said once that is verified then our
17   disposition is fraud?
18   A. Yes. If it's not in a fraud status already.
19   Q. I'm sorry, if it's not in a fraud what?
20   A. Status.
21   Q. Ah. If it's not already in a fraud status?
22   A. Right.
23   Q. If you receive an FTC or a police report,
24   you're required to put it into a fraud status,
25   correct?

Page 56

1    A. Correct, depending on the status of the
2    account. So work with the status of the account.
3    Q. Well, what do you mean when you say depending
4    on the status of the account?
5    A. Sometimes it's an AFLR we get tem fraud, I
6    fraud.
7    Q. So sorry, I want to make sure that we're all
8    speaking -- using the same terminology. You said
9    sometimes if it's a what?
10   A. AFLR status.
11   Q. AFLR?
12   A. Yes.
13   Q. What is AFLR status?
14   A. That would considered just as an more or less
15   (inaudible) --
16        STENOGRAPHER: I'm sorry, I didn't
17   understand that part.
18        MR. KELLER: Madam Court Reporter, I'll
19   cover it. Thank you.
20   BY MR. KELLER:
21   Q. So an AFLR status is a normal status?
22   A. Yes.
23   Q. What other statuses are there?
24   A. Well, ATBR, ACOL, tem fraud, I fraud.
25   Depending.

Page 57

1    Q. ATBR, what's that?
2    A. I don't remember at the moment.
3    Q. Okay. So nothing specific that you have to do
4    with an ATBR status unless you need to switch it to
5    fraud?
6    A. Yes, or IDSP.
7    Q. Did you say or IDSP?
8    A. Yes, depending on the image.
9    Q. What is IDSP?
10   A. It's a dispute status.
11   Q. Okay, it means that it has been disputed?
12   A. Yes.
13   Q. What is ACOL?
14   A. I don't remember, but depending on the status
15   and the images that's how we disposition the account.
16   Q. Okay, so tem fraud, is that temporary fraud?
17   A. The status, yes.
18   Q. Under what circumstances does NCA place an
19   account into a temporary fraud status?
20   A. So currently we work with the dispute codes of
21   103 and 104. Or there's currently work for FCRAs as
22   well. So if -- go ahead.
23   Q. So when you say codes 103 and 104, those
24   correspond to response codes in the e-OSCAR system,
25   right? That's what those are?

15 (Pages 54 to 57)

Page 58

1    A. Yes.
2    Q. And those are response codes associated with
3    temporary fraud?
4    A. Tem fraud, yes.
5    Q. How long has NCA used temporary fraud codes?
6    A. I'm not sure.
7    Q. Okay. How long has NCA placed accounts in a
8    temporary fraud status?
9    A. I'm not sure.
10    Q. Do you know what circumstances exist such that
11    NCA would place an account in a temporary fraud status
12    as opposed to a permanent fraud status?
13    A. Can you repeat?
14    Q. Yeah. So NCA will sometimes use a temporary
15    fraud status, correct?
16    A. Correct.
17    Q. Why does NCA use a temporary fraud status?
18    A. Why. So as I said we just use the dispute
19    codes of 103 or 104. Sometimes the FCRA, they -- the
20    FCRA we receive as well.
21    Q. Does FCRA stand for Fair Credit Reporting Act?
22    A. Yes.
23    Q. When say the FCRA we will receive, what are you
24    receiving?
25    A. So on e-OSCAR, different from the 103 and 104

Page 59

1    codes, that's something that is on that sheet.
2    Sometimes they will say this is fraud, not mine, or
3    information stolen. So that's when we -- and it can
4    also determine position of the account, so.
5    Q. All right, so I think I understand where we're
6    going. When you receive the ACDV from the e-OSCAR
7    system, there's already a code that is selected,
8    right?
9    Q. Code?
10    Q. So, for example, when you receive an ACDV on
11    e-OSCAR, that document tells you certain information,
12    correct?
13    A. Correct.
14    Q. One of the things that it might tell you to
15    indicate an account might be identity theft is not
16    mine, correct?
17    A. No. It would have to be specific.
18    Q. It would have to be specific --
19    A. Yes, for the FCRA notes we work with if the
20    consumer is saying that this is fraud or identity
21    stolen.
22    Q. So you -- NCA does not allow you to treat a
23    dispute designated as not mine as possible fraud; is
24    that correct?
25    A. Could you repeat?

Page 60

1    Q. Yeah. So when you pull up an ACDV, when you
2    open an ACDV from your queue; you follow me so far?
3    A. Yes.
4    Q. Certain information is in the ACDV, correct?
5    A. Correct.
6    Q. One of them will be a dispute code. It'll
7    say --
8    A. Yes.
9    Q. -- what are the dispute codes, it could be --
10    it could say incorrect balance, or not mine, or verify
11    all information, right?
12    A. Right.
13    Q. And for NCA's purposes, if the dispute code
14    says not mine, NCA does not treat that as possibly
15    being fraud, correct?
16    A. Correct.
17    Q. And that's been the same since you started
18    working on the ACDV team, right?
19    A. Right.
20    Q. So your job in processing ACDVs is unless you
21    see that there is an FTC report or -- excuse me --
22    unless you see an FTC identity theft document or a
23    police report, you're required to match the data
24    that's already in NCA's software back to the ACDV
25    response and submit it, correct?

Page 61

1    MS. CLAYDON: I'm going to object to the
2    question as compound and testifying.
3    You can answer, Miss Brown.
4    Q. You can answer.
5    A. It's not only if it's police report or FTC
6    report. If it's a police report or FTC report, that
7    would consider to be in I fraud status, the images
8    with the dispute that we considered to IDSP status.
9    So depending on the image or depending on the dispute
10    codes or the FCRA that's how we disposition the
11    accounts.
12    Q. When you say disposition the accounts, you mean
13    the ultimate response, right?
14    A. That's how we process it.
15    Q. Right, okay, so when you say disposition you
16    mean processing a dispute?
17    A. Processing the account, yes.
18    Q. Okay. So let me ask you a new question, okay?
19    A. Okay.
20    Q. Your job in processing ACDVs is generally to
21    match the data that's already in NCS's software to the
22    ACDV response, correct?
23    A. Correct.
24    Q. But there are certain exceptions, right?
25    A. Meaning?

16 (Pages 58 to 61)

Page 62

1    Q. Meaning NCS will allow you to process a
2  response differently based on certain things in the
3  ACDV, correct?
4    A. Correct.
5    Q. Those things include a police report, yes?
6    A. Yes.
7    Q. And an FTC identity theft affidavit, correct?
8    A. Correct.
9    Q. Anything else?
10    A. Yes. Regular disputes, FCRA, and the
11  disposition codes.
12    Q. When you say regular disputes --
13    A. I'm sorry.
14    Q. -- what are you referring to?
15    A. As in the images without an FTC or identity
16  theft affidavit or police report.
17    Q. Okay. So receiving certain documents in a
18  regular dispute?
19    A. Correct.
20    Q. What documents if you receive them allows NCA
21  to do anything more than just match data?
22    A. I'm sorry, I don't understand.
23    Q. Okay. So we know that generally you're
24  required to match the data in NCA's software to the
25  ACDV response that you submit, yes?

