IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


```
----------------------------- )
                              )
DEMETRE DURHAM,               ) CIVIL NO.
                              ) 1:23-CV-00244 LEK-WRP
          Plaintiff,          )
                              )
          vs.                 )
                              )
NATIONAL CREDIT ADJUSTERS,    )
LLC.,                         )
                              )
          Defendant.          )
                              )
----------------------------- )
```

DEPOSITION OF IVAN JONES,

Taken on behalf of Plaintiff, via Zoom, commencing at

9:02 a.m., Hawaii Standard Time, on May 14, 2024,

pursuant to Notice.


REPORTED BY:

    TERRI R. HANSON, CSR NO. 482

    Registered Professional Reporter

Page 2

1           APPEARANCES
2
3   For Plaintiff, Demetre Durham:
4       JUSTIN A. BRACKETT, ESQ.
        515 Ward Avenue
5       Honolulu, Hawaii 96814
        justinbrackettlaw@gmail.com
6
7   For Defendant, National Credit Adjusters, LLC.:
8       KUKUI CLAYDON, ESQ.
        Starn O'Toole Marcus & Fisher
9       Pacific Guardian Center
        Makai Tower, Suite 1900
10      733 Bishop Street
        Honolulu, Hawaii 96813
11      kclaydon@starnlaw.com
12
    Also Present:
13  Jacob Bach, Esq., national counsel for National Credit
    Adjusters, LLC.
14
    Zoom hosted by:
15  Ralph Rosenberg Court Reporters
16
17
18
19
20
21
22
23
24
25

Page 3

1               I N D E X
2   EXAMINATION BY                    PAGE
3     Mr. Brackett               5
4
5       EXHIBITS FOR IDENTIFICATION
6   Deposition Exhibit No. 1
    Notice of Taking Deposition.         11
7
    Deposition Exhibit No. 2
8   Experian, Feb 13, 2023.              94
9   Deposition Exhibit No. 3
    Experian, Mar 28, 2023.              98
10
    Deposition Exhibit No. 4
11  Experian, Apr 05, 2023.             100
12  Deposition Exhibit No. 5
    Account Demographics & Notes, 06/09/2023.    105
13
14  Deposition Exhibit No. 6
    Debtor documents.                   121
15  Deposition Exhibit No. 7
    Transcript.                         124
16
17
18
19
20
21
22
23
24
25

Page 4

1           WHEREUPON, the following proceedings were duly
2   had:
3           IVAN JONES,
4       after having been first duly sworn,
5   was examined and testified as follows:
6
7           MR. BRACKETT:  All right.  Good morning.
8   My name is Justin Brackett.  I'm the attorney for the
9   plaintiff, Demetre Durham.  This is the deposition of
10  Ivan Jones, an employee of defendant, National Credit
11  Adjusters, LLC.  It's in the matter of Demetre Durham
12  versus National Credit Adjusters, LLC, a case bearing
13  court file No. 1:23-CV-00244 LEK-WRP, before the U.S.
14  District Court for the District of Hawaii.
15          The deposition is taking place via Zoom on
16  May 14, 2024, with the questioner located at 515 Ward
17  Avenue, Honolulu, Hawaii.  That's where I'm at.
18          The court reporter will videotape and
19  stenographically be recording these proceedings at all
20  times unless otherwise specified.
21          As a preliminary matter, we wish to eliminate
22  interruptions.  I'm insisting on strict enforcement of
23  Rule 30(c)2 of the Civil Rules of Procedures as to no
24  speaking objections be lodged.  And in the event that an
25  objection could be interpreted as suggestive, that the

Page 5

1   deponent be asked to leave the room before the objection
2   is stated.
3           Moreover, I request that the deponent only be
4   instructed not to answer when necessary to preserve a
5   privilege, to enforce a limitation ordered by the court,
6   or to present a motion to terminate or limit pursuant to
7   Rule 30(d)3.
8           The defendant, National Credit Adjusters, LLC,
9   may be referred to as NCA throughout this deposition.
10          Now, would all present please identify
11  themselves for the record beginning with the witness.
12          THE WITNESS:  Ivan Jones.
13          MS. CLAYDON:  Kukui Claydon for National
14  Credit Adjusters.  With me is Jacob Bach, national
15  counsel for National Credit Adjuster, just here to
16  observe.
17          MR. BRACKETT:  And, of course, Terri Hanson
18  is the court reporter.
19          Ms. Hanson, what is your email address?
20          THE COURT REPORTER:  It's
21  terrihanson59@gmail.com.
22
23          EXAMINATION
24  BY MR. BRACKETT:
25      Q.  Before me went on the record, Mr. Jones, you

2 (Pages 2 to 5)

Page 6

1  had stated your address as 2400 North Arizona Avenue
2  there in Chandler, Arizona?
3      A. Correct, Apartment 1042.
4      Q. Thank you for that. All right. So where are
5  you located now, Mr. Jones?
6      A. Same address.
7      Q. So you're Zooming in from home today?
8      A. Oh, no, I'm at work.
9      Q. Okay. And where do you work?
10     A. National Credit Adjusters.
11     Q. And where is the location of the National
12 Credit Adjusters that you're located at now?
13     A. 555 West Chandler Boulevard, Chandler, Arizona.
14     Q. Have you ever given a deposition before?
15     A. No, sir.
16     Q. Have you ever testified in court?
17     A. No, sir.
18     Q. What is your job title at NCA?
19     A. Account manager.
20     Q. And what are some of your job responsibilities
21 there at NCA?
22     A. Just collect all delinquent accounts.
23     Q. Anything else?
24     A. No, sir.
25     Q. Did you prepare for today's deposition?

Page 7

1      A. I'm not understanding the question.
2      Q. Sure.
3      A. No, I didn't prepare.
4      Q. Okay. Did you review any documents in
5  preparation for today?
6      A. Yes, yes.
7      Q. And what documents did you review?
8      A. I just reviewed the recording of the call.
9      Q. And that would be the call between you and Mr.
10 Durham?
11     A. Correct.
12     Q. Did you speak with anyone in preparation for
13 today's deposition?
14     A. Yes.
15     Q. Okay. Who did you speak with?
16     A. I'm not -- I forgot his name. I spoke to him
17 yesterday.
18     Q. Was it Jacob Bach?
19     A. I think so, yes.
20     Q. Anyone else?
21     A. No, sir.
22     Q. Of course, today we're gonna go through --
23 well, I guess one more question on that. How long did
24 you speak with Mr. Bach yesterday?
25     A. Just previously, about five minutes.

Page 8

1      Q. And have you ever went by any other name?
2      A. No, sir.
3      Q. Do you use any other names while working at
4  NCA?
5      A. No, sir.
6      Q. Do you have an employee number at NCA?
7      A. Yes, sir.
8      Q. What is that?
9      A. CP208.
10     Q. That's C as in Charlie, P as in Paul?
11     A. Paul.
12     Q. And then 208?
13     A. Correct.
14     Q. And in regards to the deposition today, I'll be
15 asking you a series of questions. You're doing
16 fantastic. I will lay out a couple of the ground rules.
17     Every time you respond, I request that you
18 respond verbally. If you nod your head, I'm not gonna
19 catch that.
20     A. Okay.
21     Q. It's not gonna catch that on her typing.
22 Uh-huhs and un-uns unfortunately won't work. So yes or
23 no is way more clear.
24     And if you don't understand a question today,
25 if it ever is a situation; and you've already done this;

Page 9

1  where you don't understand the question, always feel
2  free to ask. You know, I want to make sure that you
3  understand what I'm asking so that you can make a clear
4  statement of the record and, you know, tell us exactly
5  what happened.
6      A. Yes, yes.
7      Q. We will be taking breaks. I don't anticipate
8  that today is gonna take too long. But if it goes over
9  an hour or goes into a second or third hour, I will take
10 a break at the top of every hour or five minutes.
11 Hopefully that helps you out because now you know, hey,
12 if I need to go get a drink or use the restroom or
13 anything, it's gonna happen in five minutes.
14     A. All right.
15     Q. But at the same time, I understand that we're
16 all prisoners in your bodies, and sometimes are bodies
17 have other thoughts in mind more than our mind does,
18 maybe you need to go to the restroom or get some water
19 or something like that a little more urgently, and
20 that's fine. If you really need to take a break, just
21 let me know.
22     A. Okay.
23     Q. And at that time, what will happen is, if I
24 have a series of questions that I'm on, I would ask that
25 we finish that series of questions and then take the

3 (Pages 6 to 9)

Page 10

```
 1    break.  Does that sound fair?
 2        A.  Yes, sir.
 3        Q.  Okay.  And so as far as today is concerned, do
 4    you have any questions about this deposition and what
 5    you're doing?
 6        A.  No, sir.
 7        Q.  Okay.  Very good.  If you come up with any
 8    throughout, please let me know.
 9        Are you currently on any medications or drugs
10    or anything that would inhibit your ability to testify
11    truthfully today?
12        A.  No, sir.
13        Q.  And moving on, you said that you had reviewed
14    the audio recording of your call with Mr. Durham.
15        Did you review any other documents or any other
16    paperwork or anything else in preparation for today?
17        A.  No, sir.
18        Q.  And did you get a copy of the notice of
19    deposition before appearing at this deposition today?
20        A.  No, sir.
21        Q.  So I'm gonna try to share my screen now.
22    There's an a notice of deposition that was transmitted
23    over to your attorneys.  I'll open it up we'll quick.
24        MR. BRACKETT:  Okay.  So, Madam Court
25    Reporter, I request that you mark this notice of taking
```

Page 11

```
 1    deposition of Ivan Jones by stenographer and/or
 2    videotape as Exhibit 1 to today's deposition.  And, of
 3    course, I'll email these to you in the break.  I
 4    apologize for not getting them the you earlier.
 5    BY MR. BRACKETT:
 6        Q.  But there's a document on your screen.  Do you
 7    see that now, Mr. Jones?
 8        A.  Yes, sir.
 9        Q.  And I'm gonna scroll through it.  It's three
10    pages total.  I'll make it single page so that you can
11    see all three papers.  Have you seen this document
12    before?
13        A.  No, sir.
14        Q.  It simply states that pursuant Rule 30(b)1 of
15    the Federal Rules of Civil Procedure and agreement of
16    the parties, plaintiff, by and through counsel, will
17    take the deposition of National Credit Adjusters, LLC
18    employee Ivan Jones by oral examination before a
19    qualified notary public on May 14, 2024, at 9:00 a.m.,
20    Hawaii Standard Time, and will be conducted via Zoom and
21    recorded through stenographic or video means.
22        Do you see all that?
23        A.  Yes, sir.
24        Q.  Okay.  And are you looking at that on a
25    computer screen now?
```

Page 12

```
 1        A.  Yes.
 2        Q.  Okay.  So it's pretty big?
 3        A.  I see it.
 4        Q.  And I didn't need to zoom in, but you see that
 5    I can, is that right?
 6        A.  Correct.
 7        Q.  Okay.  But you can see it even now and you can
 8    read it just fine even when it's not zoomed in?
 9        A.  Correct.
10        Q.  Okay.  I'll be going through a few different
11    documents today.  I just want to make sure that you're
12    able to see them.  Sometimes I have deponents that are
13    testifying on a cell phone.
14        A.  Okay.
15        Q.  It can make it difficult sometimes for them to
16    read --
17        A.  Yeah.
18        Q.  -- what I'm trying to point out.  So hopefully
19    you can see everything.  If at any time today you don't
20    see what I'm asking you, please just say, I'm sorry, I'm
21    not seeing that, can you zoom in or --
22        A.  Okay.
23        Q.  -- can you scroll down or anything like that,
24    and I'll gladly help.
25        A.  Okay.
```

Page 13

```
 1        Q.  And I know we've already established some of
 2    this, but my questions, I like to continue a flow of,
 3    who was your employer?
 4        A.  National Credit Adjusters.
 5        Q.  And how long have you worked there?
 6        A.  Eight years.
 7        Q.  What jobs have you had while working at NCA?
 8        A.  I worked at the airport, but not for long at
 9    all, not for long.
10        Q.  Okay.  And was that as an employee of National
11    Credit Adjusters?
12        A.  No.
13        Q.  And in your job there at National Credit
14    Adjusters, what positions have you held?
15        I think you had previously testified today that
16    you are an account manager.
17        Have you been anything else since you were
18    hired eight years ago?
19        A.  No, sir.
20        Q.  You've always been an account manager?
21        A.  Yes, sir.
22        Q.  When did you last go through a training?
23        A.  What did you say, sir?
24        Q.  When did you last go through a training there
25    at NCA?
```

4 (Pages 10 to 13)

Page 14

1    A. The last training that they had.
2    Q. How long ago was that?
3    A. Not really sure.
4    Q. Was it over a year ago?
5    A. No, it was more recent than that.
6    Q. Was it sometime in 2024?
7    A. Yes.
8    Q. Okay. So sometime in the last four and a half
9  months?
10    A. Correct.
11    Q. Okay. And what was that training on?
12    A. Basically on rebuttals and how to overcome
13  objections.
14    Q. What do you mean by rebuttals?
15    A. Just how to overcome objections when you get an
16  irate person on phone and when someone's refusing to
17  pay.
18    Q. What did they teach you as to how to overcome
19  those objections?
20    A. Just to find out what the problem is and trying
21  to come up with a solution and be courteous.
22    Q. Anything else?
23    A. No, sir.
24    Q. So find out what the problem is, they're
25  wanting you to get to the root of it?

Page 15

1    A. That is correct, what is the reason why they
2  feel that way and see if we can find a solution to them.
3    Q. What kind of solutions can you offer?
4    A. Solutions to -- how to make them pay their
5  bill, feel comfortable paying their bill.
6    Q. So the solution would be to help 'em figure out
7  how to pay?
8    A. That is correct.
9    Q. How often do you go through training at NCA?
10    A. We have training periodically on different
11  areas.
12    Q. And what do you mean by periodically?
13    A. It could be -- not really sure.
14    Q. So it's not every three months or six months?
15    A. I would say every three months.
16    Q. Okay. Is it always the same substance or is
17  there different topics that they talk about in these
18  trainings?
19    A. No, it's different topics.
20    Q. Have you ever received any training on the Fair
21  Debt Collection Practices Act?
22    A. Absolutely.
23    Q. What about the Fair Credit Reporting?
24    A. Absolutely.
25    Q. And what about training on local state laws for

Page 16

1  the states you're calling in to?
2    A. Absolutely, yes, sir.
3    Q. What other kind of trainings have you received?
4    A. We receive training on fraud disputes.
5    Q. Okay. And what is a fraud dispute?
6    A. Well, a fraud dispute is when someone calls in
7  and they're stating that it wasn't them who took out the
8  loan or they're calling in and we -- and they're not
9  identifying, like if we don't have the correct date of
10  birth or Social Security number or address.
11    Q. And what happens at NCA if someone calls in and
12  they can't correctly identify themselves?
13    A. We're not able to continue the call. If they
14  refuse to verify -- when they call in, we have to verify
15  three pieces of information. And if they don't verify
16  any of those information, we're not able to continue the
17  call.
18    Q. What kind of information do they need to
19  verify?
20    A. Their date of birth, last four of the social,
21  and address.
22    Q. Any other pieces of information work?
23    A. We can verify an email or a telephone number
24  that they called in on.
25    Q. Do you guys have caller ID there?

