IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| DEMETRE DURHAM, | Civil No. 23-00244 MWJS-WRP |
| Plaintiff, | ORDER ON PLAINTIFF'S MOTIONS IN LIMINE NOS. 1-12 AND DEFENDANT'S MOTIONS IN LIMINE NOS. 1-6 |
| vs. | |
| NATIONAL CREDIT ADJUSTERS, LLC, | |
| Defendant. | |

## INTRODUCTION

Trial is set to begin on September 22, 2025, on two of Plaintiff Demetre Durham's claims against Defendant National Credit Adjusters, LLC (NCA): one under the Fair Credit Reporting Act (FCRA) and the other under the Fair Debt Collection Practices Act (FDCPA). In advance of trial, the parties filed timely motions *in limine*, and the court held a hearing on these motions on September 8, 2025.

By way of this order, the court now resolves each motion. As the parties are aware, however, *in limine* rulings are provisional. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). While the parties must therefore comply with these rulings so long as they are in place, the parties may ask the court to revisit them at the appropriate point during trial—and, indeed, must do so to preserve their evidentiary contentions for appeal. *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015).

## <u>DISCUSSION</u>

**A.    Defendant's Motion *in Limine* No. 1 [Dkt. No. 84]**

In its first motion *in limine*, NCA seeks to preclude Durham from offering speculative testimony on alleged damages.  This motion is DENIED.

1.    NCA notes that "[i]t is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery."  Dkt. No. 84-1 at PageID.878 (quoting *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001) (citations omitted)).  And as examples of what it casts as speculative, NCA identifies specific damages theories drawn from Durham's disclosures:  alleged damages stemming from (1) "loss of credit opportunity and chilling/deterrent effect on applying for credit"; (2) "being deterred in applying for future lines of credit"; (3) "[l]ost opportunities to obtain credit in the form of unspecified number of credit offers"; and (4) "damage to credit scores [that] also impact[ed] the interest rates on current loans, credit requested during the inaccurate reporting, if applicable, or caused decreased credit limits on existing accounts."  *Id.* at PageID.876 (quoting Durham's Amended Rule 26(a)(1) Initial Disclosures).  NCA also identifies Durham's anticipated testimony about "his alleged intent to purchase condominium units in Kentucky, which he alleges he intended to use to build 'generational wealth,'" as "too speculative to constitute a basis for damages."  *Id.* at PageID.878.

NCA's contention is that these alleged forms of damages are impermissibly speculative because Durham "lacks the personal knowledge" required to establish that "economic damages" were suffered. *Id.* at PageID.880. NCA further contends that none of Durham's other proposed witnesses "are qualified to opine" on Durham's "alleged economic damages" either. *Id.* at PageID.881. For example, NCA points out that Durham "has not produced sufficient evidence of what his credit score was prior to, during, and after the events at issue," and that his deposition testimony shows he himself "does not know this information." *Id.* at PageID.880-81.

2. Durham opposes the motion, but he does not dispute the basic principle that speculative damages are improper. Nor does he distinctly dispute that his own testimony will be insufficient to establish economic damages flowing from the alleged loss of an investment opportunity in Kentucky or from changes to his credit scores. He does not suggest that his testimony could somehow establish what his credit score was before the events at issue on this lawsuit, what effect NCA's conduct allegedly had on that score, or what affect any downward adjustment of his credit score had on any economic opportunity. He likewise does not argue that his testimony could establish economic harm flowing from the last Kentucky investment opportunity.

Durham instead limits himself to three rejoinders: first, that while "Defendant is entitled to claim Plaintiff's unrealized economic damages speculative, it cannot preclude the jury from hearing Plaintiff's testimony about his worry and feelings

toward his damages," Dkt. No. 105, at PageID.1111; second, that NCA's motion is too broad and lacks "specificity," *id.* at PageID.1112; and third, that NCA's motion is a summary judgment motion in disguise, *id.* at PageID.1115.

The first of Durham's arguments is persuasive as far as it goes: although NCA argues that Durham's testimony is insufficient to establish economic damages, NCA has not argued that Durham is unable to establish his own emotional or noneconomic damages. Nor has NCA argued that noneconomic damages are unavailable for the claims Durham will be advancing at trial. To the extent NCA's motion sought to preclude Durham from presenting testimony about his noneconomic damages, therefore, the motion is DENIED to that extent.

The second of Durham's arguments is unpersuasive. As noted, NCA identified a list of specific damages theories that Durham himself had disclosed through his initial disclosures; Durham is not well positioned to argue that these theories are insufficiently specific, given that NCA simply quoted Durham's own words. NCA also specifically identified the Kentucky investment opportunity—and that is a similarly specific theory of damages, as evidenced by the fact that Durham was extensively questioned about this specific topic during his deposition. NCA's motion, in other words, distinctly tees up the question of whether Durham's testimony—or the testimony of any of his other proposed witnesses—could conceivably support these damages theories. And in his

4

opposition, Durham offers no reason why Durham's testimony *would* be sufficient to support these theories.