Page 63

1    A. Yes.
2    Q. But we're talking about exceptions where you're
3  allowed to do something different than just match
4  data, okay?
5    A. Okay.
6    Q. And you've said that you're allowed to do
7  something different if you get a police report or an
8  FTC identity theft affidavit, right?
9    A. Right.
10    Q. Under those circumstances you're allowed to
11  respond by deleting the account from credit reporting,
12  correct?
13    A. Credit reporting?
14    Q. You know that when you process -- you know that
15  the disputes that come in through e-OSCAR are
16  associated with credit reporting, right?
17    A. Right.
18    Q. And when you or any other NCA person that works
19  on the ACDV team, when any of you receive a police
20  report or an FTC identity theft affidavit, you respond
21  a certain way; is that right?
22    A. Right.
23    Q. What is that response?
24    A. So normally we would put -- put it in a fraud
25  status. I fraud. And then we will note delete I

Page 64

1  fraud, put the disposition code that's attached
2  including FTC or whichever documents we got, and
3  that's a notation on -- that would be the notation on
4  WinDebt. And for e-OSCAR we would chose number 7 for
5  our deleting account.
6    Q. Okay. So NCA allows you and anybody else
7  processing consumers' disputes through e-OSCAR if they
8  receive an FTC identity theft affidavit or a police
9  report to enter the account into fraud status on
10  WinDebt and delete the account by using a number 7 on
11  e-OSCAR, yes?
12    A. Yes.
13    Q. And are there any other circumstances that
14  allow an NCA ACDV agent to do anything other than
15  match data?
16    A. Would that include any -- any additional
17  information other than from those that you mentioned
18  and the image as well?
19    Q. I'm asking you that.
20    A. Oh. Yes.
21    Q. What are the circumstances that allow an NCA
22  agent processing e-OSCAR disputes to do anything other
23  than match data in response to an ACDV?
24    A. If the image requires a POA, they will update
25  that as well. Or lawyer letter, they will update as

Page 65

1  well.
2    Q. I'm sorry, I heard you say if the image
3  requires a POA, but I didn't understand the other one.
4    A. Lawyer letter, we will update it as well.
5    Q. Would you spell that, because I'm still not
6  getting that word.
7    A. L-a-w-y-e-r.
8    Q. Ah. A lawyer?
9    A. Yes.
10    Q. Okay. So if NCA receives some document
11  indicating that a lawyer is involved?
12    A. We'll have to update information on WinDebt as
13  well.
14    Q. All right. So we have a POA?
15    A. Power of attorney.
16    Q. We have lawyer involved?
17    A. Right.
18    Q. Any other exceptions?
19    A. The FCAR. The dispute codes.
20    Q. The dispute codes themselves?
21    A. Yes.
22    Q. Anything else?
23    A. The FCRA.
24    Q. What do you mean when you say the FCRA? Oh,
25  you're saying the FCRA relevant information?

17 (Pages 62 to 65)

Page 66

1    A. Yes, that also came up e-OSCAR as well.
2    Q. Okay. So FCRA relevant information refers to
3    the information that's typed up, if any, about that
4    dispute that came in, right?
5    A. The account, yes.
6    Q. So we know that there are dispute codes like
7    not mine, claims true identity theft, right?
8    A. Yes.
9    Q. But other than the dispute codes, sometimes
10   there's information in the FCRA relevant information
11   section, correct?
12   A. Yes, correct.
13   Q. You're allowed to consider that information as
14   well, correct?
15   A. Yes, correct.
16   Q. Under what circumstances would the information
17   in the FCRA relevant information field allow you to do
18   anything different than just match data?
19   A. Based on what is said.
20   Q. Right. What would be said that might allow you
21   to do something other -- let me ask you this: What is
22   contained in the FCRA relevant information section
23   that actually allows you to do anything different than
24   match data?
25   A. So that would require to change the status of

Page 67

1    the account.
2    Q. Okay, so you might be able to change the status
3    of the account; is that right?
4    A. Yes, right.
5    Q. That's in WinDebt, correct?
6    A. Yes.
7    Q. But as far as processing the dispute, you're
8    still simply matching data, right? As far as
9    responding on e-OSCAR?
10   A. Yes. We still have to do all information.
11   Q. Okay. So regardless of whether you do a status
12   update in the collection software, there's nothing
13   other than an FTC identity theft affidavit or a police
14   report that allows you to do anything other than match
15   the data in response to an ACDV, correct?
16   A. No, as I said, lawyer letter as well, and the
17   power of attorney.
18   Q. Okay. So let's break those down.
19   A. Okay.
20   Q. Power of attorney?
21   A. Yes.
22   Q. Lawyer letter?
23   A. Yes.
24   Q. The queue codes, the FCRA relevant information,
25   right?

Page 68

1    A. Right.
2    Q. All right. So if you receive a power of
3    attorney --
4    A. Yes.
5    Q. -- what does NCA allow you to do?
6    A. So I would have to put the information on
7    WinDebt and still do my notation of matching what is
8    on e-OSCAR to WinDebt, and then I would have change if
9    it's in an AFLR status I would have to change the
10   status the status to IDSP.
11   Q. IESB?
12   A. IDSP.
13   Q. Do you know what IDSP stands for?
14   A. No. I don't know what it stands for.
15   Q. Okay. So when you receive the power of
16   attorney, other than matching data, you're required to
17   put the information in WinDebt and change the status
18   to IDSP, correct?
19   A. Correct.
20   Q. But as far as responding on e-OSCAR, you're
21   still just matching data, correct?
22   A. Correct.
23   Q. Lawyer letter. I think you said lawyer or
24   lawyer letter?
25   A. Lawyer letter.

Page 69

1    Q. Okay. So you're allowed to do something --
2    you're required to do something different when you
3    receive a lawyer letter, correct?
4    A. Yes.
5    Q. What are you as an employee on the ACDV team,
6    what are you required to do when you receive a lawyer
7    letter?
8    A. It's similar to the POA process, still have to
9    update the lawyer information, still do the notation,
10   and depending on the status that it's in the account
11   should move to IDSP.
12   Q. Okay. So if you receive a lawyer letter --
13   A. Yes.
14   Q. -- you're required to update the lawyer
15   information in WinDebt, yes?
16   A. Yes.
17   Q. Do a notation to move the status to IDSP,
18   correct?
19   A. Correct.
20   Q. But you are -- but you are still required to
21   match data and that's the response that you submit
22   back to the credit bureaus, right?
23   A. I still have to match information from e-OSCAR
24   to WinDebt.
25   Q. You understand that when you respond on e-OSCAR

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 70

```
 1    that NCA is communicating to the credit bureaus,
 2    correct?
 3        A. Correct.
 4        Q. So as far as the information that's
 5    communicated to the credit bureaus, a lawyer letter
 6    makes no difference, correct?
 7        A. I don't understand what you mean.
 8        Q. When you receive a letter lawyer you put
 9    something -- you change the status in the collection
10    software called WinDebt, right?
11        A. Correct.
12        Q. You update that information on WinDebt?
13        A. Correct.
14        Q. But on e-OSCAR you don't do anything different
15    other than match data, correct?
16        A. Correct.
17        Q. Okay. So it seems like there's a trend here.
18    It seems that under certain circumstances you're
19    required to update the status that you put into
20    WinDebt, but it doesn't change the way that you
21    respond on e-OSCAR, right?
22        A. Right.
23        Q. All right. So we've gone through power of
24    attorney and the lawyer letter. The next thing you
25    said was dispute codes.
```

Page 71

```
 1        A. Right.
 2        Q. Tell us how certain dispute codes might change
 3    the way that you respond on e-OSCAR.
 4        A. So for 037, or 019, I would have to send that
 5    to my team lead to know if I should -- that's
 6    bankruptcy codes, so she would have to check on the
 7    account to see if whatever is to be done. For 103 or
 8    104 codes, that's required tem fraud status, TFRD.
 9        Q. Okay. Any other disputes codes that have you
10    do anything different other than just match data?
11        A. Not that I can recall.
12        Q. Okay. So when you receive the code that's
13    associated with bankruptcy --
14        A. Yes.
15        Q. -- you send it to a teammate who --
16        A. No, team lead.
17        Q. Team lead.
18        A. Yes.
19        Q. You send it to a team lead to decide what's to
20    happen next; is that right?
21        A. Yes, she would check on it.
22        Q. How long -- so do you just close it out on
23    your end and put it in her queue?
24        A. No, I just send her the ID number of the
25    account.
```

Page 72

```
 1        Q. And how long does that take before she gets
 2    back to you?
 3        A. Not long.
 4        Q. Seconds? Minutes?
 5        A. Minutes. If she's not busy.
 6        Q. So do you just keep that dispute up on your
 7    screen until you get a response?
 8        A. No.
 9        Q. You move on to the next one?
10        A. Yes.
11        Q. And then you go back when you get a response?
12        A. Yes.
13        Q. Okay. So when you receive a bankruptcy code
14    you have to get someone else involved, right?
15        A. Yes.
16        Q. When you get a 103 or 104 code, that's when you
17    put it into a temporary fraud status, correct?
18        A. Correct.
19        Q. Where do you put it into a temporary fraud
20    status?
21        A. Where?
22        Q. Yeah. It is in WinDebt?
23        A. Oh, yes, WinDebt.
24        Q. So temporary fraud status goes into NCA's
25    software, but you still, in responding to the ACDV to
```