Page 17

1    A. Yes, sir.
2    Q. And so you see the number that they call from?
3    A. Correct.
4    Q. And when they call in, walk me through that --
5  well, first off, I guess, tell me a little bit about
6  what your work station looks like.
7    A. My work station is clean. I don't have any
8  papers on my work station. I don't have any type of
9  information on my work station.
10    Q. Do you have any pictures of your family or
11  pets?
12    A. No, sir. No, sir.
13    Q. And has it been the same work station for the
14  past eight years?
15    A. No.
16    Q. So you've moved a couple of times?
17    A. Yes, sir.
18    Q. And what is your work station like now or
19  describe it to me if you could? I mean, let's say
20  you're sitting -- are you sitting at your desk now?
21    A. No, sir.
22    Q. Okay. Are you in a conference room?
23    A. Yes.
24    Q. Okay. At a conference table?
25    A. Well, I don't -- I'm not, per se, in a

Page 18

1    conference room.  I'm just sitting in another room with
2    a desk and a computer.
3        Q.  Are you able to sort of show me from, you know,
4    moving around your computer there to sort of show me the
5    room you're in?
6        A.  Oh, yeah.  Oh, shoot.
7        Q.  Looks like a nice office.
8        A.  Absolutely.
9        Q.  Who's office is that?
10       A.  This is the office where they go over -- they
11   go over -- they evaluate people and go over calls for
12   people that needs -- probably needs improvement on calls
13   that they can work on to make them a better collector.
14       Q.  Have you been in that office before?
15       A.  Absolutely.
16       Q.  How many times?
17       A.  Very rare.
18       Q.  So usually if you're going in that office, it's
19   because you've done something wrong or --
20       A.  No, no.
21       Q.  -- need to improve on something?
22       A.  No, it's not that they did anything wrong.  We
23   have -- like calls, maybe we're not making enough calls
24   or we're not getting contact with people or the promises
25   that we make, they try to help us to make it better in

Page 19

1    those type of areas.
2        Q.  So some of the reasons you might be called in
3    is if you're not making enough calls?
4        A.  Correct.
5        Q.  Or if --
6        A.  If the group is at an average and you're not at
7    that average, yeah, correct.
8        Q.  And what would an average be?
9        A.  That we're making like what, 80 to 100 to 300
10   calls a day.
11       Q.  So 80 to 300 calls per day?
12       A.  Correct.
13       Q.  So if you're making 300 calls a day, you're
14   probably doing better than the person making 80 calls a
15   day?
16       A.  That is correct.  Because the ratio that we do
17   is the more calls you make, the more people you get in
18   contact, and the more conversions you'll get, the more
19   money you'll get.
20       Q.  How many hours is in a normal day for you?
21       A.  Eight hours a day.
22       Q.  So at NCA they understand the more calls you
23   can make, the more conversions you can get?
24       A.  Well, the more calls you make, the more people
25   you can probably contact.  And once we contact that

Page 20

1    person, that's when we can see if we can convert 'em
2    into payers.
3        Q.  How many calls do you make on average per day?
4        A.  Well, I don't -- I'm on inbound.  I'm on
5    inbound.  I take all the inbound calls.
6        Q.  Do you do any outbound calls?
7        A.  I do.  When I have to follow up on someone
8    either declines in the system or the check comes back
9    NSF, I would give them a call.  I'll reach out to 'em.
10       Q.  And in regards to the other part it you said,
11   need to help them get better promises or they help you
12   get better promises, is that right?
13       A.  Yeah.  Once we get contact, we try to set 'em
14   up on either for them to pay the bill or we set 'em up
15   on payment arrangements.  That's a promise, when we get
16   someone to set up a payment arrangement.
17       Q.  So when you make a call or receive a call on
18   behalf of NCA, you're looking for either a payment or a
19   promise to pay?
20       A.  We're looking for them to either pay the bill
21   or we set 'em up on a payment arrangement.  Or you get
22   some people who refuse to pay.  Some people are not
23   working, they have problems in their life, so we're not
24   -- they're not able to set up a payment arrangement.
25       Q.  What do you do in that situation?

Page 21

1        A.  We try to find the problem and see if we can
2    find a solution to it, just be courtesy to those guys
3    and professional.  And whenever they're on -- you know,
4    get back on the right track, we have 'em give us a call.
5    You know, we don't want to shut the door.  We leave the
6    door open for those guys and give 'em a good experience
7    to call back.
8        Q.  Do you follow up with them?
9        A.  No.  Well, I don't, sir.  Like I'm on inbound.
10   But, yes, people's lives change.  Maybe at that time
11   when they called, they're not in a good situation.  But
12   like, I mean, that's a part of life.  Things change.
13   So, yes, we stay in contact with 'em, see if they're in
14   a better situation, or they'll give us a call back and
15   state that they found a job and they're willing -- they
16   want to set up a payment arrangement.
17       Q.  So if you take an inbound call and they say
18   that they're not going to pay or not able to pay, do you
19   then code it in the system so that someone in the
20   outbound calls follows up with them?
21       A.  Yes, sir, I do notate it, the reason why
22   they're not able to pay, and I mark it accordingly, and
23   we set up a follow-up callback.
24       Q.  How soon would that follow-up callback happen?
25       A.  I'm not really sure, sir.  They might put it

6 (Pages 18 to 21)

Page 22

1  back on the dialer system or we'll set it out for 30
2  days.
3       Q.  When you say dialer system, are you referring
4  to LiveVox?
5       A.  Correct.
6       Q.  And you guys use LiveVox there at NCA?
7       A.  Correct.
8       Q.  And when your outbound calls with LiveVox, is
9  that a dialer that's being used?
10      A.  Yes, a dialer system.  Yeah, they make the
11  calls for us.
12      Q.  And does that system also use a prerecorded
13  voice?
14          Like does it have a machine that says, this is
15  an important call, you know, please stand by, a
16  representative will be on the phone shortly?
17      A.  I'm not sure about that, sir.
18      Q.  Okay.  I need to ask one --
19      A.  I just know my experience with the outbound is
20  -- yeah, when a person answers, like, I mean, we're
21  sitting there, and it just answers and someone says
22  hello, and then that's when we ask for that particular
23  person.
24      Q.  I see you're wearing a headset.  Do you wear a
25  headset in your normal day-to-day work there at NCA?

Page 23

1       A.  Correct.
2       Q.  And I can hear you very clearly, so that
3  probably helps, right?
4       A.  Absolutely.
5       Q.  And you can hopefully hear me very clearly this
6  way, too?
7       A.  Correct.
8       Q.  And going back to your work station, how big is
9  the space in front of you when you're out on the floor
10  and working in your normal day-to-day work there at NCA?
11      A.  Space, like this, like a cubicle.
12      Q.  Do you have walls on both side of you?
13      A.  Correct.
14      Q.  Is there another representative to your right?
15      A.  Correct.
16      Q.  And another representative to your left?
17      A.  That is correct.
18      Q.  And how large do you think your cubicle is?
19          You said about this big.  So three feet, four
20  feet wide?
21      A.  That is correct.  I would say that.
22      Q.  And do you have a computer?
23      A.  Yes.
24      Q.  And you said you don't have any papers, you
25  keep it clean?

Page 24

1       A.  Correct.
2       Q.  And what else?  I mean, what color are the
3  cubicle walls?
4       A.  Grayish.
5       Q.  And what else is on your desk other than the
6  computer?
7       A.  You have the keyboard and a mouse.
8       Q.  Do you have a separate phone?
9       A.  No, sir.
10      Q.  So the phone goes through the computer?
11      A.  Correct.  Yeah, we don't have phones on our
12  desk.
13      Q.  And have you ever worked on the outbound team?
14      A.  Yes, I have.
15      Q.  And in regards to the outbound team, you said
16  that when they say hello, that's when you respond.
17          Is that when your computer will generate the
18  information about the person?
19      A.  Correct, correct.
20      Q.  And so they say hello.  Have you ever in the
21  outbound team heard them saying hello multiple times
22  like, you know, they're looking for someone to respond?
23      A.  No.  When they say hello, that's when we ask
24  whatever name pops up on the screen.
25      Q.  That happens pretty quick, right?

Page 25

1       A.  It does.
2       Q.  I worked for BellSouth FastAccess in their
3  customer service department for a while and similar type
4  situation, you know, we check in on people.
5       A.  Yes.
6       Q.  And I've been at that cubicle.
7       A.  Yeah, it's back-to-back-to-back, back-to-back
8  calls.  Like as soon as you get off one, ding, there
9  goes another one.
10      Q.  Right.  As soon as you end this call, another
11  one's coming, right?
12      A.  Absolutely.
13      Q.  And you're supposed to make notes for every
14  call, right?
15      A.  Absolutely.
16      Q.  Okay.  And do you use shorthand?
17      A.  No, sir.  We just talk and type.
18      Q.  Oh, that's nice.  That's way better than I had
19  it.
20      A.  Yeah, yeah, we talk and type.
21      Q.  Okay.  So you're sitting there on your computer
22  typing as fast as you can?
23      A.  No, we are.  We're typing exactly what the
24  conversation is about.  We're putting in our
25  Mini-Miranda notes, our quality assurance, and that we

7 (Pages 22 to 25)

Page 26

1  verified three pieces of information. While on the
2  outbound, we just have to verify just a piece of
3  information, and we notate everything. And we ask them,
4  you know, would they like to pay their bill. And we
5  just talk and type. And that's how you get past most of
6  the calls.
7       Q. And it comes at you rapid pace?
8       A. Yeah, the wrap, the wrap time. We want to
9  eliminate the most wrap time, that is correct.
10      Q. And just for those that don't understand what
11  wrap time is, can you explain it to us?
12      A. Well, wrap time is basically is when you hang
13  up the phone with an individual, and some people they
14  don't talk and type, so wrap time is how many seconds
15  before you get to the next call.
16      Q. And how many seconds does it take for you to
17  get to the next call on average?
18      A. I talk and type. As soon as I -- my wrap time
19  is 10 seconds, 9 seconds.
20      Q. Wow, that's amazing.
21      A. Yeah.
22      Q. So as soon as one of 'em is done, you're on the
23  next one?
24      A. Yes, sir.
25      Q. Awesome. And as far the wrap time, that's

Page 27

1  gonna slow it down over all, right? I mean, the longer
2  you're in wrap time, the less calls you can make per
3  day?
4       A. There you go. That's it. Yes, sir.
5       Q. And they don't want you going into overtime?
6       A. No, there's no overtime here.
7       Q. So you've gotta get it done in eight hours,
8  whether it's 80 calls or 300?
9       A. That is correct.
10      Q. And if it's below 80 calls, then you get called
11  in that room you're in now?
12      A. Yes, sir. On the average, if you're below the
13  average, yes, sir. What are you doing at your desk?
14  Not moving from account to account.
15      Q. And you say average, that sounds like my law
16  school first year. They graded on a curve. So
17  basically it wasn't how smart I was. It was how smart
18  everyone in my room is and me compared to them.
19      A. That is correct.
20      Q. Okay. So you may be on a real fast-paced team,
21  and you gotta get faster?
22      A. That is correct, if you want to keep up.
23      Q. Okay. Otherwise, would they move you to
24  another team or what would happen?
25      A. No, no, no, we're all on the same team.

Page 28

1       Q. Okay.
2       A. It's just I might have more promises than you.
3  I might have more contacts than you.
4       Q. And that's what it's about, right, promises?
5       A. Yes.
6       Q. Contacts?
7       A. It's making contact.
8       Q. The more contacts, the more promises?
9       A. There you go. Yes, sir.
10      Q. And when you get those promises, do they keep a
11  tally of how many promises each of you get?
12      A. Absolutely.
13      Q. Okay. Do they keep a tally of how many
14  pavements someone gets?
15      A. Absolutely.
16      Q. Is there a board there in the room that would
17  show Ivan Jones and all of the other reps and how they
18  did --
19      A. No, sir. No, we don't have a board. That's on
20  our computer. Everyone has their individual stats that
21  they can see on their computer.
22      Q. That's exciting. So it's sort of like a video
23  game, you get more and more points?
24      A. Absolutely.
25      Q. So how many promises is a good day?

Page 29

1       A. Well, for me a good day is 20 promises.
2       Q. Yeah, that sounds pretty good.
3       A. Yeah, 'cause I'm on inbound. So people call
4  in, I'm just calling to pay my balance.
5           Okay, ma'am.
6           That's like a laydown, you know, yeah. So
7  that's just -- I'll be off that call in two minutes and
8  two seconds.
9       Q. That's the ones you want?
10      A. Yeah, those are the ones you want. But the
11  outbound, the outbound people, a good day for those
12  guys, I would say about 10 promises would be a great day
13  for them.
14      Q. It's almost like cold calling for them?
15      A. No. It is, it is, it is like cold calling,
16  yep. It's a numbers game.
17      Q. They don't know whether the person that they're
18  calling has heard from you before or never heard of NCA
19  ever?
20      A. They might have received a -- our validation
21  letter.
22      Q. Okay.
23      A. Yeah.
24      Q. Hopefully they know something?
25      A. Absolutely.

8 (Pages 26 to 29)

Page 30

1    Q. And if they already are aware, then that makes
2 your lives and your jobs a lot easier?
3    A. A whole lot easier, yes, sir.
4    Q. Because we all get those calls.
5    A. Yeah, yeah.
6    Q. What are you calling about?
7    A. Okay. I'm looking for this person.
8       No, we have the wrong number or, no, he's not
9 here.
10       And you might just be talking to that person.
11    Q. Right.
12    A. It's something else. These people are
13 something else these days.
14    Q. Yeah. So you've gotta sort of, you know,
15 double check 'em, right?
16    A. Absolutely. That's where that verification
17 process comes in.
18    Q. And when you're making the outbound calls there
19 at NCA, do you start out with saying, I'm a debt
20 collector and I'm trying to collect this debt, or how
21 does it begin?
22    A. Yeah, that's the -- that's the Mini-Miranda.
23    Q. You wouldn't do that right off the bat, though,
24 would you?
25    A. No, sir, we have to verify first that we have

Page 31

1 the right person before we can go into that.
2    Q. Okay. And on the outbound calls, that
3 verification would be at least one bit of information
4 that lines up, right?
5    A. That is correct.
6    Q. Could it be just a name?
7    A. No. We -- no. It would have to either be the
8 date of birth, last four of the social, or the address,
9 one of those three.
10    Q. And if you get one of those three, then you can
11 start?
12    A. Yes, sir.
13    Q. Give 'em the Mini-Miranda, tell 'em why you're
14 calling, ask for a payment?
15    A. That is correct, yeah. Identify the creditor
16 and, yes, sir.
17    Q. And when NCA calls, who is the creditor?
18    A. We deal -- we deal with different -- we deal
19 with payday loans.
20    Q. Is that the entirety of what NCA purchases?
21    A. For the most part, yes.
22    Q. Have you ever seen a car loan?
23    A. Absolutely, yes, I have.
24    Q. What about --
25    A. Yeah, they --

Page 32

1    Q. Oh, go ahead.
2    A. Yes, yeah, we do car loans.
3    Q. Personal loans, car loans?
4    A. Personal loans, yes, yeah, and -- yeah. 'Cause
5 I do see in the notes that it is a car -- it's a car,
6 they're trying to look -- wanting their title back,
7 absolutely, yes, sir.
8    Q. Payday loans, car loans, personal loans, any
9 other accounts that you've collected there at NCA?
10    A. No, sir. Well, it's -- we do Total Visa.
11    Q. Oh, okay.
12    A. Yeah, yeah, we do Total Visa. It's basic stuff
13 like that.
14    Q. That's a new one for me. Do you know anything
15 about Total Visa?
16    A. I mean, Total Visa, it could be like a Verve,
17 MasterCard, could be some type of, you know, MasterCard
18 or, you know, some type of card, MasterCard or Visa.
19    Q. And so when you get there each day, do they put
20 into the system, like all of these particular type of
21 accounts and say, hey, you're working this kind of
22 account today?
23    A. No, we flip everything. They put it on the
24 auto dialer system. I don't know how they set it up in
25 the morning with those guys for the dialer campaign.

Page 33

1 But, no, we come in, and we're -- they're flipping it.
2 We're running. And whatever pops up, that's what we go
3 on.
4    Q. How many people are in the room that your
5 cubicle is in?
6    A. 17.
7    Q. Are there other rooms with more employees --
8    A. No, no, no, we're all on the same floor.
9    Q. Is it in a business park?
10    A. Yes.
11    Q. So 17, is that the individuals like yourself,
12 the --
13    A. The account managers, yes, sir.
14    Q. And do they work in shifts?
15    A. Yes, sir.
16    Q. After your eight-hour shift is over, does
17 someone else sit at your cubicle?
18    A. No, sir.
19    Q. So they have their own assigned cubicles?
20    A. Correct.
21    Q. And so 17 people at a time, but there are other
22 empty desks as well?
23    A. Correct.
24    Q. For the next shift that's coming?
25    A. No, there's no other shift. The office is open

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 34

1  from 7:00 to 5:00, Pacific Standard Time.
2      Q. And you guys start calling right at 7:00 a.m.?
3      A. Correct.
4      Q. Some of those calls probably going to the East
5  Coast?
6      A. That is correct. Yeah, I think it's a
7  three-hour time zone difference.
8      Q. I'm sorry. You're audio cut out there. I
9  heard three time zone difference and then something
10 else?
11     A. No, it's just -- yeah, East Coast, I think, is
12 a three-hour time zone difference from Pacific Standard
13 Time.
14     Q. And the dialer will know where to dial and
15 when?
16     A. Absolutely. Yeah, it won't let us dial if
17 it's, you know -- it's not -- we have to dial in the
18 states that's from 8:00 a.m. to 9:00 p.m. their time.
19 It won't let us dial if it's not around those times,
20 8:00 in the morning their time.
21     Q. I know people move around a lot now. Like I'm
22 in Hawaii, but I've got an east Tennessee telephone
23 number. Is it based on telephone numbers?
24     A. Not really sure.
25     Q. Have you ever had an outbound call where

Page 35

1  someone said, hey, this is too early?
2      A. You know what? Yes, sir. That happened, that
3  happened before. It's very rare. And actually, I mean,
4  you're right. It does, 'cause people do move, so the
5  area code might be different, yes, sir.
6      Q. And I guess the inverse could happen, too,
7  maybe too late? Probably less rare.
8      A. Yeah, I've never really had that happen.
9      Q. How many days do you work each week?
10     A. I work Monday through Friday.
11     Q. Does anyone work there on the weekends?
12     A. No, sir.
13     Q. How many breaks do you get each day?
14     A. I don't take a break. I'm inbound. I try to
15 maximize my efforts on the phone. The only break I take
16 is when I'm going to the bathroom, and I take an hour
17 lunch.
18     Q. Are there days where you don't even take that
19 hour lunch?
20     A. No, sir. Well, on Fridays I don't take a
21 lunch. I just work 7:00 to 3:00 on Fridays.
22     Q. How are you compensated?
23     A. We get a regular -- we get a regular base
24 salary plus commission.
25     Q. So it's not hourly?