But the court is persuaded by Durham's third argument. NCA's motion reads, in effect, like a motion for summary judgment—one designed to broadly preclude Durham from seeking economic damages at all—which is outside the appropriate scope of a motion *in limine*. Indeed, the principal case that NCA cites in support of its position is a decision in which a court granted summary judgment on the issue of damages. *See* Dkt. No. 84-1, at PageID.878-79 (discussing *Robbins v. CitiMortgage, Inc.*, No. 16-CV-04732, 2017 WL 6513662, at *18 (N.D. Cal. Dec. 20, 2017)). And a motion *in limine* "is not a proper vehicle by which to seek summary judgment on all or a portion of a claim." *Brophy v. Almanzar*, No. SACV 17-01885, 2022 WL 22871446, at *1 (C.D. Cal. Jan. 12, 2022) (cleaned up). For that reason, motions *in limine* that "seek to exclude broad categories of evidence" are "generally disfavored." *Id.* Because NCA's motion falls into that disfavored category, and because there are no circumstances here that would overcome that disfavor, NCA's first motion *in limine* is DENIED in full.

3. This does not mean Durham is free to seek a jury finding of economic damages based on speculative evidence. It is possible that, in the more particularized context of trial, it will become clear that Durham's testimony cannot establish any of his economic damages theories, or that the probative value of that testimony is substantially outweighed by the danger of "unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Accordingly, at any point during his testimony, if it truly appears that Durham's testimony—or any other witness's testimony—on any particular theory of damages is speculative, or if its probative value is outweighed by one of the aforementioned dangers, NCA may raise a specific objection to that aspect of the testimony in real time. Moreover, before a witness is allowed to opine on any economic damages theories, they will need to lay a foundation for how they have sufficient personal knowledge to offer that opinion; NCA may request an opportunity to conduct voir dire of any such foundation. To the extent it becomes evident that testimony on a line of damages is speculative *after* it has been offered, NCA may request that the court strike the testimony and instruct the jury to disregard it. And, finally, to the extent that Durham fails to offer sufficient evidence to support a jury finding of economic damages, NCA may move for judgment as a matter of law at the appropriate time. The court's limited ruling here is that it will not effectively take economic damages off the table now, in this pretrial posture, because to do so would be to allow NCA the relief of summary judgment through the guise of granting a motion *in limine*.

### B.    Defendant's Motion *in Limine* No. 2 [Dkt. No. 85]

NCA's second motion *in limine* seeks to preclude Durham and his counsel from making "prejudicial statements concerning the size of NCA and its financial status, including its alleged ability to pay . . . substantial amounts of punitive damages." Dkt.

6

No. 85-1, at PageID.899-900.  NCA further seeks to preclude "arguments concerning the differences in resources available between NCA and Plaintiff, especially as it may relate to NCA's resources available to it to conduct FCRA investigations." *Id.* at PageID.900. This motion is GRANTED in part and DENIED in part.

1.  The motion is GRANTED to the extent NCA seeks to preclude Durham and his counsel from arguing to the jury that NCA should be held *liable* based on its size or financial status, or based on any comparison between NCA's resources and those of anyone else (whether of Durham or any other individual or company).  Arguments of that sort have little if any probative relevance to the question of liability, and their inflammatory and unduly prejudicial nature is obvious.  That is true even in cases in which a larger company is litigating against a smaller company.  *See, e.g.*, *Nanometrics, Inc. v. Optical Sols., Inc.*, No. 18-cv-00417, 2023 WL 7169549, at *3-4 (N.D. Cal. Oct. 30, 2023) (ruling, in a case involving a larger and a smaller company, that "such evidence would constitute an improper attempt to garner juror sympathy based on a 'David v. Goliath' argument unrelated to the merits of the action").  It is more so in a case between an individual plaintiff and a company.  The probative value—if there is any—of evidence of this sort is substantially outweighed by the risk of unfair prejudice, confusing the issues, and misleading the jury.  *See* Fed. R. Evid. 403.

Durham nonetheless contends that he should be permitted to offer this inflammatory evidence, and he asserts that "[i]n FCRA cases, the resources available to

7

a data furnisher to conduct a fulsome investigation is one of the factors considered in

determining whether investigations are reasonable." Dkt. No. 106, at PageID.1122. The

court does not agree with Durham's characterization of the cases he cites. Durham

relies, for example, on *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997),

and *Johnson v. MBNA American Bank, NA*, 357 F.3d 426, 432-33 (4th Cir. 2004), in support

of his contention. But neither case held that a plaintiff could seek to persuade a jury to

find a data furnisher liable under the FCRA based on its wealth or financial status, let

alone based on a comparison between its resources and those of an individual

consumer. The cases held, instead, that it is appropriate for a jury to weigh the costs of

verifying the accuracy of information against the possible harm of reporting inaccurate

information. This kind of balancing test focuses on how costly it is to take an

investigative step—and how costly it is to fail to do so. It does not ask, as Durham

suggests, whether any particular company has the means to pay what reasonableness

demands. Nor would the court accept that if a company lacked the resources to

conduct a reasonable investigation, that it would no longer be required to do so—or

that a less capitalized company need not be as reasonable as a more capitalized one.