Page 73

```
 1    the credit bureaus, you're still just matching data,
 2    correct?
 3        A. Correct.
 4        Q. All right. The last thing you said as far as
 5    an exception is FCRA relevant information.
 6        A. Yes.
 7        Q. What is it that you do differently when there's
 8    something in the FCRA relevant information section?
 9        A. It's -- it would be similar to the dispute
10    codes. Depending on what is said, sometimes -- I
11    can't recall all of it, but that's applied under the
12    doctrine of estoppel. That would be like disputes
13    that would be IBC status, had identity stolen, or that
14    would be, like, tem fraud status, depending on the
15    status that the account is in.
16        Q. Okay. But the way that you respond to the
17    credit bureaus through e-OSCAR that's still just
18    matching data, correct?
19        A. Yes.
20        Q. Okay. I've now gone through all of the items
21    that you listed and I want to ask you some questions
22    now that we've gone through your entire list. Okay?
23        A. Okay.
24        STENOGRAPHER: Counsel, before we do that,
25    can we take a little break?
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 74

1      MR. KELLER:  Ma'am, would you like a
2   break?
3      THE WITNESS:  Sure, no problem.
4      MR. KELLER:  How long would you like?
5   Five minutes?
6      THE WITNESS:  Five minutes is okay.
7      MR. KELLER:  All right.  It is 3:15 p.m.
8   Eastern, we will break until 3:20 p.m. Eastern.
9      Thank you.
10         (Recess taken.)
11  BY MR. KELLER:
12   Q.  The time is 3:22 p.m. Eastern.  All the same
13  parties are present for the stenographic/audio visual
14  deposition of Miss Brown.
15      Miss Brown, are you ready to continuing
16  testifying?
17   A.  Yes, I am ready.
18   Q.  So I had asked you under what circumstances
19  you, the person on the ACDV team processing consumer
20  disputes, under what circumstances you're allowed to
21  do anything other than match data that's in NCS's
22  software.  Do you remember that question?
23   A.  Yes.
24   Q.  And you told me that there are certain
25  exceptions which -- which require you to do something

Page 75

1   more than just matching data, correct?
2    A.  Correct.
3    Q.  Those situations were power of attorney, lawyer
4   letter, dispute codes, certain FCRA relevant
5   information, information in that section, and police
6   reports, and FTC identity theft affidavits, correct?
7    A.  Yes.
8    Q.  Is that a yes?
9    A.  Yes.
10   Q.  And of that list, the only items which allow an
11  NCA employee on the ACDV team to respond any
12  differently to the ACDV to the credit bureaus, were
13  the police report and FTC identity theft affidavit,
14  correct?  Everything else was just updating
15  information in WinDebt, right?
16   A.  No.
17   Q.  How's that?  Go ahead.
18   A.  Okay, so as I said, update I do update the
19  lawyer information or the POA information, the
20  consumer -- the consumer's listed the account that is
21  on NCA's system, then that is considered of -- if the
22  consumer is disputing, so the status would change to
23  IDSP depending on the status that the account is in.
24  Like, for example, an AFLR status, I would have to
25  update the information, and once the account is

Page 76

1   listed, I will change -- change it to IDSP status.
2    Q.  But changing the status all occurs through
3   WinDebt, the collection software, correct?
4    A.  Yes.  Yes, correct.
5    Q.  So as far as processing the ACDV, and as far as
6   responding on e-OSCAR, all you do is match data,
7   correct?
8    A.  Correct.
9    Q.  Okay.  So I want to try to make it real clear
10  here, and you correct me if this is wrong.  Your job,
11  like the other people on the ACDV team responding to
12  consumer disputes, your job is to always match
13  whatever data is already in NCA's system in responding
14  to the credit bureaus, unless you receive a police
15  report or an FTC identity theft affidavit, correct?
16   A.  No, not correct.  Or other, as I listed, the
17  POA and the lawyer letter, the consumer sometimes it's
18  not just those.  Sometimes the images just consist of
19  the consumer saying they're disputing the account that
20  we have, the account that's on system.
21      So it's not all the time the images came with
22  those type of information.  Regular image is just
23  disputing.  And depending on the status that the
24  account is in, then we will disposition the account
25  accordingly.

Page 77

1    Q.  When you say depending on the status the
2   account is in, are you talking about the status to the
3   credit bureaus on e-OSCAR, or the status in NCA's
4   collection software?
5    A.  The status in NCA's software collection.
6    Q.  Right, so what I'm asking you about is the
7   information that is communicated to the credit
8   bureaus, okay?
9    A.  Okay.
10   Q.  Do you understand that the information that's
11  communicated to the credit bureaus is only the
12  information that you respond to on e-OSCAR?
13   A.  I'm sorry, could you repeat?
14   Q.  Sure.  Can you tell us how it is that NCA
15  communicates credit information to the credit bureaus?
16   A.  By our notation on the WinDebt.
17   Q.  Does WinDebt integrate with e-OSCAR?
18   A.  When you say integrate, what do you mean?
19   Q.  Let me -- let me try to ask you a different
20  way, okay?
21   A.  Okay.
22   Q.  When you open up a dispute from the queue in
23  e-OSCAR, you see certain things on your screen, right?
24   A.  Yes.
25   Q.  The response that you're supposed to put in, is

Page 78

```
 1    it prepopulated?
 2        A.  Yes.
 3        Q.  So the response that you're supposed to put in
 4    in response to receiving a credit dispute on e-OSCAR,
 5    the system already puts that response in for you,
 6    correct?
 7        A.  Correct.
 8        Q.  And your job is to ensure that the data
 9    matches, right?
10        A.  Right.
11        Q.  And under certain circumstances you may have
12    change the code, correct?
13        A.  Correct.
14        Q.  So I understand that you have to go into the
15    WinDebt software at times to change what's in NCA's
16    system; is that right?  That sometimes you have to go
17    into WinDebt and change information or change the
18    status?
19        A.  Change the status.
20        Q.  Does your changing of the status in WinDebt in
21    any way effect the communication that you give by
22    responding on e-OSCAR?
23        A.  No.
24        Q.  Okay.  So here's what I think is going on and I
25    want you to correct me if I'm wrong.
```

Page 79

```
 1        A.  Okay.
 2        Q.  NCA requires you to submit a response to the
 3    credit bureaus which matches the data in NCA's system
 4    precisely, correct?
 5        A.  Correct.
 6        Q.  And when you change a dispute code, you're only
 7    doing that in the WinDebt system, NCA's collection
 8    software, correct?
 9        Q.  When you say change a dispute code --
10        Q.  You may have called it status.
11        A.  Okay.
12        Q.  Okay.  So change my -- what I said to dispute
13    status.  Does that change the way you respond?
14        A.  Yes.
15        Q.  So the dispute status that you may have to
16    change, is that dispute status in any way communicated
17    through e-OSCAR back to the credit bureaus?
18        A.  No, not through e-OSCAR.
19        Q.  Okay.  So you get that e-OSCAR screen is what
20    is being communicated to the credit bureaus, right?
21        A.  Right.
22        Q.  And you get that NCA's collection software
23    WinDebt is what changes only in NCA's internal system,
24    right?
25        A.  Right.
```

Page 80

```
 1        Q.  So when you change a dispute status it effects
 2    only what people who work for NCA can see in NCA's
 3    collection software, correct?
 4        A.  Correct.
 5        Q.  But it does not effect the information that NCA
 6    communicates to the credit bureaus, correct?
 7        A.  Not quite.  Still depending on the -- still
 8    depending on we have different codes to process the
 9    account.
10        Q.  Okay, but you say process the account and
11    you're referring to both WinDebt and e-OSCAR, right?
12        A.  Right.
13        Q.  I'm simply asking you whether any of your
14    changes to the dispute status are communicated through
15    e-OSCAR?
16        A.  Yes.
17        Q.  What -- how is it that your change to the
18    statuses are communicated through e-OSCAR?
19        A.  Because, for example, if it's -- as I said, FTC
20    or police report, I fraud status, IFRD through e-OSCAR
21    we would chose number 7.  If --
22        Q.  Go ahead.
23        A.  If it's a regular account with no image, just
24    matching the data from e-OSCAR to WinWeb we normally
25    choose number 1.  So depending on if it's an image, or
```

Page 81