Page 36

1      A. Yes, it is hourly, and plus commission.
2      Q. What is your hourly rate?
3      A. I'm at $25 an hour plus commission.
4      Q. And then as far as the commission, how does
5  that work?
6      A. We have a -- well, my goal, we have a specific
7  goal, and once we achieve that goal, and anything we get
8  over that goal we get a certain percentage.
9      Q. What percentage on average?
10     A. What is it? I think it's 4 percent,
11 4.5 percent, something like that.
12     Q. And that's 4 to 4 1/2 percent of what you --
13     A. Of -- yeah. My goal is, we have to -- it's
14 $54,000 we have to bring in house before anything.
15 After that, we get that 4 percent in our pocket.
16     Q. And is that per week?
17     A. No. That's for the month.
18     Q. Okay.
19     A. Yeah, that's for the month. I think I'm
20 clearing like 140 -- 140,000 a month.
21     Q. You're a stellar employee there?
22     A. I'm the top gun. I'm the top dog in my pool.
23 I collected $844,000 last year. I was number one in
24 Chandler in the whole company of inbound people.
25 There's about 11 of us on the inbound. So I did great.

Page 37

1  I did a good job last year, yeah.
2      Q. That's fantastic. And so when you collect
3  844,000, that pushes your salary up quite a bit, I would
4  assume?
5      A. Yeah. I mean, yeah.
6      Q. A good amount of bonus?
7      A. I got a raise, you know. I got a raise. You
8  know, they give you these little plaques at the end of
9  the year and you a little compensation for your
10 efforts and your good work performance. So, yeah.
11     Q. And you said something there, you're in
12 Chandler.
13     A. Uh-huh.
14     Q. Where are the other locations for NCA's call
15 centers?
16     A. They have one in Peoria, Jamaica, and the
17 corporate office is in Hutchinson, Kansas.
18     Q. The corporate office is there. Do they also
19 have a call center there?
20     A. Yes. It's four offices; Chandler, Peoria,
21 Jamaica, and Kansas, Hutchinson, Kansas.
22     Q. So you're one of the ones that's doing around
23 300 per day, if it were outbound maybe. But inbound you
24 said is difference, so I'm sorry. That's a weird
25 question. Strike that.

10 (Pages 34 to 37)

Page 38

1      How many inbound calls do you receive on an
2  average day?
3      A. Yeah, that's -- about that, the 300. That's on
4  a good day, you know. Some days it's a little bit
5  slower. It might be slower.
6      Q. What's a slow day?
7      A. I'd say a hundred.
8      Q. Who do you report to?
9      A. Who is my manager?
10     Q. Yes.
11     A. Mike Ohlund and Tricia.
12     Q. How many bosses do you have?
13     A. There's what? One, two, three. Three.
14     Q. So Mike Ohlund, Tricia, and?
15     A. Karl.
16     Q. Do they listen to your calls?
17     A. Absolutely.
18     Q. Do they direct you on what to say?
19     A. No.
20     Q. Do you have a script?
21     A. Yes. I mean, we have a verification script
22  when we take our payments. We have a verification
23  script, but we don't like have a script when we talk to
24  these guys.
25     Q. So NCA sort of gives you guys some freedom to

Page 39

1  say it how you feel like it's most appropriate?
2      A. No, we -- well, we have to, you know, go by the
3  rules and regulations, and we have to, you know, do the
4  Mini-Mirandas and the verifications right. And we go
5  into the call, courtesy, we -- we're very professional
6  when we're talking to these people. We try to help
7  these guys. That is our job is to help them and find a
8  solution to pay their bill.
9      Q. Do you guys have -- I think you mentioned
10  there's some procedures. Are there processes or
11  procedures that are taught to you there at NCA?
12     A. Absolutely.
13     Q. What kind of policies does NCA have?
14     A. There's a lot of policies. We have a policy
15  for fraud. We have a policy for disputes. We have a
16  policy for credit consumer counseling. We have -- it's
17  a lot of policies that we have to adhere to 'cause each
18  call could be different.
19     Q. One of the policies is verification, right?
20     A. Absolutely.
21     Q. Verification not only of who the individual is
22  that you're speaking to, but also their payment? I
23  think you mentioned payment verification or?
24     A. Yeah, that's our -- we have a script, a
25  verification script when we take a payment, yes.

Page 40

1      Q. What is that script?
2      A. Well, it's a script if they're paying -- if
3  they're making their payment good today, they're paying
4  it off, we have a script that if we're doing recurring
5  payments, and we have a script if it's a future date.
6      Q. And I bet you've read that script a bunch of
7  times?
8      A. I'm out of breath every day, over and over and
9  over again.
10     Q. Do you remember it?
11     A. I -- yeah, I remember it sort of. But I
12  still -- we have to read it verbatim. We can't miss not
13  one word.
14     Q. Okay. Do you think you could restate it here
15  now without seeing it in front of you?
16     A. To confirm our records are correct, I'm going
17  to repeat the information that you gave me. Hold on. I
18  know this. Hold on.
19         To confirm our records are correct -- not all
20  of it, sir. Not -- I couldn't do it verbatim. I would
21  have to -- I always look at it and read the script
22  'cause it's different ones, so it has different verbiage
23  on each one.
24     Q. Sure. And I'm sorry to put you on the spot
25  there.

Page 41

1      A. Yeah, yeah, you did. You got me on that one.
2      Q. If anyone knew.
3      A. No, no, you got me on that one. I know that.
4  Yeah, you got me on that one. But for the most part, I
5  always read the script because quality assurance is
6  listening -- they're listening to all of our calls, so
7  we have to say it verbatim. We can't miss not one word
8  or we get dinged for that.
9      Q. Yeah. They don't want you going off script,
10  right?
11     A. No, they don't want us going off script.
12     Q. You can get in trouble that way?
13     A. Yeah, you get dinged.
14     Q. And what's a ding?
15     A. Basically you missed a word or you didn't say
16  this, so they just want to bring it to our attention
17  just to make sure we don't do it again.
18     Q. How many dings do they allow?
19     A. It's every time if you're not reading that
20  script verbatim. Every time.
21     Q. And if you have five dings, is that too many?
22     A. No. No one's gonna have five dings if they're
23  reading it verbatim. No one is gonna have that. It's
24  like repetitious to us. We read that thing over and
25  over again every day all day. So that's -- we don't

11 (Pages 38 to 41)

Page 42

1  have that problem of that sort. But if you do miss one
2  word, they'll bring it to your attention, like you have
3  to say this word or you forgot this word or you, know,
4  be like sorry. Okay. Won't happen again, you know.
5      Q. Have you ever seen 'em let someone go because
6  too many dings?
7      A. No, no, no.
8      Q. They need the employees, right?
9      A. Huh?
10     Q. They need those employees, right?
11     A. Oh, absolutely, absolutely.
12         MR. BRACKETT: All right. It's 10:03. So
13  let's take a five-minute break. Is five minutes enough
14  time?
15         THE WITNESS: Absolutely. We can keep
16  going if you want to. But five minutes is cool.
17         MR. BRACKETT: Right. Let's come back at
18  10:08. That way I get a chance to take care of
19  business. I'll be back here shortly, and we'll get back
20  on the record in just a few minutes.
21         (Off the record from 10:04 to 10:18.)
22         MR. BRACKETT: All right. Let's get back
23  on the record. It's 10:18 a.m. here in Hawaii.
24  BY MR. BRACKETT:
25     Q. Mr. Jones, did you have a chance to talk with

Page 43

1  your attorney during the break?
2      A. No, no, sir.
3      Q. You didn't talk to Mr. Bach or anything?
4      A. No, sir.
5      Q. Very good. Of course, you're still under oath.
6  You understand that?
7      A. Yes, sir.
8      Q. Very good. Did you talk with anyone else
9  during the break?
10     A. No, sir, I went to the bathroom and came back.
11     Q. Very good. All right. Before the break, we
12  were talking about some of the policies and procedures
13  there at NCA. You identified, I think, four different
14  topics there. One of them was fraud, another was
15  dispute, then credit or consumer counseling, and
16  verification. Are there any other policies that you're
17  aware of there at NCA?
18     A. Talking to third parties. Talking to third
19  parties. We have a lot of -- lot of policies, a lot of
20  different policies.
21     Q. Okay.
22     A. But those are the ones that I'm aware of.
23  Well, I'm aware of all of 'em, but it's like it's --
24  those are the ones that really stand out that we work
25  on, bankruptcy, bankruptcy policies, that we work on to

Page 44

1  make sure that we're doing the right thing on the phone.
2      Q. And in regards to talking with a third party,
3  what is NCA's policy?
4      A. Well, we have to get permission from the
5  customer first to talk to that individual, and we have
6  to state a policy. We have to read them a script that
7  they're giving us permission to talk -- from the
8  customer that they're giving us permission to talk to
9  this person, and then that person gets on the line. We
10  let 'em know that they're on a recorded line and that
11  the customer gave us permission to talk to them, and if
12  that's okay with them.
13     Q. Okay. And so it is possible for NCA to talk
14  with a third party, but they just have to get the
15  customer or consumer's --
16     A. Permission to talk to 'em, yes, sir. And if
17  we're using their information, banking information, they
18  would have to provide us with that information, not the
19  customer.
20     Q. Okay. And in regards to these calls involving
21  third parties, is it possible for NCA to call out and
22  put the customer on, you know, a three-way call?
23     A. That is correct. They could do that.
24     Q. And so if the customer is saying, hey, I filed
25  a police report, please just call the police department

Page 45

1  and let's verify this, then NCA could do that?
2      A. I never -- I never had that happen. I never
3  had someone say, let's call. If they have a police
4  report, that has -- most likely that has to do with a
5  fraud. 'Cause that's -- if it's a fraud account, we
6  either ask them either go to IdentifyTheft.com [sic] and
7  obtain a fraud report from there or they can go to a
8  police station and file a report. And we have to have
9  that report within 30 days.
10     Q. And so you have to have the report within 30
11  days. Is it -- backing up to my previous question, is
12  it possible for NCA while on the phone with a customer
13  to reach out to the police station and, you know, have a
14  conversation with the police department in addition to
15  the customer?
16     A. Well, I've never had that happen before, but if
17  that -- if they wanted to call the police station and if
18  they have an individual, we would still need their
19  permission to talk to that person or whoever. We would
20  have to go through that scenario. As long as they give
21  us permission to talk to whoever, then we can talk to
22  that person, and we have to read them the script that
23  they're giving us permission, and we have to ask them,
24  do we have their permission as well to talk to them.
25     Q. So it is possible?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808)524-2090

Page 46

1   A. It's -- yes.
2   Q. A customer could say, hey, I've got a police
3   report, like you requested. I don't have it here
4   personally, but I'd like for you to be on the phone with
5   me. Let's call the police department, and let's talk
6   with them. You guys could patch in a third-party police
7   department at that time?
8   A. Well, they would have to do that. We don't do
9   that. They would have to do that. And, yeah, if they
10  verify -- if they give us permission to talk to whoever
11  that person is, yes, sir. But if it's -- if they have a
12  police report, we would -- we have an email where they
13  need to send that police report to. And that's
14  info@ncaks.com. And that's the fraud report. So
15  anything that they have, so, I mean, if they have one,
16  we direct 'em there. That's where they need to send it
17  to, send the report, fraud report to, to that email.
18  Q. So for the fraud process, NCA's procedure is
19  either get the IdentifyTheft.com statement or the police
20  report, is that right?
21  A. That is correct. Yeah, we send 'em to
22  IdentifyTheft.com.
23  Q. Is it IdentifyTheft.com or .gov?
24  A. That is correct. It's .gov, that is correct.
25  Q. I wasn't trying to trick you there. I thought

Page 47

1   so, too. I was reading --
2   A. No, it is .gov.
3   Q. -- .com. I'm sorry about that. I didn't mean
4   to say the wrong thing. But, yeah, IdentifyTheft.gov.
5   A. No. I said the wrong thing. I said .com. I
6   should have said .gov. That is correct, it is .gov.
7   Q. And so what if the consumer says, well, I don't
8   have the report yet, but I have a police report number,
9   then what is the process?
10  A. They don't have the report but have a police
11  report number. I've never experienced that, eight
12  years. I'm not really sure about that one, sir. I
13  would ask a manager. And if there's anything that I
14  don't know, I'm gonna refer it to my manager and get the
15  proper answer to it.
16  Q. Would NCA direct you to get the police report
17  number?
18  A. Yes, yes. I mean, I would write down the
19  police report number, yes.
20  Q. It would be real easy to put that into the
21  notes there at NCA, right?
22  A. That is correct.
23  Q. And that adds a little validity to their
24  statement, right?
25  A. That is correct, but --

Page 48

1   Q. I didn't -- oh, go ahead.
2   A. Yeah. But we would need, you know, some type
3   of report for them to email us at that info@ncaks.com.
4   Q. And you said that's the fraud department. Do
5   you know what the KS stands for?
6   A. It's Kansas.
7   Q. Okay. So that's where their corporate office
8   is there in Hutchinson, right?
9   A. Correct.
10  Q. So they would need to email it to their
11  corporate offices there in Kansas?
12  A. That is correct.
13  Q. And until they email that police report, does
14  NCA take the position that the account is still valid?
15  A. Well, I'm not really sure. I'm not really
16  sure. I know we would notate it as such even though --
17  even though that they -- if they state that it's a fraud
18  account and they don't have a fraud report, we still
19  notate it as such and we still put it in a fraud status.
20  Q. What does that fraud status do within NCA?
21  Does that mean that no more calls go out?
22  A. That is correct.
23  Q. And that they notify the credit bureaus?
24  A. I'm not sure. I'm not sure about that one.
25  I'm not -- I'm not sure about that one.

Page 49

1   Q. What else do they do? When you have are
2   someone say, hey, this wasn't me, how do you handle that
3   as an employee there at NCA?
4   A. If it wasn't me, we would verify all of the
5   information. We would verify, again, date of birth,
6   last four of the social, address. We would go to the
7   account details where they have the banking information
8   where the money was put into. We would verify that. We
9   would verify if they had a previous employment when they
10  filled out the application. If we have that, we would
11  verify that information. We would let them know the
12  date that it was open. We would let them know the last
13  payment they made to the client. And, yeah.
14  Q. And what if some of this information doesn't
15  match up? Like, for instance, I know in Mr. Durham's
16  case, he said, that's not my bank. I don't have a bank
17  account at Truist. So at that point in time, what is
18  the process that you're supposed to follow as an NCA
19  employee?
20  A. I mean, basically, we're gonna put it into a
21  dispute status and request that the docs be sent out to
22  him. He wanted to see the agreement that -- a
23  signature. And that's when we put it in the dispute
24  status and we request that the docs be sent out to him.
25  And if we have the docs, if we had the media already in

Page 50

1  house, a manager will send it out immediately.  If not,
2  if we have to wait for the docs from the client, it
3  might take -- I've seen it take a long period of time
4  for them to get the docs over to us.  We have to wait
5  for those docs to come.  And then they'll mail it out to
6  the customer and show them the proof that they do owe
7  it.
8       Q.  And if it takes months, potentially for the --
9  strike that.
10          If there's a potential, the consumer says, this
11 is fraud, this isn't me, then you guys put it in dispute
12 status, is that right?
13      A.  Well --
14      Q.  Or do you put it in --
15      A.  If he didn't request that he wanted to see the
16 contractual agreement, if he wants -- he wants the proof
17 that he did this.  So that's when we have to provide him
18 with the proof, and that's the contractual agreement
19 that he signed or someone signed or they might have
20 fraudulently signed his name.  But we have to show him
21 the validity of the debt and show him the proof of that
22 agreement.
23          So either we have it on the media and the
24 manager will send it right out to him.  But if we have
25 to wait and get it from the original creditor, then we

Page 51

1  have to wait for that to come.
2       Q.  And how long is his account in a dispute status
3  then there at NCA?
4       A.  Until we receive that agreement, until we get
5  the docs, and we send it right out to those guys.  And
6  then if it --
7       Q.  So that --
8       A.  Go ahead, sir.
9       Q.  Go ahead.  Sorry.
10      A.  No.  What was you gonna say, sir?
11      Q.  I was gonna ask in regards to that, I was
12 flipping through some of the stuff, and I thought that
13 the NCA process was that it flags it as disputed for 30
14 days.  So for 30 days they won't make any more outbound
15 calls or --
16      A.  That's correct, that's correct.  They won't
17 make any outbound calls, but it's still gonna remain in
18 a dispute status until we can provide 'em with the
19 information that he wants.
20      Q.  And after the 30 days, then the calls can start
21 again?
22      A.  No, sir.  I have -- I'm not really sure about
23 that.  But -- no, no, we can't make calls.  It's still
24 in a dispute status after 30 days.  I've seen it in
25 dispute status after 30 days.