The question of what qualifies as a reasonable investigation does not turn on whether

any particular company can afford to be reasonable. Nor does it turn on whether the

company has more resources than any particular consumer.

In a similar vein, although Durham asserts that "[t]he reasonableness of Defendant's investigation(s) must consider the resources available to the company, which includes its financial status," Dkt. No. 106, at PageID.1123, the case he thereafter cites does not, in this court's view, support his assertion. In *Henson v. CSC Credit Services*, 29 F.3d 280, 286-87 (7th Cir. 1994), the Seventh Circuit held that while a credit reporting agency "may initially rely on public court documents, because to require otherwise would be burdensome and inefficient," such "exclusive reliance may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report." *Id.* As in *Cushman* and *Johnson*, this analysis concerns what investigative steps are reasonable in light of the costs and benefits of those steps; *Henson* nowhere suggests that this analysis at all turns on whether any particular credit reporting agency (or furnisher such as NCA) can afford to take the steps.

Finally, Durham argues that NCA's "financial status is also relevant to show motive" because NCA's "entire motive is financial gain, particularly in choosing when and how to [report credit] after being put on notice of a potential inaccuracy." Dkt. No. 106, at PageID.1125. The court does not agree that NCA's resources and relative wealth are probative of its motive in this case. To be sure, if Durham has evidence that NCA cut corners in its investigation in order to *gain* money—if he has evidence to show that NCA's investigative choices were driven by greed—he may well be allowed to offer

9

that evidence, subject to scrutiny under Federal Rule of Evidence 403. But he may not merely assert that because a company has abundant resources, surely it is cutting corners in its debt collection practices. No rational jury could rely on a speculative inferential leap of that sort, and even if one could, the danger of unfair prejudice would substantially outweigh any probative value.

In sum, nothing supports Durham's contention that he should be permitted to lead a jury to a finding of liability based on the resources or relative wealth of NCA. And the court, having carefully considered the probative value of the proffered evidence in the factual context of this case, concludes that any probative value is substantially outweighed by the dangers of unfair prejudice to NCA, confusing the issues, and misleading the jury. NCA's second motion *in limine* is therefore GRANTED to the extent it seeks to preclude Durham and his counsel from making any argument or suggestion that NCA's resources, or relative wealth compared to Durham, are appropriate grounds on which to base liability.

2. The motion is DENIED, however, to the extent Durham seeks to present evidence of NCA's resources or relative wealth for the limited purpose of supporting an argument for punitive damages.

As the Ninth Circuit has explained, while the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award, and cannot make up for the failure of other factors, such as reprehensibility," juries nonetheless "have

10

traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting." *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 777 (9th Cir. 2005) (cleaned up). At least in considering a motion to reduce any punitive damages award as constitutionally excessive, the court would be at liberty to consider not only NCA's financial condition, but also Durham's financial vulnerability. *See, e.g.*, *Miller v. Equifax Info. Servs.*, 2014 WL 2123560, at *5-*6, *9 (D. Or. May 20, 2014).

NCA's motion does not explain why it would not be appropriate for the jury to consider these factors here for the limited purpose of assessing a punitive damages award. And at the hearing on these motions, NCA confirmed that it is not seeking to bifurcate these proceedings so that punitive damages are considered only after any finding of liability has been made. Accordingly, Durham must be allowed to offer evidence of NCA's resources and relative wealth during trial, so that the evidence is available for the jury to rely on should it find liability and turn to punitive damages in its deliberation.

That said, given the limited and narrow purpose for which this evidence is admissible, and given the significant risk of unfair prejudice if the evidence is not handled appropriately, the court will carefully monitor how this evidence is presented. NCA is also invited to propose a limiting instruction that the court might give the jury during trial, shortly before or after evidence of this nature is introduced, to make clear what limited uses the jury may make of it. Counsel for Durham are admonished that

11

they may not, in any way—directly or indirectly—imply to the jury that it may find NCA *liable* based on this evidence. They may only argue that, should the jury find liability, it may consider this evidence in deciding whether punitive damages are appropriate and, if so, in what amount.

With these understandings, NCA's second motion *in limine* is DENIED only to the extent it seeks to preclude evidence of NCA's resources and relative wealth for the limited purpose of supporting a punitive damages award.