```
 1    regular account, or as I said before stuff like that,
 2    they will have different numbers to choose from over
 3    e-OSCAR.
 4        Q.  So you're saying that other than -- other than
 5    getting a police report or an FTC identity theft
 6    affidavit, there are still -- or a bankruptcy code --
 7    other than those items, are there any circumstances
 8    that would change whether you do anything other than
 9    match data to e-OSCAR?
10        A.  Yes, because normally, as I said depending on
11    the status.  So, for example, when we get TBAR,
12    T-B-A-R, that's normally a delete.  So sometimes that
13    refers to choose number 3 over e-OSCAR.
14        So depending on the account we have different
15    codes to choose from on e-OSCAR when processing the
16    account.
17        Q.  Okay.  Some of the information that you're
18    required to match would be the balance amount,
19    correct?
20        A.  No.
21        Q.  You're never required to match the balance?
22        A.  No.
23        Q.  Okay.  Is that because your software already
24    has the information prepopulated?
25        A.  On WinDebt.
```

21 (Pages 78 to 81)

Page 82

1     Q. Right. WinDebt is a software, right?
2     A. Right.
3     Q. So NCA already prepopulates the response for
4  you, right?
5     A. Right.
6     Q. So your job is only to potentially change the
7  status based on what you see, correct?
8     A. Correct.
9     Q. All right, I got it. So let me ask you this:
10  A code 1 in e-OSCAR, what's the purpose of that code?
11     A. That's just a regular account, just to see if
12  names match, address, date of birth is the same.
13  Whether it matches. Just, that would be just a
14  regular account, choose code 1.
15     Q. So code 1 is for demographic information; name,
16  phone number, stuff like that?
17     A. Or disputes.
18     Q. What's code 3?
19     A. Delete.
20     Q. So under what circumstances does NCA allow you
21  to delete an account from credit reporting?
22     A. If FCRA or police report.
23     Q. Nothing else?
24     A. So code 7 is for delete due to fraud. That's
25  for like FCRAs and police report. For code 3

Page 83

1  sometimes the status is represented just delete.
2  That's just for delete purpose.
3        So when we check our credit reporting on our
4  system sometimes the account will say delete entire
5  account. Or an IPOA, status IPOA, that's for a
6  code 3. But code 7 is for delete due to fraud and
7  that's for like the FTC report, police report, or the
8  fraud affidavit.
9     Q. So code 7 which allows you to delete due to
10  fraud --
11     A. Right.
12     Q. -- is only used when you receive an FTC report,
13  a police report, or a fraud affidavit, correct?
14     A. Correct.
15     Q. What if you read a dispute letter from a
16  consumer and it says this is not mine? Under that
17  circumstance, you don't do anything more than match
18  data, correct?
19     A. Pertaining to an image?
20     Q. Well, where else would you see a consumer
21  saying that?
22     A. In the response code.
23     Q. Okay. So regardless, wherever you see it,
24  whether it's in an image or in a response code, you
25  wouldn't be allowed to do anything other than have the

Page 84

1  system match data, correct?
2     A. If it's an image, depending on the status,
3  like, for example, if it's an AFLR, then I would put
4  it to an IDSP status.
5     Q. Remind me what an AFLR is.
6     A. It's -- it's just a regular account that's in
7  collection on the floor, that status.
8     Q. So if there's a regular account that's in
9  collections and you receive an image that says not
10  mine, what is it that you do?
11     A. Move it to IDSP status.
12     Q. What is an IDSP -- that just moves it to the --
13     A. Yes.
14     Q. Correct?
15     A. Right.
16     Q. So all that communicates to the credit bureaus
17  is that it is being disputed, right?
18     A. Right.
19     Q. It doesn't say that it's not owed, right?
20     A. Well, I'm not sure about the information, but
21  that's just what I do.
22     Q. Okay. Remind me what a code 3 is used for.
23     A. 3 is just delete. There's more information,
24  but I can't recall all of it, but it's a delete.
25  Sometimes we have certain statuses that's supposed to

Page 85

1  be deleted. We can just choose that code, code 3.
2     Q. You're allowed to choose a code 3 when the
3  system tells you that you're allowed to delete it?
4     A. Right. When we do our credit reporting on our
5  system sometimes, depending on the status again of the
6  account, sometimes it would say delete entire account.
7  So we choose code 3 for that.
8     Q. Right, so if the system itself, the collection
9  software, tells you to delete the entire account, then
10  you're allowed to delete the entire account, correct?
11     A. Right.
12     Q. But you're not allowed to use code 3 unless the
13  collection software WinDebt tells you to delete an
14  entire account, correct?
15     A. Correct.
16     Q. The information that's in NCA's internal
17  system, the one that matches the data for you; do you
18  know what I'm talking about?
19     A. E-OSCAR.
20     Q. Well, so you have -- e-OSCAR is the online
21  portal that communicates from NCA to the credit
22  bureaus, correct?
23     A. Correct.
24     Q. And WinDebt is NCA's collection software,
25  correct?

Page 86

1    A. Correct.
2    Q. So when you open up -- when you or any other
3    person processing ACDVs opens up an ACDV through
4    e-OSCAR in the queue, the response is prepopulated
5    based on whatever's in NCA's collection software,
6    correct?
7    A. Correct.
8    Q. The information that's in NCA's collection
9    software, do you know where it comes from?
10   A. No, I don't.
11   Q. Do you know whether the information in NCA's
12   collection software is true?
13   A. Well, our job is to work with the information
14   that's in e-OSCAR.
15   Q. Right, your job is to work with the information
16   in NCA's system, and that's regardless of whether you
17   know if the information is correct, right?
18   A. Right.
19   Q. And, in fact, you don't know whether the
20   information in NCA's collection software is correct,
21   right?
22   A. I don't know, right.
23   Q. And that's -- the way that you respond to
24   e-OSCAR in doing your job in processing disputes,
25   that's been the same since you've been on the e-OSCAR

Page 87

1    team, correct?
2    A. Right.
3    Q. I'm sorry, did you say correct?
4    A. Correct. Correct.
5    Q. So your job never has been to determine whether
6    a consumer owes money, correct?
7    A. Correct.
8    Q. Your job has never been to determine whether a
9    consumer is the victim of identity theft, correct?
10   A. Sorry. Could you repeat?
11   Q. Yeah. Your job -- in your job NCA allows you
12   to delete an account or mark it as fraud only under
13   certain circumstances, right?
14   A. Right.
15   Q. And those circumstances are when NCA's
16   collection software tells you that you can delete the
17   account, or when you receive certain documents,
18   correct?
19   A. Correct.
20   Q. And the documents include only an FTC report, a
21   police report, or a fraud affidavit, correct?
22   A. Correct.
23   Q. You yourself, as a person responding to credit
24   disputes from a consumer, you don't know whether the
25   information that you're responding with when you hit

Page 88

1    submit is correct, right?
2    A. Right.
3    Q. You yourself have never verified the truth of
4    any of the information in response to any credit
5    dispute through an ACDV, correct?
6    A. Correct.
7    Q. You have never had any discussion with anyone
8    at NCA about any negative performance unless it's been
9    related to the number of credit disputes you process,
10   correct?
11   A. Correct.
12   Q. And you always average more than your goal,
13   correct?
14   A. Correct.
15   Q. You're aware that NCA has call recordings from
16   when a consumer calls in or when NCA calls a consumer,
17   correct?
18   A. Correct.
19   Q. But in your job processing credit disputes
20   through e-OSCAR, NCS does not allow you to review
21   those call recordings, correct?
22   A. Correct.
23   Q. NCS does not allow you to change the way you
24   respond when submitting a credit dispute to e-OSCAR
25   based on any call recordings, correct?

Page 89

1    A. Correct.
2    Q. If you review an image that is a dispute letter
3    from a consumer, and you yourself believe the consumer
4    does not owe any money or that the consumer does not
5    owe that account at all, you're still -- NCA still