Page 52

1       Q.  And the NCA process or procedure, as far as you
2  understand it, would keep it in that status until the
3  documents were received?
4       A.  That is correct.
5       Q.  At which time, then the documents go out, the
6  consumer has what they asked for, and then you can start
7  calling them again?
8       A.  Well, if it's a valid dispute and they prove to
9  him that he does owe it, yes, they will move it back to
10 the floor for us to collect on.
11      Q.  And who makes --
12      A.  And it would show in our notes that we mailed
13 him the information of the proof, and then they would
14 take it out of dispute and move it back to the floor for
15 us to collect on.  And most likely normally when that
16 happens, when they receive the letter -- I mean, when
17 they receive our docs and they see everything and they
18 see their signature or whatever, then they'll call us
19 back and be like, okay, what can I do to resolve this?
20      Q.  And who makes the decision there at NCA to move
21 it back to the floor?
22      A.  I have no idea.
23      Q.  But that's not your decision to make?
24      A.  No, sir.  No, sir.
25      Q.  And as far as you there on the floor, you would

Page 53

1  just see that, hey, this account is back in here and
2  we're collecting it again, right?
3       A.  It would have in the notes that they mailed out
4  the media to -- the information to those guys, and,
5  yeah, and they would see it.  It would be out of dispute
6  and moved back to the floor, and it's stated there in
7  the notes.  And they would take it out of dispute.
8       Q.  While it's in dispute status there at NCA, do
9  they continue to report on credit of the consumer?
10      A.  I'm not really sure, but I -- yes, I have seen
11 it still.  When we go to credit reporting, it's either a
12 yes or no there that they -- that the account is credit
13 reporting or not, yes.
14      Q.  You've seen it before where it's still being
15 reported on the credit in spite of the fact that it's in
16 a dispute status?
17      A.  Yes.
18      Q.  And even in spite of the fact that it may be in
19 a fraud status?
20      A.  Not really sure, but, yes.  I'm not really sure
21 about the fraud.  But --
22      Q.  Until you get the IdentifyTheft.gov affidavit
23 or the police report, NCA assumes the debt is still
24 owed?
25      A.  That is correct.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 54

1    Q. By that individual?
2    A. That is correct. Until we receive that,
3    they -- yes, they will assume. But we still give them
4    the courtesy and we still move it to, you know, that
5    department until we can receive that information.
6    Q. So even though it may be in one of those
7    departments, you there on the floor can still receive
8    calls from the consumer?
9    A. Correct.
10    Q. And you can still talk to the consumer?
11    A. Correct.
12    Q. And still work with them to try to help them
13    resolve the issues?
14    A. That's if they're willing to take it out of
15    that status. And we have to ask them, is this something
16    that you want us to do? Do you want to remove the
17    dispute? Do you want us to remove the fraud status, and
18    would you like to resolve it? Yes. And if they say
19    yes --
20    Q. Beside -- oh, go ahead. If they say yes?
21    A. If they say yes, then we will proceed in trying
22    to help them rectify the situation.
23    Q. But it's not required that you transfer it to a
24    special dispute department?
25    A. No, sir.

Page 55

1    Q. Or it's not required at NCA if it's flagged as
2    fraud that you transfer the call to some special fraud
3    department?
4    A. No, sir. If they ask us to take it out of
5    dispute or fraud, we are able to move forward with the
6    call.
7    Q. You guys can talk to 'em even if they don't ask
8    if it's just a situation where they've called, and you
9    don't know -- I guess you probably -- strike that.
10    You probably do know who it is that's calling
11    by the caller ID, right?
12    A. Sometimes, if the number is associated with the
13    account, it will pull the account right up.
14    Q. And it will populate it right there on your
15    screen?
16    A. That is correct. We have to --
17    Q. Have their lien?
18    A. Absolutely. We have to go through the
19    verification process just to make sure that we're
20    talking to the right person before we can proceed, yes,
21    sir.
22    Q. So as an inbound call operator at NCA, when you
23    receive a call, what does your screen look like? You
24    know, can you describe some of it to me? Like what --
25    A. It just gives 'em their name, their address,

Page 56

1    their date of birth, Social Security number -- the last
2    four of their social, and date of birth, address. It
3    gives them the creditor's name, the amount that's owed.
4    And then it has the notes on there, on the side of it,
5    it has the date -- that we hit a box, and it shows us
6    the date that it was opened, the last payment that was
7    made on the account.
8    We can go into details and show, you know, what
9    bank the money went into. They have references that
10    they put on the application.
11    Yes, we have all that information. And then we
12    have all the previous notes, the date, the time the
13    calls were made. We have all the notes and previous
14    notes in the system.
15    Q. You said it shows the last four of the Social
16    Security number. Does it show the entire Social
17    Security number?
18    A. No, sir. It's just the last four.
19    Q. Is there ever an occasion that you need to get
20    the full Social Security number to verify who someone
21    is?
22    A. Yes, sir. Yes, sir.
23    Q. So you can see the full Social Security number
24    on your screen?
25    A. No, sir. That's if they provide us for -- if

Page 57

1    they provide us the social, like if they're calling in,
2    and if they don't have like a letter with the account ID
3    number, I would ask 'em, let me have your social. If I
4    can't -- sometimes you click on the number, you know,
5    numbers change, people numbers change so it's not coming
6    up 'cause they -- that number was two, three, four, five
7    years ago. So then that's when I would ask 'em for
8    their full social to bring up account, and it populates
9    it immediately.
10    Q. Oh, okay. So your system is set up so that you
11    can either type in the account number that NCA has
12    applied to the account or the full social?
13    A. That is correct.
14    Q. What else could you type in to pull up a
15    customer's account?
16    A. The client account ID number. We could do
17    that. And obviously their first and last name. We
18    could try it that way. If it doesn't come up, then most
19    likely they're not in our system or we have the wrong
20    number or we have the wrong person.
21    Q. And if it's the wrong person or the wrong
22    number, what happens?
23    A. Yeah, we take their number immediately out of
24    the system, apologize for the inconvenience. You know,
25    some calls we make we're dialing kid's phones, you know,

Page 58

```
 1   cell phones, or they just got the number.  So we have to
 2   immediately take it out of the system and apologize for
 3   the inconvenience.
 4       Q.  You wouldn't want to tell them you're a debt
 5   collector?
 6       A.  No.  No, we don't tell 'em that we're a debt
 7   collector.
 8       Q.  And as far as the notes when you have a --
 9   backing up.  So typically the very first thing that you
10   see is going to be their name and their information on
11   your screen, right?
12       A.  Correct.
13       Q.  And the only way that that would not be the
14   case is if they call from a different number that the
15   system did not recognize?
16       A.  That is correct, and that -- and it didn't
17   populate in our system.  But when I ask them, let me
18   have your social to bring it up for you, let me see, you
19   know, what I can do to help you out.  When they give me
20   the full social, then it pops right up.
21       Q.  Okay.  If you're already looking at their
22   information, already have, you know, their name, their
23   address, information about the account on your screen,
24   would you then still need to potentially verify the full
25   Social Security number?
```

Page 59

```
 1       A.  No, we do the last four.  That's why when
 2   people call in, we verify their date of birth, the last
 3   four of the social, and their address.
 4       Q.  And if they're willing to give you that, then
 5   that's plenty?
 6       A.  That's -- we assume we have the right person.
 7   They verified everything.  So we assume that, you know,
 8   we have the right individual.  And then we move on with,
 9   you know, the quality assurance and the Mini-Miranda.
10       And then after that, that's when they'll tell
11   us, well, you guys have all that information, but do you
12   know if -- do you know if you have the correct person?
13   I didn't do this.  Do you know it's me?  You know,
14   they'll start going into, you know, basic stuff like
15   that.
16       And if it's a dispute or fraud, then we put it
17   in there accordingly.  We put it in there accordingly.
18       And if they ask us, do you have proof of that,
19   that's when we have to get the docs from the original
20   creditor or we already have it and we send it out to
21   'em.
22       Q.  As an account manager there at NCA, can you
23   remove it from someone's credit?
24       A.  No, I can't.  I can't.  We don't touch the
25   credit, no, no, sir.  No, I can't.  No, sir.
```

Page 60

```
 1       Q.  What does --
 2       A.  But that's -- but that's -- we have a policy,
 3   60 to 90 days after an account is paid off, we do
 4   request that they delete from the credit bureaus.  And
 5   then 30 to 45 days, it'll be updated, you know, on their
 6   credit.  We update on their credit on the 1st and 15th
 7   of each and every month.
 8       Q.  Okay.  And what can you do as an account
 9   manager there at NCA to help a consumer, you know, who
10   says that, hey, this is fraud, this isn't me?
11       A.  Well, I mean, like I said, I mean, if it's not,
12   I would verify all the pieces of information that we
13   have on the account.  Like I said, the date of birth,
14   Social Security number, address.  We would inform them
15   the date that this was opened, the date that they made
16   their last payment.
17       If I see a place of employment up there, I'll
18   ask 'em, are you still working at UPS?  to see what they
19   said.
20       Well, like, yeah, I'm still working there.  Oh,
21   I haven't worked there in years.
22       They have relatives.  We sometimes ask
23   relatives.  Do you know this person?  Do you know that
24   person?  'Cause it has on there, it distinguishes
25   mother, sister or whatever.  So I would ask 'em, you
```

Page 61

```
 1   know, do you know this person?
 2       Oh, yeah, yeah, I do know that person.
 3       Do you know this person?
 4       Yes.
 5       Okay.  Well, this -- you put this on the
 6   application as references on the application.  So it
 7   might strike a nerve there.
 8       Or, you know, like and they'll say, oh, okay, I
 9   remember.  I remember.
10       How do you want to pay your bill?
11       Q.  Okay.  All right.  And do you update the place
12   of employment?
13       A.  Absolutely.
14       Q.  If they say, I haven't worked at UPS in years,
15   do you ask where do you work now?
16       A.  Absolutely.  What do you currently do for a
17   living?
18       Q.  And you get that name of the employer?
19       A.  Absolutely.
20       Q.  And their place of employment like as far as
21   location?
22       A.  Absolutely.
23       Q.  And as far as the relatives are concerned, do
24   you ever get contact information for the relatives?
25       A.  No, we don't get contact information for the
```

16 (Pages 58 to 61)

Page 62

1     relatives.  We don't even call relatives.  We don't call
2     relatives at all.  We can't.  We can't call relatives.
3         Q.  It's used to more just jog their memory?
4         A.  That is correct, that they put the references
5     down on the application.
6         Q.  Are you able to remove the account from the
7     system?
8         A.  No, sir.  I'm not able to do that.
9         Q.  Are you able --
10        A.  No, sir.
11        Q.  -- to stop the dialer from calling a number?
12        A.  Absolutely, absolutely.  Sometimes they request
13    no calls, written only.  We do have -- we have a field
14    that we can do that.  I can do that.  Stop the calls and
15    be written only.
16        Q.  It's not you that stops the calls.  You notate
17    it and then someone else stops the calls, is that right?
18        A.  No, I can do that.  I can do that part.  If
19    they ask that they don't want any more calls, just to
20    correspond through mail only, I can do that.  We go --
21        Q.  Can you remove --
22        A.  What was you gonna to say, sir?
23        Q.  I was just gonna ask, can you remove the
24    telephone number?
25        A.  Absolutely.

Page 63

1         Q.  You can delete it?
2         A.  Absolutely, I could take it out of the system.
3     Actually, when we put it -- we go to account maintenance
4     and we put it on the -- it has, you know, a field where
5     it's no calls, written only.  We click that.  It
6     automatically takes everything out of the system, takes
7     the number out of the system, and it flags it and it
8     blocks us from calling it.
9         Q.  In a situation of dispute, what else does NCA
10    allow you to do as an account manager?
11        A.  I'm not understanding the question.  You said
12    dispute.
13        Q.  Yeah, like if the customer is disputing --
14    well, I guess I need to ask.  For Mr. Durham's
15    situation, would you consider that a dispute or a dispute?
16        A.  Well, I would consider it -- I mean, I would
17    consider it a fraud because that's what he said.  But
18    when I verified all the information that was correct and
19    when he told me that he wanted to see the proof, that's
20    when we have to put it into dispute and get the docs and
21    get the docs out to him and show him, you know, what he
22    requested.  We want him to see the agreement and see who
23    signed it and basic stuff like that.
24        Q.  So if you would have notated it as fraud, it
25    would not have been able to send him the documents?

Page 64

1         A.  I know the fraud procedure is that we have
2     to -- we have to request a report and we have to send
3     them the identity theft, and we need that information
4     within a 30-day period.  The fraud status, it does stop
5     the calls.  I'm not really sure about that one.  It
6     does -- it does -- the fraud status definitely it stops
7     the calls.  We cannot call the consumer once it's in the
8     fraud or dispute status.  We can't call those guys.
9         Q.  But you don't know if fraud sends them any
10    paperwork or not?
11        A.  Yeah, the fraud -- we do send them -- we do
12    send them some paperwork that they have to fill out and
13    they have to respond back within a 30-day period.
14        Q.  And that paperwork would be related to filling
15    out the identity theft affidavit or filing a police
16    report?
17        A.  That is correct.
18        Q.  And so if you have the address of the consumer,
19    you would want to have the fraud department send them
20    this information so that they can complete it at home
21    and send it back?
22        A.  That is correct, sir.
23        Q.  And as far as the dispute or the dispute
24    status, you can actually send them the original
25    paperwork?

Page 65

1         A.  That is correct.
2         Q.  And then that verifies the debt?
3         A.  That is correct.  That's the contractual
4     agreement that they signed.  It has their signature on
5     it.
6         Q.  And once they have that paperwork, you guys can
7     start collecting it again?
8         A.  Once we -- yes, they will move it -- they will
9     move it back to the floor.  That is correct.
10        Q.  Back to the floor, you mean back to the --
11        A.  Back to collection, to collect activity on it.
12        Q.  Okay.  And if it is a fraud that they're
13    claiming, is there anything else that NCA allows you to
14    do other than to notate it as fraud and have the fraud
15    department send them that affidavit to mail back in?
16        A.  No.  Basically, no, we put it -- we put it into
17    that status.  We put it into a fraud status for those
18    guys until we can --
19        Q.  You can't delete any of the information and the
20    account, you can't delete their address or phone number
21    or anything to stop the further collections?
22        A.  That, I think it automatically does that.  Once
23    we put it in a fraud status, it automatically does that
24    for us.  We don't have to do it like manually.  When we
25    put it in a fraud status, the system automatically

17 (Pages 62 to 65)

Page 66

1    triggers that, that there's no calls to be made at all.
2         Q.  And you can't like delete the account or
3    anything from the system?
4         A.  No.  No, we can't.  We can't delete any account
5    from the system.
6         Q.  Is there anything else that NCA allows you to
7    do to help the customer with that situation?
8         A.  Not -- I'm not really sure.  You know, like I
9    said, I try to overcome that situation.  But if I can't
10   overcome it, then we just put it in a fraud status and
11   we move on.
12        Q.  How do they train you to overcome such a
13   situation?
14        A.  By verifying all of that pertinent information.
15        Q.  And if that's all verified, then it's okay to
16   continue collecting?
17        A.  No.  That's not -- it's not okay to continue
18   collecting.  They still might say it's fraud.  That's
19   when we have to get that agreement, those docs.  We have
20   to request that the docs be sent out to those guys.
21        Q.  And if it's already been over 30 days, they had
22   the opportunity to fill out the docs and send them in,
23   can you continue collections then?
24        A.  No, sir.  If they filled out the information
25   and they sent it back to us, no, sir, it's still in a

Page 67

1    fraud or dispute status.  No, sir, we can't collect on
2    it unless they want us to remove it.
3         Q.  What if they didn't send the stuff, the
4    paperwork back in, they never sent you guys a fraud
5    affidavit, can you collect it at that point in time?
6         A.  No, sir.  We have to wait until those guys get
7    those -- the documents -- the docs first.  We have to
8    make -- we have to send them the information, the proof
9    first, before we can collect on it.  And they will have
10   it in the system that they mailed it to the address.
11   And if it's in a dispute, you'll see the code go back,
12   like it's back to the floor.  That way -- then we're
13   able to do it.
14        Q.  So if it's sent back to the floor because the
15   30 days has ran, they did not respond, they didn't tell
16   you guys anything, provide you with a fraud affidavit or
17   police report, and it's sent back --
18        A.  If they send it back to the floor, yes, sir, we
19   can collect on it.
20        Q.  And by they, do you mean management or the
21   fraud department or who is they?
22        A.  That is correct.
23        Q.  So management or fraud department could send it
24   back to the floor?
25        A.  That is correct.  After, I guess, they sent out