### C.    Defendant's Motion *in Limine* No. 3 [Dkt. No. 86]

In its third motion *in limine*, NCA seeks to preclude Durham from offering "documents prepared by third parties that lack foundation and lack documentation attesting to their authenticity." Dkt. No. 86-1, at PageID.910. And NCA seeks to preclude "any credit report or credit disclosures prepared by any consumer reporting agency(ies) and any credit denial(s) issued by any non-party financial institute a[s] hearsay." *Id.* NCA points out these documents "were produced by Plaintiff during discovery and were not obtained via subpoena," which NCA says raises questions about whether they are authentic. *Id.*

The court DENIES this motion because it will be more appropriate to consider NCA's objections in the more particularized context of trial. The question under Federal Rule of Evidence 901 is whether a party has offered sufficient evidence to support a jury finding that an item is what the proponent claims it is. It is possible

12

Durham will be able to lay this foundation as to at least some of these contested documents; for example, it might suffice for him to testify that he himself pulled a document from his own individual account on a third-party company's website and that the copy presented at trial is a fair and accurate depiction of what Durham personally saw on that website. *See, e.g.*, *United States v. Duncan*, No. 22-10278, 2024 WL 208138, at *1 (9th Cir. 2024) (discussing *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000)). There may well be documents for which Durham is not as well situated to offer sufficient evidence of authenticity. In either event, the court will resolve these objections as they arise at trial.

The same is true for any hearsay objections—those are best considered during trial. Durham is advised, however, that in the face of an objection from NCA, the court might not admit the entirety of a document if only a small portion qualifies as relevant non-hearsay. To give a concrete example: if Durham seeks to offer evidence that a credit report included the $470 debt, and if his argument is that this item constitutes non-hearsay because he does not propose to offer it for its truth, Durham will still need to show why other items on the credit report—including, perhaps, a credit score— should also be admitted. Given that these questions are best resolved during trial, however, the court DENIES NCA's motion to the extent it sought to preclude credit reports and other documents from third parties on hearsay grounds.

Finally, as to NCA's separate contention that the CFPB document should be excluded because none of Durham's proposed witnesses are "attorneys and therefore are unqualified to testify as to a CFPB circular that concerns complying with federal law," Dkt. No. 86-1, at PageID.910, the court is not yet prepared to agree with this contention because it is conceivable that the document might bear on the issue of what notice NCA had of its statutory obligations. Evidence that NCA had received ample notice might constitute evidence supporting an argument that NCA's failure to meet those obligations was reckless. At the same time, the probative value of the CFPB document might not be substantially outweighed by the danger of unfair prejudice or the risk of juror confusion, because—in response to Durham's anticipated argument that the document provided ample notice—NCA's representatives would likely be free to offer their own testimony of what they understood the document to require (and what ambiguities in the document they understood themselves to be acting consistently with). Nonetheless, because it is more appropriate to consider the admissibility of this document in the more particularized context of trial, the court DENIES NCA's motion as to this document as well.

### D.    Defendant's Motion *in Limine* No. 4 [Dkt. No. 87]

During discovery—and as required by governing procedural rules—NCA produced its insurance policy declaration page to Durham. NCA's fourth motion *in limine* seeks an order prohibiting the introduction of evidence concerning NCA's

14

insurance, as well as any testimony or questioning concerning insurance coverage in this matter or the ability of insurance to cover any judgment against NCA. Dkt. No. 87-1, at PageID.920. Because counsel for Durham indicated that he does not oppose this motion, it is GRANTED.

Under Federal Rule of Evidence 411, "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." And while the court "*may* admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control," *id.* (emphasis added), the court should decline to admit insurance-related evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. *See* Fed. R. Evid. 403.

Durham's written submission initially opposed NCA's motion on the ground that the insurance policy has probative value because NCA "has not conceded that it is a debt collector, while its insurance likely includes FDCPA coverage—a fact which tends to show Defendant is a debt collector." Dkt. No. 110, at PageID.1155. But counsel for NCA confirmed that it does not intend to dispute that it is a debt collector at trial, and its pretrial statement reflects this same position. Dkt. No. 78, at PageID.831 ("NCA believes the following material facts are not reasonably in dispute . . . NCA is a debt collector."). The insurance policy therefore need not be introduced for any probative value it might have on this issue.

Durham's written submission separately argued that the jury "will infer Defendant's inability to pay a judgment, especially if Defendant offers no evidence as to its financial resources as Defendant has requested." Dkt. No. 110, at PageID.1158. But it is far from obvious that there is any risk the jury would conclude that NCA would be unable to pay a legal judgment in this case; Durham has identified no reason to believe that NCA would say as much or in any way suggest to the jury that it should think so. Durham himself surely will not say anything to that effect to the jury. And it is far from obvious that a jury would find that a company is insolvent or incapable of paying a judgment merely because the jury has not been asked to consider evidence of the company's wealth; a more likely inference, in that situation, is that the jury would take it for granted that the company could pay a judgment if one is imposed. In any event, given the court's earlier ruling that Durham will be permitted to offer evidence of NCA's resources for the limited purpose of supporting a possible punitive damages award, there is plainly no reason to believe the jury would reach the conclusions Durham says he fears.