6    doesn't allow you to do anything differently than just
7    have the system match data, correct?
8    A. Right.
9    Q. Had NCA allowed you -- if it allowed you to use
10   your own judgment in responding to the credit bureaus
11   for consumer you would do it, right?
12   A. No.
13   Q. Why not?
14   A. I would just always work with what I see on the
15   screen. Nothing personal.
16   Q. You always record what you see on the screen
17   because that's what NCA requires you to do, correct?
18   A. Right.
19   Q. And NCA is the one that issues your paycheck,
20   correct?
21   A. Correct.
22   Q. But if NCA instructed you to read each dispute
23   and yourself to determine whether you believe someone
24   should owe money or be responsible for an account, you
25   yourself would use your best judgment in following

23 (Pages 86 to 89)

1    NCA's instructions, right?
2        A.  Right.
3        Q.  If you -- if you believed based on reading a
4    dispute letter and everything available to you that an
5    individual was the victim of identity theft, but he
6    didn't have a police report or an identity theft
7    affidavit or an FTC report, you'd still be required to
8    process that dispute solely based on matching data,
9    right?
10       A.  Right.
11       Q.  You wouldn't be able to delete the account?
12       A.  No, you wouldn't be able to delete it, but I
13   could put it in a IDSP status if it's not already in.
14       Q.  And that just allows you to note that the
15   consumer disputes it, right?
16       A.  Change the status depending on the status it is
17   in.
18       Q.  Do you have call recordings available to you in
19   your job?
20       A.  No.
21       Q.  Have you ever asked to review call recordings
22   in your job?
23       A.  No.
24       Q.  You've reviewed thousands of dispute letters,
25   correct?

1    when you receive -- well, tell us what you mean by
2    that, certain accounts under certain statuses.
3        A.  Okay.  So, again, like the AFLR that would be
4    on a regular account.  If it's a TBAR, that would be a
5    deleting status.  IPOA is disposition where I have to
6    fill out two pages and -- accounts like that.
7        Q.  So you've received training on processing
8    codes?
9        A.  Right.
10       Q.  Have you had any training relating to identity
11   theft other than the NCA's requirement that if you
12   receive certain documents you delete?
13       A.  No.
14       Q.  And all of this has been the same since you
15   first started working on the ACDV team, right?
16       A.  No, from time to time there are changes.
17       Q.  What changes have there been?
18       A.  So since recently we have we're actually
19   dealing with the FCRA.  That's one.
20       Q.  Anything else?
21       A.  Not that I can remember.
22       Q.  Okay.  When you say we are actually dealing
23   with the FCRA, what do you mean?
24       A.  The complaints that -- anything that is said,
25   that also determines how to disposition an account.

1        A.  Correct.
2        Q.  And those dispute letters -- through those
3    dispute letters consumers have told you that they
4    didn't owe money, right?
5        A.  Right.
6        Q.  They've told you that they've been the victim
7    of identity theft, right?
8        A.  Right.
9        Q.  But regardless of what they say in those actual
10   dispute letters, NCA requires you to process that
11   dispute by matching data, yes?  Matching the data
12   that's in NCA's system, right?
13       A.  Right.
14       Q.  What sort of -- have you had any training in
15   your job?
16       A.  Yes.
17       Q.  What training have you had?
18       A.  I was trained how to disposition the accounts,
19   what to do when I get certain accounts under certain
20   statuses.
21       Q.  So when you say disposition the accounts, you
22   mean how to process a dispute, right?
23       A.  Right, right.
24       Q.  When you say what to do when receiving certain
25   accounts under certain statuses you mean what to do

1        Q.  Well, okay.  So when you say actually dealing
2    with the FCRA, are you saying actually dealing with
3    the Fair Credit Reporting Act?
4        A.  Yes, the information that is populated.
5        Q.  The what?
6        A.  The information that is populated.
7        Q.  Okay.  How -- when you say since recently
8    you're dealing with -- you're actually dealing with
9    the FCRA, what time period did you start dealing with
10   the FCRA as you say?
11       A.  I don't remember when exactly, but it's early I
12   think this year or sometimes last year.
13       Q.  Okay.  But you said the complaints.  I don't
14   understand what it is that you might actually do
15   differently in dealing with the FCRA.  Can you
16   explain?
17       A.  Okay, so sometimes the FCRA can say like not
18   supply under the doctrine of estoppel.  Some
19   information like that, I don't quite remember
20   everything, but that can require us to, like, change
21   the status.
22           If it's not already in an IDSP status, we are
23   required to change it to IDSP.  Or if it's in like my
24   identity is stolen, if the account is not already in a
25   tem fraud status, TFRD, then we are required to change

Page 94

1  it. So depending on the status, and depending on the
2  information that we got, that's how we disposition the
3  accounts.
4      Q. Okay, so in your time at NCA, NCA has added the
5  way that you process certain items by requiring you to
6  change the status, correct?
7      A. Correct.
8      Q. But that does not change your requirement to
9  match data when you submit an ACDV response, correct?
10     A. Correct.
11     Q. So with respect to when you're allowed to
12  delete an account, whether delete it entirely or
13  delete due to fraud, NCA has always required you to
14  receive one of those documents, an identity theft
15  affidavit or a police report, in order to delete,
16  correct?
17     A. Correct.
18     Q. And that's been the same since you first
19  started working on the ACDV team, right?
20     A. Correct.
21     Q. If a consumer does not have an identity theft
22  affidavit or a police report, the item on their credit
23  will not be deleted, correct?
24     A. Correct.
25     Q. NCA requires the consumer to provide an

Page 95

1  identity theft affidavit or a police report, otherwise
2  the account will remain credit reporting, right?
3      A. Correct.
4      Q. And that's been the same since you started
5  working on the ACDV team in 2020?
6      A. Correct.
7      Q. Do you know what a court order is?
8      A. No, I don't.
9      Q. Do you know what a judgment is?
10     A. Not really.
11     Q. So if you received a document that said
12  judgment or court order, nothing in NCA's policies and
13  procedures would require you to do anything in
14  response to that document, correct?
15     A. I don't know.
16     Q. You've not had any training on what happens in
17  courts, correct?
18     A. Correct.
19     Q. And you've had no training relating to fraud or
20  identity theft other than if you receive one of a
21  designated document you have to use a certain code,
22  right?
23     A. Right.
24     Q. So NCA does not allow you to use a phone in
25  your work in processing disputes, correct?

Page 96

1      A. Correct.
2      Q. NCA does not allow you to use email in
3  processing disputes, correct?
4      A. Correct.
5      Q. You're not allowed to do any research in
6  processing disputes, correct?
7      A. Correct.
8      Q. You're not allowed to call consumers in
9  processing disputes, correct?
10     A. Correct.
11     Q. And all of that has been the same since you've
12  been working on the ACDV team, correct?
13     A. Correct. Correct.
14     Q. So your job is not to actually do any
15  investigation, your job is to match data and look for
16  certain documents, right?
17     A. Right.
18     Q. And you've never done any actual investigation,
19  correct?
20     A. Correct.
21     Q. If you receive a document that you don't
22  understand, is there anything that you're supposed to
23  do?
24     A. Yes, I can ask my team lead to assist me.
25     Q. Is it a common thing for you to get help in

Page 97

1  processing a dispute?
2      A. No. It all depends. If I get an image and I
3  don't understand, then I'll ask for help.
4      Q. Do you know of the legal requirements of the
5  Fair Credit Reporting Act as it relates to your job in
6  processing credit disputes?
7      A. Could you repeat?
8      Q. Yeah. As it pertains to your job in processing
9  credit disputes, do you know any of the legal
10  requirements?