Page 68

1    the media, after they sent out the docs and they have
2    the proof that it was those guys.  'Cause they wouldn't
3    put it back to the floor if they -- if it wasn't -- they
4    didn't have the proof.
5         Q.  So if it populates on your screen, then you
6    pretty much understand that this is a valid account, an
7    active account, I can collect it?
8         A.  Well, no.  It could pop up on our screen, but
9    it could still be in the dispute or fraud status.  It
10   could still be in that status.  Like I said, if they
11   called in and it says, you know, that they sent the
12   media and it's back to the floor and it's out of dispute
13   status, we can collect on it.
14        If they call in and they want to work it out,
15   they received a letter, and now they're calling back in
16   to work it out, then, yes, we continue with the call and
17   we try to help those guys get back on the right track.
18        Q.  And by right track, you mean?
19        A.  Helping them rectify their balance, setting 'em
20   up on payments or if they want to pay it off.
21        Q.  Collecting a payment from 'em?
22        A.  Correct.
23        Q.  Or a promise to pay?
24        A.  Correct.
25        Q.  All right.  Where on your screen does it show

Page 69

1    fraud status or dispute status?  Is it at the top or
2    bottom or is it in the notes or where would you find
3    that?
4         A.  I think it's like right in the middle.  It's
5    like right in the middle.  It has status.  It's right in
6    the middle.  It's on the account.  And like I said, it
7    wouldn't wait -- you know, we're not able to work it
8    until -- you know, we still have to verify those guys
9    first to see if it's them.  But the status it right in
10   the middle of our screen.
11        Q.  So the status is the middle.  What's on top?
12   Their --
13        A.  Yeah, their contact information.
14        Q.  What's on the left?
15        A.  That's the details, the banking information,
16   the date that it was opened, basic stuff like that.  And
17   at the bottom --
18        Q.  And to the right?
19        A.  And at the bottom, it's the notes.  And they
20   also have it in the notes also.
21        Q.  So at the bottom are the notes.  How big is
22   your screen?  Is it a standard screen?
23        A.  Standard, yes.
24        Q.  Like 15 inches or so?
25        A.  Correct.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 70

```
 1    Q.  It's not a really big screen like flat screen
 2   that they have?
 3    A.  No, no, no, sir.
 4    Q.  That's reserved for the managers?
 5    A.  Okay.  They do have a little bigger screen than
 6   us.
 7    Q.  Okay.  And those notes, when you see those at
 8   the bottom, how many notes do you see on your screen
 9   when it first populates?
10    A.  It all depends on when we received the account.
11   If it's a newer account, it won't have too many lines on
12   it.  But if it's been in our office for years, then we
13   would see, you know, the updated, the most recent notes.
14   And then if we want to see more, we just have to scroll
15   down, and we'll see the rest.
16    Q.  The most recent ones are on top?
17    A.  No.  The most recent ones is at the bottom.
18    Q.  At the bottom of your screen, but those are the
19   ones you will see first?
20    A.  Correct.
21    Q.  And you have to scroll down, you said, to see
22   the rest of 'em?
23    A.  Or scroll up.  I don't know how you want to --
24   you know, if we scroll, it'll go to the top.  But at the
25   bottom is the most previous ones, the recent ones.
```

Page 71

```
 1    Q.  How tall do you think that section of notes is
 2   on your screen?
 3    A.  It's about the same as the boxes that we're
 4   talking in.
 5    Q.  So two to three inches tall?
 6    A.  Yeah.
 7    Q.  And then if you want to see more than just the
 8   most recent notes, you have to scroll down through them?
 9    A.  Yeah.  Or they have -- they have this little
10   button where you can make it bigger and you can see all
11   the notes.  Or they have a button where if you just want
12   to see the notes that you contacted, that you talked to
13   the customer, you could do it that way, too.
14    Q.  Is there a find function?
15    A.  A find?
16    Q.  Right.  Like how would you know if you've
17   talked to them before?  Do you put in your employee
18   number?
19    A.  No, that's all -- that's automatic.  It has the
20   date, the time, and it has our numbers.  Mine is CP208.
21   And then if they called in, we have to put in consumer
22   called in.  Or if they call out, you know, talked to
23   consumer, you know.  Then we do the MM, Mini-Miranda;
24   QA, quality assurance.  Then we put verified date of
25   birth, Social Security number, address, and we verify --
```

Page 72

```
 1   and we document what the conversation was about.  Or,
 2   you know, the details -- or the -- we put in the
 3   arrangements on the account.
 4    Q.  So walk me through it, if you would.  What is
 5   the process that NCA requires you to follow when a
 6   consumer calls and disputes an account?
 7    A.  Well, when a consumer calls in and they dispute
 8   the account, again, we verify all of their information,
 9   we verify everything just to make sure it's them or if
10   they can recognize it or if they might -- you know, or
11   if they say they paid it already.  Sometimes they paid a
12   fraudulent company.  Sometimes they didn't even pay us,
13   but they paid someone else thinking that they -- but
14   they -- in all actual reality they paid the wrong
15   company.  Because all they've gotta do is call the
16   original creditor, and they'll tell those guys who they
17   sold the account to.  And that's National Credit
18   Adjusters.
19       So you shouldn't be talking to no one else in
20   reference with that, but they don't know that.  So when
21   another company call those guys, and then they threaten
22   these people, they threaten 'em.
23       And I always tell 'em, we have to follow the
24   FDCPA rules and regulations, and that's the Fair Debt
25   Collection Practices Act.  We can't threaten you that
```

Page 73

```
 1   we're gonna sue you or we're gonna send someone to your
 2   house to serve you with papers.  We can't do none of
 3   that.  We can't do that.  And that's what a lot of these
 4   people are getting out here.
 5       So when then said, I paid this already.
 6       No, you haven't paid it.
 7       Yes, I have proof that I paid it.
 8       That's a dispute to us.  We have to notate it
 9   as a dispute, and they have to send us whatever the
10   information.  But we know that they didn't pay National
11   Credit Adjusters.  They paid a fraudulent company.
12    Q.  So if --
13    A.  Or they're disputing the amount of it.  Because
14   they -- you know, when you default on your contractual
15   agreement, there might a little bit interest added on to
16   the account, so they dispute it that way.
17       No, I don't agree with this.  No, no, I don't
18   agree with this amount.
19       Okay.  I mean, that's fine.  But, you know,
20   they -- we have to put it in a dispute status.  If they
21   don't agree with anything or anything of that nature, we
22   have to put it into a dispute status.
23    Q.  So what I'm hearing is, if NCA -- well, if you
24   as a representative of NCA receive a call from a
25   consumer who disputes an account, first you've gotta
```

19 (Pages 70 to 73)

Page 74

1  verify all the information, is that right?
2      A.  That is correct.
3      Q.  Then you have to notate it as dispute?
4      A.  Well, we have to verify, you know, all the
5  information and find out, I mean, what is their dispute
6  obviously, what is the reason why you disputing it,
7  seeing if we can overcome that dispute, verify all the
8  information, and see if we can overcome that dispute.
9          If we're not able to overcome the dispute, yes,
10  sir.  We put it into a dispute status and we request
11  that the docs be sent out to these guys.
12      Q.  And if you get a call there at NCA and the
13  consumer claims he was a victim of identity theft, what
14  is the process you're supposed to follow then?
15      A.  Same thing.  Verify all of their information
16  and find out what they're -- if they're a victim of
17  identity theft, verify all the information.  And if they
18  are a victim, we put it in a fraud status.  We would
19  give them -- if they want to go to IdentifyTheft.gov, we
20  would give 'em the original account number, we would
21  give 'em our ID number, the amount, the date that it was
22  opened.  We would give them all that pertinent
23  information, and then we would put it into a fraud
24  status.  And we would send them the paperwork either to
25  fill out or they can go to the police station and get a

Page 75

1  report, and they have to email us that report to
2  info@ncaks.gov [sic].
3      Q.  Can you email them the fraud report to fill
4  out?
5      A.  No, we send it to those guys.  We send it to
6  'em in the mail.
7      Q.  Do you make sure that they have your email
8  address and fax number so that they can send that
9  information, too?
10      A.  Absolutely.
11      Q.  That's what the process is there at NCA?
12      A.  Yeah.
13      Q.  Make sure they have the email address or fax
14  number?
15      A.  Yeah.  And they have all the information that
16  was given to 'em, the original creditor, the date that
17  it was opened, and we give 'em all the information, yes,
18  sir.
19      Q.  And if they say that they've already filed a
20  police report, you would write down the police report
21  number?
22      A.  That's if they have a police report number.  If
23  not, if you have a police report, email it to
24  info@ncaks.gov.
25      Q.  Do you think that the police report number

Page 76

1  really matters to NCA or do they really just want the
2  physical report?
3      A.  What?  As far as I'm concerned?
4      Q.  Sure.
5      A.  Or -- I mean, that would be helpful.  I mean,
6  if they do have a police report, but they still have to
7  -- a police number, we would notate it in the system
8  that they have a police number.  But in all actual
9  reality, they still need to email us that report to that
10  info@ncaks.gov to really make it valid.
11      Q.  Can you contact the police report -- or I'm
12  sorry.  Strike that.
13          Can you contact the police department with the
14  police report number and request the report from the
15  police department?
16      A.  That I don't know.  I've never even heard that
17  for eight years.  No one ever gave me like a number.
18  That's something different for me.  I've never even
19  heard that.  But I mean -- I mean, I wouldn't.  I
20  wouldn't call the police department.  I would tell them
21  for them to go to the police department and obtain that
22  report and email it to us.
23      Q.  Would you even be allowed to contact the police
24  department?
25      A.  That I would ask my manager.  I would ask my

Page 77

1  manager in reference with that one because I don't -- I
2  don't know for sure that answer.
3      Q.  It could go possibly into that talking with
4  third parties process, right?
5      A.  No.  If they -- if they ask me -- if they give
6  me permission to talk to someone, I can talk to them.
7  If they give me verbal permission -- we have this script
8  that we have to say.  And if they give me permission to
9  talk to someone, yes, I would talk to them.
10      Q.  You can call out and speak with --
11      A.  I can -- I'm not gonna call -- I'm not gonna
12  call the police station just me just calling 'em to
13  verify if that person filled out a report with this
14  number.  I can't.  I'm not gonna do that.  We can't do
15  that because they didn't give me permission to call
16  those guys.  They didn't -- we need them on the phone
17  and they need to be on the phone.  I can't call 'em.
18      Q.  So the customer can't give you permission to
19  call the police department?
20      A.  Not really sure.  I would have to ask my
21  manager in reference with that one.  But I'm not -- I
22  wouldn't -- I'm not gonna call the police department.  I
23  would just ask them to send me the information.  It's a
24  whole lot easier, if you have that number, send me the
25  police report, email it to that address.  But I would

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 78

1  verify with my manager before I would do any of that.
2  But I'm not --
3       Q.  You say it would be easier, easier for NCA,
4  right?
5       A.  Well, it'd be -- it'd be easier for -- well,
6  yeah, it would be easier for the consumer just to email
7  us the information, the report.  Because someone's gonna
8  have to email us the report regardless.  If they have a
9  report number or anything, we verify it from the police
10  station, okay, yes.  Okay.  Give me authorization.  The
11  police says, yes, we have a report.  They still have to
12  email it to info@ncaks.gov.
13       Q.  Without that email, without that fax, as far as
14  NCA is concerned, the police report doesn't exist until
15  they receive it, right?
16       A.  That is correct, sir.
17       Q.  Okay.  What are you required to say on every
18  call?
19       A.  The Mini-Miranda.
20       Q.  Anything else?
21       A.  We have to say this communication is from a
22  debt collector, this is an attempt to collect a debt,
23  any information obtained would be used for the purpose.
24  We have to say that on every call after we verify we're
25  talking to the right person.

Page 79

1       Q.  Anything else you're required to say every
2  call?
3       A.  We have to tell 'em, you know, the creditor,
4  the, you know, the amount of the debt, yeah.
5       Q.  Is it important to tell them those things on
6  every call?
7       A.  Well, absolutely, absolutely.  Some of 'em
8  forget.  Some of 'em remember.  It's different names,
9  they might forget.  So, yeah, absolutely.  It just
10  refreshes their memory.
11       Q.  And you get a lot of calls, right?
12       A.  Tremendous.
13       Q.  Tremendous amount of calls?
14       A.  Uh-huh (moves head up and down).
15       Q.  Is that right?
16       A.  Correct.
17       Q.  And so it can be pretty tough on our brains,
18  you know, when you're a hundred plus calls into the day,
19  to remember to say that every time?
20       A.  No.  That's like -- that's automatic for us.
21  That's -- every call we have to say that.  And then --
22  what is it called?  I know if it's a red thing, we have
23  to say this other disclosure.  I forgot what it's
24  called.  But if it's -- we have to say another
25  disclosure if it's in red letting 'em know the laws, you

Page 80

1  know, on the account.  But not on every call.  It's just
2  when the call is lit up in red we have to say this other
3  disclosure.
4       Q.  What does the call lit up in red signify?
5       A.  It's just letting 'em know the laws in their
6  states and their rights -- and their rights.  So like in
7  New Mexico and New York, we have this -- we gotta read
8  this long script.  It's just the laws in their state.
9       Q.  Okay.  And are you also required to state your
10  name?
11       A.  Absolutely.  You mean on every call?
12       Q.  Yes, sir.
13       A.  Absolutely.  Yeah, that's mandatory.  That's a
14  given.  That's every call.
15       Q.  Anything else?  You know, we've got state laws,
16  we got the Mini-Miranda, we got your name.  Anything
17  else you're required on every call to do?
18       A.  Got to notated, quality assurance, QA.  We've
19  gotta put if they called in or if it is either outbound
20  or call in.  We have to verify the information.  We have
21  to do the Mini-Miranda, give them the creditor, give
22  them the amount.
23       MR. BRACKETT:  Okay.  We've been going just
24  over an hour.  It's 11:20 here in Hawaii.  If you guys
25  are okay with it --

Page 81

1       THE WITNESS:  11:20.
2       MR. BRACKETT:  Yes, sir.
3       THE WITNESS:  11:00, 12:00, 1:00, 2:00.
4  Oh, I see.  You guys are three hour difference.
5       MR. BRACKETT:  Right.
6       THE WITNESS:  It's 2:00 -- no.  This is
7  Central.  What time?  Central Time, yeah, you guys are
8  -- wow.  Okay.
9       MR. BRACKETT:  What time do I have you
10  till?  Like I know earlier, you know, Ms. Claydon had
11  stated that there's a certain time you need to be out of
12  here today.  What time --
13       THE WITNESS:  You will have me here till
14  5:00, sir.
15       MR. BRACKETT:  Okay.  Very good.  And so
16  that's 2:00 p.m. my time.  So another two and a half
17  hours at most.  Is it okay with you if we go for another
18  30 minutes or so so that we can get this section done?
19  And then it should be just a little more after that.
20       THE WITNESS:  Yes, sir.
21       MR. BRACKETT:  Are you okay, Kukui?
22       THE WITNESS:  Yes, sir.
23       MR. BRACKETT:  Terri, are you doing all
24  right?
25       THE COURT REPORTER:  (Moves head up and

21 (Pages 78 to 81)

Page 82

```
 1   down.)
 2       MR. BRACKETT:  All right.  We'll keep
 3   rolling then.
 4   BY MR. BRACKETT:
 5       Q.  All right.  Let's talk about Demetre Durham.
 6   Tell me what you know about Mr. Durham.
 7       A.  I don't know anything about Mr. Durham.  All I
 8   know is he called in and he asked me what was my name.
 9   I gave him my name.  I verified all the information, and
10   I went in with the call.  And I think he -- if I
11   remember, he stated, do you have the right person?
12       And I think I stated, well, you verified all
13   the information, so, yes, I assume I have the right
14   person.
15       And that's when -- it was very brief, man.  It
16   wasn't a long call at all.  That's when -- that's when
17   he said that he -- you know, he wants the -- he wants
18   the proof that he -- he didn't -- he wanted the proof
19   that he did this.  So that's when I told him, you know,
20   I'll get the docs and send it out to him.  And I think
21   that was -- I know the call was very, very brief.  It
22   wasn't really into detail.  It was just very, very
23   brief.
24       Q.  Have you spoken with him any other times than
25   that one?
```

Page 83

```
 1       A.  No, sir.
 2       Q.  Do you know the date that you spoke with him?
 3       A.  No, sir.
 4       Q.  Would the call notes help you?
 5       A.  Absolutely.  I think it was sometime in March,
 6   March, I don't know the exact date.  March 20th.  I'm
 7   not sure.  I know it was a few months ago.
 8       Q.  March 2023?
 9       A.  Maybe -- that might be it.  I know it was in
10   March.  I know it was a few months back.
11       Q.  How do you know it was in March?
12       A.  When I heard the call or when the account
13   popped up, I seen it in the notes.
14       Q.  Did anyone else at NCA speak with Mr. Durham?
15       A.  I'm not -- I'm not -- you mean in my office or
16   within the company?
17       Q.  Within the company.
18       A.  I think someone else spoke to him, but I don't
19   know who.  I know previous -- there was previous notes
20   on it, but it wasn't -- it was my first time talking to
21   him, but I think other people spoke to him.
22       Q.  Did you have an opportunity to review the notes
23   in your call with him?
24       A.  No, sir.
25       Q.  It was too short?
```