For these reasons, NCA's fourth motion *in limine* is GRANTED.

### E.      Defendant's Motion *in Limine* No. 5 [Dkt. No. 88]

NCA's fifth motion *in limine* seeks to "prohibit any testimony or questioning concerning Plaintiff's cancer diagnosis or treatment in this matter." Dkt. No. 88-1, at PageID.929. Durham wishes to testify that he was recently diagnosed with cancer and

16

is receiving cancer treatment to "contextualize his damages" from NCA's conduct. Dkt.

No. 108, at PageID.1143. But under the factual circumstances of this case—which

include, as Durham has elsewhere noted, the fact that his cancer diagnosis is a very

recent development, and not something he has been struggling with throughout the

broader span of time in which he claims to have been emotionally damaged, *see, e.g.*,

Dkt. No. 82—the court agrees that the probative value of any testimony or questioning

concerning this cancer diagnosis or treatment is substantially outweighed by the danger

of unfair prejudice to NCA. *See* Fed. R. Evid. 403. NCA's motion is GRANTED.

That said, Durham has indicated that he will request permission to testify using a

mask (or perhaps a plexiglass barrier of the sort this court regularly used during the

COVID-19 pandemic). The court also recognizes that, whether he testifies with

accommodations or not, Durham may at times show physical strain or discomfort in

court. It would be appropriate for Durham to briefly offer some explanation about this

discomfort, so that the jury is able to fairly evaluate his demeanor and testimony.

Accordingly, while it would not be appropriate for Durham to testify or be questioned

specifically about his cancer diagnosis or treatment (or for any other witness to offer

like testimony), the court will allow Durham to provide limited and generic testimony

to the effect that he has been dealing with a significant medical condition. Given the

limited purpose for which this testimony is allowed, however, the court will carefully

monitor this testimony and will intervene if the testimony is too extended or detailed.

But the court will not permit Durham to testify that his noneconomic damages are more severe because of his medical conditions. That is, Durham will not be permitted to attempt to "contextualize" his damages by testifying about the details of his medical condition and attempting to draw links between the condition and NCA's conduct. Extended testimony about the interactions between Durham's conditions and NCA's alleged conduct could have some probative value on the extent of Durham's damages, but that probative value is substantially outweighed by the danger of unfair prejudice and confusion of issues.

With the understanding that it will not preclude more limited and generalized testimony for the specific purpose authorized above, NCA's fifth motion *in limine* is GRANTED.

### F.    Defendant's Motion *in Limine* No. 6 [Dkt. No. 89]

In its final motion *in limine*, NCA seeks to preclude Durham and his counsel from making statements or arguments concerning "other lawsuits filed against NCA and/or the original credit[or] of the debt, Cash Central." Dkt. No. 89-1, at PageID.936. The motion is GRANTED in part and DENIED in part.

To the extent that other lawsuits were "settled without an establishment of liability," as NCA says is true of the "vast majority" of the lawsuits, *id.*, the court GRANTS NCA's motion and orders that Durham is precluded from offering evidence or making statements or arguments concerning them. At least under the circumstances

of this case, the probative value of a lawsuit that settles without a statement of liability is simply too tenuous and limited; that probative value, if any, is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading of the jury. Moreover, allowing testimony about lawsuits that did not result in liability would open the door to a series of mini-trials on the question of whether NCA did anything wrong in those other cases. That danger of undue delay and a waste of the jury's time substantially outweighs any probative value.

The motion is DENIED, however, to the extent that any cases resulted in a finding of liability. While it is true that "any case in which liability was established likely has its own unique fact patterns that makes it inapplicable to this lawsuit," *id.*, the court has not been provided with the details of any such lawsuits and cannot, at this stage, assess whether any particular case is sufficiently comparable to the present case. And if it turns out that NCA has elsewhere been found liable for conduct bearing a significant factual resemblance to Durham's allegations, a jury could conceivably rely on that past conduct to (1) support a finding of willfulness for purposes of liability, and (2) support a punitive damages award.

That said, there is a high danger that any evidence, statements, or arguments about other lawsuits would result in unfair prejudice, confusion of the issues, undue delay, or wasting time. *See* Fed. R. Evid. 403. In the face of such evidence or arguments, for example, the court would need to give NCA fair leeway to explain to the jury why,

19

in its view, the other lawsuits are *not* sufficiently similar to the present one, or to make any other arguments distinguishing or mitigating the significance of the evidence. In this way, here again the proceedings could devolve into a series of mini-trials about other cases.