11     A. I'm sorry, I don't understand.
12     Q. Do you know what the Fair Credit Reporting Act
13  is?
14     A. No.
15     Q. Do you know what the Fair Debt Collection
16  Practices Act is?
17     A. No.
18     Q. Now, when you process disputes through e-OSCAR,
19  meaning, when you respond by supplying the credit
20  bureaus with information in response to a dispute; do
21  you follow me so far?
22     A. Yes.
23     Q. The screen that you use to submit a dispute
24  says that you have to certify that the information is
25  true, right?

25  (Pages 94 to 97)

Page 98

1    A. Correct.
2    Q. But you don't know whether the information is
3    true that you submit, right?
4    A. Right.
5    Q. You just know that it's data that's listed
6    somewhere in NCA's system, right?
7    A. Right.
8    Q. And you process -- you hit submit on those
9    disputes even though you don't know if the information
10   is true or correct because that's what NCA requires
11   you to do, right?
12   A. Right.
13   Q. I'll represent to you that the credit disputes
14   in this case took place over a year ago. Did you know
15   that?
16   A. Yes, I saw the date.
17   Q. Where did you see the date?
18   A. I got the email stating when it happened, when
19   I note the account.
20   Q. Do you remember what you did in processing any
21   dispute involved in this case?
22   A. As in how I processed the account?
23   Q. As in do you remember any document that you
24   reviewed? Do you remember what you wanted to
25   consider? Do you remember what you did before hitting

Page 99

1    submit? Any of those things?
2    A. There was no document on the account. As in --
3    Q. And you remember that from over a year ago?
4    A. As in image pertaining to the note, I did not
5    receive an image.
6    Q. How do you know that?
7    A. Because there would be document attached if
8    there's an image.
9    Q. Let me ask you this question.
10   A. Okay.
11   Q. Do you remember what you ate for breakfast in
12   -- on any given day in 2023?
13   A. Okay.
14   Q. Do you remember any specific dispute that you
15   processed over a year ago?
16   A. No, I don't.
17   Q. So how is it that you could tell me whether you
18   -- you couldn't tell me whether you received an image
19   in response to any specific dispute, could you?
20   A. No.
21   Q. When you process a dispute in your job, is
22   there any record or note made anywhere?
23   A. On the system, on WinDebt.
24   Q. The account notes?
25   A. Yes.

Page 100

1    Q. Now, do you go in and type something into the
2    account notes, or does the system itself automatically
3    generate a response?
4    A. Just the system.
5    Q. Okay. Miss Brown --
6    A. Yes.
7    Q. -- what are the hours that you work today?
8    A. Today I work 8 to 5. 8 a.m. to 5 p.m., sorry.
9    Q. What's your understanding of what you
10   accomplish in your job?
11   A. What do you mean?
12   Q. Well, do you understand that consumers are
13   disputing information in their credit?
14   A. Right.
15   Q. And that you're the person that is tasked by
16   NCA, along with your other colleagues that are on the
17   ACDV team, you're the person that's tasked with
18   responding to those disputes?
19   A. Yes.
20   Q. Do you know what effect -- well, do you know
21   whether anyone at NCA has ever been required to
22   conduct an investigation into a consumer's dispute?
23   A. No, I don't.
24   Q. But you and the other people on the ACDV team,
25   that's never been your job, right?

Page 101

1    A. Right.
2    Q. Do you know what credit is used for?
3    A. No, I don't.
4    Q. If you could go back, would you have processed
5    the disputes involved in this case any differently
6    than you did?
7    A. Pertaining to -- pertaining to the notes, no.
8    Q. You wouldn't have done anything differently; is
9    that right?
10   A. Right.
11   Q. You treated -- you treated this person the same
12   as you would have treated anybody else in the world,
13   correct?
14   A. Correct.
15   Q. And your job is to do your job the way that
16   your employer wants you to, right?
17   A. Right.
18   Q. And that's what you did in this case?
19   A. Right.
20   Q. It's 4:10 p.m. Let's go ahead and take a
21   five-minute break.
22           (Recess taken.)
23   BY MR. KELLER:
24   Q. The time is 4:17 time Eastern. We're back on
25   record for stenographic/audio visual deposition of

26 (Pages 98 to 101)

Page 102

1    Miss Brown.
2        Miss Brown, are you ready to continue
3    testifying?
4        A. Yes, I am.
5        Q. NCA relies on you to process credit disputes,
6    right?
7        A. Right.
8        Q. They give you the ability to enter certain
9    information based on your own judgment, right?
10       A. Could you repeat?
11       Q. Yeah. Based on your judgment, what you see,
12   you have certain things, certain things decisions that
13   you're allowed to make in regards to how you process a
14   dispute, right?
15       A. Right.
16       Q. And NCA relies on you to do those things,
17   right?
18       A. Right.
19       Q. That's been the case since you first started
20   working on the ACDV team, right?
21       A. Right.
22       Q. And, in fact, when you process a dispute it's
23   -- there's nobody else for the company that's
24   processing that dispute, just you, right?
25       A. Right.

Page 103

1        Q. I'm gonna try to share my screen here. So I
2    have -- can you see my screen?
3        A. Yes.
4        Q. We're looking at NCA's account notes for
5    Demetre Durham, correct?
6        A. Correct. Okay.
7        Q. This is a document that's marked, you see at
8    the bottom here, NCA 5, correct?
9        A. Correct.
10       Q. And the account notes span from NCA 5 to NCA 8,
11   correct?
12       A. Right.
13       Q. These are -- this document, NCA's account
14   notes, is this document available to you when you are
15   processing disputes?
16       A. Yes.
17       Q. And that's been the same since you started
18   working on the ACDV team, right?
19       A. Yes.
20       Q. What sort of information do you get from NCA's
21   collection notes?
22       A. So this normally -- the same information I'm
23   currently seeing.
24       Q. Okay. Well, so the information that
25   prepopulates your response to an ACDV all comes from

Page 104

1    the same system that keeps the collection notes; is
2    that right?
3        A. Right.
4        Q. So looking at NCA 5 at the bottom, we see that
5    November 30th, 2022, a letter was sent to Mr. Durham,
6    right?
7        A. Right.
8        Q. By the way, this document, the collection
9    notes, this is a document that's kept in WinDebt,
10   correct?
11       A. Correct.
12       Q. And that's a document that you have access to
13   in your computer, correct?
14       A. Right.
15       Q. NCS -- excuse me -- NCA uses this document in
16   order to conduct business like determine whether an
17   amount is owed, whether something is disputed, and to
18   determine whether a consumer has called before and
19   other correspondence, correct?
20       A. Correct.
21       Q. That's all been the same since you first
22   started working for NCA, right?
23       A. Right.
24       Q. And then below we see on NCA 5, the bottom of
25   it, we see that LIVEVOX which is a system that is used

Page 105

1    to make calls to consumers, correct?
2        A. Correct.
3        Q. LIVEVOX made multiple calls to Demetre Durham,
4    right?
5        A. Correct.
6        Q. And we're going now to scrolling on the
7    collection notes and we see more phone calls, right?
8        A. Right.
9        Q. We see February 1st, 2023, the account was
10   reported to the credit bureaus, right?
11       A. Right.
12       Q. And you know based on looking at that that Mr.
13   Durham's account with NCA was reported to Equifax,
14   Experian, and TransUnion, right?
15       A. Right.
16       Q. Then we also see on February 3rd, 2023, that
17   the consumer called, made a phone call to NCA,
18   correct?
19       A. Correct.
20       Q. And on February 3rd, 2023, he claimed fraud,
21   correct?
22       A. Correct.
23       Q. Now, you had available to you that this
24   individual was claiming fraud, but you did not have
25   available to you the call recordings that NCA keeps,

27 (Pages 102 to 105)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 106

1    right?
2    A. Correct.
3    Q. And NCA doesn't allow you to review or consider
4    call recordings in processing credit disputes, right?
5    A. Right.
6    Q. Then February 3rd, 2023, someone moved the
7    account to temporary fraud, correct?
8    A. Correct.