Page 84

```
 1       A.  Correct.
 2       Q.  Did you review any of the account information
 3   when you spoke to Mr. Durham?
 4       A.  Yes, I verified his date of birth, last four of
 5   the social, and address.  And then that's when I think
 6   he asked me, are you sure, you know, you have the right
 7   person?  He said something in that nature.
 8       And I was -- I just said, you know, I was like,
 9   yeah, I mean, you -- you know, you verified all the
10   information.  I assume I'm -- yeah, I'm talking to the
11   right person.  And that was basically -- and that was
12   basically it.
13       And he just said that he requested -- that he
14   wants the docs, he wants the proof that he did this.
15       So that's when I told him, you know, you know,
16   I'll put it in a dispute status and we'll have the docs
17   sent out to him.
18       And he was just like, okay, and the call ended.
19       Q.  But you didn't have a chance to review the
20   notes?
21       A.  I mean, I seen the notes, but I didn't -- no, I
22   didn't -- I didn't look at the notes.  I didn't review
23   it or anything.  I didn't go up --
24       Q.  Did it -- oh, sorry.  Go ahead.
25       A.  No, sir.  I didn't go up, you know, all the way
```

Page 85

```
 1   since we've had the account.
 2       Q.  Did it show in the middle of your screen that
 3   it was disputed or that it was fraud?
 4       A.  You know what?  I don't think so.  I'm not --
 5   I'm not -- I don't remember that.  I don't remember
 6   that.  I don't think it stated that.  I think I put it
 7   in the dispute status.
 8       Q.  That you moved it to dispute?
 9       A.  Correct.  I'm not -- to be honest with you, I'm
10   not really sure.  I'm not really sure about that.  To be
11   honest with you.  I'm not really sure if it was already
12   in dispute or already in a fraud status.  I can't
13   remember that.  I'm not really sure.
14       Q.  If it had shown dispute or fraud in the middle
15   of your screen and have taken to look at the notes, find
16   out why?
17       A.  Absolutely.  And if -- I mean, if it was in the
18   fraud or anything status, you know, I would have asked
19   him, did he provide us with the fraud report or the
20   police report or has he received any of the docs of the
21   agreement?  I would have asked him that.  But he didn't.
22   He requested it.
23       Q.  But that wasn't the case?
24       A.  Yeah, that wasn't the case.  He requested that
25   information.  So that's when I told him, you know, I'll
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808)524-2090

Page 86

1  get the docs out to him.  And he just said, you know,
2  thank you.  Okay.  He wanted to -- he wanted to show
3  that it was him.  He wanted us to show proof to him that
4  he -- that he's the one that did this.  And that was the
5  call.
6      Q.  And you then notated the account?
7      A.  Yeah, I notated the account accordingly, yeah.
8  And I think --
9      Q.  How did you notate the account?
10      A.  Customer called in, gave him Mini-Miranda, QA,
11  verified date of birth, Social Security number, and
12  address.  And customer disputes account, wants docs.  He
13  wants the docs.
14      So I think I might have put it in dispute.  But
15  I'm not sure if it was already there.  But if it was
16  already there, I would have asked him the questions and
17  what was the reason why he was calling in and if he gave
18  us all the pertinent information.  That would have been
19  a conversation for sure.  But that wasn't the case.  He
20  was requesting -- he was requesting that we provide him
21  with that information.
22      Q.  Did you mail that information to him?
23      A.  I didn't, no.  I don't mail him anything.
24      Q.  Did you email any information to him?
25      A.  No, we don't email those guys anything.  The

Page 87

1  manager has to do that.  And whenever we get the docs,
2  you know, whatever department that handles that, mails
3  it out to 'em.  We don't do any of that.
4      Q.  Did you fax any information to him?
5      A.  No, sir.
6      Q.  Did you send any information to Mr. Durham any
7  way at all?
8      A.  No, sir.  I didn't send him anything.
9      Q.  You don't have the power to do any of that, you
10  just notate the account and let the system do what it's
11  supposed to, right?
12      A.  Or the manager.  And I put it -- I put it in
13  the correct field.  I put it either in the dispute or
14  the fraud status.  That's the only thing that we do.
15      Q.  But you couldn't put it in fraud status because
16  that wouldn't have sent him the documents, right?
17      A.  Not really -- I noted dispute.  Man, I'm not
18  really sure on that one, sir.
19      Q.  Dispute certainly sends the documents to him as
20  far as you know, right?
21      A.  Absolutely, absolutely.  And that's what he
22  requested.  I know the fraud status, you know, we would
23  need that information.  We would need for them to email
24  us that information or we send it out the information to
25  them and they have 30 days to get it back to us.  But

Page 88

1  I'm not really sure if the fraud sends out the docs.
2  I'm not really sure of that.
3      Q.  Have you ever emailed a consumer who called in?
4      A.  Not any docs or anything.  I emailed them like
5  an arrangement letter or a settlement letter.  But any
6  of that other stuff, we don't touch that.  We don't do
7  anything with that.
8      Q.  You don't send them the fraud report or the
9  police --
10      A.  No, no, we don't.  Yeah, we -- the account
11  managers, we don't do any of that.  Either the manager
12  or that department does that.
13      Q.  As far as this account is concerned, was it
14  with cashcentral.com?  Is that what you understand?
15      A.  We do collect on cashcentral.com, but I'm not
16  sure if that's what it was.  Like I said, it was like
17  three months ago.  I can't remember -- I don't know if
18  it was Cash Central, but we do collect on Cash Central.
19  We do do cashcentral.com.
20      Q.  Are those consumer debts?
21      A.  I don't know what type of debt that they are.
22      Q.  Do you have any reason to argue the debt was
23  incurred for anything other than consumer purposes?
24      A.  I mean, obviously, you know, when people go to
25  them establishments, they need the money.  They're in

Page 89

1  some type of situation they need the money, so that's
2  when they go and they obtain these short-term loans.
3      Q.  They're personal loans, right?
4      A.  We call 'em short-term.
5      Q.  Have you ever called a business to collect a
6  debt?
7      A.  No, sir.  We don't -- we don't have like
8  business-to-business accounts collections.
9      Q.  At NCA, you guys collect consumer debts, right?
10      A.  Correct.
11      Q.  As a collector there in Arizona, do you have to
12  register with the state?
13      A.  No, sir.  I didn't have to register.  I've been
14  on collections for 20 years.  I never registered with
15  the state.
16      Q.  Some states require it, some don't.  You know,
17  I didn't know if that was required in your state or not.
18      Have you worked in any other states?
19      A.  No, sir.
20      Q.  And you say you've been doing collections for
21  20 years.  Where were you before NCA?
22      A.  The Law Office of Joe Pezzuto.
23      Q.  How long were you with them?
24      A.  Eight years.
25      Q.  And what about before that?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 90

1    A. I can't even remember. I've always stayed at a
2  job for a long period of time. This is basically my
3  second. I don't jump around from job to job. I have a
4  good stability history of it.
5    Q. Great. It's hard to find nowadays.
6    A. You know, I've gotta take care of my family,
7  man, you know. I'm the only one, you know. So if I go
8  down, everything goes down. So...
9    Q. Yeah, gotta pay that mortgage, right?
10   A. Well, pay. It is what it is. Rent or
11  mortgage, you're gonna have to pay something. You've
12  gotta pay something. So, you know, and it's tough out
13  here for people these days. You know, that's why
14  they're in the situations that they're in. You know,
15  it's just tough out here.
16      So we just try to give them that courtesy and
17  try to help 'em out and understand their situation and
18  try to do the best that we can for 'em when we talk to
19  'em on the phone. So that's all we can do.
20   Q. Yeah, I wish I could afford a mortgage.
21   A. It's, you know, in Arizona, man, the average
22  houses, man, it's like $400,000, man. It's like 2,800 a
23  month. I mean, two bedrooms is like $2,000, $2,200,
24  man. It's ridiculous, man. Everything, gas, food is
25  going up. Everything's going up but my paycheck, you

Page 91

1  know. It's unbelievable these days. You know, it
2  really is. You know, but it is what it is, you know.
3  And in the state of Arizona, so many people have lost
4  their home -- their homes. I forgot the percentage of
5  it, literally lost their homes, you know. It's unreal.
6  You know, everything goes up, food, gas. Everything go
7  up, but our paychecks, man. That remains the same. So
8  that just puts you in, you know, a bad situation, you
9  know. That debt to ratio is not there. It doesn't add
10  up, you know. So...
11   Q. It sounds like you empathize with your
12  customers?
13   A. Absolutely, I care. You know, that's the
14  bottom line is I care. You know, a lot of people just
15  want to get the money, want to get the money, you know.
16      But, no, these people are human beings, just
17  like me. You know, people have problems, their
18  situations. I mean, people lose their jobs. People
19  have death in their family. People -- everybody does,
20  you know, at one point in life, you know.
21      So actually I empathize a lot, you know. And
22  that's -- and they love me. They love me, and that's
23  why I'm so good at what -- of what I do, you know.
24  That's why I'm -- I've been successful this whole time.
25  I've done great all my life in collections. Done great.

Page 92

1  Had a good life.
2    Q. Bad things happen to good people.
3    A. It really does, and it's, you know, it's sad.
4  It's a sad situation, you know. But it's tough.
5      And then on the flip side of it, it's tough
6  when someone calls in knowing they owe it, but want to
7  play games, you know. Want to try to buck the system.
8  Want to try to -- just like what he did. That's all he
9  did is try to buck the system, you know. And try to,
10  you know, catch people up, and that's when they want to
11  sue people, you know. Because they -- you know, it's
12  just -- it's crazy. It's crazy these days, man, how
13  people think in society today, you know. And it's sad
14  what people do to other folks in society today. Steal
15  people -- like steal people's information, going to do
16  this, and it's just sad, man, all this identity theft
17  out here. It's sad.
18      You work hard for someone just to take all of
19  your information and screw up your life. It's just sad,
20  you know. It's so...
21   Q. It can be a real burden on people when they are
22  dealing with that.
23   A. It is a burden. It is a burden. And then it's
24  hard for them to, you know, when they're trying to
25  accomplish something and get a house, oh, this popped

Page 93

1  up. It's in a dispute status. And then they call in,
2  and it's just a big mess. It's a big mess.
3      But, you know, that's what we try to overcome
4  it, and we just try to help these people to the best of
5  our ability and the best of their ability. People on
6  Social Security, they don't have nothing. They don't
7  have my savings. They don't have no 401(k)s. They
8  don't have no retirement funds. They don't have no, you
9  know, no Roth accounts. They don't have none of that
10  these days. Society is really messed up, and a lot of
11  people they -- I feel sorry for 'em, you know.
12   Q. Takes years --
13   A. When they retire. Huh?
14   Q. Takes years to build credibility and --
15   A. Yeah.
16   Q. -- only one or two things to destroy it all.
17   A. Yeah, it's sad, man, you know. But it is what
18  it is. If you ain't smart and if you don't know what's
19  going on in society these days, you're gonna fall
20  victim.
21      MR. BRACKETT: I've got a couple of credit
22  reports to go through. We'll just do this real quickly.
23  I don't know that you've ever seen these before, so it
24  might not be super helpful. But I'm gonna share my
25  screen real quick.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 94

1    This will be Exhibit 2 to today's deposition,
2    Madam Court Reporter.
3    BY MR. BRACKETT:
4    Q.  See if I can get this pulled up.  Hopefully, on
5    your screen now is an Experian credit report.  Do you
6    see that?
7    A.  Yes, sir.
8    Q.  And it is three pages.  They're Bates stamped
9    at the bottom EXP 1, EXP 2, and EXP 3.  Do you see that
10   down here?
11   A.  Okay.
12   Q.  This was February 2023.  The date is right down
13   here and up top here.  And at that time Mr. Durham had
14   on his report this National Credit Adjusters, and it
15   said, Outcome:  Remains.
16       Have you ever seen this document before?
17   A.  No, sir.
18   Q.  Are you familiar with National Credit
19   Adjusters' credit reporting policies?
20   A.  I just know -- I just know when an account pops
21   up, it shows -- it lets us know either it's credit
22   reporting or it's not.
23   Q.  So your account notes would tell you whether
24   it's being reported or not?
25   A.  I would -- it's highlighted.  We click -- we

Page 95

1    just mouse over the credit report, and it says credit
2    reporting with a Y or an N.
3    Q.  And you said earlier that NCA reports on the
4    1st and 15th?
5    A.  That's -- yeah, that's when it's -- when the
6    account is paid in full.
7    Q.  But if they are updating or submitting
8    information to the credit reporting agencies, they would
9    do that on the 1st or 15th, is that right?
10   A.  I'm not really sure about that.  I just know
11   once they pay it off, they pay their balance in full, we
12   update on the 1st and 15th.  And our policy is 60 to 90
13   days we request that they delete our trade line.
14   Q.  Okay.
15   A.  And then 30 to 45 days, they might see a paid
16   in full status that way.  But anything else, I'm not
17   really too sure about, sir.
18       And if it's not credit reporting, it has a date
19   on there that we can see when it will credit report.  If
20   we see that, we can tell them that specified date when
21   it will report.  But if it has a no there, an N there,
22   it's -- we're not credit reporting.  But if it has a --
23   Q.  So not every account at NCA is being reported
24   to the credit reporting agencies?
25   A.  Correct.

Page 96

1    Q.  Some reports are never reported.  Or some
2    accounts.  Strike that.  I need to state a clear record.
3       Some accounts at NCA are never reported to the
4    credit reporting agencies?
5    A.  Like I said, if when we mouse over it, if it
6    has yes or N, it's not reporting, it might be too old.
7    So we -- it's not credit reporting.  But sometimes it
8    says yes, and we're not credit reporting until this
9    specified date.
10   Q.  And if they pay before it's put on the credit
11   report, will it ever be put on the credit report?
12   A.  It's possible.
13   Q.  It's possible to keep it off your credit
14   report?
15   A.  No.  It's possible that it might be reported.
16   Q.  Even though you paid it?
17   A.  Correct.
18   Q.  And you said sometimes NCA has accounts that
19   are too old to report in the credit, but they still
20   collect 'em?
21   A.  That's correct.  I mean, when we mouse over the
22   credit report and it's not reporting, but yeah, we are
23   still trying to collect the money, yes, sir.
24   Q.  And then on the bottom of this first page on
25   EXP 1, it says, Before dispute.

Page 97

1       And at the top of the second page, it shows,
2    Dispute results.
3       Mine is hard to see because the screen sharing
4    thing is on.  I can't move it.
5       But in this one it shows it as a collection
6    account and $470 past due, right?
7    A.  Correct.
8    Q.  And it was to cashcentral.com?
9    A.  Okay.
10   Q.  That was the original creditor?
11   A.  I see it.
12   Q.  And that was your guy's customer, right?  Or
13   client, I should say.  That's the NCA client, right?
14   A.  Well, yeah, yeah, they sold us the account.
15   Q.  Okay.  And then NCA was trying to collect it
16   from Mr. Durham?
17   A.  That is correct.
18   Q.  And one way that they were collecting it was by
19   reporting it to the credit reporting agencies?
20   A.  I guess, yes, sir.
21   Q.  And it says the dispute result.  It shows still
22   collection account, $470 past due.  And it says, this
23   item remained unchanged from your -- processing of your
24   dispute in February 2023, right?
25   A.  What do you mean about that, sir?

25 (Pages 94 to 97)

Page 98

1    Q. So it appears as though, according to this
2    credit report, Mr. Durham had disputed the debt, and NCA
3    verified it.
4    A. I'm not sure about that, sir. I'm not -- I've
5    never even seen this before, so I'm not really sure.
6    I'm not really sure.
7    Q. But in February, at least as of February 13,
8    2023, NCA was saying that Mr. Durham owed them this
9    money of $470 for that cashcentral.com account?
10    A. Yes, sir, that's the balance.
11    Q. Then the next one happened a couple of weeks
12    later.
13        MR. BRACKETT: Madam Court Reporter, please
14    mark this one as Exhibit 3 to today's deposition.
15    BY MR. BRACKETT:
16    Q. In March, one month later, guess like a month
17    and a half later, on March 28 Mr. Durham pulled his
18    credit again. Again, it's an Experian credit report.
19    Has some of his information. It says Experian at the
20    top here.
21        And at that time National Credit Adjusters, if
22    you can see at the bottom, it's still showing on Mr.
23    Durham's credit report, right?
24    A. Yes, sir.
25    Q. Showing it's potentially negative. So they're

Page 99

1    still reporting it in March as having a balance of $470,
2    right?
3    A. I see that.
4    Q. Do you have any reason to dispute the
5    authenticity of this document?
6    A. I don't even know what this -- I don't even
7    know what -- I've never seen this document before. I
8    don't know what's going on with the document. I don't
9    know what Mr. Durham was doing at that time. I don't
10    know what NCA was doing at the time. I don't -- I don't
11    know. I have no idea.
12    Q. Is NCA's address there in Hutchinson, Kansas,
13    the 327 West 4th Avenue?
14    A. Correct.
15    Q. And the original creditor or client for NCA in
16    this case was cashcentral.com, right?
17    A. Correct.
18    Q. And it had a statement there from Mr. Durham, I
19    have no knowledge of this account.
20        But NCA, after the reinvestigation, told
21    Experian that this item remains unchanged from the
22    processing of his dispute in February of 2023, right?
23    A. That's what it says.
24    Q. And then finally as far as credit reports,
25    that's one more I'll share.

Page 100

1        MR. BRACKETT: Madam Court Reporter, please
2    mark this as Exhibit 4 to today's deposition, I think.
3    BY MR. BRACKETT:
4    Q. And then this one is in April. Now, you said
5    you had talked to him in March 2023, right?
6    A. Yes, sir.
7    Q. Okay. So on April 5th, 2023, Mr. Durham got a
8    credit report from Experian again, and this time the
9    account is still showing up as a collection on his
10    report, right?
11    A. I see that.
12    Q. And it's still showing the $470 past due as of
13    April 2023, correct?
14    A. I see that.
15    Q. And it still shows that the item is remaining
16    unchanged from the processing of the dispute in February
17    of 2023?
18    A. Okay. What does it that mean? The item
19    remains unchanged. What does that mean?
20    Q. Mr. Durham had been asking for this to be
21    removed from his credit --
22    A. Okay.
23    Q. -- and disputed that it is owed. Again, you
24    can see a new statement here, I have no knowledge of
25    this account.

Page 101

1    A. Right.
2    Q. But despite his disputes, NCA was still
3    reporting.
4    A. Oh, they were still reporting on the credit,
5    okay. Okay.
6    Q. Does that make sense?
7    A. Oh, yeah, that makes sense.
8    Q. It does show that the account information was
9    disputed by consumer. Do you know if that was because
10    of your removal of the account and putting it into the
11    dispute status?
12    A. Account information disputed by consumer.
13    Meets requirement of the fair debt collect -- most
14    likely.
15    Q. And in regards to this reporting, it's still on
16    his collection as of April 5, 2023, right?
17    A. I see, yeah. But I don't have nothing to do
18    with his credit report. I don't have anything. I
19    didn't put anything on his credit -- on his credit
20    report at all. I didn't put anything on there.
21    Q. You didn't put anything on there. You couldn't
22    remove anything either, right?
23    A. No, no, sir.
24    Q. You didn't have that power?
25    A. No, I don't have that power at all. So, I

26 (Pages 98 to 101)

Page 102

1    mean, his -- I understand now.  I understand, you know,
2    what -- he's upset that it's on his credit bureau.
3    That's what I understand now.  He's upset it's on his
4    credit bureau, and National Credit Adjusters is
5    reporting it on there.
6         So when he's disputing it, he wants us to
7    remove it off his credit bureau and we didn't, is that
8    correct?
9    Q.  Yeah.  Absolutely.  Or at least update it as
10   disputed.  I'm going back to Exhibit 3 to today's
11   deposition, the March 28, 2023, credit report.  And on
12   this one it shows the account, it shows it as
13   potentially negative.  But I don't see anything on here
14   showing that it was disputed as of March 28, 2023,
15   right?
16   A.  Okay.
17   Q.  And as you had stated, NCA reports every 1st
18   and 15th, right?
19   A.  I'm stating that if the account is paid in
20   full.  I'm not saying we don't report every time like
21   someone makes a payment or anything in that nature.  We
22   don't report like that.  We don't report every time
23   someone makes a payment.  I'm stating that when the
24   consumer pays, when the customer pays off their bill, we
25   update on -- we send them a balance in full letter, and

Page 103

1    we update on their credit on the 1st and the 15th.
2    Every time a consumer makes a payment on the account, we
3    don't report it that way.  So...
4    Q.  In regards to your account notes, there's a lot
5    of account notes for Mr. Durham's account, and I
6    couldn't understand a lot of 'em.  There's a lot of --
7    like what does MM mean?
8    A.  Mini-Miranda.
9    Q.  I thought so.  But I can't guess, you know.
10   A.  Yeah, yeah.
11   Q.  I don't know what exactly shorthand you guys
12   may be using.
13        So, all right.  Do you know what -- what is
14   SPCL?
15   A.  SPCL, special, specialty.
16   Q.  That's okay if you don't remember.
17   A.  Yeah, I'm not really sure.  Specialty account,
18   it's like, yeah.
19   Q.  What about CAD?
20   A.  See, that's all -- that's all those guys.
21   Those are them departments.  That's not -- that's not --
22   CAD.  See, I would have to -- can you show that to me?
23   Q.  Sure.  What about TCL?
24   A.  That's -- that's those -- that's like upper
25   management.

Page 104

1    Q.  Someone else may --
2    A.  Yeah, that's upper management or -- but, see, I
3    would have to see.  If you could show me the notes.  If
4    there's anything else after that, 'cause T -- that's not
5    an account manager.  That's somebody else.  That's the
6    upper management.
7    Q.  All right.  I'm gonna show you a document here
8    in just a moment.
9    A.  Yeah, CAD.  Yeah, that's not us.  That's not an
10   account manager.
11   Q.  What about SYS?
12   A.  System.  That's not us.
13   Q.  There's a few others.  We'll just -- I'm
14   opening it up now.  Sorry.
15   A.  Okay.
16   Q.  It will take me a minute to get it pulled up.
17   Here we go.  All right.  Do you see a document on your
18   screen now?
19   A.  Yes.
20   Q.  Very good.  I'm gonna make it easier for
21   everybody.
22   A.  Yeah, if you can enlarge it a little bit more.
23   Q.  You got it.
24        MS. CLAYDON:  Are you going to mark this as
25   an exhibit?  Sorry.

Page 105

1         MR. BRACKETT:  Oh, yeah.  Thank you.
2         Madam Court Reporter, please mark this as
3    Exhibit 5 to today's deposition.
4    BY MR. BRACKETT:
5    Q.  Have you ever seen this document before, Mr.
6    Jones?
7    A.  That's the account.  Yeah, that's -- those are
8    the notes.  That's the time, the date, and it shows.
9    Now, this A155.  This right here.  That's an account
10   manager.  But this SWD and this EOD, that's -- they're
11   the one reported.  That's upper management.  That's not
12   an account manager.
13        But A155 is -- yeah, see, consumer called in.
14   That's an account manager.
15        The EODs.  All this, LKBs.  That's not an
16   account manager.  That's not us.
17   Q.  Okay.
18   A.  The J225.  That's an account -- that's an
19   account manager.  The 21, that's an account manager.
20   But the KAJ and the KBC, that's not us.
21   Q.  All right.  Very good.  I think earlier you had
22   testified that LiveVox is the dialer that --
23   A.  Yeah, that's the dialer system.  That's the
24   LiveVox call.  That's the dialer system, yep.
25   Q.  And then JDN, do you know who that might be or

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 106

1   what that means?
2       A.  No, that's -- that's not an account manager.
3   That's not one of us.
4       Q.  Very good.  The EOD, do you know what that