For these reasons, the court orders that before Durham or his counsel attempt to offer any evidence or make any statements or arguments concerning other lawsuits, they must first proffer—outside the presence of the jury—precisely what they intend to offer or argue, so that the court can carefully conduct a Rule 403 analysis.

With these understandings, NCA's final motion *in limine* is GRANTED in part and DENIED in part.

### G.    Plaintiff's Motions *in Limine* [Dkt. No. 90]

Durham has filed a single omnibus motion in which he moves for twelve different pretrial evidentiary rulings.

1.    Durham first requests that the court prohibit any "[s]uggestion/claims that any Police Report or Identity Theft Report was required, necessary or otherwise affected the investigation." Dkt. No. 90, at PageID.943. Durham clarified the nature of this motion at the hearing: he seeks only to ensure that NCA does not argue that Durham was *legally* required to provide NCA with a police report or affidavit. In response to this clarification, NCA confirmed that it had no intention of making that

legal argument.  Given that there is no evident need to enter an order on this topic in this pretrial posture, Durham's first motion *in limine* is DENIED.

2.  Durham's second motion asks the court to prohibit NCA from offering evidence of settlements, other lawsuits filed by Durham, other claims made by him, and compromise offers and negotiations.  *Id.* at PageID.948.

This motion is GRANTED in part and DENIED in part.  It is GRANTED to the extent Durham seeks to preclude evidence of compromise offers and negotiations (separate from any settlements that may have followed).  Offers and negotiations have no obvious probative value, and their introduction into evidence would carry a significant risk of confusing the issues.  Similarly, the mere fact that Durham has filed other lawsuits and made other claims (separate from whether any have resulted in liability) has no obvious probative value.  Accordingly, any probative value of compromise offers, negotiations, lawsuits, and claims is substantially outweighed by that risk.  *See* Fed. R. Evid. 403.

It is a closer call whether any settlements—rather than mere lawsuits or claims— have probative value.  Perhaps a jury could conclude that if Durham settled with third parties for a certain amount, that settlement amount might roughly reflect at least the minimum amount of his actual damages that were caused by those third parties rather than NCA.  But here again, the court concludes that any probative value of these

settlements is substantially outweighed by the danger of unfair prejudice and confusing of the issues. Durham's motion is therefore GRANTED as to settlements as well.

But Durham's motion is DENIED to the extent it seeks to preclude NCA from presenting evidence and making arguments about factual evidence—that is, about what other parties actually did, as a matter of fact, in connection with the credit reporting and debt collection in this case. NCA will be permitted to present a complete factual picture to the jury of how various corporate actors handled different aspects of the matter under the jury's consideration, so that the jury properly understands NCA's specific role. NCA will also be allowed to argue that it was the conduct of other actors—rather than NCA—that caused some of Durham's alleged damages. Although NCA may not use the shortcut of referring to settlement amounts, lawsuits, or claims to make its point, it is free to point to evidence of what third parties factually did and to make arguments that those third parties caused at least some of the alleged damages as a matter of fact.

With these understandings, Durham's second request is GRANTED in part and DENIED in part.

3. Durham's third motion *in limine* asks that the court "exclude any suggestion that no one has been charged, convicted or found responsible regarding the identity theft incidents that are the subject of the alleged debt." Dkt. No. 90, at PageID.950.

This motion is DENIED.  The fact that there is no obvious perpetrator of the alleged identity theft—and that no records have emerged from Cash Central or elsewhere that would make clear some other individual took out the debt at issue—is highly relevant to assessing whether NCA reasonably investigated the relevant automated credit dispute verifications.

To be sure, NCA will not be permitted to blame Durham for failing to identify an alleged identity theft himself.  But NCA makes clear in its response that it does not intend to do so.  NCA will be permitted to explore the available facts concerning who took out the loan, and whether there truly is any obvious indication in the available records that it was not Durham who did so.  Exploring these factual issues is part of NCA's legitimate defense; it does not amount to blaming Durham for failing to solve the alleged identity theft himself.  And, of course, Durham remains free to raise more particularized objections during trial.

4.   In his fourth motion, Durham seeks to "exclude the attempt by any Defendant to reference action taken by any [credit reporting agency], or place liability on, any credit bureau for their action or inaction with respect to Plaintiff's FCRA disputes."  Dkt. No. 90, at PageID.951.  Because NCA does not oppose this motion, it is GRANTED.  But the court agrees with NCA that the motion "should not be construed so broadly as to prohibit discussing the elements of Plaintiff's claim."  Dkt. No. 100, at PageID.993.  NCA is free to present evidence of the conduct of the CRAs and other third

parties.  It is also free to argue that third parties caused at least some of Durham's alleged damages.  This ruling only restricts NCA from arguing that it should not be held liable for any of its alleged failings because other actors also made errors.