9    Q. Can you tell me what EOD is?
10   A. End of day, but I'm not really sure of anything
11   else.
12   Q. And we know that there was a phone call that
13   was transferred on February 6th, 2023?
14   A. Based on notes, yes.
15   Q. Then February 7th, 2023, after Mr. Durham had
16   already called NCA, a CBR, credit bureau inquiry,
17   comes in to NCA's system, right?  February 7th, 2023,
18   12:52 p.m., right?
19   A. Right.
20   Q. That's -- that tells us that NCA received a
21   dispute from a credit bureau, correct?
22   A. Correct.
23   Q. And the code that was used in that ACDV, which
24   was a code that was not selected by NCA was 001
25   corresponding to not mine, provider confirmed complete

Page 107

1    ID?
2    A. Right.
3    Q. And the NCA relevant information, it says, this
4    account do not belong to me, right?
5    A. Right.
6    Q. Now, putting aside your job for NCA for just a
7    second, do you know what identity theft is?
8    A. No.
9    Q. Do you know what fraud is?
10   A. No.
11   Q. Do you have any idea whether if someone who
12   used a consumer's information, meaning their Social
13   Security Number or other personal identifiers, to open
14   up an account, do you know whether the consumer who
15   did not authorize that transaction, do you know
16   whether that consumer could be responsible for the
17   debt that was incurred?
18   A. I do not know.
19   Q. And you've not had any training on that, right?
20   A. No.
21   Q. Do you know who LKB is?  Who those initials are
22   for?
23   A. Lashawn.  I think it's for Lashawn.
24   Q. Is she one of the top performers?
25   A. Lashawn Blackwell.  She fluctuates.

Page 108

1    Q. So then we also see on February 7th, 2023, at
2    2:49 p.m., that there's another phone call to NCA by
3    the consumer, right?
4    A. Right.
5    Q. Tells us, the consumer stated the account was
6    fraud, and -- and it tells us that the person on the
7    call team for NCA said that he needed to provide a
8    police report, right?
9    A. Right.
10   Q. And that's your understanding of what's
11   required for someone to get an account deleted due to
12   fraud, right?
13   A. Right.
14   Q. On February 7th, 2023, after that phone call
15   from the consumer was transferred, the consumer said
16   that his Social Security Number was compromised,
17   right?
18   A. Right.
19   Q. That he didn't obtain any loan, right?
20   A. Right.
21   Q. He said that someone used his information and
22   Cash Central gave them money and they apparently
23   didn't pay it, right?
24   A. Right.
25   Q. He wanted NCA to remove it from his credit at

Page 109

1    that time, right?
2    A. Right.
3    Q. That second person, the person at NCA who was
4    responding advised that he would need to send a copy
5    of a police report, right?
6    A. Right.
7    Q. And Mr. Durham said that it's NCA's job to --
8    to gather that information, right?
9    A. Right.
10   Q. But that's not consistent with your
11   understanding at your job, right?
12   A. Right.
13   Q. According to the way that you've been trained,
14   it's the consumer's job to prove he or she does not
15   owe a debt or that he or she is the victim of identity
16   theft, correct?
17   A. Correct.
18   Q. It's not anybody at NCA's job to investigate
19   that, right?
20   A. Right.
21   Q. So February 13th, 2023, KBJ, there's another
22   e-OSCAR dispute.  We know that from CBR inquiry being
23   denoted in the notes, right?
24   A. Right.
25   Q. Same not mine, dispute is entered, correct?

28 (Pages 106 to 109)

Page 110

1    A. Correct.
2    Q. And here we don't see any FCRA relevant
3  information, right?
4    A. Right.
5    Q. Do you know who provides the FCRA relevant
6  information?
7    A. No, I don't.
8    Q. And as a result of processing that credit
9  bureau dispute, the account remains credit reporting,
10  right? It was just marked as in dispute status,
11  right?
12    A. Right.
13    Q. So that means that the balance, all the same
14  information was still communicated to the credit
15  bureau, right?
16    A. Right.
17    Q. Even though no one actually verified whether
18  the information was correct, right?
19    A. Right.
20    Q. So then we have February 16th, 2023, another
21  dispute that comes in from the credit bureaus, right?
22    A. Right.
23    Q. Do you know who RMJ is?
24    A. I think that was -- no, it's not. I don't
25  know.

Page 111

1    Q. Okay. Now this time the dispute code is a 103
2  corresponding to claims true identity fraud, account
3  fraudulently opened, right?
4    A. Right.
5    Q. Now, NCA does not do anything to investigate
6  whether this account was the result of fraud or
7  fraudulently opened, correct?
8    A. Right.
9    Q. But NCA still responds with the same data
10  that's in NCA's system for Mr. Durham and responds
11  with that to the credit bureaus, correct?
12    A. I'm sorry, I couldn't -- correct. Sorry.
13    Q. And that's consistent with what NCA requires
14  you to do, which is, allow the system to autogenerate
15  a response unless you get a police report or an
16  identity theft affidavit, right?
17    A. Right.
18    Q. That's all been the same since you started
19  working on the ACDV team, right?
20    A. Right.
21    Q. All right. Then who is JAB?
22    A. Genice.
23    Q. Ah. Okay, so on February 20th, 2023, Genice,
24  one of NCA's top performers, she processes another
25  dispute that comes from the credit bureaus, right?

Page 112

1    A. Right.
2    Q. And this time it's another code 103, claims
3  true identity fraud, account fraudulently opened,
4  correct?
5    A. Correct.
6    Q. And here in the FCRA relevant information it
7  says, file a fraud report with police department, and
8  it provides the number 23049604, correct?
9    A. Right.
10    Q. But in NCA, employee who is on the ACDV team
11  processing this dispute would never be allowed to call
12  the police department, correct?
13    A. Correct.
14    Q. Never be allowed to check what's associated
15  with that number that was provided, correct?
16    A. Correct.
17    Q. In fact, you all have never even had phones in
18  that department, right?
19    A. Correct.
20    Q. There's another dispute that comes in on
21  February 23rd, 2023, and that is another 001 dispute
22  code, correct?
23    A. Correct.
24    Q. This one has documents attached as noted by the
25  system, right?

Page 113

1    A. Right.
2    Q. Can you tell us based on the notes what happens
3  in response to that dispute?
4    A. Could you repeat?
5    Q. Yeah. Can you tell us based on the collection
6  notes what happened to the dispute that was processed
7  on February 23rd 2023?
8    A. So that's attached, is showing that it was
9  moved to dispute.
10    Q. Okay. On February 27th, 2023, there's another
11  inbound call from Demetre Durham to NCA, correct?
12    A. Correct.
13    Q. And according to the notes, which you can see
14  when you're processing a dispute, Mr. Durham said that
15  his Social Security Number got compromised and Cash
16  Central loan -- well, it says loaned the money
17  fraudulently, correct?
18    A. Correct.
19    Q. And the debt collector for NCA told him to send
20  a copy of the report, right?
21    A. Right.
22    Q. He said that he didn't have access to a
23  computer to get the identity theft report done, right?
24    A. Right.
25    Q. But when a consumer tells you they don't have

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 114

1    access or the ability to send something, that doesn't
2    change the way that you process a dispute, right?
3        A. I wouldn't know because I don't take calls,
4    that's not a part of my job description.
5        Q. Do you review the notes from the credit reports
6    when you're processing disputes?
7        A. It depends on the status, and my initial is
8    KBJ, so I would have only been on this account once.
9        Q. Have you seen your initials yet?
10       A. Yes, you have passed it.
11       Q. Excuse me.
12       A. KBJ.
13       Q. Tell me -- tell me where.  What date?
14       A. February 13.  Hold on.
15       Q. I see right here.
16       A. Yes.
17       Q. Okay, so by the time you processed this dispute
18   you were involved in processing a dispute on February
19   13th, 2023, right?
20       A. Right.
21       Q. And your -- that was one of the disputes that
22   said not mine, provider confirmed complete ID, right?
23       A. Right.
24       Q. And other than marking it as disputed, you
25   submitted the same information that was already in

Page 115

1    NCA's system, correct?
2        A. Correct.
3        Q. You communicated that back to the credit