5   stands for?
6       A.  No, sir.  And that's -- well, that's --
7   whoever, the EOD, they reported it to the credit
8   bureaus.  That's who did that.
9       Q.  Earlier you told me your number was CP208?
10      A.  CP208, yes, sir.
11      Q.  So is this you at the bottom here of -- and I
12  should have reviewed the whole thing.  Give me just a
13  moment.  Well, just, I guess let's go to this question
14  real quick.  Is this you P208?
15      A.  Correct.
16      Q.  So this notates and demonstrates your call with
17  Mr. Durham?
18      A.  That is correct.
19      Q.  And in March of 2023, specifically March 30th,
20  2023, were you an account manager on the outbound or the
21  inbound calls at that time?
22      A.  Inbound.
23      Q.  Okay.  And so as far as that's concerned, would
24  this have signified an inbound call from Mr. Durham at
25  1:39 p.m.?

Page 107

1       A.  No.  This one right here.  Consumer called in.
2       Q.  Oh, this one.
3       A.  He just -- yeah, this one right here, consumer
4   called in.  He just gave -- probably he gave me like
5   another number.  I updated something.  He gave us
6   permission to call him more if we need, and he -- I
7   entered another number in the system for him.
8       Q.  But this is your note, this would have been how
9   you made it, phone number, consumer gave permission to
10  call blank; which I guess the number has been redacted;
11  entered as cell phone.  Is that what you did?
12      A.  Correct.
13      Q.  And then the call continued and -- oh, it says,
14  consumer called in, called something.
15          Did you call him back?
16      A.  No, sir.  That's just -- I don't know why it's
17  blank like that, but the consumer called in, and I put
18  it in -- well, we have to go through the cannot pay now
19  status.
20          But if you slide back over, there go my notes
21  right here.  Consumer called in, gave Mini-Miranda, QA;
22  Mini-Miranda, QA, verified date of birth, Social
23  Security number, and address.  And I just put, customer
24  dispute account, want docs.
25          And then I moved the account to no pay dispute.

Page 108

1   Oh, shoot.
2       Q.  That's what happens when you put up a no pay
3   dispute?  The screen goes black?
4       A.  Oh, shoot.  What happened here?
5       Q.  You may have to stay in that office longer if
6   you mess up that.
7       A.  I can hold it.  It was up here.  Hold on.  How
8   did she have it up here?  Oh, that might be it.
9       Q.  That looks better.
10      A.  Is that good, sir?
11      Q.  Much better.  Thank you.
12      A.  Okay.  Okay.
13      Q.  I think you did it better than the previous
14  person.
15      A.  Short cords, man.
16      Q.  So I apologize.  You were saying that you made
17  this note.  This is your, you know, your employee ID
18  number, P208, right?
19      A.  Correct.
20      Q.  And you spoke with Mr. Durham?
21      A.  Correct.
22      Q.  And this is an accurate statement of what
23  happened during that call?
24      A.  Yes, that's accurate.
25      Q.  And do you have any reason to doubt the

Page 109

1   validity of this document?  Or I apologize.  Let me
2   restate that.
3           Do you have any reason to doubt the
4   authenticity of this document?
5       A.  What do you mean authenticity?
6       Q.  As you can see at the bottom, there is a Bates
7   stamp, NCA 07 -- 0007.
8       A.  Yeah, I don't seen know what that means.
9       Q.  This document, I would state --
10      A.  What did you say, sir?  You're fading in and
11  out.
12      Q.  You were working there at NCA and -- sorry
13  about that.  I said, in your employment there at NCA, is
14  this how you would see the notes?
15      A.  That is correct.  Well, I mean, no, we wouldn't
16  see the notes with this black stuff right there.  I
17  mean, we wouldn't see the notes.  That's not how the
18  notes look.  But I don't never seen no --
19      Q.  So other than the blacked out information?
20      A.  That might -- huh?  What did you say, sir?
21      Q.  Everything else looks --
22      A.  Yes, sir.
23      Q.  Other than the blacked out information,
24  everything else looks pretty accurate?
25      A.  Correct.

28 (Pages 106 to 109)

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808)524-2090

Page 110

1    Q. And this is how you would have input that note?
2    A. That is correct. Now, see this right here,
3    this Demetre Durham media will not be sent, failed risk
4    assessment.
5    Q. So what does that mean?
6    A. That means that we didn't have -- we didn't
7    have the media. We have to request it through
8    cashcentral.com.
9    Q. And in spite of the fact that you didn't have
10   the media, what happened after that? What did it show
11   on the notes here occurred next?
12   A. I have no idea. I didn't do that. That's EOD.
13   That's the system. I didn't do that.
14   Q. What does EOD stand for?
15   A. I have no idea. That's the system. That's --
16   yeah, we don't have anything -- none of the account
17   managers have nothing to do with that.
18   Q. You can see that the account was reported to
19   the credit bureaus on March 1st and March 15th, right?
20   A. Correct.
21   Q. And then same entry as here, the system
22   reported the account to the credit bureaus again on
23   April 1st, 2023, right?
24   A. Correct.
25   Q. And let's go back up. On the top it has some

Page 111

1    basic information. How much was owed on this account?
2    A. Yes, sir.
3    Q. How much was that amount?
4    A. 470.56.
5    Q. So we're down, it looks as though there was a
6    check date of July 5th, 2022. Is this a payday loan?
7    A. Yes, sir, that's an online payday loan.
8    Q. And what was the original balance?
9    A. 400.
10   Q. And then there were some fees added to it?
11   A. Yeah, the 70.56.
12   Q. And then the last due date is shown as July
13   5th, 2022. So it went into default the next day, is
14   that what it's telling us?
15   A. Correct.
16   Q. No references?
17   A. Correct.
18   Q. At least none that were in the system there at
19   NCA?
20   A. Right, that's correct.
21   Q. You guys did have the driver's license number,
22   right?
23   A. Correct.
24   Q. Did Mr. Durham dispute that that was his
25   driver's license number?

Page 112

1    A. I didn't -- we didn't discuss that.
2    Q. It looks like there was a call from LiveVox on
3    November 30th, 2022. And then a new address was entered
4    as Edgewater Drive in Ewa Beach, Hawaii, on December
5    1st, 2022, right?
6    A. Correct.
7    Q. But that address wasn't in the account before
8    that. The previous day, there was a letter sent to his
9    address in Antioch, Tennessee, right?
10   A. Correct, I see that. Yeah, but that's none of
11   us. That's none of the account managers. We didn't do
12   any of that. We didn't send none of that out. That's
13   either the system or the upper management did that.
14   Q. Do you know who A155 is?
15   A. No, sir. Me personally, I don't know who A155
16   is. But I can -- I mean, it's -- we can find out who
17   that person is.
18   Q. That's pretty easy to search within the --
19   A. Yeah, yeah.
20   Q. What about J195?
21   A. Now, that's a Jamaica. That's a Jamaica
22   person. That's -- yeah, that's Jamaica.
23   Q. What about J225?
24   A. That's Jamaica.
25   Q. Do you know who either of these individuals

Page 113

1    are?
2    A. I would have to look it up.
3    Q. Do you know who LKB is?
4    A. No. That's like a system, that's a system
5    thing. That's not -- that's not, yeah, that's not an
6    account manager.
7    Q. Do you know who JAB is?
8    A. No, that's not an account manager. Any account
9    manager would either CP is for the Chandler office, CA
10   is for our Peoria office, Jamaica is J, starts with a
11   JA, and Hutchinson, what is Hutchinson? Hutchinson is
12   something else. But if you don't see that, that's not a
13   person. That's a system issue.
14   Q. What about this A030?
15   A. Now, that's -- that's somebody. That's an
16   account manager.
17   Q. Did you say they're in Peoria?
18   A. Most likely.
19   Q. What about --
20   A. We can always find out who that is, though.
21   Q. Pretty easy to find out, right?
22   A. Yeah.
23   Q. Probably just take a couple of seconds?
24   A. Yeah.
25   Q. Any idea what DMD stands for?

29 (Pages 110 to 113)

Page 114

1    A. No, I don't know what that is, but that's a
2 system issue. That's a system. That's not a live
3 person doing that. Well, it ain't one of the account
4 managers.
5    Q. And then SLE, you said that's a system thing,
6 too?
7    A. Correct. But that meant that we didn't have
8 the media. We have to wait for cashcentral.com to get
9 it to us. But those others, this FAG, this EOD, see
10 moved to -- see, here it is right here.
11    It says, move to -- on 4/18/2023, it says, Move
12 to floor, the account disposition changed at follows.
13    But then move to floor. Then it has -- see, I
14 don't know. This is -- move to fraud, account
15 disposition changes, account changed, change section.
16    Marked account for CBR.
17    Now, right here it says, Marked the account for
18 CBR removal, marked account for CBR removal.
19    This was on 4/18. Claims true identity fraud,
20 open. Account fraudulently opened. Provide -- whoa,
21 whoa, whoa -- docs.
22    Now here go. Here go the docs and stuff right
23 here. Docs attached, including FTC report.
24    Received correspondence.
25    Okay. Yeah. Okay. Okay. That's when he sent

Page 115

1 us the correspondence, Durham. Durham sent us the
2 correspondence, scanned the docs, claim ID theft with
3 the police report.
4    Okay. So he already -- he already did -- I
5 mean, this was all way back in 2023. Why -- we in 2024.
6 This is crazy. And then they filed one 2023, this EOD
7 is reported to the credit bureaus.
8    Yeah, but that's not an account manager.
9    That TAC and, received lawsuit from -- what?
10 What is this? 6/9 --
11    Q. Real quick. Tell me about this EOD account
12 reported to credit bureaus. It says, Account 16829300
13 reported to credit bureaus.
14    That means that the system there at NCA
15 reported it to the credit bureaus for Mr. Durham, right?
16    A. Correct.
17    Q. On May 1st, 2023, is that right?
18    A. That's what I see. Yeah, correct.
19    Q. So despite the previous entry saying, marked
20 account for credit bureau removal on April 18th, it was
21 still reported on May 1st, 2023, by NCA, right?
22    A. That's what it shows right there.
23    Q. All right.
24    A. Yeah, that's the system. You know, the account
25 manager didn't do any of that, but that's what the

Page 116

1 system is indicating.
2    Q. And any time it shows this, you were showing me
3 there a moment ago, account disposition changed and it
4 says, Moved to floor, that means that it's back in
5 collections, right?
6    A. I'm not -- I'm not -- not really sure about
7 that one. Don't -- I'm not -- I don't know who FAG is,
8 but I'm not really sure about that one.
9    It just says, Moved to floor, account
10 disposition changed as follows.
11    I guess they moved it, the disposition because
12 it went right seconds, you see the time stamp. The time
13 stamp was the same with the seconds right here. The 17,
14 there's only 10 seconds. They moved it to the floor.
15    So that -- yeah, that wasn't -- I'm not really
16 sure about that. But they moved it to a fraud status on
17 -- where did you go, sir?
18    Q. Sorry about that. I was trying to look for the
19 other ones. Go ahead. Yeah, seconds later they moved
20 it to fraud.
21    A. They moved it to the fraud status, so that's
22 what happened there. So it was already, I mean, in
23 fraud. I mean, the change section; account changed,
24 changed section. Marked account for CBR removal.
25    That's all seconds within each other on

Page 117

1 April 18. So I don't know what happened after that.
2    Q. What is the typical thing that you, as an
3 eight-year veteran working there at NCA, one of their
4 best employees, if you see moved to floor on the notes,
5 what does that usually mean?
6    A. Well, as far as I'm concerned, when it says
7 moved to floor, that means that -- but I don't see that
8 they mailed -- that they mailed him the proof. Normally
9 it would have the address and that letter stamped that
10 they mailed him the proof. I don't see that under that.
11 I don't see that if he was requesting those docs.
12    Because we did receive something. There was
13 docs. He did send over some, but we didn't -- I didn't
14 see that on there. So I'm not really -- I'm not really
15 sure what that -- what that meant. Because, I mean, it
16 really -- it went right into a fraud status afterwards,
17 so it wasn't like moved to the floor and then moved
18 to -- it wasn't on the floor and -- I'm not really sure
19 to be honest with you. I don't know.
20    I just know when it says moved to floor, it has
21 the address under there that we sent him the docs. We
22 sent him the proof. I don't see that. So I don't know.
23 I don't know what that means.
24    Q. I'm showing you another entry on February 23rd,
25 2023. It says, Moved to dispute account disposition

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

Page 118

1    changed as follows.
2        Is there usually information after these
3    semicolons. It looks like might be stuff missing?
4        A. No, no, it ain't nothing -- there's nothing
5    missing. That's it. There's nothing missing after them
6    colons.
7        Q. Then it says at 5:11:47 p.m. on February 23rd,
8    2023, it says, Attorney closed, moved back.
9        What does that tell us?
10    A. I have no idea, sir.
11    Q. Do you know who what KMD is?
12    A. No, sir. That's one of them upper management
13    people. I don't know. I don't know who that is.
14    Q. And then the account got moved again two
15    minutes later to fraud.
16    A. Yeah, same KMD.
17    Q. And then five hours later, 11:06 [sic] it says
18    that it was moved to temp fraud. What is temp fraud?
19        Is that that 30-day thing that we were talking
20    about earlier?
21    A. Well, yeah, or -- yeah, or we don't have any of
22    the information. Or we don't have, you know, we don't
23    have any -- no information. They just saying it's
24    fraud, but we don't have no report. We don't have
25    anything. And that's EOD. I don't even know what that

Page 119

1    is.
2        Q. Might that be end of day?
3        A. I'm not really sure.
4        Q. What about this, on March 26, 2023, at 10:34
5    p.m. it says, Move to temp.
6        Do you know what that file is?
7        A. No, sir. I don't know what EOD --
8        Q. A minute and a half later it's moved temp to
9    H101. Do you know what H101 is?
10    A. No, sir. I don't get into none of that -- all
11    that stuff there, man. That ain't mine. That ain't my
12    deal. Do you know what I'm saying, sir? That I
13    don't -- that ain't my deal. All I want to see is the
14    balance and if you want to pay.
15        All this stuff right here, that's them. That's
16    the system. That's -- we don't have nothing to do with
17    that.
18        But, I mean, we do have something to know what
19    status it's in and everything. But, no, I don't know.
20    I don't know what all that it is, sir. And strategy
21    code applied, and I don't know what that is.
22        Q. Your job as an account manager is to verify --
23    A. Account manager is get money.
24    Q. Get money, is that right?
25    A. Correct.

Page 120

1        Q. All right.
2        A. And put it in the right field and the right
3    status when the time permits. If it's in dispute or
4    fraud, put it in there. Give 'em the pertinent
5    information, verify, you know, stuff like that.
6        But all this, this system stuff, yeah, we don't
7    do that, sir. We don't -- that's not -- those are not
8    account managers like me. That's something totally
9    different.
10    Q. What about this 103? Do you know who this
11    might be?
12    A. No. That's the same thing. This is -- this
13    claims true identity fraud.
14        Yeah, that's not a person. This 103, that's
15    not a person.
16    Q. Yeah. So your job as an account manager at NCA
17    is to do what?
18    A. Is to get money, collect the money. Verify,
19    you know, just do, you know, what the FDCPA rules and
20    regulations want us to do. We abide by the law and try
21    to collect the debt, and try to collect the debt.
22        And if it's a dispute or whatever, we do the
23    proper procedures to put it in dispute and put it in
24    fraud statuses. And basically it's just collections,
25    yeah.

Page 121

1        But all this moving stuff to the floor and
2    moving all that, we don't have nothing -- and reporting
3    to the credit bureaus, we don't have nothing to do with
4    that.
5        Q. You can't control any of that?
6        A. No, sir, we can't control that.
7        MR. BRACKETT: All right. Let's take a
8    quick break. I've only got a couple more questions.
9    Should be able to wrap it up in 30 minutes or so.
10    THE WITNESS: Okay.
11    MR. BRACKETT: And off the record at 12:27
12    here in Hawaii.
13        (Break from 12:27 to 12:40.)
14    MR. BRACKETT: Okay. Back on the record at
15    12:40.
16    BY MR. BRACKETT:
17    Q. And a couple of things, first off, Mr. Jones,
18    did you speak with your attorney during the break?
19    A. No, sir.
20    Q. And in regards to documents, I'm gonna share my
21    screen real quick. We were just talking about a little
22    bit of stuff. I want to just get this exhibit -- oh, I
23    don't have it. Oh, yeah, I do.
24        This is going to be Exhibit 6 to today's
25    deposition. Have you ever seen this document before or

Page 122

1  one like it?
2      A.  Yes, sir.  That's the details.  Yes, sir.
3      Q.  Is this something you would access as an
4  account manager there at NCA?
5      A.  Yeah, they -- it shows -- yeah, the open date,
6  and -- well, and the last reported and the last payment
7  date and stuff like that, yes, sir.
8      Q.  Is there any reason that you have to dispute
9  the authenticity of this document?
10     A.  No, I don't dispute it.
11     Q.  Okay.  And this is Mr. Durham's account that
12  we're discussing again, right?
13     A.  Correct.
14     Q.  Did NCA have any other accounts for Mr. Durham
15  in its system that you're aware of?
16     A.  No, sir.
17     Q.  So this would have been that cashcentral.com
18  account, right?
19     A.  Correct.
20     Q.  And this document tells us -- or what does it
21  tell us about the dispute?
22     A.  Dispute was added on March 30, 2023.
23     Q.  And that's when you spoke with him, right?
24        We can go back to Exhibit 5, if you would like.
25  Let's go back to that real quick.  And previously I

Page 123

1  think you had testified you talked to him in March
2  of 2023, and then back on Exhibit 5 here, I think you
3  had said that this was your --
4      A.  Okay.  Yes, sir.  Yes, sir.
5      Q.  And what date did you speak to Mr. Durham?
6      A.  March 30, 2023.
7      Q.  And as a result of that call, my understanding
8  is your testimony was that you moved the account to a
9  dispute status, is that right?
10     A.  Correct.
11     Q.  So going back real fast to Exhibit 6, that
12  coincides with what Exhibit 6 is showing us, right?  It
13  was added to dispute status on March 30th, 2023, right?
14     A.  Correct.
15     Q.  But Mr. Durham had disputed it before that,
16  right?
17     A.  That's what I seen in the previous notes.
18     Q.  And so it was originally disputed or at least
19  was disputed on February 15, 2023, right?
20     A.  That's what it shows there, yes.
21     Q.  And again, you have no reason to doubt the
22  authenticity of this document, do you?
23        Is has a Bates stamp at the bottom, NCA 0009.
24  This came from NCA?
25     A.  Correct.

Page 124

1      Q.  This is a document you guys maintain in your
2  system there at NCA, right?
3      A.  Correct.
4      Q.  You've seen a similar kind of document like
5  this before?
6      A.  Yes, sir.
7      Q.  And so it would show us, according to this
8  document, that Mr. Durham's account was disputed back on
9  February 15, 2023, right?
10     A.  Yes, that's when it was reported.
11     Q.  But the dispute wasn't added until March 30th,
12  2023?
13     A.  Correct.
14     Q.  Last thing we'll go through today is the phone
15  call.  I'm gonna play it for you, but I also have the
16  transcript, so I'm gonna share the transcript.  This
17  will be Exhibit 7 to today's deposition.  I'll get to
18  that in just a moment.
19        First off, I'm going to hopefully get my
20  computer to do what I want it to do.  Just a moment.
21        Previously I think you had testified you only
22  spoke to Mr. Durham once, right?
23     A.  Correct.
24        MR. BRACKETT:  All right.
25        (Audio played.)

Page 125

1  BY MR. BRACKETT:
2      Q.  Okay.  So a couple of quick questions about
3  that.  First off, was that your voice, Mr. Jones?
4      A.  Yes, sir.
5      Q.  And is that the entirety of the call you had
6  with Mr. Durham?
7      A.  Yes, sir.
8      Q.  And when you received the call, you were
9  attempting to collect the cashcentral.com debt from Mr.
10  Durham?
11     A.  What was that, sir?
12     Q.  When you received the call, were you attempting
13  to collect the debt, that cashcentral.com debt from Mr.
14  Durham?
15     A.  Yes, sir.
16     Q.  You believed you had the right guy?
17     A.  Correct.
18     Q.  In spite of the notes that previously had been
19  input into NCA's system?
20     A.  Correct.
21     Q.  And in spite of Mr. Durham's credit --
22     A.  Yeah, he verified all the information, so I
23  have the correct person.
24     Q.  So in spite of the previous notes saying he
25  disputed it and in spite of his credit reporting

32 (Pages 122 to 125)

Page 126

1  disputes, you still believed, based on what you were
2  seeing there in your system, that this was the right
3  guy?
4      A.  Well, he requested -- excuse me, sir.  He
5  requested that he wanted -- he said if I thought that he
6  was the right person.  He requested -- he wanted to see
7  the docs, the documentation.  So I was -- I wanted to
8  provide him with the documentation.  And what we do, we
9  put it in the dispute status.
10     Q.  At the beginning of the call, NCA wanted you to
11 collect from Mr. Durham, right?
12     A.  That is correct.
13     Q.  And that's why it wasn't in a dispute status
14 when he called in that day?
15     A.  Correct.
16     Q.  NCA requires a physical identity theft
17 affidavit or a police report to stop collecting from a
18 consumer who claims fraud, right?
19     A.  Correct.
20     Q.  And a consumer's only other option is to pay
21 the debt?
22     A.  That's if he -- if we find the validity that
23 it's -- that it's him that owes the debt, yes, sir.
24     Q.  Do you have any reason to dispute the
25 authenticity of that recording?

Page 127

1      A.  No, sir.
2      Q.  And was the transcript, Exhibit 7 to today's
3  deposition, an accurate portrayal of that recording?
4      A.  Yes, sir.  That's when I moved it to a dispute
5  status on that day.
6      Q.  I thank you for that.  Mr. Durham thanks you
7  for that.
8      A.  Okay.
9      MR. BRACKETT:  Let's take about one-minute
10 break.  I want to just see if I have any that questions.
11 I think I'm pretty much done here.  I want to make sure
12 I don't miss anything, though.  Give me just one minute.
13     THE WITNESS:  Yes, sir.
14     MR. BRACKETT:  Off the record at 12:53.
15     (Off the record from 12:53 to 12:54.)
16     MR. BRACKETT:  All right.  Back on the
17 record at 12:54.
18 BY MR. BRACKETT:
19     Q.  Mr. Jones, have you communicated with
20 cashcentral.com regarding this debt?
21     A.  No, sir.
22     Q.  Could you have called cashcentral.com as an
23 employee of NCA?
24     A.  No, sir.  Yeah, they sold the account to us.
25     Q.  And you, as an account manager, you don't have

Page 128

1  the ability to contact the original creditor and speak
2  with them?
3      A.  No, sir.
4      Q.  Not in regards to any customer's dispute or
5  anything?
6      A.  No, sir.
7      MR. BRACKETT:  Okay.  That's all of the
8  questions that I have.
9      Ms. Claydon, do you have any questions for this
10 witness.
11     MS. CLAYDON:  No.  I just wanted to note
12 for the record that Mr. Jones has been called in as
13 personal capacity as an employee, not as a
14 representative on behalf of the company.
15     MR. BRACKETT:  That's correct.  Thank you
16 for reiterating that.
17     And any final spellings before we end, Ms.
18 Hanson.
19     THE COURT REPORTER:  (Moves head from side
20 to side.)
21     MR. BRACKETT:  Okay.  I have two quick
22 questions then, Mr. Jones.
23     THE WITNESS:  Yes, sir.
24     MR. BRACKETT:  I think your attorney has
25 already stated this off the record before we went back

Page 129

1  on, but you have the right to read and review your
2  deposition transcript.  Would you like the opportunity
3  to read and review it?  And Ms. Claydon may talk on your
4  behalf.
5      MS. CLAYDON:  Yeah, Mr. Jones, we've
6  advised that we would like you to have the opportunity
7  to review.
8      THE WITNESS:  Yes, yes, sir.
9      MS. CLAYDON:  We can accept it from the
10 court reporter on your behalf and get it to you for
11 review.
12     THE WITNESS:  Yes, ma'am.  Yes, sir.  I
13 would like that.
14     MR. BRACKETT:  And the second question is,
15 would you guys like to obtain a copy of today's
16 deposition.
17     THE WITNESS:  Yes, sir.
18     MR. BRACKETT:  Okay.  All right.  Then
19 we're off the record at 12:56 p.m.
20     (Concluded at approximately 12:56 p.m., May
21 14, 2024.)
22     (Jones Deposition Exhibit Nos. 1 through 7,
23 inclusive, were marked for identification.)
24          * * * * *
25

33 (Pages 126 to 129)

Page 130