5.  Durham next requests that the court "preclude Defendant[] from eliciting testimony which would be hearsay from their own representatives."  Dkt. No. 90, at PageID.953.  The court DENIES this motion for the same reasons that led it to deny NCA's third motion *in limine*:  it will be more appropriate to consider, in the particularized context of trial, whether NCA will be able to overcome a hearsay objection to any of the evidence it seeks to introduce.

6.  Durham's sixth motion is that the court preclude NCA from raising a bona fide error defense to the FDCPA claim.  The motion is DENIED.  Durham suggests that NCA did not plead a bona fide error defense with sufficient particularity.  Dkt. No. 90, at PageID.956.  That is not an argument suitable to a motion *in limine*.  *See, e.g., Smith v. Charter Commc'ns, Inc.*, No. CV 18-69, 2025 WL 80390, at *4 (D. Mont. Jan. 13, 2025).  And whether NCA is able to provide sufficient evidence to support a bona fide error defense or not is a question for the jury to resolve at trial.[1]

---

[1]    In his trial brief, Durham asserts that he requested summary judgment on the bona fide defense, and that the court simply "did not rule" on his request.  Dkt. No. 126, at PageID.1748.  That description of the procedural history is not complete.  Durham only sought summary judgment on his FDCPA claims under 15 U.S.C. §§ 1692e, 1692c(b), and 1692f.  *See* Dkt. No. 47-1, at PageID.307, 313-16; *see also* Dkt No. 63, at PageID.614 n.1.  His contention was that NCA violated these statutes as a matter of law,

7.   As noted earlier, Durham intends to seek both economic and noneconomic

damages at trial.  Whether he will present sufficient evidence for either form of

damages will be for the jury to determine.  But in Durham's seventh motion, he seeks

an order that would "exclude any evidence, suggestion, or testimony that a doctor,

therapist, or any other expert is required to demonstrate emotional harm for Plaintiff's

actual damages."  Dkt. No. 90, at PageID.957.

Durham's counsel clarified at the hearing that he seeks only to prevent NCA

from arguing that an expert is *legally* required to establish noneconomic damages.  This

means that Durham does not seek to preclude NCA from arguing to the jury that (1) a

doctor or other expert would be persuasive evidence—and that one would expect

Durham to present evidence of that sort if Durham truly had suffered significant

noneconomic injury, or (2) the lack of expert evidence substantially weakens Durham's

---

and that NCA had no bona fide defense against the claims.  Dkt. No. 47-1, at
PageID.313-17.  Because the court granted summary judgment to NCA on each of these
claims on grounds other than a bona fide defense, it had no need to resolve whether a
bona fide defense could have served as a further basis for summary judgment in NCA's
favor.

The only FDCPA claim proceeding to trial is Durham's claim, under 15 U.S.C.
§ 1692g(a), that NCA failed to send him an initial written notice of the debt.  Durham
did not seek summary judgment on that claim.  If he nonetheless intended to seek
summary judgment on a bona fide defense related to this § 1692g(a) claim—despite not
having sought summary judgment on the claim itself—he did not adequately disclose
that intention in his written submissions.

claim for noneconomic damages because (in NCA's view) Durham's testimony is not credible and it lacks any corroboration from a medical source.

In response to this clarification, NCA confirmed that it had no intention of making the argument that an expert is legally required. Given that there is no evident need to enter an order on this topic at this time, Durham's seventh request is DENIED.

8. In his eighth motion, Durham asks the court to prohibit NCA from suggesting or offering evidence that Durham's disputes were "frivolous." Dkt. No. 90, at PageID.958. The court agrees with NCA that Durham's request is too broad, and that any objections he has to particular arguments or evidence are better addressed "at trial on a question-by-question bas[i]s." Dkt. No. 100, at PageID.996. The court also agrees with NCA that it will be up to the jury to decide, after it hears all of the evidence, including Durham's testimony—and the evidence that he was highly reluctant to provide a police report or identity theft affidavit—whether Durham's disputes were non-meritorious or even patently non-meritorious in some sense. This eighth request is DENIED.

9. In Durham's ninth motion, he seeks to prohibit NCA from arguing or presenting evidence that Durham or any of his agents caused the non-appearance or non-involvement of the identity thief. NCA does not oppose the motion—and, indeed, has made clear in its response that it "has not made any suggestions or arguments regarding this and NCA does not intend to." *Id.* at PageID.997. Here again, because

26

there appears to be no need to enter a pretrial order on this issue, Durham's motion is DENIED.

10.   Durham's tenth motion asks the court to "exclude testimony, evidence, or reference to investigations performed by Defendants' employees or agents which were not disclosed during discovery." Dkt. No. 90, at PageID.960.  But NCA represents in its response that "[a]ll investigations have been revealed." Dkt. No. 100, at PageID.997.  At the hearing, Durham helpfully acknowledged that this motion was filed to ensure that there were no undisclosed investigations.  Given NCA's response, the motion is DENIED.