4    bureau, correct?
5        A. Correct.
6        Q. Now, your processing of that dispute comes
7    after information was available to you where the
8    consumer explained that the account is fraud, right?
9        A. Right.
10       Q. And it comes after the consumer had already
11   explained that his Social Security Number was
12   compromised and that he did not obtain the loan,
13   correct?
14       A. Right.
15       Q. But knowing that that information is directly
16   before you processed the dispute, and that's literally
17   the entries right before you processed the dispute,
18   you're not allowed to do anything differently in
19   processing the dispute than you normally would, right?
20       A. Correct.
21       Q. And even though those -- you know that NCA
22   keeps those call recordings you're not allowed to
23   listen to them, right?
24       A. Right.
25       Q. Let's do this.  The dispute that you processed,

Page 116

1    according to the notes, was dated February 13th, 2023,
2    right?
3        A. Right.
4        Q. All right, so we're looking -- can you hear me
5    okay?
6        A. Yes.
7        Q. We are on the document which your employer NCA
8    has provided and marked as NCA 10.  Do you see that
9    document?
10       A. Yes.
11       Q. This is a letter from Demetre Durham to
12   Experian which came in through the e-OSCAR system to
13   NCA, correct?
14       A. Correct.
15       Q. And he explained that he requested the removal
16   of the Cash Central trade line with a specific account
17   number, right?
18       A. Right.
19       Q. And he says that he has no knowledge of this
20   debt, right?
21       A. Right.
22       Q. And he also says that he requests removal of
23   the credit inquiry as, quote, I did not authorize
24   them, cashcentral.com and/or NCA, to loan money under
25   my name or my Social Security Number, right?

Page 117

1        A. Right.
2        Q. So if you review this -- if you had reviewed
3    this document you would know that the consumer is
4    telling NCA that he did not authorize the account
5    which formed the basis of this debt with NCA, right?
6        A. Right.
7        Q. But you're not allowed to investigate whether
8    he opened the account, whether he did not authorize
9    the account, or whether somebody else did it, correct?
10       A. Right.
11       Q. And even if you had determined that he did not
12   authorize the opening of this account, NCA would not
13   allow you to process the dispute any differently than
14   you did, correct?
15       A. Correct.
16       Q. You live and work in Jamaica, correct?
17       A. Correct.
18       Q. So this case is pending in Hawaii.  Is there
19   anything -- would you be able to appear for a trial in
20   this case in Hawaii?
21       A. No.  I don't think so.
22       Q. And there's nothing that we could do or offer
23   such that you would be available to testify in the
24   United States, correct?
25       A. I don't know.

Page 118

1    Q.  Would you be willing to voluntarily come to a
2    trial to testify?
3        Let me ask it another way.  If it were up to
4    you, would you voluntarily testify at a trial in this
5    case?
6    A.  No.
7    Q.  Is there anything that you believe is important
8    for us to know about this case or your work?
9    A.  No.
10   Q.  I'm gonna take a quick four- to five-minute
11   break, and I think I'm either wrapped up or wrapping
12   up with the questions, okay, Miss Brown?
13   A.  Okay.
14   Q.  All right.
15       MR. KELLER:  It's 4:41 p.m., we're taking
16   a break.
17           (Recess taken.)
18   BY MR. KELLER:
19   Q.  It is September 18th, 2024, 4:45 p.m. Eastern.
20   All the same parties are present for the continued
21   audio visual deposition of Miss Brown.
22       Miss Brown, are you ready to continue
23   testifying?
24   A.  Yes.
25   Q.  You -- I don't want to retread old ground --

Page 119

1    okay, you ready?
2    A.  Yes.
3    Q.  Are you at your desk right now where you
4    normally work?
5    A.  No.
6    Q.  Where are you now?
7    A.  In a private room just for this session.
8    Q.  Okay.  Is anybody in the room with you?
9    A.  She was, but she's no longer here.
10   Q.  Who was in the room with you?
11   A.  Genice.
12   Q.  Genice, she's another person --
13   A.  Yes.
14   Q.  Is she another employee on the ACDV team?
15   A.  Yes.
16   Q.  Do you know why she was sitting in on your
17   testimony?
18   A.  We both were required to be here.
19   Q.  Okay.  So you had the ability to modify or
20   delete the account from Mr. Durham's credit; is that
21   right?
22   A.  Right.
23   Q.  But you did not do so, right?
24   Q.  Pertaining to the notes?
25   Q.  Well, you didn't do so period, right?

Page 120

1    A.  Pertaining to the notes, no.
2    Q.  Your initials as shown on NCA's collection
3    notes are KBJ; is that right?
4    A.  Yes.
5    Q.  I appreciate your time.  Noting the time I
6    don't think I have anything further.  Thank you so
7    much?
8    A.  Okay, thank you very much.
9        MR. KELLER:  I'll pass the witness to Ms.
10   Claydon.
11       MS. CLAYDON:  Thank you for your time
12   today, Miss Brown.  I have no questions for you.
13       THE WITNESS:  Okay, thank you.
14       MR. KELLER:  It is 4:47 p.m. Eastern and
15   we've concluded the deposition of --
16       MR. BRACKETT:  There are two questions
17   unfortunately that we have to ask in Hawaii.
18       Miss Brown, would you like the opportunity
19   to read and review your deposition transcript?
20       MS. CLAYDON:  Miss Brown, I will respond
21   on behalf of you for this one and say yes we
22   would like the opportunity to review.
23       MR. BRACKETT:  And the last question would
24   be would you like a copy of the transcript?
25       MS. CLAYDON:  We would like a copy of the

Page 121

1    transcript, thank you.
2        MR. KELLER:  I was gonna get that next.
3        MR. BRACKETT:  Sorry about that.  Didn't
4    mean to steal your glory.
5        MR. KELLER:  We appreciate you making sure
6    it's getting done.
7        And, Madam Court Reporter, I think we're
8    ready to go off, and then Mr. Brackett can make
9    his request as well.
10       Miss Brown, I really appreciate it,
11   pleasure to meet you today, and thank you for
12   spending so much time.  I'm hoping tomorrow -- it
13   should be a lot quicker because of your work, so
14   thank you.
15       THE WITNESS:  Okay, thank you.
16       STENOGRAPHER:  So for the record, if I
17   could have counsel state, I mean, I know Kukui, I
18   just want to make sure you are purchasing, and
19   what format would you like?  If counsel could go
20   ahead and repeat.
21       MS. CLAYDON:  Electronic is fine for me.
22       MR. BRACKETT:  Yeah, electronic --
23       MS. CLAYDON:  I'll put my email, sorry, in
24   the chat box so you have it.
25       STENOGRAPHER:  Go ahead, Justin.

31 (Pages 118 to 121)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 122

1          MR. BRACKETT:  Yeah, electronic's fine.
2          MR. KELLER:  And for Mr. Brackett, let's
3    make sure that includes the ASCII and then
4    obviously the copy of the video.
5          MR. BRACKETT:  Duran, do you want text,
6    txt?
7          MR. KELLER:  Oh, yeah, that's what ASCII
8    is, it's just a txt file.
9     (Deposition concluded at 10:54 a.m. HST)
10          - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1    I, KAVIA BROWN, hereby certify that I have read the
2    foregoing typewritten pages, 1 through 124, inclusive,
3    and corrections, if any, were noted by me, and the
4    same is now a true and correct transcript of my
5    testimony.
6      DATED:  Honolulu, Hawaii, _____
7
8
9
10    _____
11      KAVIA BROWN
12
13    Signed before me this _____
14    Day of _____, 20___.
15
16    _____
17
18
19
20
21
22
23    Case:  DEMETRE DURHAM vs. NATIONAL CREDIT ADJUSTERS,
      LLC
24    Civil No.:  1:23-CV-00244 LEK-WRP
      Deposition Dated:  September 18, 2024
25    Taken by:  Sheila Moore

32 (Pages 122 to 123)

CERTIFICATE

I, Sheila Moore, Certified Shorthand Reporter, do Hereby certify:

That the foregoing deposition was taken before me on the date and at the time shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript:

_X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

___ Was NOT made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

___ Was waived.

I further certify that I am not an attorney for any of the parties thereto, nor in any way concerned with the cause.

Dated this 8TH day of OCTOBER, 2024, in Honolulu, Hawaii.

_____
Sheila Moore, CSR No. 501