```
 1        I, IVAN JONES, hereby certify that I have read the

 2   foregoing typewritten pages 1 through 129, inclusive,

 3   and corrections, if any, were noted by me, and the same

 4   is now a true and correct transcript of my testimony.

 5        DATED:  Chandler, Arizona _____

 6

 7

 8

 9        _____

10                IVAN JONES

11

12

13   Signed before me this _____

14   day of _____ 2024.

15

16

17   _____

18

19   Durham vs. National Credit Adjusters, LLC.; Civil No.

20   1:23-CV-00244 LEK-WRP; Deposition taken on May 14, 2024,

21   by Terri R. Hanson, RPR, CSR No. 482.

22

23

24

25
```

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

```
1                        CERTIFICATE

2   STATE OF HAWAII )
                     )   ss.
3   COUNTY OF KAUAI )

4        I, TERRI R. HANSON, RPR, CSR NO. 482, do hereby
    certify:
5

6        That on Tuesday, May 14, 2024, at 9:02 a.m.,
    Hawaii Standard Time, appeared before me IVAN JONES, the
7   witness whose deposition is contained herein; that prior
    to being examined, the witness was by me duly sworn;
8

9        That the deposition was taken down by me in
    machine shorthand and was thereafter reduced to
    typewriting; that the foregoing 131-page transcript
10  represents, to the best of my ability, a true and
    correct transcript of the proceedings had in the
11  foregoing matter;

12       That pursuant to Rule 30(e) of the Hawaii Rules
    of Civil Procedure, a request for an opportunity to
13  review and make changes to this transcript:

14   _X_ Was made by the deponent or a party (and/or their
         attorney) prior to the completion of the
15       deposition.
     ___ Was not made by the deponent or a party (and/or
16       their attorney) prior to the completion of the
         deposition.
17   ___ Was waived.

18

19       I further certify that I am not an attorney for
    any of the parties hereto, nor in any way concerned with
    the cause.
20

21       Dated this 27th day of May, 2024, in Inver Grove
    Heights, Minnesota.

22

23            Terri R. Hanson
              TERRI R. HANSON, CSR NO. 482
24            Registered Professional Reporter

25
```