11.   Durham next asks the court to exclude evidence or testimony concerning provisions in the FCRA and FDCPA that allow the recovery of attorneys' fees and costs in certain circumstances.  NCA does not oppose the motion.  It is GRANTED.

12.   In its final motion *in limine*, Durham asks the court to preclude NCA from "indicating the reporting was accurate or complete." Dkt. No. 90, at PageID.963.  In support of this motion, Durham points to the court's summary judgment order, in which the court had noted that NCA had not disputed that there was an "inaccuracy" for FCRA purposes.  Dkt. No. 70, at PageID.729.

This motion is DENIED.  The court granted summary judgment to Durham specifically on the "threshold requirement of a reasonable-investigation claim [under the FCRA]:  that there was something inaccurate in NCA's reporting that it had an

27

obligation to reasonably investigate." *Id.* at PageID.728. This ruling was not made in a

vacuum, but in response to Durham's contention that he should be granted summary

judgment on the "*threshold* showing that NCA's data was incomplete or

inaccurate." Dkt. No. 47-1, at PageID.319 (Durham's memorandum in law) (emphasis

added). It was therefore limited to the "threshold requirement," which is the

requirement that a furnisher "receiv[e] notice . . . of a dispute with regard to the

completeness or accuracy of any information provided by a person to a consumer

reporting agency." 15 U.S.C. § 1681s-2(b)(1). The Ninth Circuit has described this

threshold requirement as the obligation of a plaintiff to "make a prima facie showing

that the furnisher's report was inaccurate." *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246,

1251 (9th Cir. 2022); *see also Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 756 (9th Cir.

2018) (discussing a credit reporting agency's comparable obligation to conduct a

reasonable investigation once the consumer has "present[ed] evidence tending to show

that a [credit reporting agency] prepared a report containing inaccurate information")

(citation omitted). NCA chose not to dispute this threshold point at summary

judgment, and for that reason, the court proceeded to the next step of a reasonable-

investigation claim, which is whether NCA reasonably "conduct[ed] an investigation

with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1)(A). And there it

found genuine disputes of material facts.

28

The upshot is that at trial, Durham will have no obligation to "make a prima facie showing that the furnisher's report was inaccurate." *Gross*, 33 F.4th at 1251. The jury may take for granted that Durham "present[ed] evidence tending to show" an inaccuracy, *Shaw*, 891 F.3d at 756, and the question for the jury will be whether the alleged inaccuracy—on which Durham made a prima face showing—was reasonably investigated. The court will not instruct the jury that it must accept as a matter of law Durham's testimony that he truly was the victim of identity theft; it will be up to the jury to assess Durham's testimony and resolve that issue. This means that NCA is free to argue, as part of its defense of the reasonableness of its investigation, that while it accepted Durham's claim of identity theft once he supplied a police report and an identity theft affidavit, there was—and remains—insufficient evidence to actually conclude Durham truly was an identity theft victim. NCA is also entitled to argue that after it conducted a reasonable investigation of Durham's dispute, it properly concluded that its furnished information was accurate. And NCA may argue that a reasonable investigation would not have turned up any inaccuracy, because none in fact existed. *Accord Gross*, 33 F.4th at 1251 (quoting *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018), favorably for the proposition that "a FCRA plaintiff must 'demonstrat[e] that *had* the furnisher conducted a reasonable investigation, . . . the furnisher would have discovered that the information it reported was inaccurate or incomplete"). Whether NCA chooses to make any of these arguments at trial, as a

29

matter of sound trial strategy, is a decision for NCA to make. But the court will not instruct the jury to accept as a matter of law a conclusion that the jury is empowered to accept or reject as a matter of fact.

For these reasons, Durham's twelfth and final motion is DENIED.

## CONCLUSION

For the foregoing reasons, the Court GRANTS NCA's Motion *in Limine* Nos. 4 and 5 and Durham's Motions *in Limine* Nos. 4 and 11; GRANTS in part and DENIES in part NCA's Motions *in Limine* Nos. 2 and 6 and Durham's Motion *in Limine* No. 2; and DENIES NCA's Motions *in Limine* Nos. 1 and 3 and Durham's Motions *in Limine* Nos. 1, 3, 5, 6, 7, 8, 9, 10, and 12.

IT IS SO ORDERED.

DATED: September 9, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

---

Civil No. 23-00244 MWJS-WRP; *Demetre Durham v. National Credit Adjusters, LLC*; ORDER ON PLAINTIFF'S MOTIONS IN LIMINE NOS. 1-12 AND DEFENDANT'S MOTIONS IN LIMINE NOS. 1-6